UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| PALM TRAN, INC. AMALGAMATED TRANSIT UNION LOCAL 1577 PENSION PLAN, Individually and On Behalf of All Others Similarly Situated, )))))) | Case No.: _____ |
| | Hon. |
| Plaintiff, ) | CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| v. ) | |
| CREDIT ACCEPTANCE CORPORATION, BRETT A. ROBERTS, and KENNETH S. BOOTH, )))))) | JURY TRIAL DEMANDED |
| Defendants. )) | |

Plaintiff Palm Tran, Inc. Amalgamated Transit Union Local 1577 ("Plaintiff")

alleges the following upon personal knowledge as to allegations specifically

pertaining to Plaintiff and, as to all other matters, upon the investigation of counsel,

which included: (a) review and analysis of public filings with the United States

Securities and Exchange Commission ("SEC") made by Credit Acceptance

Corporation ("Credit Acceptance" or the "Company") and related parties; (b) review

and analysis of press releases and other publications disseminated by Credit

Acceptance and related parties; (c) review and analysis of shareholder

communications, conference calls and postings on Credit Acceptance's website

concerning the Company's public statements; (d) review and analysis of news

articles concerning Credit Acceptance and related parties; (e) review of the complaint filed by the Massachusetts Attorney General ("Mass AG Complaint"); and (f) review of other publicly available information concerning Credit Acceptance, related parties, and/or the Individual Defendants (as defined below).

## I.      NATURE OF THE ACTION

1.      This is a federal securities class action against Credit Acceptance and certain of its officers for violations of the federal securities laws.  Plaintiff brings this action on behalf of all persons or entities that purchased or otherwise acquired Credit Acceptance common stock from November 1, 2019 through August 28, 2020 inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  The Exchange Act claims allege that certain defendants made a series of false and misleading statements and omissions, which artificially inflated the Company's stock price.

2.      Credit Acceptance provides financing programs, and related products and services to independent and franchised automobile dealers in the United States. These programs are offered through a nationwide network of automobile dealers who benefit from sales of vehicles to consumers who otherwise could not obtain financing, as 95% of Credit Acceptance's loans are considered subprime. The Company's tag line is "We change lives!" and the Company asserts its financing programs give consumers "a second chance" in improving their credit scores.

3.     However, rather than change lives for the better or improve consumers credit scores, Credit Acceptance employed a fraudulent scheme whereby it knowingly provided consumer auto loans that it knew could not be repaid and in fact consistently harmed consumers for its own financial benefit.  The Company did this despite knowing that it is illegal to knowingly provide loans that cannot be repaid and also charged usurious interest rates that violated state law.  Further, in order to fund its operations, the Company then packaged these sub-standard loans in securitizations and knowingly misrepresented the structure and composition of these securitizations to unsuspecting investors.

4.     The ugly truth about the Company's predatory and illegal business practices was revealed on August 28, 2020 when the Massachusetts Attorney General filed the Mass AG Complaint against Credit Acceptance alleging that Credit Acceptance has, for years, been making unfair and deceptive automobile loans to thousands of Massachusetts consumers.  In addition, the lawsuit specifically alleges that Credit Acceptance provided its investors with false and/or misleading information regarding the asset-backed securitizations they offered to investors, and that the Company engaged in unfair debt collection practices as well.

5.     As alleged in the Mass AG Complaint, Credit Acceptance has been making high-risk, high-interest, subprime auto loans to Massachusetts borrowers whom the Company knew, or should have known, were unable to repay their loans.

In approving the loans, Credit Acceptance recklessly ignored the likelihood that the borrowers would default on their loans and that a substantial portion of its loans to high-risk, low-score borrowers would never be repaid — a practice that is in fact illegal. Credit Acceptance also knew, based on its own collection, repossession, and deficiency data, and on its historical default data, that the performance of its loans was consistently abysmal, and that well over 50% of high-risk, low-score borrowers would default, typically just a little more than a year into their loans.

6.     However, while the Company profited on these high-risk, low-score loans, default was catastrophic for borrowers, who lost their cars and down payments, had their credit scores damaged, and were left with an average debt after default of about $9,000—which Credit Acceptance continued to collect through unlawful and aggressive collection processes. The Mass AG Complaint also detailed how the Company's collection employees continually harassed Massachusetts consumers by calling them as often as eight times a day, while Massachusetts law permits no more than two calls per week.

7.     Additionally, these borrowers were also subject to hidden finance charges on their Credit Acceptance loans as many borrowers were required to purchase vehicle service contracts as a condition of obtaining loans from the Company. In addition, the Company's dealers added an extra markup to the prices of vehicles they sold to high-risk borrowers with poor credit or low scores, and the

4

extra markup was a hidden finance charge that was never disclosed to borrowers. Including the amount of the hidden finance charges in the calculation of the borrowers' interest rates results in an actual interest rate higher than the Massachusetts usury ceiling of 21% for virtually all of Credit Acceptance's borrowers subject to these charges.

8.     Finally, the Mass AG Complaint alleges that, in order to fund its loans, Credit Acceptance sold securities to Massachusetts investors by means of false or misleading statements concerning the characteristics of the loans and contracts collateralizing the securities.  Notably, the Mass AG Complaint alleges that Credit Acceptance "*__willfully__* deceived investors concerning the credit characteristics of the loans."

9.     In response to the public disclosure of the Mass AG Complaint, Credit Acceptance's stock price fell $85.36 per share, or over 18%, to close at $374.07 per share over two trading days ending on September 1, 2020.

10.    As a result of Defendants' wrongful acts and omissions and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant damages as throughout the Class Period, Defendants made materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and adherence to the appropriate laws and regulations.  Specifically, Defendants failed to disclose to

investors: (i) that the Company was topping off the pools of loans that they packaged and securitized with higher-risk loans; (ii) that Credit Acceptance was making high-interest subprime auto loans to borrowers that the Company knew borrowers would be unable to repay; (iii) that the borrowers were subject to hidden finance charges, resulting in loans exceeding the usury rate ceiling mandated by state law; (iv) that Credit Acceptance took excessive and illegal measures to collect debt from defaulted borrowers; (v) that, as a result, the Company was likely to face regulatory scrutiny and possible penalties from various regulators or lawsuits; and (vi) that, as a result of the foregoing, Defendants positive statements about the Company's business, operations, and adherence to appropriate laws and regulations were materially misleading and/or lacked a reasonable basis.

## II.   **JURISDICTION AND VENUE**

11.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)), as the Company conducts business in this Judicial District.  The Company maintains its principal

executive offices in this Judicial District.  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

### III.   PARTIES

14.    Plaintiff Palm Tran, Inc. Amalgamated Transit Union Local 1577 purchased Credit Acceptance common stock during the Class Period as set forth in the accompanying certification, incorporated by reference herein, and suffered damages as a result of the federal securities law violations alleged herein.

15.    Defendant Credit Acceptance is incorporated under the laws of the Michigan and maintains its principal executive offices at 25505 W. 12 Mile Road, Southfield, Michigan 48034.  Credit Acceptance common stock trades on the NASDAQ under the symbol "CACC."

16.    Defendant Brian A. Roberts ("Roberts") has served at all relevant times as the Chief Executive Officer ("CEO") of Credit Acceptance and a member of the Company's Board of Directors.

17.    Defendant Kenneth S. Booth ("Booth") has served at all relevant times as the Chief Financial Officer ("CFO") of Credit Acceptance.

18.    Defendants Roberts and Booth are referred to as the "Individual Defendants."

19.     Credit Acceptance and the Individual Defendants are referred to as the "Defendants."

20.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Credit Acceptance, were privy to confidential, proprietary and material adverse non-public information concerning Credit Acceptance, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

21.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able

to and did, directly or indirectly, control the conduct of Credit Acceptance's business.

22.   The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts, and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

23.   As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock is, and is, registered with the SEC pursuant to the Exchange Act, and were traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Credit Acceptance's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of Credit Acceptance's common stock

would be based on truthful and accurate information.  The Individual Defendants'
misrepresentations and omissions during the Class Period violated these specific
requirements and obligations.

24.    The Individual Defendants are liable as participants in a fraudulent
scheme and course of business that operated as a fraud or deceit on purchasers of
Credit Acceptance's publicly traded common stock by disseminating materially
false and misleading statements and/or concealing material adverse facts.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.    Background

25.    Credit Acceptance is a subprime auto finance company providing loans
and other related financial products that enable automobile dealers to sell vehicles
to consumers. In 2019, Credit Acceptance funded about 370,000 subprime auto loans
nation-wide of which over 95% were subprime loans. A substantial portion of Credit
Acceptance's loans are never repaid. The Company also securitizes and sells its
loans to investors.

26.    The decision to fund a loan and the amount of the funding are made
solely by Credit Acceptance. The Company performs all significant functions
relating to the process of the loan application, including assessment of the
application and verification of consumer information, such as employment, income,
and residence.

**Collection Rates**

27.     Credit Acceptance's expected collection rate is the primary driver of the funding payment for its loans. Based on the forecast of expected collections, the Company calculates the payment to the dealer at a level designed to maximize the Company's economic profit on the loan. Credit Acceptance expects to collect substantially less than the total amount of the loan, and its payment for the loan is substantially less than the amount of the Company's expected collection. Credit Acceptance's ability to accurately forecast collections under its loans is critical to the Company's business.

28.     When the Company's borrowers miss loan payments, the Company's collection employees immediately make a collection call to the borrower, typically within one day of a missed payment due date. The Mass AG Complaint alleged that it was Credit Acceptance's stated policy to call or attempt to call any individual delinquent borrower as many as 8 times per day, while Massachusetts law permits no more than two collection calls per week.

29.     Credit Acceptance's loans are virtually all subprime. But many borrowers—those with low expected collection rates or "scores"—have experienced intense forms of financial distress, such as previous bankruptcies, foreclosures, repossessions, judgments, or garnishment of wages, and are at higher than average risk of nonpayment of their Credit Acceptance loans. While Credit Acceptance

profits from these high-risk, low-score Massachusetts loans, the vast majority of the high-risk borrowers default on their loans.

30.     For borrowers, default is a financial disaster. When borrowers default, their cars are repossessed by Credit Acceptance and sold at auction. After repossession, the borrower's debt remains, but not the asset. The Company's policy is to continue to collect the debt indefinitely (or until it is paid). Tellingly, while Credit Acceptance markets its loans to consumers as an "opportunity to improve your credit score," the defaulting borrowers end up with substantially worse credit than before.

31.     The expected collection rate of an average Credit Acceptance loan has declined from 75.6% in 2013 to just 66.0%, last year. In spite of the poor performance of the Company's high-risk low-score loans, Credit Acceptance has steadily increased the percentage of high-risk low-score loans it makes to its borrowers.

32.     When Credit Acceptance approves and funds high-risk loans to borrowers, the Company does not determine nor take into account the likelihood that the borrower would default on the loan, and does not consider the default rate, prospectively or retrospectively, when it decided to approve or fund its loans. As a result, there was no level of expected default at which the Company does not approve or fund a high-risk loan.

33.     As described further below, Credit Acceptance has told investors that its loans "entail a higher risk of delinquency, default, and repossession and higher losses than loans made to consumers with better credit." The Company collects and services its own loans, and as a part of its collection and servicing activities maintains data on the payment and nonpayment of the loans and is aware of the default status of each of its loans. These collection and servicing efforts show that Credit Acceptance knew which loans defaulted, how many of the loans defaulted, and the scores of the loans that defaulted.

### Hidden Finance Charges

34.     Credit Acceptance also provides dealers with access to vehicle service contracts ("VSC") which are then sold to the Company's borrowers. A VSC is a promise to pay for the repair or replacement of certain components of the vehicle in the event of a mechanical failure. The VSCs are purchased by borrowers when they buy their cars, and the retail cost of the VSC is financed as part of the Credit Acceptance loan. The Company only permits dealers to finance the purchase of VSCs offered by Credit Acceptance, and as alleged in the Mass AG Complaint, the Company required purchase of a VSC as a condition of obtaining a Credit Acceptance—a blatant hidden finance charge.

35.     But this finance charge was not disclosed to Credit Acceptance borrowers, resulting in borrowers receiving inaccurate and understated disclosures

of the finance charges of their loans. The VSC cost must also be included in the calculation of the borrower's interest rate on their Credit Acceptance loan. Since virtually all of the Company's loans are made at, or very close to, the 21% Massachusetts usury ceiling for interest rates, and properly including the amount of the hidden finance charge attributable to the required VSC causes the borrower's interest rate to be higher than the 21%, in violation of state law. The failure to disclose hidden finance charges in CAC loans is an unfair or deceptive act or practice.

### Loan Securitization

36.    Additionally, the Mass AG Complaint describes the issues with the Company's loan securitization process and information provided to investors. Typically, when Credit Acceptance securitizes its loans and sells them to investors, the offering documents describe the characteristics of the loans in order to disclose to investors the nature of the collateral underlying the securities. Typically, however, the offering documents for Credit Acceptance's securities only describe the characteristics of a portion of the loans, those committed to the securities before a specified date, referred to in the offering memorandum as the "Cut-off Date," and transferred to the security trust as of the Closing Date of the securitization. Loans that will be selected after the Closing Date, during what the offering documents refer to as the "Revolving Period," are not described in the offering documents.

37.     Credit Acceptance deliberately and intentionally selected loans after the Closing Date that had credit characteristics that were materially worse than the characteristics of the loans Credit Acceptance selected and included in the securitization prior to the Closing Date. Credit Acceptance did so consistently and repeatedly, in successive securitizations. Credit Acceptance told investors that it did not expect the credit characteristics of the loan to differ materially when Credit Acceptance knew that the characteristics were materially different because Credit Acceptance itself selected loans after the Closing Dates with scores that were materially different from the scores of the loans selected prior to the Closing Date. Credit Acceptance willfully deceived investors concerning the credit characteristics of the loans.

38.     The Mass AG Complaint states that "Credit Acceptance knew or should have known that the statements in its offering documents that Credit Acceptance 'does not expect that the characteristics of the Loans and related Contracts purchased during the Revolving Period will be materially different from those transferred on the Closing Date' are materially false and misleading."

**B.     Defendants' Materially False and Misleading Statements**

39.     The Class Period begins on November 1, 2019 when Credit Acceptance released its financial results for the third quarter of 2019. The Company announced consolidated net income of $165.4 million, or $8.73 per diluted share, for the three

months ended September 30, 2019 compared to consolidated net income of $151.0 million, or $7.75 per diluted share, for the same period in 2018. Additionally, the adjusted net income, a non-GAAP financial measure, for the three months ended September 30, 2019 was $168.4 million, or $8.89 per diluted share, compared to $147.2 million, or $7.56 per diluted share, for the same period in 2018.

40.   Also, on that date, Credit Acceptance filed its Quarterly Report Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2019 (the "November 2019 10-Q"). In the 10-Q, the Company describes its business as "offer[ing] financing programs that enable automobile dealers to sell vehicles to consumers, regardless of their credit history." The Company further represented that "[w]ithout our financing programs, consumers are often unable to purchase vehicles or they purchase unreliable ones. Further, as we report to the three national credit reporting agencies, an important ancillary benefit of our programs is that we provide consumers with an opportunity to improve their lives by improving their credit score and move on to more traditional sources of financing."

41.   The November 2019 10-Q also highlighted the Company's continuous evaluation of collection rates on each loan:

> We monitor and evaluate the credit quality of Consumer Loans on a monthly basis by comparing our current forecasted collection rates to our initial expectations. We use a statistical model that considers a

16

number of credit quality indicators to estimate the expected collection rate for each Consumer Loan at the time of assignment. The credit quality indicators considered in our model include attributes contained in the consumer's credit bureau report, data contained in the consumer's credit application, the structure of the proposed transaction, vehicle information and other factors. We continue to evaluate the expected collection rate of each Consumer Loan subsequent to assignment primarily through the monitoring of consumer payment behavior. Our evaluation becomes more accurate as the Consumer Loans age, as we use actual performance data in our forecast. Since all known, significant credit quality indicators have already been factored into our forecasts and pricing, we are not able to use any specific credit quality indicators to predict or explain variances in actual performance from our initial expectations. Any variances in performance from our initial expectations are the result of Consumer Loans performing differently than historical Consumer Loans with similar characteristics. We periodically adjust our statistical pricing model for new trends that we identify through our evaluation of these forecasted collection rate variances.

When overall forecasted collection rates underperform our initial expectations, the decline in forecasted collections has a more adverse impact on the profitability of the Purchased Loans than on the profitability of the Dealer Loans. For Purchased Loans, the decline in forecasted collections is absorbed entirely by us. For Dealer Loans, the decline in the forecasted collections is substantially offset by a decline in forecasted payments of Dealer Holdback.

42.     Appended as an exhibit to the November 2019 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified that "the [November 2019 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "the information contained in the [November 2019 10-Q] fairly presents, in

all material respects, the financial condition and results of operations of the Company."

43.     On February 11, 2020, Credit Acceptance filed their Annual Report Form 10-K for the quarter and full year ended December 31, 2019 (the "2019 10-K"). Under "Risk Factors," the Company writes how important it is for the Company to accurately forecast and estimate the amount and timing on future collections:

**Our inability to accurately forecast and estimate the amount and timing of future collections could have a material adverse effect on results of operations.**

<u>Substantially all of the Consumer Loans assigned to us are made to individuals with impaired or limited credit histories or higher debt-to-income ratios than are permitted by traditional lenders.</u> **Consumer Loans made to these individuals generally entail a higher risk of delinquency, default and repossession and higher losses than loans made to consumers with better credit.** <u>Since most of our revenue and cash flows from operations are generated from these Consumer Loans, our ability to accurately forecast Consumer Loan performance is critical to our business and financial results.</u> At the time of assignment, we forecast future expected cash flows from the Consumer Loan. Based on these forecasts, which include estimates for wholesale vehicle prices in the event of vehicle repossession and sale, we make an advance or one-time purchase payment to the related Dealer at a level designed to maximize economic profit, a non-GAAP financial measure. We continue to forecast the expected collection rate of each Consumer Loan subsequent to assignment. These forecasts also serve as a critical assumption in our accounting for recognizing finance charge income and determining our allowance for credit losses.

44.     Additionally, Credit Acceptance's 2019 10-K stated repeatedly how the Company, and its network of dealer-partners, comply with applicable state and

federal laws and regulations, as well as underwriting guidelines set forth by the

Company:

> *Dealer Servicing Agreement.* As a part of the enrollment process, a new Dealer is required to enter into a Dealer servicing agreement with Credit Acceptance that defines the legal relationship between Credit Acceptance and the Dealer. The Dealer servicing agreement assigns the responsibilities for administering, servicing, and collecting the amounts due on Consumer Loans from the Dealers to us. Under the typical Dealer servicing agreement, a Dealer represents that it will only assign Consumer Loans to us that satisfy criteria established by us, meet certain conditions with respect to their binding nature and the status of the security interest in the purchased vehicle, and comply with applicable state and federal laws and regulations.

* * *

> While a Dealer can submit any legally compliant Consumer Loan to us for assignment, the decision whether to provide funding to the Dealer and the amount of any funding is made solely by us. Through our Dealer Service Center, we perform all significant functions relating to the processing of the Consumer Loan applications and bear certain costs of Consumer Loan assignment, including the cost of assessing the adequacy of Consumer Loan documentation, compliance with underwriting and legal guidelines and the cost of verifying employment, residence and other information provided by the Dealer.
>
> We audit Consumer Loan files for legal and underwriting guidelines on a daily basis in order to assess whether our Dealers are operating in accordance with the terms and conditions of our Dealer servicing agreement.

* * *

> Our business model allows us to share the risk and reward of collecting on the Consumer Loans with the Dealers, more so with the Portfolio Program than the Purchase Program. Such sharing is intended

<u>to motivate the Dealer to assign better quality Consumer Loans, follow our underwriting guidelines, comply with various legal regulations, meet our credit compliance requirements and provide appropriate service and support to the consumer after the sale.</u> In addition, our Dealer Service Center works closely with Dealers to assist them in resolving any documentation deficiencies or funding stipulations. We believe this arrangement causes the interests of the Dealer, the consumer and us to all be aligned.

\* \* \*

**Regulation**

Our business is subject to laws and regulations, including the Truth in Lending Act, the Equal Credit Opportunity Act, the Fair Credit Reporting Act and various other state and federal laws and regulations. <u>These laws and regulations, among other things, require licensing and qualification; limit interest rates, fees and other charges associated with the Consumer Loans assigned to us; require specified disclosures by Dealers to consumers;</u> govern the sale and terms of ancillary products; and define the rights to repossess and sell collateral. Failure to comply with these laws or regulations could have a material adverse effect on us by, among other things, limiting the jurisdictions in which we may operate, restricting our ability to realize the value of the collateral securing the Consumer Loans, making it more costly or burdensome to do business or resulting in potential liability. The volume of new or modified laws and regulations has increased in recent years and has increased significantly in response to issues arising with respect to consumer lending.

45.   Furthermore, the 2019 10-K described the process for the assignment of consumer loans to the Company using their proprietary credit scoring system, as well as the collection efforts done by Company employees to ensure payment of loans:

A Consumer Loan is originated by the Dealer when a consumer enters into a contract with a Dealer that sets forth the terms of the agreement between the consumer and the Dealer for the payment of the purchase price of the vehicle. The amount of the Consumer Loan consists of the total principal and interest that the consumer is required to pay over the term of the Consumer Loan. Consumer Loans are written on a contract form provided by us. Although the Dealer is named in the Consumer Loan contract, the Dealer generally does not have legal ownership of the Consumer Loan for more than a moment and we, not the Dealer, are listed as lien holder on the vehicle title. Consumers are obligated to make payments on the Consumer Loan directly to us, and any failure to make such payments will result in our pursuing payment through collection efforts.

All Consumer Loans submitted to us for assignment are processed through our Credit Approval Processing System ("CAPS"). CAPS allows Dealers to input a consumer's credit application and view the response from us via the Internet. CAPS allows Dealers to: (1) receive a quick approval from us; (2) interact with our proprietary credit scoring system to optimize the structure of each transaction prior to delivery; and (3) create, electronically execute and print Consumer Loan documents. All responses include the amount of funding (advance for a Dealer Loan or purchase price for a Purchased Loan), as well as any stipulations required for funding. The amount of funding is determined using a formula which considers a number of factors including the timing and amount of cash flows expected on the related Consumer Loan and our target return on capital at the time the Consumer Loan is submitted to us for assignment. The estimated future cash flows are determined based upon our proprietary credit scoring system, which considers numerous variables, including attributes contained in the consumer's credit bureau report, data contained in the consumer's credit application, the structure of the proposed transaction, vehicle information and other factors, to calculate a composite credit score that corresponds to an expected collection rate. Our proprietary credit scoring system forecasts the collection rate based upon the historical performance of Consumer Loans in our portfolio that share similar characteristics. The performance of our proprietary credit scoring system is evaluated monthly by comparing projected to actual

Consumer Loan performance. Adjustments are made to our proprietary credit scoring system as necessary.

\* \* \*

*Servicing.* Our largest group of collectors services Consumer Loans that are in the early stages of delinquency. <u>Collection efforts typically consist of placing a call to the consumer within one day of the missed payment due date, although efforts may begin later for some segments of accounts.</u> Consumer Loans are segmented into dialing pools by various phone contact profiles in an effort to efficiently contact the consumer. We utilize text messaging as an additional means to contact the consumer. <u>Our collectors work with consumers to attempt to reach a solution that will help them avoid becoming further past due and get them current where possible.</u>

46.     Appended as an exhibit to the 2019 10-K were substantively the same SOX certifications as referenced in ¶ 42, *supra*, which were signed by the Individual Defendants.

47.     Additionally, the Quarterly Report 10-Q's filed by Credit Acceptance on May 27, 2020 and July 31, 2020, respectively, also contained substantively the same representations as referenced in ¶ 41, *supra*, concerning Credit Acceptance's monthly evaluations of the credit quality for the Company's subprime loans. The 10-Q's also contained the same SOX certifications as referenced in ¶ 42, *supra,* which were signed by the Individual Defendants.

48.     The above statements in ¶¶ 39-47 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and adherence to the appropriate laws and regulations.

Specifically, Defendants failed to disclose to investors: (i) that the Company was topping off the pools of loans that they packaged and securitized with higher-risk loans; (ii) that Credit Acceptance was making high-interest subprime auto loans to borrowers that the Company knew borrowers would be unable to repay; (iii) that the borrowers were subject to hidden finance charges, resulting in loans exceeding the usury rate ceiling mandated by state law; (iv) that Credit Acceptance took excessive and illegal measures to collect debt from defaulted borrowers; (v) that, as a result, the Company was likely to face regulatory scrutiny and possible penalties from various regulators or lawsuits; and (vi) that, as a result of the foregoing, Defendants positive statements about the Company's business, operations, and adherence to appropriate laws and regulations were materially misleading and/or lacked a reasonable basis.

### C.    **The Truth Is Revealed**

49.    On August 28, 2020, the Massachusetts Attorney General, Maura Healey ("Healey"), filed the stunning Mass AG Complaint in Suffolk County Superior Court against Credit Acceptance for allegedly making unfair and deceptive auto loans to thousands of Massachusetts consumers, providing investors with false or misleading information regarding auto securities they offered, and engaging in unfair debt collection practices.

23

50.     The complaint alleged that since 2013, Credit Acceptance failed to inform investors that the Company topped off the pools of loans that they packaged and securitized with higher-risk loans, despite claiming otherwise in disclosures to investors. The complaint also alleged that Credit Acceptance has made high-interest subprime auto loans to Massachusetts borrowers that the Company knew borrowers would be unable to repay, in violation of state law. The Complaint states "[Credit Acceptance's] business model is based on making loans to borrowers—including high-risk borrowers with low [credit] scores—who are not likely to repay their loans, and [Credit Acceptance's] profit model involves making money on loans that are not repaid." As such, Credit Acceptance <u>"recklessly ignored the likelihood that the borrowers would default on their loans."</u>

51.     Further, the lawsuit stated that while the Company profited, its borrowers had their credit ruined, lost vehicles or their down payments, and were left with thousands of dollars in debt. Additionally, the borrowers were also subject to hidden finance charges, resulting in loans exceeding the usury rate ceiling of 21%, which is mandated by state law. The Mass AG Complaint also alleged that the Credit Acceptance took excessive and illegal measures to collect debt from defaulted borrowers, including sending faulty notices to borrowers with repossessed vehicles, harassing consumers with unlawfully repetitious collections calls, and overcharging consumers on their deficiencies. The Mass AG Complaint alleges that Credit

Acceptance "<u>was aware that consumers found the collection attempts to be</u> <u>oppressive and harassing.</u>"

52.     The Mass AG Complaint alleges that Credit Acceptance defrauded as many as 24,000[1] borrowers over a six-year period in Massachusetts, and seeks as much as $120 million in damages, or $5,000 per violation. Also, the Mass AG Complaint is seeking an injunction preventing the Company from continuing its current unlawful loan practices under its current business model.

53.     On August 31, 2020, the Massachusetts AG published a press release announcing the lawsuit against Credit Acceptance. In the press release, AG Healey stated, "This company made unaffordable and illegal loans to borrowers, causing them to fall into thousands of dollars of debt and even lose their vehicles. We are taking a close look at this industry and we will not allow companies to profit by violating our laws and exploiting consumers." Additionally, the release points out that this lawsuit is part of AG Healey's "review of securitization practices in the subprime auto market—an industry-wide investigation that remains ongoing."

49.     Analysts at Credit Suisse noted that the Massachusetts lawsuit is particularly relevant as the "evidence gathered and arguments made in the [Mass AG Complaint] could strengthen" other state AG investigations and lawsuits. The

---

[1] Between 2013 and 2019, Credit Acceptance funded approximately 4,000 subprime used car loans annually in Massachusetts, with an aggregate value of $458 million.

analysts also wondered if the lawsuit will result in material changes to business practices or origination levels, because "[i]f the company has to change business practices this could result in lower expected collections and a write down to book value."

54.    In response to the public disclosure of the Mass AG Complaint, Credit Acceptance's stock price declined precipitously from $459.43 at close on August 28, 2020 down to $374.07 at the close of trading on September 1, 2020—an $85.36 drop equating to an 18% two-day decline in share price.

## V.    CLASS ACTION ALLEGATIONS

55.    Plaintiff brings this class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities who purchased or otherwise acquired Credit Acceptance common stock from November 1, 2019 through August 28, 2020, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Credit Acceptance and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

56.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff

at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Throughout the Class Period, Credit Acceptance's common stock was actively traded on the NASDAQ (an open and efficient market) under the symbol "CACC." Millions of Credit Acceptance shares were traded publicly during the Class Period on the NASDAQ. As of September 30, 2020, Credit Acceptance had over 17 million shares of common stock outstanding. Record owners and the other members of the Class may be identified from records maintained by Credit Acceptance and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

57. Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein. Plaintiff does not have interests adverse to the Class.

58. Plaintiff will fairly and adequately protect the interests of the other members of the Class and has retained The Miller Law Firm, P.C. and Saxena White P.A.; counsel with significant experience and expertise leading complex class action and securities litigations.

59.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)     whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b)     whether Defendants participated in and pursued the common course of conduct complained of herein;

c)     whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, and prospects of Credit Acceptance;

d)     whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of Credit Acceptance;

e)     whether the market price of Credit Acceptance common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f)     the extent to which the members of the Class have sustained damages and the proper measure of damages.

60.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

61.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VI.    UNDISCLOSED ADVERSE FACTS

62.    The market for Credit Acceptance common stock was an open, well-developed and efficient market at all relevant times.  As a result of the materially false and misleading statements and omissions described herein, Credit Acceptance common stock traded at artificially inflated prices during the Class Period.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, as well as its business, accounting, financial operations and prospects, as alleged herein.  Plaintiff and the other members of the Class purchased or otherwise acquired Credit Acceptance common stock relying upon the integrity of the market price of the Company's common stock and market information relating to Credit Acceptance, and have been damaged thereby.

63.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial

contributing cause of the damages sustained by Plaintiff and the other members of the Class.

## VII.  **LOSS CAUSATION**

64.    During the Class Period, as detailed herein, the Defendants made a series of false and misleading statements and omissions that artificially inflated the prices of Credit Acceptance common stock and operated as a fraud or deceit on Class Period purchasers of Credit Acceptance common stock by failing to disclose to investors material adverse facts. When Defendants' misrepresentations and fraudulent conduct were disclosed, the price of Credit Acceptance common stock fell precipitously as the prior inflation came out of the prices of the Company's common stock.  As a result of their purchases of Credit Acceptance common stock during the Class Period, Plaintiff and the other Class members suffered economic loss.

65.    By Defendants' failing to disclose the true state of the Company's business, investors were not aware of the true state of the Company's financial status. Therefore, the Defendants presented a misleading picture of Credit Acceptance's business practices and procedures.  Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused Credit Acceptance to conceal the truth.

66.     The decline in the price of Credit Acceptance's common stock after the truth came to light was a direct result of the nature and extent of the Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of Credit Acceptance's common stock price decline negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss suffered by Plaintiff and the other Class members was a direct result of the Defendants' fraudulent scheme to artificially inflate the prices of Credit Acceptance common stock and the subsequent decline in the value of Credit Acceptance common stock when the Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII.  SCIENTER ALLEGATIONS

67.     As alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

68.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Credit Acceptance, their control over, receipt and/or modification of Credit Acceptance's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Credit Acceptance, participated in the fraudulent scheme alleged herein.

## IX.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

69.     At all relevant times, the market for Credit Acceptance's common stock was an efficient market for the following reasons, among others:

a)     Credit Acceptance's common stock met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market;

b)     As a regulated issuer, Credit Acceptance filed periodic public reports with the SEC and the NASDAQ;

c)     Credit Acceptance's common stock was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

d)     Credit Acceptance regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

70.     As a result of the foregoing, the market for Credit Acceptance's common stock promptly digested current information regarding Credit Acceptance

from all publicly available sources and reflected such information in Credit Acceptance's stock price. Under these circumstances, all purchasers of Credit Acceptance's common stock during the Class Period suffered similar injury through their purchase of Credit Acceptance's common stock at artificially inflated prices and a presumption of reliance applies.

71. A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiff's fraud claims are grounded in Defendants' omissions of material fact of which there is a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding Credit Acceptance's business practices, financial results and condition, and the Company's internal controls—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered such information important in the making of investment decisions.

## X.   NO SAFE HARBOR

72. The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and

misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

73.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Credit Acceptance who knew that the statement was false when made.

## XI.  CLAIMS AGAINST DEFENDANTS

### COUNT I

**Violations of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against All the Defendants**

74.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against all Defendants.

75.     During the Class Period, Credit Acceptance and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Credit Acceptance common stock; and (iii) cause Plaintiff and the other members of the Class to purchase Credit Acceptance common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

76.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Credit Acceptance common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  The Exchange Act Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued herein as controlling persons of Credit Acceptance, as alleged herein.

77.     Credit Acceptance and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate

commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Credit Acceptance as specified herein.  These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Credit Acceptance's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts, and omitting to state material facts necessary in order to make the statements made about Credit Acceptance and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Credit Acceptance's common stock during the Class Period.

78.   Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's

operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other, and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

79.    These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them.   Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly, and for the purpose and effect of concealing Credit Acceptance's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

80.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Credit Acceptance common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of Credit Acceptance shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the common stock trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Exchange Act Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired Credit Acceptance common stock during the Class Period at artificially inflated high prices and were damaged thereby.

81.     At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Credit Acceptance, which were not disclosed by the Exchange Act Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired Credit Acceptance common stock during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

82.     By virtue of the foregoing, Credit Acceptance and the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

83.     As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against The Individual Defendants

84.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

85.     The Individual Defendants were and acted as controlling persons of Credit Acceptance within the meaning of Section 20(a) of the Exchange Act as alleged herein.   By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.   Each of the Individual Defendants was provided with or had unlimited access to copies of the

Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

86.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

87.     As set forth above, Credit Acceptance and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a)   Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)   Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c)   Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees and experts' witness fees and other costs; and

d)   Awarding such other relief as this Court deems appropriate.

## XIII.  **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.


Dated: October 2, 2020                    Respectfully Submitted,

*/s/ E. Powell Miller*_____
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
**THE MILLER LAW FIRM P.C.**
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com

**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White, III
Lester R. Hooker

41

7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

Steven B. Singer
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com

*Plaintiff's Counsel*