## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| PALM TRAN, INC. AMALGAMATED TRANSIT UNION LOCAL 1577 PENSION PLAN, Individually and On Behalf of All Others Similarly Situated, | Case No.: 2:20-cv-12698-LVP-EAS |
| | Hon. Linda V. Parker |
| Plaintiff, | |
| | AMENDED CLASS ACTION COMPLAINT FOR |
| v. | VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| CREDIT ACCEPTANCE CORPORATION, BRETT A. ROBERTS, and KENNETH S. BOOTH, | |
| | JURY TRIAL DEMANDED |
| Defendants. | |

Ontario Provincial Council of Carpenters' Pension Trust Fund and

Millwright Regional Counsel of Ontario Pension Trust Fund (together "Lead

Plaintiffs") allege the following upon personal knowledge as to allegations

specifically pertaining to Lead Plaintiffs and, as to all other matters, upon the

investigation of counsel, which included: (a) review and analysis of public filings

with the United States Securities and Exchange Commission ("SEC") made by

Credit Acceptance Corporation ("Credit Acceptance" or the "Company") and

related parties; (b) review and analysis of press releases and other publications

disseminated by Credit Acceptance and related parties; (c) review and analysis of

shareholder communications, conference calls and postings on Credit Acceptance's website concerning the Company's public statements; (d) review and analysis of news articles concerning Credit Acceptance and related parties; (e) review of the enforcement action filed by the Massachusetts Attorney General; and (f) review of other publicly available information concerning Credit Acceptance, related parties, and/or the Individual Defendants (as defined below).

## I.      NATURE OF THE ACTION

1.      This is a federal securities class action against Credit Acceptance and certain of its officers for violations of the federal securities laws.  Lead Plaintiffs bring this action on behalf of all persons and entities that purchased or otherwise acquired Credit Acceptance common stock from May 4, 2018 through August 28, 2020, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  The Exchange Act claims allege that certain defendants engaged in a scheme and/or made a series of false and misleading statements and omissions, which artificially inflated the Company's stock price.

2.      Credit Acceptance provides car loans to customers, who otherwise have a hard time obtaining traditional financing, through a nationwide network of automobile dealers.  The Company's tag line, repeated throughout its filings with the Securities and Exchange Commission and communications with investors, is

"We change lives!" and the Company asserts that its loans give its customers "a second chance" to improve their credit scores by helping them find a car that fits their needs and is within their budget.  Nearly all of Credit Acceptance's loans are considered subprime.  Credit Acceptance then packages these loans into securitizations and sells them to investors to raise capital to fund more loans.

3.     On August 28, 2020, the Attorney General for the State of Massachusetts filed an enforcement action against the Company in Massachusetts Superior Court which laid bare the very foundation of the Company's business model and profitability, revealing practices that rendered misleading the Company's statements that it complies with applicable laws and regulations.  The enforcement action alleged that the Company engaged in illegal and unfair and deceptive trade practices with respect to auto lending, debt collection, repossessions, and asset-backed securitizations.  During the Class Period, and while under investigation by the Massachusetts Attorney General, the Company's Chief Executive Officer ("CEO"), Brett A. Roberts, sold $24 million dollars in his own personal holdings of Credit Acceptance common stock, an amount that was dramatically out of line with his prior stock sales.  Even more troubling, Defendant Roberts sold $11 million of his holdings weeks before the filing of the enforcement action.  *See* Section VIII.C, *infra*.  The enforcement action filed by the Massachusetts Attorney General alleged as follows.

3

4.      First, with respect to Credit Acceptance's lending practices, the enforcement action by the Massachusetts Attorney General alleged that the Company (1) approved and funded high-risk subprime loans in violation of Massachusetts law and regulations; (2) failed to disclose the Company's deceptive practice of marking up vehicle prices for cars sold to customers with low expected collection rates; and (3) failed to disclose that the purchase of a Vehicle Service Contract ("VSC") was a required condition of obtaining a loan and that, (4) when properly accounted for in calculating interest rates, the purchase of the required VSC resulted in an actual interest rate that exceeded Massachusetts' usury rate. *See* Section IV.B.1, *infra*.

5.      Second, with respect to Credit Acceptance's debt collection practices the Massachusetts Attorney General alleged that the Company, engaged in unfair and deceptive acts or practices such as excess contacts and harassment of consumers, including making approximately 1.7 million collection calls in violation of Massachusetts law and regulations, calling borrowers up to 8 times per day where Massachusetts law allows no more than two calls per week. *See* Section IV.B.2, *infra*.

6.      Third, with respect to Credit Acceptance's vehicle repossession and auction practices, the Massachusetts Attorney General alleged that the Company (1) failed to calculate the deficiency amounts owed by borrowers based on the fair

4

market value of the repossessed vehicle; (2) collected deficiency amounts from

borrowers that were not based on the fair market value of the repossessed vehicle;

and (3) failed to include a description of the calculation of the deficiency amount,

based on the fair market value of the repossessed vehicles, as required by

Massachusetts law.  *See* Section IV.B.3, *infra*.

7.      Last, with respect to Credit Acceptance's securitization practices, the

Massachusetts Attorney General alleged that the Company "willfully deceived"

investors by selling securities by means of materially false or misleading

statements in offering documents that failed to disclose material differences in the

characteristics of the loans selected for the securities, allowing Defendants

unsustainably cheap access to the capital markets.  *See* Section IV.B.4, *infra*.

8.      Many of the unfair, deceptive, and illegal practices identified in the

enforcement action brought by the Massachusetts Attorney General have been

corroborated by Confidential Witnesses[1] ("CWs") in various geographic locations,

who have provided details on, *inter alia*, the unfair and deceptive nature of Credit

Acceptance's lending practices, confirmed that the Company lent to customers

without regard to their ability to pay or the probability of default, approved loans

for customers whose payments exceeded 25% of their monthly income in

---

[1] Confidential witnesses ("CWs") will be identified herein by number (CW1, CW10). All CWs will
be described with the use of neutral pronouns to protect their identities.

contradiction of internal guidelines, approved dealers with "red flags" to push even more predatory loans, and made collection calls to borrowers multiple times a day without regard to applicable state law. The CWs also confirm that while customers *should* have been informed that VSCs were optional, the product was so heavily incentivized that Credit Acceptance loans included VSCs without the customer's knowledge or consent, with no real penalty imposed on dealers.

9.     The market's reaction to disclosure of the Company's reliance on illegal and unsustainable business practices and the true regulatory risk faced by the Company was dramatic.  Specifically, analysts at Credit Suisse noted, on August 31, 2020, that the enforcement action "lays out the issues more clearly than we have seen in the past supported by data from the underlying loans" and was particularly relevant as the "evidence gathered and arguments made . . . could strengthen" other state Attorney General investigations and lawsuits.  Moreover, the analysts expressed concerns as to whether the enforcement action would result in material changes to the Company's business practices or origination levels, because "[i]f the company has to change business practices this could result in lower expected collections and a write down to book value."

10.     After disclosure of the enforcement action by the Massachusetts Attorney General, Credit Acceptance's stock price plummeted $85.36 per share, or over 18%, to close at $374.07 per share over the two trading days ending on

September 1, 2020, injuring Lead Plaintiffs and the Class.  Many of the practices

identified by the Massachusetts Attorney General are currently also the subject of

complaints or investigations by at least 43 State Attorneys General and various

Federal authorities, including the Consumer Financial Protection Bureau and the

Department of Justice.  Credit Acceptance has noted that the results of the

"regulatory investigations by both state and federal agencies . . . could have a

material adverse impact on [the Company]."

11.    After the Class Period, on March 15, 2021, further supporting the

allegations and evidence advanced by the Massachusetts Attorney General as to the

illegality of the Company's practices, the Massachusetts Superior Court denied

Credit Acceptance's motion to dismiss and granted in part the Massachusetts

Attorney General's motion for summary judgment.  *See* ¶¶ 33 n.3, 46, 64, 69, 77,

*infra*.  Just over a month later, on April 29, 2021, Credit Acceptance announced an

"agreement in principle" to settle the enforcement action, estimated a probable loss

of $27.2 million, and announced the "retirement" of the Company's CEO,

Defendant Brett A. Roberts.  *See* ¶¶ 78, 84-5, *infra*.  Shortly thereafter, Credit

Acceptance also announced the "retirement" of its Chief Legal Officer.  *See* ¶¶ 86,

*infra*.

12.    As a result of Defendants' wrongful acts, omissions, and scheme to

defraud, and the precipitous decline in the market value of the Company's common

stock, Lead Plaintiffs and other Class members have suffered significant damages, as throughout the Class Period, Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and adherence to the appropriate laws and regulations. Specifically, Defendants failed to disclose to investors that the Company was violating the law when it (1) approved and funded high-risk loans that it knew customers were unable to repay, *see* Section, IV.B.1(i); (2) engaged in the unfair and deceptive practice of marking up prices for cars sold to certain borrowers, *see* Section, IV.B.1(ii); (3) required the purchase of VSCs, *see* Section, IV.B.1(iii); (4) engaged in unfair and deceptive debt collection and repossession practices, *see* Sections, IV.B.2-3; (5) sold securities to investors pursuant to materially misleading statements in the Company's offering documents in order to cheaply access the capital markets, *see* Section, IV.B.4; (6) that, as a result, the Company was likely to face regulatory scrutiny and possible penalties from various regulators or lawsuits; and (7) that, as a result of the foregoing, Defendants' statements about the Company's business, operations, reputation, and adherence to appropriate laws and regulations were materially misleading and/or lacked a reasonable basis.

## II.    JURISDICTION AND VENUE

13.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa).

15.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)), as the Company conducts business in this Judicial District.  The Company maintains its principal executive offices in this Judicial District.  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

## III.   PARTIES

16.    Ontario Provincial Council of Carpenters' Pension Trust Fund purchased Credit Acceptance common stock during the Class Period as set forth in its previously filed certification, incorporated by reference herein, and suffered damages as a result of the federal securities law violations alleged herein.  *See* ECF No. 16-2.

9

17.    Millwright Regional Counsel of Ontario Pension Trust Fund purchased Credit Acceptance common stock during the Class Period as set forth in its previously filed certification, incorporated by reference herein, and suffered damages as a result of the federal securities law violations alleged herein. *See* ECF No. 16-2.

18.    Defendant Credit Acceptance is incorporated under the laws of Michigan and maintains its principal executive offices at 25505 W. 12 Mile Road, Southfield, Michigan 48034.  Credit Acceptance common stock trades on the NASDAQ under the symbol "CACC."

19.    Defendant Brian A. Roberts ("Roberts"), who is no longer with the Company, served during the Class Period as the Chief Executive Officer ("CEO") of Credit Acceptance and a member of the Company's Board of Directors.

20.    Defendant Kenneth S. Booth ("Booth"), who is currently the CEO of the Company, served during the Class Period as the Chief Financial Officer ("CFO") of Credit Acceptance.

21.    Defendants Roberts and Booth are referred to as the "Individual Defendants."

22.    Credit Acceptance and the Individual Defendants are referred to collectively as "Defendants."

23.     During the Class Period, the Individual Defendants, as senior

executive officers and/or directors of Credit Acceptance, were privy to

confidential, proprietary and material adverse non-public information concerning

Credit Acceptance, its operations, finances, financial condition and present and

future business prospects via access to internal corporate documents, conversations

and connections with other corporate officers and employees, attendance at

management and/or board of directors meetings and committees thereof, and via

reports and other information provided to them in connection therewith.  Because

of their possession of such information, the Individual Defendants knew or

recklessly disregarded that the adverse facts specified herein had not been

disclosed to, and were being concealed from, the investing public.

24.     The Individual Defendants are liable as direct participants in the

wrongs complained of herein.  In addition, the Individual Defendants, by reason of

their status as senior executive officers and/or directors, were "controlling persons"

within the meaning of Section 20(a) of the Exchange Act and had the power and

influence to cause the Company to engage in the unlawful conduct complained of

herein.  Because of their positions of control, the Individual Defendants were able

to and did, directly or indirectly, control the conduct of Credit Acceptance's

business.

25.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts, and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

26.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and is traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Credit Acceptance's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of Credit Acceptance's common stock would be based on truthful and accurate information.

The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

27.    The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Credit Acceptance's publicly traded common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    <u>Company Background</u>

28.    Credit Acceptance holds itself out as a subprime auto financing company that provides loans and other financial products that enable automobile dealers to sell vehicles to consumers regardless of their credit history.  To raise capital to fund new loans, the Company securitizes and sells its loans to investors. The Company derives over 90% of its revenues from finance charges on its loans. Credit Acceptance frequently touts its ability to accurately forecast expected future cash flows for its loans, which is critical to the Company's business.

29.    Credit Acceptance has two programs through which it acquires loans: the Portfolio Program and the Purchase Program.  Under the Portfolio Program, Credit Acceptance advances money to dealers (referred to as the "advance") and holds back a portion of future payments to the dealer (referred to as the "holdback").  Under the Purchase Program, Credit Acceptance buys the loans from

the dealers, keeps all amounts collected from the consumer, and does not share the

risk of non-payment with the dealer.

30.    Dealers navigate the loan process through the Company's interface,

the Credit Approval Processing System or "CAPS."  CAPS, and Credit

Acceptance's policies reflected in CAPS, serve to inflate vehicle prices, keep

interest rates high, and push addon products on customers, such as VSC and GAP

insurance[2].  This is because dealers in the Portfolio Program "work" CAPS to

maximize their "advance," which is a portion of the expected future cash flows

from the loan.  Combined with down payment and trade-in, which are retained by

the dealer, the advance determines whether the dealer will profit on the front end of

the deal or not.  The advance is listed in CAPS and updated in real time as dealers

modify deal parameters.

31.    According to Credit Acceptance, when the Company's borrowers

miss loan payments, the Company's collection employees immediately make a

collection call to the borrower, typically within one day of a missed payment due

date.  In most cases, defaulting customers' vehicles are repossessed and sold at

wholesale auction, after which the sale price is credited to the outstanding loan

balance.  A debt collection lawsuit is subsequently filed for any deficiency.

---

[2] GAP insurance generally helps pay off a loan if the car is totaled or stolen and the
policy holder owes more than the car's depreciated value.

Deficiency judgments and wage garnishment may hound Credit Acceptance

customers for decades.  As described in the enforcement action filed by the

Massachusetts Attorney General, these customers' lives are not "changed for the

better" and the "second chance" they are offered by the Company is illusory.

### B.   The Massachusetts Attorney General Enforcement Action

32.    On December 4, 2014, Credit Acceptance received a civil

investigative demand from the Massachusetts Attorney General relating to the

origination and collection of non-prime auto loans in Massachusetts.  On

November 20, 2017 and July 22, 2020, Credit Acceptance received additional

investigative demands from the Massachusetts Attorney General seeking updated

information related to the Company's origination and collection of consumer loans,

and information regarding securitized activities.

33.    On August 30, 2020, the Massachusetts Attorney General served

Credit Acceptance with a complaint (the "Massachusetts Attorney General

Complaint") alleging that the Company engaged in unfair and deceptive trade

practices with respect to auto lending, debt collection, repossessions, and asset-

backed securitizations.  *See* Exhibit 1; Complaint, *Commonwealth of*

*Massachusetts v. Credit Acceptance Corp.*, No. 2084-cv-01954-BLS2 (Mass.

Super. Aug. 28, 2020).  Below is an overview of the allegations and facts pled in

the Massachusetts Attorney General Complaint, a summary of the Massachusetts

Superior Court's Order[3] denying Credit Acceptance's motion to dismiss and granting in part the Massachusetts Attorney General's motion for summary judgment, and corroborating evidence from Lead Plaintiffs' investigation.

### 1. Auto Lending Practices

34.     The Massachusetts Attorney General's Complaint raises claims related to Credit Acceptance's auto lending practices, including that Credit Acceptance illegally (i) approved and funded high-risk subprime loans in violation of Massachusetts law and regulations; (ii) failed to disclose its deceptive practice of marking up vehicle prices for cars sold to borrowers with low expected collection rates (or Credit Acceptance scores); and (iii) failed to disclose that the purchase of a VSC was a required condition of obtaining a loan and that, when properly accounted for in calculating interest rates, the purchase of the addon resulted in an actual interest rate that exceeded the Massachusetts' usury rate.

### a. Approving and Funding High-Risk Subprime Loans in Violation of Massachusetts State Law

35.     Credit Acceptance controls all aspects of the loan process and renders the ultimate decision to fund the loan, including the determination as to the amount

---

[3] On March 15, 2021, the Massachusetts Superior Court entered an order denying a motion by the Company to dismiss four of the Massachusetts Attorney General's seven claims and granting in part and denying in part a motion by the Massachusetts Attorney General for partial summary judgment on three of its claims. *Commonwealth v. Credit Acceptance Corp.*, No. 2084-cv-01954-BLS2, 2021 WL 1147444 (Mass. Super. Mar. 15, 2021).

of funding. The Company also determines the expected collection rate for each loan it funds but does not disclose the rate to the dealer or the borrower.

36.    The Massachusetts Attorney General's Complaint notes that the expected collection rate of an average Credit Acceptance loan nationwide has declined from 72% in 2013, to 64% in 2019.  Tellingly, the Company does not consider or determine the likelihood that the borrower will default when it approves and funds a loan.  As such, the Massachusetts Attorney General's Complaint alleges that the likelihood of default has no effect on Credit Acceptance's calculation of the expected collection rate, nor is it even an input into or output from the Company's collection model.

37.    Credit Acceptance's business model allows all applications for loans to be approved and funded, regardless of a borrower's credit score.  Thus, the Company only expects to collect, on average, approximately 70 cents of every loan dollar owed by Massachusetts borrowers and assumes the remainder will be unpaid.  Overall, about 62% of the loans with scores lower than 70% (Credit Acceptance expects to collect less than 70 cents of every loan dollar) have defaulted or are non-performing.  But default rates alone do not fully illustrate the difficulty these high-risk low-score borrowers have in repaying their Credit Acceptance loans.  For loans in Massachusetts made between 2013 and 2016, only 4.6% of borrowers with Credit Acceptance scores lower than 60% and 7.1% of

borrowers with scores lower than 70% were current for the entire term of their loans.  The remaining roughly 93-95% of borrowers missed at least one payment and/or were delinquent at some point during the terms of their loans.  Yet, Credit Acceptance continued to market its loans to customers as an "opportunity to improve your credit score," despite the inevitable that well over 50% of high-risk low-score borrowers will end up with substantially worse credit than before.

38.     Credit Acceptance has steadily increased the percentage of high-risk low-score loans in Massachusetts since 2013.  The Massachusetts Attorney General Complaint provides data that shows Credit Acceptance was able to maintain profits despite the high probability that its loans were destined to default through markups and mandatory add-on products, which on average increased the borrower's total payment obligation to nearly *two and a half times the cost to the dealer of the car*.  As pled, the bulk of the spread between Credit Acceptance's expected collection of about $12,400 and the Company's payment to the dealer of about $7,800 was the Company's profit on the average loan.  This profit was, on average, a little over $3,100, or about 40% of Credit Acceptance's upfront payment to the dealer.  And because the Company's return depends on the spread between Credit Acceptance's expected collection rate and payment to the dealer, rather than on the collection rate itself, the Company was able to maintain profitable returns on high-risk low-score loans despite reduced collections.  Thus, a loan's default

produces a significant negative consequence for borrowers, but typically has few

negative consequences for Credit Acceptance, as the Company does not expect

borrowers to repay their loans in their entirety and scales its payments to dealers

accordingly.

39.    In addition, the Massachusetts Attorney General Complaint pled facts

supporting their allegation that Credit Acceptance knew or should have known at

origination that borrowers were unlikely to be able to repay their high-risk

subprime loans.  Specifically, the Massachusetts Attorney General's Complaint

points to the fact that the performance of the Company's high-risk low-score loans

has varied little over time.

40.    Furthermore, Credit Acceptance collects and services its own loans,

and as a part of its collection and servicing activities, maintains data on the

payment and nonpayment of the loans, and is aware of the status of each of its

loans.  Between 2013 and 2019, Credit Acceptance knew which loans defaulted,

how many of the loans defaulted, and the scores of the loans that defaulted.

Therefore, when Credit Acceptance approved and funded loans to Massachusetts

borrowers between 2013 and 2019, the Company had the data, the capability, and

the opportunity to determine the likelihood of default for each of its loans—and to

decline to fund loans to borrowers who were likely to default or, at the very least,

alter loan terms to reduce the likelihood of default.

41.     Lead Plaintiffs' independent investigation has corroborated the predatory nature of Credit Acceptance's lending practices, confirmed that the Company lent to customers without regard to their ability to pay or the probability of default, approved loans for customers whose payments exceeded 25% of their monthly income in contradiction of internal guidelines, and approved dealers with "red flags" to push even more predatory loans.  Specifically:

- CW1[4] described Credit Acceptance as doing the bare minimum in vetting the consumers' credit and background information, adding that Credit Acceptance "did not take into consideration" whether the consumer could make the payments.  As an example, CW1 explained that Credit Acceptance did not conduct a review of the consumers' income and other expenses over the previous 90-day period leading up to their submitting of the loan application, which would have provided an accurate assessment as to whether the consumer already had a high spending and debt versus income ratio.  CW1 added that there was "no ceiling" on income or debt versus income to get approved for a loan. CW1 went on to add that they felt borrowers were "set up for failure" by Credit Acceptance.

- According to CW2,[5] an applicant's monthly car payment was *supposed to be* equal to no more than 25% of their maximum income.  If CW2's research

---

[4] CW1 was formerly employed by Credit Acceptance between May 2007 and October 2020 at the Company's headquarters in Southfield, Michigan.  The titles that CW1 held during their tenure were Compliance Specialist, Funding Analyst (05/2012 – 11/2014), and Technical Support Analyst (09/2007 – 05/2012). According to CW1, in their final reporting structure as a Compliance Specialist, CW1 reported to Senior Risk Analyst Danyal Tatum, who in turn reported to Director of Dealer Enrollment and Audit Chris Kies, who in turn reported to Chief Operating Officer Jonathan Lum, who in turn reported to CEO Brett Roberts.
[5] CW2 was formerly employed by Credit Acceptance as Senior Financial Analyst (01/2018 – 08/2019) and Product Management (10/2011 – 01/2018).  CW2 advised that in their final reporting structure, CW2 reported to Funding Supervisor David

indicated that the monthly payment exceeded that 25% maximum income, then they would tell the dealer to tell the customer either to go with a less expensive car or provide more money down to lower the payments. CW2 went on to recall that often applicants would somehow wind-up putting more money down to get the car that they wanted, and that sometimes it would be in the thousands of dollars, which CW2 found to be curious given their income, income-to-debt ratio, savings, low credit score, and other personal financial health indicators.

- CW2 added that they were not aware of any predictive analysis as to whether an applicant was likely to default on payments and have their vehicle repossessed. According to CW2, it was Credit Acceptance's algorithm that decided whether an applicant was approved. CW2 recalled that the algorithm had been created by current Chief Sales Officer Dan Ulatowski and had been used by the Company since CW2's tenure began. CW2 also recalled that Ulatowski reported to CEO Brett Roberts.

- CW2 also added that Credit Acceptance's auditors did not audit loans to see if any were approved that should not have been, but rather pulled samples of loans and audited them for error, such as missing information or misspellings.

- CW3 recalled that every customer who visited Credit Acceptance was "under water."[6]  CW3 recounted that Credit Acceptance's business comes

---

Buttigieg, who in turn reported to Senior Manager – Dealer Service Center Giovanni Gojcaj, who in turn reported to Chief Operating Officer Jonathan Lum. CW2 also advised that as a Senior Financial Analyst that they worked with titles in the Dealer Service Center, and their responsibilities included processing applications for auto loans.

[6] CW3 was formerly employed with Credit Acceptance as a Dealer Enrollment Specialist from June 2017 to April 2020 and prior to that an Insurance Specialist from November 2015 to March 2017. In their role as a Dealer Enrollment Specialist, CW3 was responsible for enrolling dealerships with Credit Acceptance by collecting background information, performing LexisNexis and other background searches on the company and its owners; and providing ongoing sales support to those dealerships. In their role as an Insurance Specialist, CW3 was responsible for processing loss claims, contacting insurance companies, reviewing total losses for totaled cars, following up on payments due, and following up on repair claims.

from predatory lending and that the Company "thrives off of people who cannot afford to purchase vehicles." CW3 explained that Credit Acceptance had dealerships tack on additional costs and 25% interest that significantly increased the cost of the car.

- CW3 went on to say that their direct supervisors Danyal Tatum, Senior Risk Analyst, and Chris Kies, Director of Dealer Enrollment and Audit, instructed CW3 to approve dealerships for enrollment even if they had red flags just to make Credit Acceptance's numbers look good.

- CW4[7] recalled that dealers also "gamed" the advances by lying about the amount of the deposit put down by the applicant. CW4 explained that dealers received a bigger advance from Credit Acceptance if documents stated that the borrower was putting down $2,000 versus $1,000 (as an example), but when Credit Acceptance followed up with some of those customers as part of "verification calls," the customers informed the Company that they had only put down $1,000 and not the $2,000 (as an example) listed by the dealer in the contract and loan. CW4 specifically recalled a verification call with a borrower whose documents from the dealer indicated that they had put down $5,000, but the borrower informed CW4 that they had only put down $1,000. CW4 explained that the dealer lying about the down payment was "a normal thing," but that it was CW4's responsibility to correct the information in the paperwork. CW4 added that they did not see any punishment and that the dealers just kept doing it. CW4 estimated that it was around 20% - 25% of contracts "with some type of discrepancy."

---

[7] CW4 was formerly employed by Credit Acceptance from November 2013 to October 2020. CW4 worked at the Company's headquarters in Southfield, Michigan. CW4 held two titles during their tenure which were Credit Analyst (09/2014 – 10/2020) and Insurance Specialist (11/2013 – 09/2014). According to CW4, they most recently reported to Nick McClure, who in turn reported to Funding Supervisor Darius Barnett. CW4 advised that their responsibilities as Credit Analyst included interacting with dealers, reviewing loan applications, and approving advances to Credit Acceptance's auto-dealer partners.

- CW5,[8] a former Market Area Manager ("MAM") at Credit Acceptance, described their role as "more than a consultant [to the dealers] and like an unpaid employee for the dealerships." CW5 explained that they handled marketing for the dealerships, customer prospecting, trained staff on how to interact with customers, and even finalized loans with customers. CW5 added that upper management wanted them to "do whatever to get customers." In reference to these additional responsibilities that they took on at dealerships, CW5 recalled that at least five of their dealerships did not physically handle their own contracts and that these dealerships relied on them to close deals. Moreover, CW5 recounted that dealerships told them to not "let customers know" they were an "agent of Credit Acceptance" and went on to recount how one dealership's owner told them to tell customers who asked, that they were his niece/nephew. When asked whether their Credit Acceptance supervisors knew about their extra responsibilities for these dealerships, CW5 responded with "absolutely."

- In reference to what CW5's manager had instructed CW5 to do while at Credit Acceptance, CW5 recalled that in June 2020, when employees were working from home due to the COVID-19 pandemic, one of CW5's dealerships was struggling with their business. CW5 recounted how CW5's DOS put pressure on CW5 and asked why CW5 had not done any contracts with the dealership yet.

- CW5 also recalled how Credit Acceptance encouraged dealers to take on riskier customers because, on one end, it looked better for dealers when those riskier customers paid their accounts; and on the other hand, even if these riskier customers did not pay, Credit Acceptance assured its dealerships not to worry because they are a non-recourse lender.

- In reference to loans given to borrowers who could not afford them, CW5 recalled one particular incident that took place right before Christmas 2020,

---

[8] CW5 was employed with Credit Acceptance as a Market Area Manager from July 2019 to January 2021. In their role, CW5 was responsible for finding prospect dealers, explaining Credit Acceptance's financing program, enrolling dealers, and acting as a consultant to dealers on how to increase business. CW5 added that during their tenure with Credit Acceptance, they reported to Director of Sales (or what employees referred to as "DOS"), Kevin Del Valle who reported to Regional Vice President, Jose Eguia who reported to the Vice President of Sales, Dan Ulatowski, who reported to CEO Brett Roberts.

where a single father who had recently obtained custody of his daughter and was living in a homeless shelter, came into a dealership to purchase a car. The man explained to the dealership the monthly payment that he could afford. According to CW5, the dealer's desk manager told them to help contract the customer because it would boost their metrics. CW5 continued to recall that they realized the payment required by Credit Acceptance's system was several hundred more than what the man said he could afford. CW5 raised this concern with the desk manager, who then told the man that the higher payment was required, but that if he had an issue with it, he could come back after the first payment and refinance. CW5 noted that they felt this was "really wrong" and stated that this was one of the reasons that they decided to leave Credit Acceptance. CW5 went on to say that even when they questioned the loan referenced above and others, their DOS would tell them that "you have to do what you have to do" to keep the customers active and to "keep the dealers alive."

### b.    Vehicle Price Markups

42.    The Massachusetts Attorney General Complaint alleges that Credit Acceptance failed to disclose its deceptive practice of marking up prices for cars sold to borrowers with low expected collection rates (or Credit Acceptance scores) that were substantially higher than the markups on cars sold to borrowers with higher expected collection rates in violation of Massachusetts law and regulations. As a result of the unlawful markup, borrowers faced interest rates that exceeded the Massachusetts' usury rate.

43.    As pled in the Massachusetts Attorney General Complaint, the price of markups on cars sold to Credit Acceptance borrowers with low scores were substantially higher than the markups on cars sold to borrowers with higher scores. The markups, which range from about 37% to 68% on average, consistently

increase as Credit Acceptance's expected collection rate decreases, and are highest for borrowers with the lowest scores.

44.     Moreover, dealers increased their markups on the prices of low-score borrowers' cars to compensate for the reduction in the Company's payments to dealers for the loans of low-score borrowers.  When it funds a loan, Credit Acceptance's policy is to deliberately and systematically reduce its payment to dealers (the full payment under the Purchase program and the upfront payment under the Portfolio program) as scores drop.  The Company's payment percentage decreases for low-score borrowers, and is lowest for the lowest-score borrowers, while the markup increases as the score drops and is highest for the lowest-score borrowers.

45.     According to the Massachusetts Attorney General Complaint, the increased markup of vehicles based on the borrowers' low Credit Acceptance scores is a hidden finance charge.  The amount of this finance charge is the amount of the markup attributable to the borrower's score, together with the increased interest resulting from this markup.  This finance charge was not disclosed to Credit Acceptance borrowers with low scores, who received inaccurate and understated disclosures of the finance charges of their loans.  In addition, the finance charge attributable to the excess markups must be included in the calculation of the borrower's interest rate.  Because virtually all of the Company's

loans are made at or very close to the 21% Massachusetts usury ceiling, properly including the amount of the hidden finance charge attributable to the markup in the calculation of the low-score borrowers' interest rates results in a recalculated or actual interest rate higher than 21% for virtually all Credit Acceptance borrowers whose cars were marked up as a result of their credit scores.

46.     Upon review of the substantive allegations within the Massachusetts Attorney General Complaint, the Massachusetts Superior Court's Order denied Credit Acceptance's motion to dismiss this claim.  Ultimately, the court held that the Massachusetts Attorney General Complaint plausibly suggests that dealers increased the interest rate on car loans by hiking up purchase prices for high-risk buyers.  Accordingly, the court found that the Massachusetts Attorney General Complaint stated viable claims that Credit Acceptance may be directly liable for failing to disclose the true effective finance charge and liable, at least for equitable remedies, as assignee of a loan charging a usurious interest rate.

47.     Lead Plaintiffs' independent investigation has corroborated the predatory nature of Credit Acceptance's practice of marking up cars.  CW5 explained that once a dealer put a price into CAPS, the price could not be changed because it was connected to the car's Vehicle Identification Number ("VIN"). CW5 noted that MAMs were taught how to instruct dealers to raise their sticker price of a car prior to it being entered into CAPS because the price could always be

lowered if need be.  Furthermore, CW5 recalled that Credit Acceptance told

dealers not to put prices on their cars and to simply put the monthly payment

amounts in case a customer, in desperate need, asked to be financed.  Accordingly,

CW5 added that the problem was that customers often could not refinance or get a

better interest rate on their vehicles because the true value of the vehicle was way

less than what the customer owed.

### c.    Required Purchase of VSCs

48.    According to the Massachusetts Attorney General Complaint, Credit

Acceptance failed to disclose that borrowers were required to purchase VSCs as a

condition of obtaining a loan and that, when properly accounted for in calculating

interest rates, the purchase of the addon resulted in an actual interest rate that

exceeded the Massachusetts' usury rate.

49.    As alleged, Credit Acceptance provides dealers with access to VSCs

through the Company's agreements with two VSC administrators (or third-party

providers, "TPPs"), and the dealers then sell the VSCs to Credit Acceptance's

borrowers.  The parties to the VSCs are the TPPs (First Automotive Service

Corporation, which is a subsidiary of SouthwestRe ("SWRE"), and Wynn's

Extended Care, Inc.) and the Credit Acceptance borrowers.  The VSCs are

purchased by the Company's borrowers when they buy their cars, and the retail

cost of the VSC is financed as part of the loan.  Credit Acceptance only permits dealers to finance the purchase of VSCs offered by the Company.

50.     Between 2013 and 2019, about 80% of eligible Credit Acceptance borrowers in Massachusetts purchased and financed VSCs as part of their Credit Acceptance loans.  The average VSC purchased by a Massachusetts Credit Acceptance borrower between 2013 and 2019 had a retail price to the borrower of about $1,600.  All VSCs purchased by Credit Acceptance borrowers were financed as part of their loans; on average, this added $2,450 to the amount of the loan (the VSC retail price financed, on average, over the 55-month term of the loan).

51.     The VSC purchase increased the amount of an average loan, and of the borrower's average monthly payment, by about 15%.  In the aggregate, VSC purchases added $51 million to the loans of Credit Acceptance borrowers in Massachusetts between 2013 and 2019 purchasing a VSC.

52.     During the 2013-2019 period the average expected collection rate for Credit Acceptance's Massachusetts loans with VSC's was 70.2%; of the $2,450 loan cost attributable to the VSC purchase, the Company expected to collect $1,721.  Credit Acceptance used a portion of the borrower's VSC payment to pay the dealer a $385 sales commission, to pay an $90 administrative fee to the TPP, and about $40 in ceding costs and taxes, and to cover the average claims cost of $478.  Most of the remainder of the borrower's loan payment attributable to the

28

VSC, or about $727, was retained by Credit Acceptance.  Thus, the income generated from VSCs being improperly forced onto borrowers contributed substantially to Credit Acceptance's profit on the loan transaction.

53.    Credit Acceptance's CAPS system rewards dealers handsomely for including VSC's and other addons, such as GAP coverage.  Not only do dealers receive a commission for selling these products, but CAPS also reduces the risk of the loan, thereby increasing the dealer advance.

54.    Despite Credit Acceptance's internal policy—which holds that a dealer may not require the borrower to purchase a VSC (*See* Exhibit 4 to the Massachusetts Attorney General Complaint)—between 2013 and 2019 numerous Credit Acceptance borrowers have been required to purchase VSCs in order to obtain loans.  Dealers told borrowers, explicitly, that "CAC would not approve my loan without purchasing a vehicle service contract," that "my application for my car loan would not be approved unless I purchased the vehicle service contract," and that "the VSC was a mandatory condition of approving my loan." *See* Exhibit 5 to the Massachusetts Attorney General Complaint.  The Company also received about 25 complaints directly from Massachusetts consumers who stated that they were required by dealers to purchase VSCs as a condition of obtaining their Credit Acceptance loans.  However, the Company ultimately dismissed these complaints after they determined that none of them "had merit."

55.     According to Credit Acceptance's manual, the Company's compliance policy required employees to review the dealer's VSC "penetration rate" (the percentage of the dealer's Credit Acceptance borrowers who purchased VSCs) in order to determine "if this complaint is part of a larger trend." *See* Exhibit 4 of the Massachusetts Attorney General Complaint.  From 2013 through 2019, numerous Massachusetts dealers had very high VSC penetration rates between 90% and 100% of their Credit Acceptance loans *See* Exhibit 7 of the Massachusetts Attorney General Complaint.  Moreover, dealers that required Credit Acceptance borrowers to purchase VSCs in order to obtain their loans did not require cash payers to purchase VSCs.  As a result, the VSC penetration rates for Credit Acceptance borrowers were often much higher than for cash customers.  At one such Credit Acceptance dealer in Massachusetts, Haddad Auto Group, 100% of Credit Acceptance borrowers purchased VSCs, while 16% of cash payers purchased VSCs.  As mentioned above, Credit Acceptance benefited from each borrower's purchase of a VSC, as the addon contributed substantially to the Company's profit on the loan transaction.

56.     During this period, Credit Acceptance did not investigate any high-penetration dealers' VSC sales or interview any customers of high-penetration dealers to determine whether they were required to purchase VSCs.  Nor did the Company take any action to remedy the required VSC purchases or to prevent

dealers from requiring borrowers to purchase VSCs.  Thus, Credit Acceptance

knew or should have known that borrowers were required to purchase VSCs in

order to obtain loans.

57.    Lead Plaintiffs' independent investigation has confirmed that while

customers *should* have been informed that VSCs were optional, the product was so

heavily incentivized that Credit Acceptance loans included VSCs without the

customer's knowledge or consent, with no real penalty imposed on dealers who

illegally required VSCs.  Specifically:

- According to CW6,[9] GAP insurance and VSCs were "really pushed" by Credit Acceptance, through the dealer, and that the dealers were heavily incentivized to get them included in an auto loan.  CW6 added that while GAP and VSCs were included in the fine print of the contracts, CW6 believed there were instances when GAP and/or VSCs were "tacked on" without the customer realizing it or without having been informed by the dealer.  CW6 recalled hearing stories from colleagues of borrowers calling up and saying that they did not realize what those additional charges were in their contracts, that dealers had never mentioned them in the negotiations, and that they (the borrower) could not afford them.

- CW4 recalled that dealers received a commission of approximately $385 for each VSC and around $100 for each GAP insurance that borrowers signed up for, on top of the risk-based increase in the advance.  CW4 recalled that dealers had the ability to auto-select VSC and GAP insurance by default – that is the addons were automatically included in CAPS and needed to be unchecked if they were going to be removed.  CW4 also recalled some

---

[9] CW6 was formerly employed by Credit Acceptance from June 2020 to June 2021 as a Credit Analyst. CW6 advised that they reported into the Company's Southfield, Michigan headquarters.  CW6 also advised that their responsibilities as a Credit Analyst included acting as a "gatekeeper" with customer-dealers and reviewing documents that accompanied loan applications such as paychecks and bank statements.

customers complaining that they had been told by the dealers that they were required take the VSC and/or GAP insurance. According to CW4, in those circumstances, the dealers were spoken to by Credit Acceptance but continued the practice because there were no real repercussions. CW4 added that since the dealers faced no real penalty that "100% they kept doing it."

- Further, CW4's responsibilities included calling borrowers and asking questions about their contracts. CW4 recalled some borrowers responding that they were told by their dealers that they had to take the add-ons in order to get approved for the loan.

- CW7[10] recalled that Credit Acceptance made VSCs and GAP mandatory and that often, loan applications would not go through the CAPs system if VSCs and GAP were not included in the contract. CW7 explained that the option to add VSCs or GAP was in a check box within the company's CAPs system. CW7 added that dealerships could uncheck the boxes for the additional products, but it could significantly change the amount of money the dealership made if they were to remove the extra insurances. CW7 went on to give the example of a dealership potentially earning $12,000 with VSCs and GAP included in the contract and "only" $6,000 with both products not included.

- Further, CW7 also recalled that VSCs and GAP were sold together as a package. CW7 added that the package was "definitely mandated" and that dealerships may tell customers it is an option but, it was not.

---

[10] CW7 was employed with Credit Acceptance from October 2019 to November 2020. In their role, CW7 was responsible for enrolling dealerships on Credit Acceptance's system, working with clients and dealerships to facilitate purchases and loans for vehicles, and helping clients and dealerships structure deals while making sure that clients did not have to make payments that were more than 25% of their income. During their tenure, CW7 reported to Director of Sales Brian Wiggins, who reported to the Regional Director and oversaw operations in Georgia, South Carolina, and Florida.

- When asked whether borrowers were informed that they could opt out of VSC and GAP add-ons, CW8[11] replied that they should have been but recalled an occasion when a dealer did not inform their customer that they added VSC and GAP to their contract.

- CW5 recalled that C5's area[12] had the highest penetration rates for VSC and GAP.  They recounted how many of their dealers had 100% penetration and that the lowest VSC penetration rate they had was 80%.  CW5 stated that Credit Acceptance encouraged dealerships to improve their performance by selling more VSCs and GAP, pointed to other successful dealerships with higher penetration rates, and threatened to penalize dealers that "did not get in line."  CW5 added that if dealerships did not take on risky customers, create contracts, sell VSC and GAP, then Credit Acceptance threatened to remove these dealers from the Company's lending programs.

- In reference to dealerships' sales of VSCs, CW9[13] recalled that dealerships were not allowed to sell other VSCs on Credit Acceptance loans.  CW9 went on to explain that dealerships were required to use the VSC products in CAPs only and no outside or other products.

- In reference to add-ons such as VSC and GAP, CW2 recalled that they saw them in a "majority" of loans, which they estimated to be around 95% of the loans, adding that "very few did not have them."  CW2 explained that they were aware as to how prevalent the add-ons were in Credit Acceptance's

[11] CW8 was employed with Credit Acceptance as a Market Area Manager from September 2019 to April 2021.  In their role, CW8 was responsible for being the liaison between dealerships and Credit Acceptance.  As a liaison, CW8 on boarded and trained new dealerships on how to use Credit Acceptance's CAPS portal.

[12] CW5 explained that their area included: Crystal Lake, Illinois to the Illinois/Iowa border, from East to West, and that from North to South, their area covered the Illinois/Wisconsin state line until 30-minutes south of Rockford, Illinois.

[13] CW9 was formerly employed with Credit Acceptance from September 2018 through April 2021 as a Sales Recruiter. In their role, CW9 was responsible for recruiting field salespeople or Market Area Managers by using LinkedIn and other tools and then taking recruits through the interview process.  During CW9's tenure with Credit Acceptance, CW9 reported to Kristen Caretti, Talent Acquisition Manager, who reported to Maya Scott, Director of Talent Acquisition, who reported to CFO Ken Booth, who reported to CEO Brett Roberts.

loans because one of their responsibilities was to see if loans had the add-ons or not.

58.     Further, even when a customer purchased VSCs and GAP insurance, the contractual benefits would be delayed to enrich Credit Acceptance. Specifically, according to CW3, Credit Acceptance often inappropriately held funds for totaled vehicles or vehicles that needed repair.  They explained that if a customer totaled their vehicle, Credit Acceptance told them that they needed to wait for GAP to process, paperwork to be filed, or other reasons before they released funds for the vehicle.  According to CW3, this was Credit Acceptance's way of charging additional interest or late fees for those cars. CW3 added that Credit Acceptance would do this with repair checks as well and that they often did this to customers who did not know any better.

59.     The required purchase of a VSC as a condition of obtaining a Credit Acceptance loan is a hidden finance charge.  The amount of this finance charge is the retail cost of the VSC to the borrower, together with interest attributable to this cost.  Because the required purchase of a VSC to obtain a Credit Acceptance loan is a finance charge, the VSC cost must be included in the calculation of the borrower's interest rate on the loan.  Virtually all of Credit Acceptance's loans are made at or very close to the 21% Massachusetts usury ceiling, and properly including the amount of the hidden finance charge attributable to the required VSC purchase in the calculation of the borrower's interest rate results in a recalculated

34

or actual interest rate higher than 21% for practically all Credit Acceptance

borrowers required to purchase VSCs.

60.     Upon review of the substantive allegations and evidence presented in

the Massachusetts Attorney General Complaint, the Massachusetts Superior Court

denied Credit Acceptance's motion to dismiss this claim. Ultimately, the court held

that the Massachusetts Attorney General Complaint plausibly alleges that dealers

required buyers to enter into VSCs as a condition of obtaining a Credit Acceptance

loan.  Accordingly, the court found that the Massachusetts Attorney General

Complaint stated viable claims that Credit Acceptance may be: (1) directly liable

for failing to disclose the true effective finance charge; (2) liable, at least for

equitable remedies, as assignee of a loan charging a usurious interest rate; and (3)

vicariously liable with respect to the VSC claim, as the complaint plausibly

suggests that dealers were acting as Credit Acceptance's agent in selling VSCs.

## 2.     Debt Collection Practices

61.     The Massachusetts Attorney General's Complaint claims that Credit

Acceptance engaged in unfair and deceptive acts or practices in connection with

the collection of loans, such as excess contacts and harassment of consumers,

including the making of about 1.7 million collection calls in violation of

Massachusetts law and regulations.

62.     Whenever Credit Acceptance's Massachusetts borrowers missed loan payments on their loans, the Company's collection employees immediately made collection calls to the borrower, typically within one day of a missed payment due date.  Between 2012 and mid-2018, Credit Acceptance had a policy whereby it would call or attempt to call any individual delinquent borrower as many as 8 times per day.  Moreover, Credit Acceptance made about 2 million collection calls to about 9,000 delinquent borrowers in Massachusetts, or about 200 collection calls to each borrower, on average, for the purpose of collecting debts during this time frame.  Of the 2 million calls, about 1.7 million, or about 170 per borrower, exceeded the two calls per 7-day period limit as required by Massachusetts debt collection regulations.  Adding insult to injury, about 10% of the borrowers called by Credit Acceptance received over 500 unlawful calls.

63.     Furthermore, Credit Acceptance was aware that consumers found the collection attempts to be oppressive and harassing.  One consumer reported a complaint to Credit Acceptance stating, "I am constantly harassed on a regular basis by this company" and was left "a barrage of ominous voicemails …where nobody said a word."  Another customer stated, "I keep getting collection calls …I am harassed day and night …I have to call them 1-2 times [a] week begging for the calls to stop." *See* Exhibit 3 to the Massachusetts Attorney General Complaint.

64.    Upon review of the substantive allegations and evidence within the

Massachusetts Attorney General Complaint, the Massachusetts Superior Court's

Order held that the Massachusetts Attorney General had standing to sue Credit

Acceptance for violating a state regulation that limits the frequency of telephone

calls by creditors to collect a debt.  The court denied Credit Acceptance's

arguments that the relevant regulation violates their constitutional rights, such as

due process, but held that the merits of the claim could not be resolved on

summary judgment because such a decision turned on conflicting expert opinions.

65.    Lead Plaintiffs' independent investigation has revealed additional

facts and evidence that corroborate this claim.  Specifically, Credit Acceptance

claims that when borrowers miss loan payments, the Company's collection

employees immediately make "*a* collection call" to the borrower, typically within

one day of a missed payment due date.  However, according to CW1, calls were

made to customers without regards to the number of times each had already been

called that day, and regardless of what state the customer resided in.  CW1

explained that this was because the system auto-dialed from one customer to the

next regardless of if the customer had already been contacted that day.  CW1

recalled customers telling them on the phone that they had already been contacted

5 to 8 times (as an example) that day.  Similarly, CW3 recounted that they were

required to call people on auto-dialer in back-to-back cycles to ask them for

money.  CW3 added that even during a pandemic, Credit Acceptance's auto-dialers called people four-to-five times a day until the shift ended.

### 3.    Vehicle Repossession and Related Practices

66.    The Massachusetts Attorney General's Complaint also raises claims related to Credit Acceptance's loan deficiency collections and its pre-sale and post-sale repossession notices to borrowers that violated Massachusetts law and regulations.  Specifically, the Massachusetts Attorney General claimed that the Company (1) failed to calculate the deficiency amounts owed by borrowers based on the fair market value of the repossessed vehicle; (2) collected deficiency amounts from borrowers that were not based on the fair market value of the repossessed vehicle; and (3) failed to include a description of the calculation of the deficiency amount, based on the fair market value of the repossessed vehicles, in pre-sale notices and a detailed explanation of the same calculation in its post-sale notices to borrowers.

67.    Under Massachusetts law pre-sale and post-sale deficiency notices to consumers who default on their car loans and whose cars are repossessed and sold by the lender must state that the deficiency (if any) is calculated based on the fair market value of the vehicle.  When the lender calculates the deficiency, the lender must use the fair market value of the vehicle in the calculation.  Between 2013 or earlier and 2018, when Credit Acceptance collected the deficiency amounts from

borrowers, it did not calculate the deficiency amounts based on the fair market value of the repossessed vehicles.  Rather, the Company calculated the deficiency amount, and explained the calculation, as the difference between the amount of the proceeds received from the disposition of the repossessed vehicle and the total amount of a consumer's obligation under the defaulted car loan.

68.   Furthermore, Credit Acceptance did not include a description of the calculation of the deficiency amount based on the fair market value of the repossessed vehicles in the pre-sale notices and a detailed explanation of the same calculation in its post-sale notices.

69.   Upon review of the substantive allegations in the Massachusetts Attorney General Complaint, the Massachusetts Superior Court's Order denied Credit Acceptance's motion to dismiss the claim that the Company sent notices about repossession in violation of the Uniform Commercial Code.  Ultimately, the court held that the Massachusetts Attorney General Complaint, and the summary judgement record as a whole, "***proves that [Credit Acceptance] sent unlawful, misleading notices***," and therefore "the Court will allow the [Massachusetts Attorney General's] request for summary judgment as to liability under the UCC and under G.L. c. 93A."

### 4.    Asset-Backed Securitization Practices

70.    The Massachusetts Attorney General Complaint alleges that Credit Acceptance engaged in unfair or deceptive acts or practices in connection with the sale of securities to investors.  For example, the Company sold securities to investors by means of (1) materially false or misleading statements in the offering documents for such securities, stating that Credit Acceptance "does not expect that the characteristics of the Loans and related Contracts purchased during the Revolving Period will be materially different from those transferred on the Closing Date" and (2) the Company's failure to disclose the material differences in the characteristics of the loans selected for the securities before and after the Closing Dates.

71.    As pled in the Massachusetts Attorney General Complaint, Credit Acceptance's offering documents stated that the characteristics of loans selected by the Company after the Closing Date (and not described in the offering materials) may "differ somewhat" and "may be of a different credit quality and seasoning" but the offering documents explicitly stated that the Company did not expect the characteristics of these loans to be "materially different from those transferred on the Closing Date."

72.    In numerous Credit Acceptance securitizations, the loans the Company selected after the Closing Date were in fact materially different from the

same characteristic of loans committed before the Closing Date and described in the offering documents.  Loans selected by Credit Acceptance for its securities after the Closing Date had consistently lower scores or expected collection rates, on average, than the loans described in the offering documents.  For seven securitizations between September 2014 and continuing through the end of 2017, the average scores of Massachusetts loans placed in the securities trusts in the revolving period were lower than the average scores of the loans placed in the trusts prior to the Closing Date for each of the securitizations.  The difference in the average scores ranged from 2.8% to 6.0%.  Overall, the average reduction in the scores for the Massachusetts loans in these securitizations was approximately 4.4%.

73.     Credit Acceptance selected the loans for its securitizations both before and after the Closing Date.  It controlled the selection process, controlled the characteristics and credit quality of the loans it selected, and controlled the disclosures to investors.

74.     Credit Acceptance had complete information concerning the characteristics of the loans selected for inclusion in the securitizations after the Closing Date.  This information was non-public, and it was never disclosed to investors.

41

75.     Credit Acceptance provided data to the Attorney General's Office for all (countrywide) loans in two securitizations, one from 2016 and one from 2017, Credit Acceptance Funding LLC 2016-2 and Credit Acceptance Funding LLC 2017-2.  The scores for loans selected by Credit Acceptance after the Closing Date (and not described in the offering documents) were 3.3 % lower for LLC 2016-2 and 3.0 % lower for LLC 2017-2 than the average scores for the loans selected before the Closing Date.

76.     Because the expected collection rate of Credit Acceptance's loans is the single most important characteristic in evaluating the underlying credit quality of the loan, the differences in the loan characteristics between the loans selected by Credit Acceptance for its securitizations before and after the Closing Date were material and should have been disclosed to investors.  Failing to disclose the true risk profile of the loans allowed Credit Acceptance to raise capital at rates that otherwise would not have been possible had the appropriate disclosures been made to investors.

77.     Upon review of the substantive allegations within the Massachusetts Attorney General Complaint, the Massachusetts Superior Court's Order denied Credit Acceptance's motion to dismiss this claim.  Ultimately, the court held that the Massachusetts Attorney General Complaint plausibly suggested that the challenged statements in offering materials were false because they misrepresented

the Company's actual intentions regarding the credit characteristics of the loans that it would add to a particular note after the closing date.  In its holding, the court explicitly stated that "[w]hether the alleged misrepresentations were material cannot be resolved on a motion to dismiss."

78.    On April 27, 2021, the Company and the Massachusetts Attorney General reached an agreement in principle to settle the lawsuit, and, as a result, the Company has estimated a probable loss of $27.2 million, all of which was recognized as a contingent loss during the first quarter of 2021.  As a formal settlement agreement has yet to be executed, the litigation remains ongoing.

### C.    **Other Regulatory Matters**

79.    Aside from the enforcement action brought by the Massachusetts Attorney General discussed above, Credit Acceptance is subject to various ongoing regulatory investigations from other state Attorneys General offices and Federal agencies.

### 1.    **The Consumer Financial Protection Bureau**

80.    On December 23, 2020, Credit Acceptance received a civil investigative demand for investigational hearings in connection with the CFPB's investigation into the Company's lending practices.  The Company objected to certain portions of the civil investigative demands for hearings and, on January 19, 2021, the CFPB notified the Company that it had withdrawn such portions from

the December 23, 2020 civil investigative demands.  On March 11, 2021, Credit

Acceptance received another civil investigative demand from the CFPB seeking

additional information relating to its investigation and an investigational hearing.

The CFPB's investigation currently remains ongoing.

## 2.    The New York Attorney General

81.    On November 16, 2020, Credit Acceptance received a subpoena for

documents from the New York Attorney General related to its investigation into

the Company's lending and collection practices.  On November 19, 2020, the

Company received a letter stating that the New York Attorney General was

considering bringing claims against the Company under the Dodd-Frank Wall

Street Reform and Consumer Protection Act, New York Executive Law § 63(12),

the New York Martin Act and New York General Business Law § 349 in

connection with the Company's origination and securitization practices.  On

December 21, 2020, Credit Acceptance received two additional subpoenas from

the New York Attorney General, one relating to data and the other seeking

testimony.  On February 24, 2021, Credit Acceptance received another subpoena

from the New York Attorney General seeking information relating to its

investigation.  The New York Attorney General's investigation currently remains

ongoing.

### 3. Maryland Attorney General and the Multi-State Investigation

82.     On August 11, 2020, Credit Acceptance received a subpoena from the Maryland Attorney General concerning the Company's repossession, sales, loan origination, and collection policies and procedures.  The subpoena included 40 other states (Alabama, Alaska, Arizona, Arkansas, California, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, and Wisconsin) and the District of Columbia.  The Maryland Attorney General's investigation currently remains ongoing.

### 4. New Jersey Attorney General

83.     On August 11, 2020, Credit Acceptance received a subpoena from the New Jersey Attorney General that was essentially identical to the August 11, 2020 Maryland subpoena, both as to substance and as to the jurisdictions identified.  The New Jersey Attorney General's investigation currently remains ongoing.

### D. Post Class Period Developments

84.     Approximately eight months after the conclusion of the Class Period, various high-level executive employees began resigning from the Company.  On

April 29, 2021, Credit Acceptance announced that Defendant Roberts, who served as the Company's CEO for nineteen years, abruptly decided to "retire."  CW9 recalled that the retirement announcement email sent by CEO Roberts said that the Company decided it was time for him to retire rather than him announcing his retirement himself.  CW9 added that there were rumors that the settlement was the reason he retired, and that the decision was made by the Company and not Roberts.

85.     On the same day, Credit Acceptance also announced that the Company reached a settlement in principle with the Massachusetts Attorney General in their Quarterly Report on Form 10-Q for the quarter ended March 31, 2021 (the "3Q 2021 10-Q").

86.     Then, only a couple of months later, on June 14, 2021, Credit Acceptance announced that Chief Legal Officer and Corporate Secretary, Charles A. Pearce, also decided to "retire" from the Company.

87.     Further, CW9 recounted that during their tenure[14], Credit Acceptance condensed certain markets, such as Massachusetts. When asked whether the turnover in Massachusetts occurred prior to or after the Massachusetts Attorney General filed their complaint, CW9 recalled that there was complete turnover in the state at least once and maybe twice during their tenure.

[14] CW9 was employed with Credit Acceptance from September 2018 through April 2021.

46

E.   **Defendants' Materially False and Misleading Statements and Omissions**[15]

   1.   **Credit Acceptance Provides an Illusory Opportunity to Improve the Lives of Its Customers**

88.   On May 3, 2018, after market close, Credit Acceptance issued a press release on Form 8-K that provided the Company's 1Q18 earnings.  The Form 8-K stated that "an important ancillary benefit of our programs is that ***we provide consumers with an opportunity to improve their lives by improving their credit score and move on to more traditional sources of financing***."  On the same day, Credit Acceptance filed its Quarterly Report on Form 10-Q (the "1Q 2018 10-Q"), repeating verbatim the statement above.  This statement was also repeated throughout the Class Period in every press release on Form 8-K announcing the Company's earnings and in each Quarterly Report on Form 10-Q and Annual Report on Form 10-K.[16]

---

[15] The statements highlighted in ***bold and italics*** within this section are those alleged to be materially false and misleading.

[16] Credit Acceptance disclosed its financial results on Form 8-K and/or 10-Q for (1) 1Q18 on May 3, 2018; (2) 2Q18 on July 31, 2018; (3) 3Q18 on October 29, 2018; (4) 4Q18 on January 30, 2019; (5) 1Q19 on April 29, 2019; (6) 2Q19 on July 30, 2019; (7) 3Q19 on November 1, 2019; (8) 4Q19 on January 30, 2020; (9) 1Q20 on May 27, 2020; (10) 2Q20 on July 30-31, 2020; (11) 3Q20 on October 29, 2020; and (12) 4Q20 on February 1, 2021. Credit Acceptance disclosed its financial results on Forms 10-K for FY2018 on February 8, 2019 and FY2019 on February 11, 2020.  Appended as an exhibit to each Form 10-Q and 10-K issued during the Class Period were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified that 10-Q or 10-K "fully

89.     On May 23, 2018, Credit Acceptance released a blog post on its website titled "Get Financed Through An Enrolled Dealer."  Within the post, Credit Acceptance promised that the Company, along with its participating dealers, would assist consumers in rebuilding their credit.  Specifically, the post stated, "The dealer will work with you to understand the type of vehicle *you want*, as well as ***work with your budget, to structure a contract that meets your needs***."

90.     On April 10, 2019 and May 20, 2020, Credit Acceptance filed Forms 8-K with the SEC, containing Shareholder Letters from Defendant Roberts (the "2019 Shareholder Letter" and the "2020 Shareholder Letter," collectively the "Shareholder Letters").  The Shareholder Letters detailed, *inter alia*, the Company's background, history, and performance results.  In the "Background" section, Defendant Roberts described Credit Acceptance as an indirect auto financing company that enabled customers to purchase a vehicle and establish (or reestablish) a positive credit history:

> The benefit of our program from the customer's perspective is also significant. ***We provide an opportunity for our customers,*** many of whom have been turned down for financing from other lenders, ***to purchase a vehicle and establish or reestablish a***

---

complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "the information contained in the [report] fairly presents, in all material respects, the financial condition and results of operations of the Company."

> *positive credit history, thereby moving their financial*
> *lives in a positive direction*.

91.     The statements above concerning the purported opportunity provided

by Credit Acceptance to improve lives and credit scores and to provide customers

with a contract that met their needs and was within their budget were materially

false and misleading when made because Defendants failed to disclose that Credit

Acceptance was violating the law when it (1) approved and funded high-risk loans

that it knew and/or were reckless in not knowing customers were unable to repay,

*see* Section, IV.B.1(i); (2) engaged in the unfair and deceptive practice of marking

up prices for cars sold to certain borrowers, *see* Section, IV.B.1(ii); (3) required the

purchase of VSCs, *see* Section, IV.B.1(iii); and (4) engaged in unfair and deceptive

debt collection and repossession practices, *see* Sections, IV.B.2-3, thereby

rendering illusory the purported "opportunity" and "benefit" provided as 62% of

the loans with scores lower than 70% would default or become non-performing.

## 2.     Generic Risk Warnings and Compliance with Applicable Regulations

92.     On May 3, 2018, after market close, Credit Acceptance issued a press

release on Form 8-K that provided the Company's 1Q18 earnings.  The press

release included cautionary statements that "*[t]he regulation to which we are or*

*may become subject could result in a material adverse effect on our business*;"

and "*[l]itigation we are involved in from time to time may adversely affect our*

*financial condition, results of operations and cash flows*."  On the same day, Credit Acceptance filed its 1Q 2018 10-Q, which repeated verbatim the statements above and included the additional statement that, in reference to pending regulatory investigations, "*[a]n adverse ultimate disposition in any action to which we are a party or otherwise subject could have a material adverse impact on our financial position, liquidity and results of operations*."  These statements were repeated throughout the Class Period in every press release on Form 8-K announcing the Company's earnings and in each Quarterly Report on Form 10-Q and Annual Report on Form 10-K.

93.    On May 4, 2018, Credit Acceptance held its 1Q 2018 Earnings Call (the "1Q 2018 Earnings Call").  During the call, an analyst asked Defendant Roberts about the pending regulatory investigations and whether the rules regarding fair lending were similar across the board.  In response, Defendant Roberts stated:

> Yes. There are state differences, but they're not huge differences. I think that maybe the main point here is in the last four years, as you point out, we have seven, eight, nine things that we've disclosed now. I think in the 24 years I was with the company before that, I don't think we had any. So clearly, something's changed in the regulatory environment. We're under a lot of scrutiny. We have been for quite a while now. The regulators have a job to do. We respect that. They certainly have their prerogative to ask questions and challenge the things that we're doing, and *it's our job to operate in a highly compliant way*, and we take that seriously. And what's

50

disclosed in the 10-Q is just where all those matters stand at this point.

94.   On February 8, 2019, Credit Acceptance filed their Annual Report Form 10-K for the quarter and full year ended December 31, 2018 (the "2018 10-K").  Under a description of the regulations governing its business, the Company noted that its "business is subject to laws and regulations, including the Truth in Lending Act, the Equal Credit Opportunity Act, the Fair Credit Reporting Act and various other state and federal laws and regulations."  The 2018 10-K stated that "***failure to comply with these laws or regulations could have a material adverse effect on us by, among other things, limiting the jurisdictions in which we may operate, restricting our ability to realize the value of the collateral securing the Consumer Loans, making it more costly or burdensome to do business or resulting in potential liability***."

95.   Further, in the 2018 10-K under "Risk Factors," the Company stated:

> As a result of the consumer-oriented nature of the industry in which we operate and ***uncertainties with respect to the application of various laws and regulations*** in some circumstances, we are subject to various consumer claims, litigation and regulatory investigations seeking damages, fines and statutory penalties, based upon, among other things, usury, disclosure inaccuracies, wrongful repossession, violations of bankruptcy stay provisions, certificate of title disputes, fraud and breach of contract. . . . ***A significant judgment against us in connection with any litigation or arbitration could have a material adverse***

51

**effect on our financial position, liquidity and results of operations.**

96.     Additionally, Credit Acceptance's 2018 10-K stated repeatedly how

the Company, and its network of dealer-partners, comply with applicable state and

federal laws and regulations, as well as underwriting guidelines set forth by the

Company:

> *Dealer Servicing Agreement.*
>
> . . .
>
> Under the typical Dealer servicing agreement, a Dealer represents that it will only assign Consumer Loans to us that satisfy criteria established by us, meet certain conditions with respect to their binding nature and the status of the security interest in the purchased vehicle**, and comply with applicable state and federal laws and regulations.**
>
> <p style="text-align:center">*       *       *</p>
>
> While a Dealer can submit any legally compliant Consumer Loan to us for assignment, the decision whether to provide funding to the Dealer and the amount of any funding is made solely by us.  Through our Dealer Service Center, we perform all significant functions relating to the processing of the Consumer Loan applications and bear certain costs of Consumer Loan assignment, including the cost of assessing the adequacy of Consumer Loan documentation, **compliance with underwriting and legal guidelines** and the cost of verifying employment, residence and other information provided by the Dealer.
>
> **We audit Consumer Loan files for legal and underwriting guidelines on a daily basis in order to assess whether our Dealers are operating in accordance**

***with the terms and conditions of our Dealer servicing agreement.***

\*        \*        \*

## Regulation

Our business is subject to laws and regulations, including the Truth in Lending Act, the Equal Credit Opportunity Act, the Fair Credit Reporting Act and various other state and federal laws and regulations. These laws and regulations, among other things, require licensing and qualification; limit interest rates, fees and other charges associated with the Consumer Loans assigned to us; require specified disclosures by Dealers to consumers; govern the sale and terms of ancillary products; and define the rights to repossess and sell collateral. ***Failure to comply with these laws or regulations could have a material adverse effect on us*** by, among other things, limiting the jurisdictions in which we may operate, restricting our ability to realize the value of the collateral securing the Consumer Loans, making it more costly or burdensome to do business or resulting in potential liability. The volume of new or modified laws and regulations has increased in recent years and has increased significantly in response to issues arising with respect to consumer lending.

\*        \*        \*

The sale of vehicle service contracts and GAP by Dealers in connection with Consumer Loans assigned to us from Dealers is also subject to state laws and regulations. As we are the holder of the Consumer Loans that may, in part, finance these products, some of these state laws and regulations may apply to our servicing and collection of the Consumer Loans. Although these laws and regulations do not significantly affect our business, there can be no assurance that insurance or other regulatory authorities in the jurisdictions in which these products are offered by Dealers will not seek to regulate or restrict the

operation of our business in these jurisdictions. ***Any regulation or restriction of our business in these jurisdictions could materially adversely affect the income received from these products***.

97.     Credit Acceptance's 2018 10-K added that "***We believe that we***

maintain all material licenses and permits required for our current operations and

***are in substantial compliance with all applicable laws and regulations.***"

98.     These statements were repeated verbatim in the Company's Annual

Report on Form 10-K for the year ending 2019.

99.     The Shareholder Letters detailed a few key success factors for its

"unique and valuable" product, stating:

> We have learned how to develop relationships with dealers that are profitable. Forging a profitable relationship requires us to select the right dealer, align incentives, communicate constantly and ***create processes to enforce standards.***
>
> . . .
>
> We have developed the ability to execute our loan origination process consistently over time. Consistent execution is difficult, as it requires us to maintain an appropriate balance between providing excellent service to our dealers and ***ensuring the loans we originate meet our standards***. We measure both loan compliance and dealer satisfaction to assess our performance, and ***use these measures to make adjustments when necessary***.

100.    The statements above concerning the Company's compliance efforts

and exposure to regulation and litigation were false and misleading when made

because Defendants knew, were reckless in not knowing, and/or failed to disclose

the material fact that the Company was violating the law when it (1) approved and funded high-risk loans that it knew customers were unable to repay, *see* Section, IV.B.1(i); (2) engaged in the unfair and deceptive practice of marking up prices for cars sold to certain borrowers, *see* Section, IV.B.1(ii); (3) required the purchase of VSCs, *see* Section, IV.B.1(iii); (4) engaged in unfair and deceptive debt collection and repossession practices, *see* Sections, IV.B.2-3, and; (5) sold securities to investors pursuant to materially misleading statements in the Company's offering documents in order to cheaply access the capital markets, *see* Section, IV.B.4, thereby ensuring that the Company would be materially impacted by regulation and litigation.

### 3.    Unfair and Deceptive Collection Practices

101.    The Company's 2018 10-K described the collection efforts done by Company employees to ensure payment of loans:

> *Servicing*.  Our largest group of collectors services Consumer Loans that are in the early stages of delinquency.  ***Collection efforts typically consist of placing a call to the consumer*** within one day of the missed payment due date, although efforts may begin later for some segments of accounts.

102.    The statement above concerning Defendants' typical collection efforts, which was repeated verbatim in the Company's Annual Report on Form 10-K for the year ending 2019, was false and misleading when made because Defendants failed to disclose that they made more than one call to defaulting

borrowers, calling each up to 8 times per day, in violation of state law.  *See* Section, IV.B.2.

103.    Credit Acceptance's 2018 10-K also described the ancillary products the Company provided to its dealers, and how the add-ons are accounted for in a consumer loan:

> ***We provide Dealers the ability*** to offer vehicle service contracts to consumers through our relationships with Third Party Providers ("TPPs").
>
> *      *      *
>
> ***We provide Dealers the ability*** to offer Guaranteed Asset Protection ("GAP") to consumers through our relationships with TPPs.

104.    The above statements concerning the Company providing the "ability" to offer VSCs and GAP insurance to dealers, which were repeated verbatim in the Company's Annual Report on Form 10-K for the year ending 2019, were false and misleading when made because Credit Acceptance failed to disclose that it often required dealers to sell these addon products and/or knew or was reckless in not knowing that these products were sold in violation of the law.  *See* Section IV.B.1(iii).

## V.    CLASS ACTION ALLEGATIONS

105.    Lead Plaintiffs bring this class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities who or which purchased or otherwise acquired Credit Acceptance common

stock from May 4, 2018 through August 28, 2020, inclusive, and who were

damaged thereby (the "Class").  Excluded from the Class are Defendants; members

of the immediate family of each of the Individual Defendants; any subsidiary or

affiliate of Credit Acceptance; the directors, officers and employees of Credit

Acceptance; any entity in which any excluded person has a controlling interest;

and the legal representatives, heirs, successors and assigns of any excluded person.

106.    The members of the Class are so numerous that joinder of all

members is impracticable.  While the exact number of Class members is unknown

to Lead Plaintiffs at this time and can only be ascertained through appropriate

discovery, Lead Plaintiffs believe that there are hundreds or thousands of members

in the proposed Class.  Throughout the Class Period, Credit Acceptance's common

stock was actively traded on the NASDAQ (an open and efficient market) under

the symbol "CACC." Millions of Credit Acceptance shares were traded publicly

during the Class Period on the NASDAQ.  As of September 30, 2020, Credit

Acceptance had over 17 million shares of common stock outstanding.  Record

owners and the other members of the Class may be identified from records

maintained by Credit Acceptance and/or its transfer agents and may be notified of

the pendency of this action by mail, using a form of notice similar to that

customarily used in securities class actions.

107.   Lead Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.  Lead Plaintiffs do not have interests adverse to the Class.

108.   Lead Plaintiffs will fairly and adequately protect the interests of the other members of the Class and have selected and retained Labaton Sucharow LLP; Lead Counsel with significant experience and expertise leading complex class action and securities litigations.

109.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)   whether Defendants participated in and pursued the common course of conduct complained of herein;

(c)   whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, and prospects of Credit Acceptance;

(d)    whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of Credit Acceptance;

(e)    whether the market price of Credit Acceptance common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

(f)    the extent to which the members of the Class have sustained damages and the proper measure of damages.

110.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

111.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VI.    UNDISCLOSED ADVERSE FACTS

112.    The market for Credit Acceptance common stock was an open, well-developed and efficient market at all relevant times.  As a result of Defendants' scheme and the materially false and misleading statements and omissions described herein, Credit Acceptance common stock traded at artificially inflated prices during the Class Period.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, as well as its business, accounting, financial operations and prospects, as alleged herein.  Lead Plaintiffs and the other members of the Class purchased or otherwise acquired Credit Acceptance common stock relying upon the integrity of the market price of the Company's common stock and market information relating to Credit Acceptance, and have been damaged thereby.

113.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiffs and the other members of the Class.

## VII.   LOSS CAUSATION

114.    During the Class Period, as detailed herein, the Defendants engaged in a course of conduct that artificially inflated and/or artificially maintained the price

of Credit Acceptance common stock and operated as a fraud or deceit on Class

Period purchasers of Credit Acceptance common stock by making the materially

false and misleading statements and omissions recited above.

115.   When the truth was revealed and became known to the market, the

price of Credit Acceptance common stock declined precipitously as the prior

artificial inflation was removed from the price of the stock.  As a result of their

purchases of Credit Acceptance common stock at artificially inflated prices during

the Class Period, Lead Plaintiffs and other members of the Class suffered a

substantial economic loss (*i.e.*, damages under the federal securities laws).  The

price decline in Credit Acceptance common stock was a direct result of the nature

and extent of the materially false and misleading statements and omissions and/or

Defendants' scheme revealed to investors and the market. Thus, the Defendants'

wrongful conduct, as alleged herein, directly and proximately caused the damages

suffered by Lead Plaintiffs and the Class.

116.   The truth about Credit Acceptance's reliance on predatory and illegal

business practices, the resulting impact on the Company's business and prospects,

the regulatory risk to which the Company was exposed, and Defendants'

statements to the contrary were revealed to be false on August 28, 2020, when the

Massachusetts Attorney General filed an enforcement against Credit Acceptance in

Massachusetts Superior Court.  The enforcement action alleged and ultimately

exposed, *inter alia*, the fact that Credit Acceptance engaged in predatory and illegal business practices with a plethora of corroborating evidence obtained from the attorney general's extensive investigation.

117.   When Defendants' misrepresentations, omissions, and/or scheme to defraud were disclosed, the price of Credit Acceptance common stock fell precipitously as the prior inflation came out of the prices of the Company's common stock.  As a result of their purchases of Credit Acceptance common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss.

118.   Due to Defendants' failure to disclose the true state of the Company's illegal and predatory lending practices and misleading securitization practices, investors were not aware of the true state of the Company's financial status. Therefore, the Defendants presented a misleading picture of Credit Acceptance's business practices, procedures, and financial success.  Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business and financial success, Defendants caused Credit Acceptance to conceal the truth.

119.   The decline in the price of Credit Acceptance's common stock after the truth came to light was a direct result of the nature and extent of the Defendants' fraud being revealed to investors and the market.  The timing and magnitude of Credit Acceptance's common stock price decline negate any

inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss suffered by Lead Plaintiffs and the other Class members was a direct result of the Defendants' fraudulent scheme to artificially inflate the prices of Credit Acceptance common stock and the subsequent decline in the value of Credit Acceptance common stock when the Defendants' prior misrepresentations and material omissions were revealed.

### A.    The January 30, 2019 Materialization of the Concealed Risk

120.   On January 30, 2020, after market close, Credit Acceptance reported its financial results for the fourth quarter of 2019 and full year 2019.  Credit Acceptance reported disappointing loan unit and dollar growth of -5.3% and +1.1% vs +5.9% and +12.4% year-over-year.  Analysts viewed the quarter negatively, focusing on Credit Acceptance's loss of market share, decreased loan volume, lower dealer signups despite a relaxation of signup requirements, and higher than expected loan provisions.  Analysts also focused on the Company's adoption of new accounting standards, which they believed would require the Company "to present additional disclosures to justify the [CECL[17] mandated] reserve, such as

---

[17] The Financial Accounting Standards Board issued a new expected credit loss accounting standard in June 2016. The new accounting standard introduces the

delinquencies and charge-offs." Credit Suisse noted, "We view this as a net negative in light of potential for increased regulatory scrutiny."

121. In response to investor concerns concerning increased transparency into the Company's preparatory and potentially illegal lending practices, on January 31, 2020, the next trading day, the price of Credit Acceptance's common stock declined $37.86 per share, or 8.46% on heavy trading volume.

## B. August 28 & 31, 2020 – the Final Revelation of the Truth

122. On August 28, 2020, the Massachusetts Attorney General, Maura Healey, filed an enforcement action against the Company in Suffolk County Superior Court for allegedly making unfair and deceptive auto loans to thousands of Massachusetts consumers, providing investors with false or misleading information regarding the Company's securitizations, and engaging in unfair debt collection practices, as described in more detail above.  Critically, the Massachusetts Attorney General Complaint also sought an injunction preventing the Company from continuing its current unlawful loan practices.

123. On August 31, 2020, the Massachusetts Attorney General published a press release announcing the lawsuit against Credit Acceptance.  In the press release, Attorney General Healey stated, "This company made unaffordable and

---

current expected credit losses methodology (CECL) for estimating allowances for credit losses. The standard is effective for most SEC filers in fiscal years and interim periods beginning after December 15, 2019.

illegal loans to borrowers, causing them to fall into thousands of dollars of debt and even lose their vehicles.  We are taking a close look at this industry and we will not allow companies to profit by violating our laws and exploiting consumers."

124.   Analysts at Credit Suisse noted, on August 31, 2020, that the enforcement action "lays out the issues more clearly than we have seen in the past supported by data from the underlying loans" and was particularly relevant as the "evidence gathered and arguments made . . . could strengthen" other state attorney general investigations and lawsuits.  The analysts also wondered whether the enforcement action would result in material changes to business practices or origination levels, because "[i]f the company has to change business practices this could result in lower expected collections and a write down to book value."

125.   In response to the public disclosure of the Massachusetts Attorney General Complaint and the allegations contained therein, Credit Acceptance's stock price declined precipitously from $459.43 at close on August 28, 2020 down to $374.07 at the close of trading on September 1, 2020—an $85.36 drop equating to an 18% two-day decline in share price, and injuring investors.

## VIII.  SCIENTER ALLEGATIONS

126.   As alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew that the public documents and statements

65

issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

127.   As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Credit Acceptance, their control over, receipt and/or modification of Credit Acceptance's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Credit Acceptance, participated in the fraudulent scheme alleged herein. In addition to the numerous facts above, the following facts also support a strong inference of scienter.

**A.**     **The Fraud Concerns the Core of Credit Acceptance's Operations**

128.   Credit Acceptance's core operations are twofold: (1) it offers financing programs and related products and services to automobile dealers that enable it to sell vehicles to consumers with an impaired credit history; and (2) it acts as a debt collector to collect on delinquent loans.

129.   Over 90% of Credit Acceptance's revenues are derived from "Finance charges."  The Company defines Finance charges to be comprised of: (1) interest

earned on Loans; (2) administrative fees earned from ancillary products; (3) program fees charged to Dealers under the Portfolio Program; (4) consumer loan assignment fees charged to Dealers; and (5) direct origination costs incurred on Dealer Loans.  As a result, the Company's financing programs and ancillary products are closely watched, highly touted, and represent a critical component of the Company's financial success.

130.   As mentioned above, Credit Acceptance's core operations also concern its debt collection practices.  Over 90% of all consumer loans assigned to Credit Acceptance are made to consumers without FICO© scores or with FICO© scores below 650.  Because of the risky nature of these loans, Credit Acceptance only expects to collect a portion of the consumer loan repayments that the Company is contractually owed.  While the Company does not need to collect the entire amount owed from each consumer loan to make a profit, the Company is heavily incentivized to increase the profitability of each loan and meet its forecasted collection rates to satisfy investor expectations.  Consequently, Credit Acceptance assigns itself the responsibilities for administering, servicing, and collecting the amounts due on consumer loans and dedicates a significant amount of its resources to that process.  In fact, Credit Acceptance dedicates over 40% of its workforce to its "serving function," of which a majority are responsible for collection activities on delinquent consumer loans.

131.    Thus, the importance of the Company's core operations raises a strong inference that the Individual Defendants knew, and/or were reckless in not knowing or disregarding, that their statements regarding Credit Acceptance's operating condition, business practices, and applicable laws were false and/or misleading or omitted material facts.

**B.    Defendants' Knowledge of and Access to Material Undisclosed Facts**

**1.    Defendants Knew and/or Were in a Position to Know the Specific Focus of Pending Regulatory Investigations and the Company's Compliance with Applicable Laws and Regulations**

132.    Credit Acceptance has been subject to regulatory investigations since at least 2014, including investigations from the Massachusetts Attorney General and the United States Department of Justice ("DOJ"), among others.  Specifically, both the Massachusetts Attorney General and the DOJ have served the Company with civil investigatory subpoenas relating to the Company's origination and collection practices and related securitization activities.  In responding to these requests and demands for testimony and otherwise producing the requested information, Defendants were aware of the information and data requested, the specific focus of the investigations, and the laws governing the specific conduct under investigation.

133.   Moreover, Credit Acceptance provides updates to investors on pending regulatory investigation in their financial statements, as an adverse ultimate disposition could (and did here) have a materially adverse impact on the Company and its operations.  Accordingly, Defendant Roberts, who signed the Company's filings pursuant to SOX, and thereby certified that Credit Acceptance's financial statements fairly represented the Company's current position, was required to be aware of the information and data requested, the specific focus of the investigations, and the laws governing the specific conduct under investigation.

134.   Furthermore, Defendants Roberts and Booth had knowledge of these regulatory investigations by virtue of their respective roles as the CEO and CFO of the Company.  In fact, Defendant Roberts has addressed numerous analyst inquiries regarding the regulatory investigations during Credit Acceptance's earnings calls.  As mentioned above in Section IV.E.2, *supra*, an analyst asked Defendant Roberts about the various regulatory investigations over the previous four years and whether the rules regarding fair lending were similar across the board.  In response, Defendant Roberts demonstrated his knowledge of the relevant regulations, stating "Yes.  There are state differences, but they're not huge differences."  Defendant Roberts then continued his response and demonstrated his knowledge of the investigations, stating "[w]e're under a lot of scrutiny. We have been for quite a while now. . . it's our job to operate in a highly compliant way,

and we take that seriously.  And what's disclosed in the 10-Q is just where all those matters stand at this point."  Defendants Roberts admission that it was part of his job to operate in a highly compliant way evinces his knowledge of the legal restrictions under which Credit Acceptance operated during the Class Period and that Defendants ignored.

135.   Similarly, Defendants displayed their knowledge of the regulatory investigations during internal Company town halls and other corporate meetings. Specifically, CW9 recalled that at the quarterly meeting following the Massachusetts Attorney General's investigation announcement in August of 2020, employees had a lot of questions for management.  At the meeting, CFO Booth noted that Credit Acceptance gets sued on a regular basis.  According to CW9, during CW9's tenure with Credit Acceptance, both the California and Texas markets were condensed a lot (in addition to Massachusetts).  CW10[18] also recalled

---

[18] CW10 was formerly employed by Credit Acceptance as a Manager – Database Administration at the Company's headquarters in Southfield, Michigan from July 2015 – October 2020.  According to CW10, they most recently reported to Vice President of Information and Security Aaron Balchunas, who in turn reported to Chief Information Officer Noah Kotch, who in turn reported to and had "direct links" to CEO Brett Roberts.  CW10 advised that as Manager – Database Administration, they managed a team of 10 people who managed some of Credit Acceptance's databases – which fed their information to Credit Acceptance's data warehouse.  They added that some of Credit Acceptance's databases were Oracle-based, while others were Microsoft-based.

monthly town halls hosted by CEO Brett Roberts where the investigations were

mentioned and where Roberts stated that the allegations were "being addressed."

136.   Further, Credit Acceptance's ability to accurately forecast collections

for its loans is critical to the Company's business.  The Company collects and

services its own loans, and as a part of its collection and servicing activities

maintains data on the payment and nonpayment of the loans and is aware of the

default status of each of its loans.  These collection and servicing efforts show that

Credit Acceptance knew which loans defaulted, how many of the loans defaulted,

and the scores of the loans that defaulted.

### 2.   Confidential Witnesses Corroborate Defendants' Access to Relevant Data

137.   Confidential Witnesses have described Credit Acceptance's data

architecture and reporting structure and have confirmed that the Individual

Defendants, by virtue of their executive roles within the Company, were privy to

and/or were given access to the data that demonstrated Credit Acceptance's

predatory and illegal practices, as identified in the Massachusetts Attorney

General's enforcement action.  Specifically:

- CW8 recalled that there was a "dealer dashboard" that showed penetration rates for all contracts that contained VSC and GAP.  They went on to say that Market Area Managers, Directors of Sales, and above including the CEO and CFO all had access to the dashboard.  CW8 added that the higher the title, the more access the employee had.  CW8 explained that the dealer dashboard also had daily and monthly reports that showed their dealerships'

daily activities.  In reference to the dealer dashboard, CW7 recalled that every MAM had access to the number of VSCs sold per dealership.

- Similarly, according to CW4, Credit Acceptance had dashboards created and run by the Company's Business Intelligence department that provided many employees access to a lot of key data at almost any time.  When asked if access to information and data increased for personnel that were higher up the chain of command, CW4 responded, "Absolutely."  CW4 then advised, as one example, that Marketing Area Managers could access data through the dashboard on dealers in their area, and that a regional manager could access data to dealers supported by the MAMs who reported up to him/her in that entire region, and a vice president of sales would have access to information and data on all the dealers in a large portion of the country (such as the southwest U.S. as an example), and that this exposure to information and data continued up the chain of command.

- In reference to Credit Acceptance's reporting systems, CW9 stated that CABI, or Credit Acceptance Business Intelligence, was Credit Acceptance's internal reporting system that housed various reports including contracts funded in each market, year over year growth, and volume.  When asked whether performance metrics reports were given from CABI to upper management, CW9 replied that the metrics were looked at by Regional Sales Managers and by the Chief Sales Officer, Dan Ulatowski[19], who reported to Defendant Roberts.  According to CW9, Market Area Manager performance reports were easily pulled up in CABI and the reporting was easy to navigate.  CW9 added that at the director level and higher, there was access to state-level data in CABI.

- CW10 identified the two databases that CW10 and CW10's team were responsible for as the Loan Originating and the Loan Servicing Databases, and went on to describe both.  According to CW10, the Loan Servicing database was used to enter updated information on existing loans and that database was used by Credit Acceptance's collections department, as well as other departments.  CW10 further explained that the number of collections calls made to a borrower were "captured" in the Loan Servicing database.  CW10 further advised that the Loan Servicing Database was also used to track loan performance, and to "flag" poor performing loans.  CW10

---

[19] A commercially available database search indicates that Dan Ulatowski is currently the Chief Sales Officer at Credit Acceptance (January 2014 – Present).

elaborated that what was captured in the Loan Servicing Database was both a call to a customer and if that customer were spoken to by a Credit Acceptance collections employee.  When asked for more specificity on how collections calls were tracked in the system and asked if Credit Acceptance's Data Warehouse had a record of the number of calls made each day, to each borrower, CW10 responded, "Yes, I'm sure of it."  CW10 reiterated that the Data Warehouse tracked the number of calls made by each Credit Acceptance collection's personnel, as well as the number of calls to each borrower.  CW10 then went on to recall that such information was often included in the morning reports to Credit Acceptance's senior executives.

- Similarly, CW10 stated that loan performance could be pulled from the database "as collections" and that Defendant Booth could easily have had that information pulled.  CW10 added that the number of loans that included VSCs could also be easily pulled.

- In reference to Credit Acceptance's dealer dashboard, CW5 recalled that there was report on everything at the Company including: the number of applications put into the system; the number of applications resulting in contracts; contracts per month with VSC and GAP added; the number of VSCs sold and the percentage of customers who filed a VSC claim within a certain period of time; the number of GAP claims and how they were paid out; and customer FICO scores (CW5 advised that this changed from a particular FICO score number to include a range that the customer's FICO score fell into).

- CW5 went on to say that it would not surprise them if the CEO and CFO had access to all of the collected data because it was regularly discussed at dealer district meeting and quarterly meetings.  Furthermore, CW5 specifically noted that their manager, Del Valle, had an open line of communication with Defendant Roberts and often talked with him directly.  CW5 went on to recount that Del Valle told them that he was hired directly by Defendant Roberts, that they knew each other, and that Del Valle was extremely well known at Credit Acceptance.  CW5 added that Del Valle worked for the Company for 16 years and said he "went way back" with Defendant Roberts.

C.   **Defendant Roberts Sells Credit Acceptance Stock in Unusual
     Amounts and at Suspicious Times**

138.   During the Class Period, Defendant Roberts engaged in stock sales

that were suspiciously timed and dramatically out of line with his prior trading

practices.  As a result of these Class Period trades, Defendant Roberts profited

from the artificial inflation embedded in the trading price of Credit Acceptance

stock caused by Defendants' false and misleading statements and omissions to

investors.  Throughout the Class Period, Defendant Roberts sold 47,449 shares for

over $22 million.  In fact, Defendant Roberts pocketed over $10.7 million in one

trading day alone.  This trading day conveniently took place less than a month

before the Massachusetts Attorney General Complaint was publicly disclosed,

which caused a substantial decline in the price of Credit Acceptance's common

stock.

139.   Defendant Roberts' Class Period sales of Credit Acceptance stock

were highly unusual and suspicious as measured by (i) the total amount of shares

sold, (ii) the contrast with his prior trading history, and (iii) the timing of the sales.

Such sales therefore raise a strong inference of scienter.

140.   To evaluate Defendant Roberts' selling activity, Lead Plaintiffs used

the publicly available trading data that Defendant Roberts was required to report to

the SEC on Form 4.  Lead Plaintiffs analyzed the trading by Defendant Roberts

during the Class Period and over the course of a similar time period immediately

74

preceding the Class Period—beginning January 8, 2016 to May 3, 2018 (the "Control Period").  The Forms 4 filed during the Class Period and Control Period are hereby incorporated by reference, and a summary of the relevant transactions is set forth in the tables and charts below.

141.   To analyze Defendant Roberts' sales, Lead Plaintiffs calculated his total sales, together with the cash proceeds from such sales, during the Control and Class Periods, excluding tax related withholding transactions.  Those totals were then compared to identify whether Defendant Roberts' sales during the Class Period were consistent with his sales during the Control Period.  These analyses reveal that Defendant Roberts' Class Period sales were extremely large, highly unusual, and suspicious when compared to the Control Period.

### DEFENDANT ROBERTS' CONTROL PERIOD TRADING
1/8/2016 – 5/3/2018

Sales

| Date | Price | No. of Shares Sold | Proceeds |
|---|---|---|---|
| - | N/A | 0 | $0 |
| **TOTAL SALES** | **N/A** | **0** | **$0** |

Withholding Transactions

| Date | Price | No. of Shares Sold | Proceeds |
|---|---|---|---|
| 3/1/2016 | $196.38 | 8,400 | $1,649,592 |
| 3/1/2017 | $204.02 | 6,870 | $1,401,617 |
| 3/1/2018 | $318.19 | 3,403 | $1,082,801 |
| **TOTAL SALES** | **-** | **18,673** | **$4,134,010** |

## DEFENDANT ROBERTS' CLASS PERIOD TRADING
5/4/2018 – 8/28/2020

Sales

| Date | Price | No. of Shares Sold | Proceeds |
|---|---|---|---|
| 8/2/2018 | $443.36 | 2000 | $886,720 |
| 11/8/2019 | $426.44 | 2,600 | $1,108,744 |
| 11/8/2019 | $427.55 | 3,696 | $1,580,224 |
| 11/8/2019 | $428.31 | 2,441 | $1,045,504 |
| 11/8/2019 | $429.09 | 1,200 | $514,908 |
| 6/5/2020 | $465.66 | 200 | $93,132 |
| 6/5/2020 | $467.28 | 400 | $186,912 |
| 6/5/2020 | $468.45 | 100 | $46,845 |
| 6/5/2020 | $469.53 | 450 | $211,288 |
| 6/5/2020 | $470.77 | 900 | $423,693 |
| 6/5/2020 | $471.93 | 1,200 | $566,316 |
| 6/5/2020 | $473.30 | 1,473 | $697,170 |
| 6/5/2020 | $474.50 | 1,300 | $616,850 |
| 6/5/2020 | $475.42 | 1,600 | $760,672 |
| 6/5/2020 | $476.35 | 1,700 | $809,795 |
| 6/5/2020 | $477.37 | 1,486 | $709,371 |
| 6/5/2020 | $478.57 | 736 | $352,227 |
| 6/5/2020 | $480.18 | 600 | $288,108 |
| 6/5/2020 | $482.01 | 1,100 | $530,211 |
| 6/5/2020 | $482.97 | 1,231 | $594,536 |
| 8/7/2020 | $510.45 | 2,400 | $1,225,080 |
| 8/7/2020 | $511.59 | 6,995 | $3,578,572 |
| 8/7/2020 | $512.41 | 4,558 | $2,335,564 |
| 8/7/2020 | $513.56 | 4,818 | $2,474,332 |
| 8/7/2020 | $514.70 | 1,565 | $805,505 |
| 8/7/2020 | $515.78 | 500 | $257,890 |
| 8/7/2020 | $516.42 | 200 | $103,284 |
| **TOTAL SALES** | **-** | **47,449** | **$22,803,458** |

Withholding Transactions

| Date | Price | No. of Shares Sold | Proceeds |
|---|---|---|---|
| 3/1/2019 | $446.83 | 6,415 | $2,866,414 |
| 3/1/2020 | $403.20 | 4,910 | $1,979,712 |
| **TOTAL SALES** | **-** | **11,325** | **$4,846,126** |

## 1. The Amount of Shares Sold and Proceeds Obtained Were Inconsistent with Prior Trading Practices

142.   As demonstrated in the chart below, Defendant Roberts' trading in Credit Acceptance stock during the Class Period varied substantially compared to his prior trading history in the Control Period.  During the Control Period, Credit Acceptance withheld 18,673 shares, for proceeds equal to $4,134,010, to satisfy tax withholding obligations.  Outside of these tax related transactions, ***Defendant Roberts did not sell any Credit Acceptance shares during the Control Period***.



143.   During the Class Period, Defendant Roberts sold 47,449 shares for proceeds equal to $22,803,458.  These trades eclipse Defendant Roberts' nonexistent sales from the Control Period.  Moreover, Defendant Roberts' three largest sales in Credit Acceptance stock, excluding shares withheld for tax purposes, took place during the Class Period.  In fact, the value of these three trades is greater than the value of all of Defendant Roberts' previous sales as a CEO when withholding transactions are excluded.

## 2.   The Timing of the Stock Sales Was Suspicious

144.   Defendant Roberts' stock sales were suspiciously timed in large measure because he sold an unusually large number of shares shortly before the public disclosure of the enforcement action by the Massachusetts Attorney General.

145.   Specifically, on August 7, 2020, just three weeks before the Massachusetts Attorney General Complaint was filed, Defendant Roberts sold 21,036 Credit Acceptance shares for over $10.7 million in gross insider trading proceeds.  Once the Massachusetts Attorney General Complaint was disseminated to the market, Credit Acceptance stock fell $85.36 per share, or over 18%, to close at $374.07 per share over two trading days.

146.   Furthermore, Defendant Roberts' trades are not subject to the safe harbor for insider trading claims provided by Rule 10b5-1, 17 C.F.R. § 240.10b5-

1.  In other words, his trades were not made pursuant to a binding agreement or established plan ("10b5-1 Plan"), which creates an affirmative defense to insider trading liability only if it is entered into by an insider "[b]efore becoming aware" of inside information, and was established in good faith.  SEC Rule 10b5-1(c); *see also Selective Disclosure and Insider Trading*, 65 Fed. Reg. 51,716, at 51,727-28 (Aug. 24, 2000).  Tellingly, Defendant Roberts' August 7, 2020 Credit Acceptance stock sales were not made pursuant to a 10b5-1 Plan, nor were any of his other trades throughout the Class Period.

147.  Accordingly, Defendant Roberts' trading behavior during the Class Period raises a strong inference of suspicious and unusual trading activity that is not subject to the protections of the Rule 10b5-1 safe harbor.

## IX.   APPLICABILITY OF PRESUMPTION OF RELIANCE: *AFFILIATED UTE* AND THE FRAUD-ON- THE-MARKET PRESUMPTIONS

148.  At all relevant times, the market for Credit Acceptance's common stock was an efficient market for the following reasons, among others:

(a)   Credit Acceptance's common stock met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market;

(b)   As a regulated issuer, Credit Acceptance filed periodic public reports with the SEC and the NASDAQ;

79

(c)    Credit Acceptance's common stock was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

(d)    Credit Acceptance regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

149.   As a result of the foregoing, the market for Credit Acceptance's common stock promptly digested current information regarding Credit Acceptance from all publicly available sources and reflected such information in Credit Acceptance's stock price.  Under these circumstances, all purchasers of Credit Acceptance's common stock during the Class Period suffered similar injury through their purchase of Credit Acceptance's common stock at artificially inflated prices and a presumption of reliance applies.

150.   A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Lead Plaintiffs' fraud claims are grounded in Defendants' omissions of material fact of which there is a duty to disclose.  As this action involves Defendants' failure to disclose material adverse

information regarding Credit Acceptance's business practices and compliance with

applicable law and regulations—information that Defendants were obligated to

disclose during the Class Period but did not—positive proof of reliance is not a

prerequisite to recovery.  All that is necessary is that the facts withheld be material

in the sense that a reasonable investor might have considered such information

important in the making of investment decisions.

## X.     NO SAFE HARBOR

151.   The federal statutory safe harbor provided for forward-looking

statements under certain circumstances does not apply to any of the allegedly false

statements pleaded in this Complaint.  The statements alleged to be false and

misleading herein all relate to then-existing facts and conditions.  In addition, to

the extent certain of the statements alleged to be false may be characterized as

forward-looking, they were not identified as "forward-looking statements" when

made, and there were no meaningful cautionary statements identifying important

factors that could cause actual results to differ materially from those in the

purportedly forward-looking statements.

152.   In the alternative, to the extent that the statutory safe harbor is

determined to apply to any forward-looking statements pleaded herein, Defendants

are liable for those false forward-looking statements because at the time each of

those forward-looking statements was made, the speaker had actual knowledge that

the forward-looking statement was materially false or misleading, and/or the

forward-looking statement was authorized or approved by an executive officer of

Credit Acceptance who knew that the statement was false when made.

## XI.    CLAIMS AGAINST DEFENDANTS

### COUNT I

**Violations of Section 10(b) of the Exchange Act of 1934 and
Rule 10b-5 Promulgated Thereunder Against All Defendants**

153.    Lead Plaintiffs repeat and reallege each and every allegation

contained above as if fully set forth herein.  This claim is asserted against all

Defendants.

154.    During the Class Period, Defendants disseminated or approved the

false statements specified above, which they knew or deliberately disregarded were

misleading in that they contained misrepresentations and failed to disclose material

facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading.

155.    Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in

that they:

(a) employed devices, schemes and artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts

necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading; or

(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Credit Acceptance common stock during the Class Period.

156.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Credit Acceptance common stock.  Lead Plaintiffs and the Class would not have purchased Credit Acceptance common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these Defendants' misleading statements.

## COUNT II

### Violations of Section 10(b) of the Exchange Act of 1934 and Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants

157.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This claim is asserted against all Defendants.

158.    This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c).  Accordingly, Lead Plaintiffs need not allege in this Count nor prove in this case that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

159.    During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and the Class; (ii) artificially inflate the market price of Credit Acceptance common stock; and (iii) cause Lead Plaintiffs to purchase Credit Acceptance common stock at artificially inflated prices.

160.    In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Lead Plaintiffs and the Class in connection with their purchases of Credit Acceptance common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

161.    Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included the knowing and/or reckless suppression and concealment of information regarding Credit Acceptance's business, and compliance with applicable laws and regulations.

162.    Lead Plaintiffs and the Class reasonably relied upon the integrity of the market in which Credit Acceptance's common stock traded.

163.    During the Class Period, Lead Plaintiffs and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct and/or the

impact of the fraudulent scheme.  Had Lead Plaintiffs and the Class known the true

extent of Defendants' unlawful scheme and unlawful course of conduct, they

would not have purchased Credit Acceptance common stock, or if they had, would

not have done so at the artificially inflated prices paid for such securities.

164.   As a direct and proximate result of Defendants' scheme to defraud

and such unlawful course of conduct, Lead Plaintiffs and the Class suffered

damages in connection with their purchases of Credit Acceptance common stock

during the Class Period.

165.   By reason of the foregoing, Defendants violated Section 10(b) of the

Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and are liable to

Lead Plaintiffs and the Class for damages suffered in connection with their

purchases of Credit Acceptance common stock during the Class Period.

## COUNT III

### Violations of Section 20(a) of the Exchange Act of 1934
### Against the Individual Defendants

166.   Lead Plaintiffs repeat and reallege each and every allegation

contained above as if fully set forth herein.

167.   The Individual Defendants were and acted as controlling persons of

Credit Acceptance within the meaning of Section 20(a) of the Exchange Act as

alleged herein.  By virtue of their high-level positions with the Company,

participation in and/or awareness of the Company's operations and/or intimate

knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

168.   In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

169.   As set forth above, Credit Acceptance and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs, individually and on behalf of the Class, pray

for judgment as follows:

a)      Declaring this action to be a class action pursuant to Rule 23(a) and

(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined

herein;

b)      Awarding Lead Plaintiffs and the other members of the Class damages

in an amount which may be proven at trial, together with interest thereon;

c)      Awarding Lead Plaintiffs and the other members of the Class pre-

judgment and post-judgment interest, as well as their reasonable attorneys' fees

and experts' witness fees and other costs; and

d)      Awarding such other relief as this Court deems appropriate.

## XIII.  JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.


Dated: July 22, 2021                    Respectfully Submitted,

                                        */s/ Michael P. Canty*
                                        **LABATON SUCHAROW LLP**
                                        Michael P. Canty
                                        Thomas G. Hoffman, Jr.
                                        Alec T. Coquin
                                        Charles J. Stiene
                                        140 Broadway
                                        New York, New York 10005
                                        Tel.: (212) 907-0700

Fax: (212) 818-0477
mcanty@labaton.com
thoffman@labaton.com
acoquin@labaton.com
cstiene@labaton.com

*Counsel for Lead Plaintiffs and the
Proposed Class*

Kelly E. Kane (P81912)
CLARK HILL PLC500
Woodward Ave
Suite 3500
Detroit, Michigan 48226
Tel.: (313) 309-9495
Fax: (313) 309-6875
Email: kkane@clarkhill.com

CLARK HILL PLC
Ronald A. King (P45088)
212 E. Cesar Chavez Ave
Lansing, Michigan 48906
Tel.: (517) 318-3015
Fax: (517) 318-3068
rking@clarkhill.com

*Liaison Counsel for Lead Plaintiffs*

# EXHIBIT 1

| CIVIL ACTION COVER SHEET | DOCKET NUMBER | Trial Court of Massachusetts The Superior Court |
|---|---|---|

| | | | |
|---|---|---|---|
| PLAINTIFF(S): | Commonwealth of Massachusetts | COUNTY | Suffolk |
| ADDRESS: | One Ashburton Place, 18th Floor | | |
| Boston, Massachusetts 02108 | | DEFENDANT(S): | Credit Acceptance Corporation |

| | | | |
|---|---|---|---|
| ATTORNEY: | Glenn Kaplan AAG, Diana Hooley AAG | | RECEIVED |
| ADDRESS: | One Ashburton Place, 18th Floor | ADDRESS: | 25505 W. Twelve Mile Road |
| Boston, Massachusetts 02108 | | Southfield, Michigan 48034-8339 | AUG 2 8 2020 |
| | | | SUPERIOR COURT-CIVIL |
| BBO: | 567308 (Kaplan); 685418 (Hooley) | | MICHAEL JOSEPH DONOVAN CLERK/MAGISTRATE |

**TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| AE1 | Action pursuant to MGL c. 93A sec. 4 | A | ☐ YES   ☒ NO |

*If "Other" please describe:

Is there a claim under G.L. c. 93A?
☒ YES   ☐ NO

Is this a class action under Mass. R. Civ. P. 23?
☐ YES   ☒ NO

**STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A**

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**
(attach additional sheets as necessary)

A. Documented medical expenses to date:
    1. Total hospital expenses ................................................................................................................. $ _____
    2. Total doctor expenses ................................................................................................................. $ _____
    3. Total chiropractic expenses ....................................................................................................... $ _____
    4. Total physical therapy expenses ............................................................................................... $ _____
    5. Total other expenses (describe below) ..................................................................................... $ _____
                                     Subtotal (A):   $ _____

B. Documented lost wages and compensation to date ........................................................................ $ _____
C. Documented property damages to date ......................................................................................... $ _____
D. Reasonably anticipated future medical and hospital expenses ...................................................... $ _____
E. Reasonably anticipated lost wages ................................................................................................ $ _____
F. Other documented items of damages (describe below) .................................................................. $ _____

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

                                        TOTAL (A-F):$ _____

**CONTRACT CLAIMS**
(attach additional sheets as necessary)

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).
Provide a detailed description of claim(s):

                                        TOTAL: $ _____

Signature of Attorney/ Unrepresented Plaintiff: X                 Date:

RELATED ACTIONS: Please provide the case number, case name, and county of any related actions pending in the Superior Court.

**CERTIFICATION PURSUANT TO SJC RULE 1:18**

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney of Record: X _____      Date: Aug 28, 2020

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                           SUPERIOR COURT
                                                       CIVIL ACTION NO.

COMMONWEALTH OF MASSACHUSETTS,        )
                                      )
            Plaintiff,                )
                                      )
       v.                             )        COMPLAINT
                                      )
CREDIT ACCEPTANCE CORPORATION,        )
                                      )
            Defendant.                )        RECEIVED
                                      )

AUG 2 8 2020

SUPERIOR COURT-CIVIL
MICHAEL JOSEPH DONOVAN
CLERK/MAGISTRATE

## I.    INTRODUCTION

1.     The Commonwealth of Massachusetts, by and through its Attorney General

Maura Healey, brings this enforcement action in the public interest pursuant to the Massachusetts

Consumer Protection Act, G. L. c. 93A, § 4. The Commonwealth alleges that Credit Acceptance

Corporation ("CAC") made unfair or deceptive automobile loans to Massachusetts consumers,

engaged in unfair acts or practices related to collection of loans and repossession of automobiles,

and sold securities to Massachusetts investors based on offering materials that contained

materially false or misleading statements.

2.     Between 2013 or earlier and the present, CAC made high-risk high-interest

subprime auto loans to Massachusetts borrowers whom CAC knew or should have known were

unable to repay their loans. When it approved and funded the loans, CAC recklessly ignored the

likelihood that the borrowers would default on their loans. When it approved and funded the

loans CAC knew, based on its own risk score (the "expected collection rate"), that a substantial

1

portion of its loans to high-risk low-score borrowers would never be repaid—CAC knew, based on its own collection, repossession, and deficiency data, and on its historical default data, that the performance of its loans was consistently abysmal, and that well over 50% of high-risk low-score borrowers would default, typically a little more than a year into their loans.

3.      CAC ignored the poor performance of its high-risk low-score loans and was indifferent to the inability of Massachusetts consumers to repay the loans because in spite of the high level of defaults, CAC earned substantial profits on its high-risk Massachusetts loans.

4.      While CAC profited, however, default was catastrophic for borrowers, who lost their cars and their down payments, whose credit was damaged, and who were left with an average debt after default of about $9,000, which CAC continued to collect through unlawful and aggressive collection processes.

5.      Between 2012 and mid-2018, CAC collection employees harassed Massachusetts consumers by calling them as often as *eight times a day*; Massachusetts law permits no more than two calls *per week*. Over this roughly six-year period, CAC made about 1.5 million collection calls in violation of Massachusetts law.

6.      When borrowers defaulted and CAC repossessed their cars, CAC failed to use the cars' fair market value to calculate any remaining loan deficiency. CAC's repossession notices to borrowers in connection with the deficiency were in violation of Massachusetts law.

7.      CAC's borrowers were also subject to hidden finance charges on their CAC loans; many borrowers were required to purchase vehicle service contracts as a condition of obtaining CAC loans, which added about $2,500, on average, to the amount of their loans. In addition, CAC dealers added an extra markup to the prices of vehicles they sold to high-risk borrowers with poor credit or low scores; the extra markup was a hidden finance charge that was never

disclosed to borrowers. Including the amount of the hidden finance charges in the calculation of the borrowers' interest rates results in an actual interest rate higher than the Massachusetts usury ceiling of 21% for virtually all CAC borrowers subject to these charges.

8.      In order to fund its loans, CAC sold securities to (*inter alia*) Massachusetts investors by means of false or misleading statements concerning the characteristics of the loans and contracts collateralizing the securities.

9.      The Commonwealth seeks restitution, disgorgement, statutory damages, and other relief for Massachusetts borrowers harmed by CAC's unfair or deceptive acts or practices. In addition, the Commonwealth seeks civil penalties of $5,000 per violation. The complaint also seeks injunctive relief to remedy and prevent additional harm arising from CAC's unfair or deceptive acts or practices, together with the costs of investigating and prosecuting this action, including reasonable attorneys' fees.

## II.      JURISDICTION AND VENUE

10.      The Attorney General is authorized to bring this action pursuant to G. L. c. 93A, § 4 and G. L. c. 12, § 5. This Court has jurisdiction over the defendants pursuant to G.L. c. 223A, § 3. The Court has jurisdiction over the subject matter of this action pursuant to G.L. c. 93A, § 4.

11.      Venue is proper in Suffolk County pursuant to G. L. c. 223, § 5, and G. L. c. 93A, § 4.

## III.      THE PARTIES

12.      The Plaintiff is the Commonwealth of Massachusetts, represented by the Attorney General, who brings this action in the public interest. The Commonwealth also has standing *parens patriae* to protect the health and well-being, both physical and economic, of its residents.

13. The Defendant, CAC, is a Michigan corporation headquartered in Southfield, Michigan. Since 2013 or earlier, it has done business in Massachusetts.

14. Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation, the reference means that the corporation engaged in such act, deed, or transaction by or through its officers, directors, agents, employees, or other representatives while they were actively engaged in the management, direction, control, or transaction of its business affairs.

## IV.    STATEMENT OF FACTS

15. Founded in 1972, CAC is one of the largest subprime auto lenders in the country. In 2017 CAC was the fifth largest lender to borrowers with credit scores under 650, and the second largest lender (after Wells Fargo) to borrowers with credit scores under 530.

16. From at least 2013 or earlier through the present, CAC has made subprime auto loans to borrowers in Massachusetts.

17. In 2019, CAC funded about 370,000 subprime auto loans countrywide. Over 95% of CAC's loans are subprime loans. CAC's revenue in 2019 was about $1.5 billion, and its net income was $656 million. CAC is publicly traded on NASDAQ, and has a current market capitalization of about $8 billion.

18. A substantial portion of CAC's loans are never repaid.

## A. CAC'S SUBPRIME LOAN BUSINESS MODEL

19. Between 2013 and 2019, CAC funded approximately 4,000 subprime used car loans annually in Massachusetts, with an aggregate value of $458 million.[1]

---

[1] Unless otherwise specified, the Massachusetts data represent loans originated between 2013 and the end of 2019, excluding dealer-canceled loans.

20.     CAC's business model allows all applications for loans to be approved and funded.

21.     CAC has funding arrangements with numerous dealers in Massachusetts; CAC refers to these dealers as its "dealer-partners." When a consumer buys a car from one of the dealers and submits a loan application through the CAC computer portal at the dealer, CAC funds the loan.

22.     Substantially all of CAC's customers have impaired or limited credit. Many of CAC's customers have higher debt-to-income ratios than those permitted by traditional lenders. Virtually all CAC borrowers have experienced financial problems in the past, or have serious credit issues. CAC's policy of funding loans for all applicants causes dealers to sell cars to buyers who otherwise would be unable to obtain a loan—buyers who, without CAC's loans, would not incur debts they cannot afford to repay.

23.     At origination CAC expects to collect, on average, approximately 70 cents of every loan dollar owed by Massachusetts borrowers (*see infra,* ¶ 82). The remaining 30 cents of every loan dollar will remain unpaid.

24.     CAC derives most of its revenues (about 92%) from finance charges. These finance charges include monies earned on CAC's loans and amounts earned from the sale of vehicle service contracts.

### 1.  The Loan Process

25.     When a consumer buys a used car from one of CAC's dealer-partners, the consumer applies for a loan through CAC's proprietary computer portal, the Credit Approval Processing System (referred to by CAC as "CAPS"). CAC approves the loan, typically within 60 seconds, and CAPS displays the terms of the loan, including the amount of the loan and the

borrower's monthly payment. If the borrower wants to obtain the loan, the borrower must agree to CAC's terms.

26.     The CAC loan is originated when the consumer signs the contract of sale. The contract—which, together with all financing documents and disclosures, is created by CAC's CAPS system—requires the consumer to make a down payment to the dealer (averaging about 20% of the car price, including the cash down payment and net trade-in value of the prior vehicle); all other amounts related to the purchase are funded in the loan.

27.     The amount of the loan consists of the total principal and interest the consumer is required to pay over the term of the consumer loan.

28.     Since 2014, the vast majority of CAC loans in Massachusetts have had interest rates of 20.99% (the Massachusetts usury ceiling is 21%).

29.     The decision to fund the loan is made solely by CAC. The amount of the funding is determined solely by CAC. CAC performs all significant functions relating to the process of the loan application, including assessment of the application and verification of consumer information, such as employment, income, and residence.

30.     CAC does not loan funds directly to the consumer. Instead, after the consumer has signed the sales contract, CAC makes a payment to the dealer, and in exchange for CAC's payment the dealer immediately assigns the loan to CAC. Apart from the down payment, CAC's payment to the dealer is the only payment the dealer receives (in some cases broken into more than one part, *see infra* ¶ 36), and the only cash funding involved in the sale.

31.     Under CAC's arrangement with the dealer, the assignment of the loan to CAC occurs automatically as soon as the contract is signed and transmitted to CAC in either physical or electronic form.

32.     Although the dealer and not CAC is the nominal party to the loan contract, the

dealer has no role in approving, making, documenting, funding, holding, servicing, or collecting

the loan. The dealer generally does not have legal ownership of the consumer loan for more than

"a moment" (CAC's term) before it is assigned to CAC, which then takes possession of the loan.

33.     Both before and after the assignment occurs CAC controls all aspects of the loan

process:

- CAC unilaterally approves the loan;

- CAC provides the funding for the loan;

- CAC creates and transmits the loan package through CAPS;

- CAC determines the amount of the loan and of the funding payment to the dealer;

- the loan is written on a contract form provided by CAC;

- CAC creates and executes all contract documents required for the loan;

- CAC sets the terms and conditions of the loan, including terms of prepayment,

  default and acceleration, repossession, and sale;

- through CAPS, CAC calculates and supplies all federal consumer disclosures,

  including the finance charge disclosures required under TILA, and verifies

  compliance with any State law requirements;

- CAC is the lien holder on the vehicle title;

- consumers are required to make all loan payments, including the first, directly to

  CAC;

- CAC makes available vehicle service contracts for the dealer to sell ("VSCs"),

  arranges with vendors to administer the VSCs, and either assumes the VSC risk or

  shares third-party profits related to the VSC;

- CAC services the loan;

- when a consumer misses a loan payment CAC pursues collection actions; and

- CAC repossesses and resells the car[2] when borrowers are unable to repay their

loans, and CAC then collects any deficiency after repossession and resale.

### 2. CAC's Financing Programs

34.     CAC offers two financing "programs" to dealers, which it refers to as the
"Portfolio" and "Purchase" programs. The consumer loans—and CAC's role in approving,
making, documenting, holding, servicing, and collecting on the loans—are the same for both
programs.

35.     The primary differences between the programs are in (i) the timing and amount of
CAC's payment to the dealer, and (ii) the pooling of loans.

 *i. Timing and amount of dealer payment.*

36.     Under the Purchase program, CAC makes its entire payment to the dealer up
front, when the loan is assigned. Under the Portfolio program, the bulk of the payment (about
87% on average in Massachusetts between 2013 and 2019), is made to the dealer up front, at the
time of assignment, while the remainder of the payment, which CAC calls the "holdback," is not
paid until CAC collects the entire amount of its upfront payment to the dealer (together with
CAC's 20% finance charges on the collections and various fees and costs, *see infra,* ¶ 49[3]), and
then only to the extent that CAC collects these funds from the borrower. If CAC does not collect
the entire amount of its upfront payment, the dealer never receives any part of the holdback. If

---

[2] Repossession typically occurs when a consumer defaults unless the consumer redeems the car, or the
cost of repossession exceeds the auction value of the vehicle.
[3] The 20% finance charge reflects 20 cents of every collected loan dollar.

8

CAC does not collect a portion of the holdback, the dealer never receives that portion of the holdback. This arrangement allows CAC to reduce its risk and investment in the loan, and to increase its return on investment.

*ii.    Pooling of loans under the Portfolio program.*

37.    Under the Portfolio program, CAC "pools" or aggregates 100 (in most cases) loans; CAC takes funds from the repayment of loans in the pool for which it collects more than the amount of its upfront payment to the dealer (plus finance charges) to make up for any shortfall when borrowers default on other loans in the pool. For dealers with more than one pool, the pools are cross-collateralized. Collections from loans are applied on a pool-by-pool basis as follows:

- first, CAC is paid for certain collection costs,

- second, CAC is paid 20% of all collections (net of collection costs),

- third, CAC is paid the aggregate amount of its upfront payments for all loans in the pool,

- fourth, the dealer holdback, if any, is paid.

38.    About 83% of CAC's Massachusetts loans between 2013 and 2019 were made under the Portfolio program, and 17% under the Purchase program.

## 3. Expected Collection Rate

39.    For each loan, at the time of origination CAC determines the amount of the loan CAC believes it will ultimately collect. This metric, which CAC refers to as the "expected collection rate" (or simply the "score"), is stated as a percentage of the loan; a score of 100 (or 100%), for instance, means CAC expects to collect the entire amount of the loan; a score of 60

9

(or 60%) means CAC expects to collect 60% of the loan. The lower the expected collection, the lower the score.

40.     The expected collection rate represents CAC's expectation, at the time it approves and funds the loan, of the proportion of the loan that will ultimately be repaid.[4]

41.     CAC's expected collection rate includes collections from all sources, payment by the borrower prior to default, auction proceeds after the borrower defaults and the car is repossessed and resold, and deficiency collections.

42.     The expected collection rate reflects the performance risk of the loan. It is based on numerous variables found in the borrower's credit report, together with quantitative data specific to the sales transaction. Examples of the approximately 20 credit-type variables used in the expected collection rate calculation are address changes, evictions, and prior bankruptcies. Of the approximately 50 transaction-specific variables, the most important factors are the contract term (a longer term reduces the score), the loan to value ratio ("LTV") (a higher LTV reduces the score), and the ratio of the borrower's monthly loan payment to the borrower's monthly income ("PTI") (a higher PTI reduces the score).

43.     CAC determines the expected collection rate for each loan it funds. To calculate the expected collection rate, CAC compares a particular loan's borrower and transaction attributes to a database of over 20 years of historical collections for loans with similar attributes. The determination of the expected collection rate for a particular loan is substantially the same under both the Purchase and Portfolio programs.

44.     CAC does not disclose the expected collection rate to the dealer or the borrower.

---

[4] CAC updates the expected collection rate during the duration of the loan.

45.     Since 2013 the expected collection rate of an average CAC loan has declined.  In

2013 the expected collection rate of an average CAC loan in Massachusetts was 75.6%.  In 2019

it was 66.0%.

#### Massachusetts Expected Collection Rates
#### By Origination Year

| Origination Year | Weighted Average Score[5] |
|---|---|
| 2013 | 75.6% |
| 2014 | 74.9% |
| 2015 | 71.8% |
| 2016 | 68.8% |
| 2017 | 67.2% |
| 2018 | 66.4% |
| 2019 | 66.0% |
| | |
| Mean | 70.1% |

46.     There was a similar decline in CAC's average expected collection rate

nationwide, from 72.0% in 2013 to 64.0% in 2019.

47.     CAC's expected collection rate is the primary driver of CAC's funding payment

for the loan.  Based on the forecast of expected collections, CAC calculates the payment to the

dealer at a level designed to maximize CAC's economic profit on the loan.  CAC expects to

collect substantially less than the total amount of the loan, and CAC's payment for the loan is

substantially less than the amount of CAC's expected collection.  The payment amount is

communicated to the dealer through CAPS prior to the sale.

48.     CAC's ability to accurately forecast collections under its loans is critical to

CAC's business.   In its investment materials CAC states that "CA[C]'s forecasted collection

rates at loan origination for our Portfolio and Purchase Program have been very accurate," that

---

[5] The weighted average score uses the loan amounts as weights.

CAC has been "[s]uccessful at predicting future performance of our loans at the time the loans are originated," and "[t]he historical difference between actual collection results and those expected at loan origination is small."[6]

49.     The accuracy of CAC's expected collection rate is critical because CAC's finance charge income is based on the spread between CAC's loan collections, on the one hand, and its loan payments to dealers on the other. Under both the Portfolio and Purchase programs, CAC sets its payment to dealers at a level that permits CAC to earn at least 20% of the expected loan collection amount as profit, *i.e.*, CAC collects, at a minimum, the amount of its payment to the dealer for the loan plus an additional 20% of the loan collections as finance charge compensation. Under the Portfolio program, CAC further reduces its upfront payment—and provides itself with an additional financial cushion—by capping the payment for each loan; the maximum upfront payment under the Portfolio program is 5% less than 80% of the expected collection rate, or [(80% * expected collection rate) – 5%]. Under the Purchase program the expected collection rate is discounted, on average, by approximately 2%, which in turn reduces the maximum payment to the dealer. Further deductions may be made under either program based on the performance of the dealer's prior loans and other factors.

50.     Between 2013 and 2019 the expected collection rate of CAC's average Massachusetts loan was 70.1%. CAC's payment to Massachusetts dealers, on average, was about 44%—43% of an average loan under the Portfolio program, and 47.9% under the Purchase program.

---

[6] During the ten-year period 2010 through December 31, 2019, on an average countrywide basis, CAC's collection rate reflecting actual collections varied from CAC's expected collection rate at origination by 0.7% for the Portfolio program, and 2.4% for the Purchase program.

**Comparison of Massachusetts Expected Collection Rate to Dealer Payment**

|  | Portfolio Program | Purchase Program | Total |
|---|---|---|---|
| 1. Expected Collection Rate | 70.3% | 69.3% | 70.1% |
| 2. Dealer Upfront Payment | 43.0% | 47.9% | 43.9% |
| 3. Difference [(1) - (2)] | 27.3% | 21.5% | 26.2% |

51.     For high-risk loans, CAC's expected collection rate is much lower, but CAC reduces its payment to dealers to keep the spread between the expected collection rate and the dealer payment roughly constant. CAC's method of scaling the dealer payment to the expected collections—and reducing dealer payments as the expected collection rate drops—permits CAC to earn comparable returns on high-risk loans with low expected collection rates and less risky loans with higher expected collection rates.

## 4.  CAC's Profit on the Loan Transaction

52.     The average CAC customer in Massachusetts between 2013 and 2019 purchased a used car with a cost to the dealer of about $7,800, made a down payment to the dealer (including trade-in) of about $2,400, and took out about a four-year loan of about $17,600, representing about $11,300 in principal and $6,300 interest. The borrower's total payment obligation, about $20,000 (the amount of the loan plus the down payment), was slightly more than two and half times the cost to the dealer of the car.

53.     When it approved and funded the loan CAC expected to collect about $12,400[7] (expected collection rate at origination) of the $17,600 in payments required under the terms of the average CAC Massachusetts loan. Of this amount, the borrower paid, on average about

---

[7] Throughout, CAC's expected and actual collections are net of certain collection expenses.

$10,500, or 85%; CAC collected approximately $1,900, or about 15% of collections, from auction proceeds and deficiency collections after default and repossession of the car.[8] The remaining $5,200 (or just under 30%) of the $17,600 loan would not be repaid.

54.     On the average loan, CAC made an initial payment to the dealer of approximately $7,800, about the same as the dealer's cost for the vehicle. CAC's payment to the dealer was about 44% of the loan amount.

55.     The bulk of the spread between CAC's expected collection of about $12,400 and CAC's payment to the dealer of about $7,800 was CAC's profit on the average loan.[9] This profit averaged a little over $3,100, or about 40% of CAC's upfront payment to the dealer, a return that was similar under both the Portfolio and Purchase programs (see table *infra,* ¶ 57).[10]

56.     On the average sales transaction, the dealer earned a profit of about $2,600 (including the value of the trade-in), or about a third of the cost of the vehicle; the dealer's profit is slightly larger than the borrower's down payment.

---

[8] These payments are based on the historical splits between borrower payments and other collections.

[9] A portion of the difference between CAC's collections and the CAC's upfront payment to the dealer is used to make the holdback payment and to pay certain costs related to the vehicle service contract (see table *infra,* ¶ 57).

[10] CAC's return is based on CACs investment in the loan; CAC's collections, including the 20% finance charge income, are based on the total loan amount, which is considerably larger than CAC's investment (upfront payment to the dealer).

**Dealer Profit & Return on Vehicle Cost**

| | |
|---|---|
| 1. Total Down Payment | 2,404 |
| 2. CAC Payment to Dealer | 7,752 |
| 3. Expected Dealer Holdback | 906 |
| 4. Vehicle Cost to Dealer | 7,754 |
| 5. Sales Tax | 617 |
| 6. Customer Fees Paid | 114 |
| 7. Dealer Profit | 2,577 |
| 8. Return on Vehicle Cost | 33.2% |

57.     For high-risk low-score loans, borrowers repay a smaller portion of their loans, but CAC's return remains virtually unchanged. Indeed, CAC's return is slightly higher on high-risk low-score loans, in spite of the reduced collections, because the return depends on the spread between CAC's expected collection rate and CAC's payment to the dealer, rather than on the collection rate itself.

**CAC % Return on Upfront Payment to the Dealer By Score Interval**

| | Score < .6 | Score < .7 | All Loans |
|---|---|---|---|
| 1. Average Expected Collections | $9,617 | $11,477 | $12,372 |
| 2. Average Upfront Payment to Dealer | $5,995 | $7,251 | $7,752 |
| 3. Average Payout For VSC Costs | $548 | $590 | $601 |
| 4. Average Expected Dealer Holdback Payments | $569 | $704 | $906 |
| 5. Average CAC Dollar Return | $2,505 | $2,932 | $3,113 |
| 6. CAC % Return on Upfront Payment (Line 2) | 41.8% | 40.4% | 40.2% |

## B. CAC'S UNFAIR HIGH-RISK SUBPRIME LOANS

### 1. The Abysmal Performance of CAC's High-Risk Loans

58.     CAC's loans are virtually all subprime. But many CAC borrowers—those with low expected collection rates or "scores"—have experienced intense forms of financial distress, such as previous bankruptcies, foreclosures, repossessions, judgments, or garnishment of wages, and are at higher than average risk of nonpayment of their CAC loans. While CAC profits from these high-risk low-score Massachusetts loans, the vast majority of the high-risk borrowers default on their loans.

59.     Of 2013-2016 borrowers with CAC scores lower than 70% (CAC expects at origination to collect less than 70 cents of every loan dollar), 59.0% had defaulted as of December 31, 2019.[11]   In addition, between 2.5% to 3% of the loans were non-performing; these are loans that are not being repaid but have not been formally charged off. Overall, about 62% of the loans with scores lower than 70% have defaulted or are non-performing.[12]

60.     Of 2013-2016 loans with CAC scores lower than 60% (CAC expects at origination to collect less than 60 cents of every loan dollar), about 71% had defaulted or were non-performing as of December 31, 2019.

---

[11] A "defaulted" loan is a loan that CAC considers charged-off; CAC considers a loan charged-off when the loan is either 90 days past due or an auction check has posted to the account. CAC defines a "Defaulted Contract" as "each Contract that has become 90 days delinquent, based on the date the last payment thereon was received by the Servicer, or has had an auction check posted to the account." (*See infra*, ¶ 90)

[12] December 31, 2019 is the cutoff for the loan data provided by CAC to the Office of the Attorney General. The default rates for loans in 2015 and 2016 are likely to rise after December 31, 2019.

16

61. There is a close inverse correlation between the level of loan defaults, on the one hand, and CAC's expected collection rate at origination, on the other. The lower CAC's expected collection rate at origination, the higher the level of default.

**Massachusetts Default & Non-Performing Loan % By Score Interval, 2013-2016 Loan Originations**

| Score Interval | Default % | Non-Performing % | Total % |
|---|---|---|---|
| 0 <= Score <0.6 | 67.8% | 2.9% | 70.7% |
| 0.6 <= Score <0.65 | 61.4% | 2.1% | 63.5% |
| 0.65 <= Score <0.7 | 52.5% | 2.9% | 55.4% |
| 0.7 <= Score <0.75 | 45.4% | 2.2% | 47.6% |
| 0.75 <= Score <0.8 | 38.0% | 1.8% | 39.8% |
| 0.8 <= Score <0.85 | 27.8% | 1.5% | 29.3% |
| 0.85 <= Score <1 | 20.5% | 0.8% | 21.3% |
| | | | |
| Mean | 43.8% | 2.0% | 45.9% |
| Score < .7 | 59.0% | 2.7% | 61.7% |

62. The default rates alone do not fully describe the difficulty high-risk low-score Massachusetts borrowers have in repaying their CAC loans. For loans made between 2013 and the end of 2016, only 4.6 % of borrowers with CAC scores lower than 60% and 7.1 % of borrowers with scores lower than 70% were current for the entire term of their loans (or as of December 31, 2019, if the term had not ended before that date). The remaining roughly 93-95% of borrowers missed at least one payment and/or were delinquent at some point during the terms of their loans.

63. For the high-risk low-score borrowers, the financial difficulties come early in the terms of the loans. For Massachusetts borrowers taking out CAC loans in 2018, only 7.9% of borrowers with scores less than 60% and 10.7% of borrowers with scores lower than 70% were current on their loans between the origination date in 2018 and December 31, 2019. About 92%

of loans with scores lower than 60% and 89% of the loans with scores less than 70% either missed payments or experienced delinquency between their origination dates in 2018 and December 31, 2019—during, on average, *the first 18 months* of their loans.

|  | 2013-2016 | 2018 |
|---|---|---|
|  | % Loans Current Throughout Loan Term | % Loans Current Throughout Loan Term |
| Score Interval | as of 12/31/2019 | as of 12/31/2019 |
| Scores < .6 | 4.6% | 7.9% |
| Scores < .7 | 7.1% | 10.7% |

64.    One of the principal reasons for the close correlation between CAC's expected collection rate (or score) and the level of default, delinquency, and missed payments is the relationship between the expected collection rate and two factors known to predict the risk of default: the payment to income ratio (PTI), and the loan to value ratio (LTV). As CAC's expected collection rate drops, the average PTI of CAC's loans increases.

| Average Payment to Income Ratio By Score Interval | | |
|---|---|---|
| Score Interval | Number of Loans | Average Payment To Income |
| 0 <= Score <0.6 | 3,778 | 13.5% |
| 0.6 <= Score <0.65 | 3,716 | 12.8% |
| 0.65 <= Score <0.7 | 4,498 | 12.2% |
| 0.7 <= Score <0.75 | 4,838 | 11.5% |
| 0.75 <= Score <0.8 | 4,163 | 10.6% |
| 0.8 <= Score <0.85 | 3,442 | 9.4% |
| 0.85 <= Score <1 | 1,552 | 8.8% |
| Mean | 25,987 | 11.5% |

65.    Similarly, as the expected collection rate falls, the average LTV of CAC's loans increases.

18

**Average Loan to Value (Retail) By Score Interval**

| Score Interval | Number of Loans | Average LTV (Retail) |
|---|---|---|
| 0 <= Score <0.6 | 3,778 | 113.9% |
| 0.6 <= Score <0.65 | 3,716 | 109.8% |
| 0.65 <= Score <0.7 | 4,498 | 105.5% |
| 0.7 <= Score <0.75 | 4,838 | 100.4% |
| 0.75 <= Score <0.8 | 4,163 | 95.9% |
| 0.8 <= Score <0.85 | 3,442 | 89.8% |
| 0.85 <= Score <1 | 1,552 | 82.9% |
| Mean | 25,987 | 101.4%[13] |

66.     In spite of the poor performance of CAC's high-risk low-score loans, since 2013,

CAC has steadily increased the percentage of high-risk low-score loans it makes in

Massachusetts. In 2013 and 2014, 24% of CAC's Massachusetts loans had expected collection

rates (or CAC scores) lower than 70%, and about 4% had scores lower than 60%. By 2019 these

proportions had risen to 66% and 27% respectively.

---

[13] The pattern of increasing LTV for lower scores is similar for wholesale LTVs:

**Average Loan to Value (Wholesale) By Score Interval**

| Score Interval | Number of Loans | Average LTV (Wholesale) |
|---|---|---|
| 0 <= Score <0.6 | 3,778 | 229.6% |
| 0.6 <= Score <0.65 | 3,716 | 202.3% |
| 0.65 <= Score <0.7 | 4,498 | 186.4% |
| 0.7 <= Score <0.75 | 4,838 | 172.9% |
| 0.75 <= Score <0.8 | 4,163 | 163.9% |
| 0.8 <= Score <0.85 | 3,442 | 151.3% |
| 0.85 <= Score <1 | 1,552 | 142.0% |
| Mean | 25,987 | 181.5% |

**% of Massachusetts Loans By Score Interval & Origination Year**

| Score Interval | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|
| 0 <= Score <0.6 | 3% | 4% | 10% | 17% | 23% | 24% | 27% |
| 0.6 <= Score <0.65 | 8% | 7% | 13% | 18% | 18% | 18% | 20% |
| 0.65 <= Score <0.7 | 13% | 13% | 18% | 19% | 19% | 20% | 20% |
| 0.7 <= Score <0.75 | 20% | 21% | 19% | 18% | 17% | 18% | 17% |
| 0.75 <= Score <0.8 | 20% | 22% | 18% | 14% | 13% | 12% | 11% |
| 0.8 <= Score <0.85 | 23% | 23% | 14% | 9% | 7% | 7% | 5% |
| 0.85 <= Score <1 | 13% | 9% | 8% | 4% | 3% | 1% | 2% |
| | | | | | | | |
| Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Score < .7 | 24% | 24% | 41% | 55% | 60% | 62% | 66% |

67.     When high-risk low-score borrowers default, they do so early in their loans—

after slightly more than a year on average. Defaulting 2013 and 2014 Massachusetts borrowers

with CAC scores lower than 70% made, on average, 15.2 monthly payments before default;

defaulting borrowers with scores lower than 60% made, on average, 13.1 monthly payments

before default.

68.     For borrowers, default is a financial disaster. When borrowers default, their cars

are repossessed by CAC and sold at auction (unless the cost of repossession exceeds the auction

value of the car). The average 2013 and 2014 Massachusetts borrower with a CAC score lower

than 60% whose vehicle was repossessed made a down payment (including trade-in) of about

$1,600, and made loan payments of about $3,400 prior to default. In exchange for the

borrower's total payments of approximately $5,000, the borrower had the use of the car, on

average, for about a year and a half.[14]  During this period standard NADA retail depreciation of

---

[14] There is typically a short lag between default and repossession.

the car averaged approximately $1,200, about a quarter of the borrower's payment. Similarly, borrowers with CAC scores less than 70% paid about $6,200—$2,000 down and $4,200 in loan payments—prior to default, while standard NADA retail depreciation for their cars averaged about $1,600, slightly more than a quarter of the borrowers' payments.

**2013-2014 Borrower Payments Prior To Repossession**

|  | Score < .6 | Score < .7 |
|---|---|---|
| 1. Total Down Payment | 1,600 | 2,000 |
| 2. Loan Payment Prior To Default | 3,400 | 4,200 |
| 3. Total Payment [(1) + (2)] | 5,000 | 6,200 |
| 4. NADA Retail Depreciation | 1,200 | 1,600 |
| 5. Ratio Total Payment to Depreciation | 4.2 | 3.9 |

69.     After repossession, the borrower's debt remains, but not the asset—the average borrower has a deficiency balance (or unpaid debt) after repossession of approximately $9,000.[15] CAC's policy is to continue to collect the debt indefinitely (or until it is paid).[16] And while CAC markets its loans to consumers as an "opportunity to improve your credit score," defaulting borrowers—well over 50% of high-risk low-score borrowers—end up with substantially worse credit than before.

70.     While default produces significant negative consequences for borrowers, it typically has few negative consequences for CAC. CAC, which does not expect borrowers to repay their loans in their entirety and scales its payments to dealers accordingly—and, in the case of the Portfolio program, pools loans to further reduce its risk—makes its expected collections and earns its expected return.

---

[15] Computed as the average loan amount less the sum of borrower payments prior to default plus repossession recoveries.

[16] In some cases, the statute of limitations may provide a time limit on CAC's collections.

21

**2.  CAC Recklessly Disregards the Risk of Default on High-Risk Loans**

71.     CAC approves all loan applications submitted through CAPS.   For every loan applicant, CAPS automatically presents financing packages for each car in the dealer's inventory.   The financing packages include CAC's payment to the dealer, and show exactly how much profit the dealer is expected to make on each car sale.

72.     On its website CAC markets its loans to consumers as providing "approval for everyone …":

"We believe everyone deserves a second chance, which is why we enable dealers enrolled with Credit Acceptance to approve everyone, including customers with any of the following:

- Bad credit history
- No credit history
- Fixed income
- Unemployment income
- Multiple open auto loans
- Multiple repossessions
- Self-employed income
- Temporary income
- Bankruptcy Chapter 7
- Bankruptcy Chapter 13 (with court/trustee approval)."

(A screen shot is attached to the Complaint as Exhibit 1.)

73.     The website also contains a testimonial from a consumer who states: "Credit Acceptance is a company that helps everyone regardless of their credit history."

### i. *CAC Ignores the Risk of Default When It Approves and Funds Its High-Risk Massachusetts Loans*

74.     Between 2013 or earlier and the present, CAC did not consider or determine the likelihood that the borrower would default on the loan when it approved and funded its loans in Massachusetts. CAC did not and does not calculate the risk of default or evaluate the borrower's financial situation to determine the likelihood of default when deciding to make a loan.

75.     While CAC has acknowledged that its expected collection rate—which measures the portion of the loan that will ultimately be repaid—reflects the riskiness of the loan, CAC does not use the expected collection rate to determine whether to approve or fund the loan. Nor is the expected collection rate used to determine the terms under which a consumer is approved or to set financing terms. Nor is it used to establish the interest rate of the loan.

76.     The likelihood of default is not an input into or an output from CAC's collection model, and the likelihood of default has no effect on CAC's calculation of the expected collection rate. Instead, CAC's expected collection rate measures the amount of the loan CAC expects to collect *whether or not* the borrower defaults, and includes monies the borrower is expected to pay prior to default, as well as monies CAC expects to collect after default.

77.     The expected collection rate of a loan is an average of the expected collections for loans with the same score. An expected collection rate of 70%, for instance, means CAC expects to collect 70% of the loan amount, on average, from all loans with this score. It does not matter to CAC (and CAC does not attempt to determine) whether this result is achieved with 100% of borrowers defaulting, and each borrower paying 70% of the loan, or with 50% of borrowers defaulting, each defaulting borrower paying 40% of the loan, and the remaining borrowers paying 100% of their loans. Each of these default levels produces an expected collection rate of 70%, each provides CAC with the same loan collection amounts, and each produces the same

23

return for CAC. A score of 70% reflects the expected collection of 70% of the loans *regardless of borrower defaults.*

78. When it approved and funded high-risk loans to Massachusetts borrowers between 2013 and earlier and the present, CAC did not determine or take into account the likelihood that the borrower would default on the loan. CAC did not consider the default rate, prospectively or retrospectively, when it decided to approve or fund its loans.

79. As a result, between 2013 or earlier and the present, there was no level of expected default at which CAC did not approve or fund a high-risk loan. Nor was there any level of expected default at which CAC lowered the interest rate of the loan, offered only to make a smaller loan, or adjusted the loan terms to reduce the likelihood of default for borrowers who were unlikely to repay their loans.

80. A loan made in complete disregard of the risk of default is an unfair loan.

## ii. *CAC Did Not Reasonably Believe at Origination That Massachusetts Borrowers Would Repay their High-Risk Loans*

81. Unlike a traditional bank, which, when it makes a loan, reasonably believes the loan will be repaid, CAC makes no determination and has no belief at origination that the borrower will repay the loan. Between 2013 and 2019 no CAC loan in Massachusetts had an expected collection rate at origination of 100%, which (hypothetically) represents the expectation, at origination, that the entire amount of the loan will be repaid. No Massachusetts loan had an expected collection rate at origination of over 90%.[17]

---

[17] The amount of the loan is the principal plus interest that accrues over the term of the loan. Some loans are paid in full before the end of the loan term (or pre-paid); these borrowers pay less interest, and thus pay less than 100% of the amounts of their loans. On average, borrowers who pay their CAC loans in full pay about 91% of their loans.

24

82.     The average CAC Massachusetts loan between 2013 and 2019 had an expected collection rate, based on CAC's calculation at origination, of 70.1%. (About half the loans had lower expected collection rates.) While some loans with an expected collection rate of 70.1% will be fully repaid, CAC's *expectation* at origination is that it will collect, on average, 70.1 cents of every loan dollar. These collections will come from borrower payments, repossession recoveries, and deficiency collections after default; the borrower will be able to repay approximately 59.6 cents of every dollar of the average loan before defaulting, with the remaining collection of 10.5 cents of every loan dollar coming from repossession proceeds and deficiency collections after default.[18]

83.     Because CAC does not expect the borrower to repay the loan and, instead, expects to collect 70.1 cents of every loan dollar on average, CAC pays the dealer about 44 cents for every loan dollar. As a result, CAC still earns its 40% return.[19]

84.     The fact that CAC, at origination, does not reasonably believe the borrower will be able to repay the loan is not an oversight; it is a basic feature of CAC's business model and profit structure. Unlike a traditional lender, CAC's business model is based on making loans to borrowers—including high-risk borrowers with low CAC scores—who are not likely to repay their loans, and CAC's profit model involves making money on loans that are not repaid. By reducing its payment to dealers commensurate with the expected likelihood of loan repayment, CAC ensures that its return, on average, remains the same, no matter how much—or how little—of the loans it expects to collect.

---

[18] The borrower and post-default payments in this paragraph, and in paragraphs 85 and 86, are based on the historical splits between borrower payments and post-default collections included in CAC's collection rate.

[19] The 44% payment is CAC's upfront payment to the dealer; the 40% return takes into account any subsequent "holdback" payment CAC makes to the dealer once these funds are collected.

85. For Massachusetts high-risk loans with CAC scores lower than 60%, CAC's expectation at origination between 2013 and the end of 2019 was that it would collect, on average, 55.4 cents of every loan dollar. Of this amount, the average borrower would pay about 43.8 cents of every loan dollar before default, with the remaining collection of 11.6 cents coming from repossession proceeds and deficiency collections after default. CAC expected that these high-risk low-score borrowers, on average, were unable to repay even half of their loans before defaulting.

86. For loans with CAC scores less than 70%, CAC expected to collect about 62.4 cents of every loan dollar, on average, with the borrower repaying about 51.2 cents before default and the remaining 11.2 cents coming from repossession proceeds and deficiency collections after default.

87. For both groups of loans, CAC's expectation at origination was that the average high-risk borrower was unable to repay even the *principal amount* of the loan (with no interest).

88. A loan the lender does not reasonably believe the borrower is able to repay is an unfair loan.

### 3. CAC Knew or Should Have Known at Origination That Borrowers Were Unlikely to Be Able to Repay Their High-Risk Subprime Loans

89. When CAC approved and funded loans to high-risk low-score Massachusetts borrowers between 2013 or earlier and the present, CAC knew or should have known that the vast majority of high-risk loans were unlikely to be repaid. CAC knew or should have known that well over half of high-risk borrowers were unable to repay their loans—that high-risk low-score borrowers were *more likely than not* to default on their loans.

90. The performance of CAC's high-risk low-score loans has varied little over time. For high-risk loans with CAC scores lower than 70% (CAC expects at origination to collect less than 70 cents of every loan dollar), the default rate for loans originated between 2013 and the end of 2016 averaged 59% (as of the end of 2019), with the highest annual value .5% higher than average (59.5%) and the lower annual value 1.3% lower (57.7%). For high-risk loans with CAC scores lower than 60% (CAC expects at origination to collect less than 60 cents of every loan dollar), the average default rate for loans originated between 2013 and the end of 2016 was 67.8%, with the highest value 1.2% higher than average (69%) and the lowest value 3% lower (64.8%).

| Massachusetts High-Risk Borrower Default % By Origination Year | | |
|---|---|---|
| Year | Score < .6 | Score < .7 |
| 2013 | 64.8% | 58.4% |
| 2014 | 69.0% | 57.7% |
| 2015 | 67.0% | 59.4% |
| 2016 | 68.5% | 59.5% |
| Weighted Average | 67.8% | 59.0% |

91. While CAC has said it does not use or calculate default rates, in documents provided to investors CAC defines a "Defaulted Contract" as "each Contract that has become 90 days delinquent, based on the date the last payment thereon was received by the Servicer, or has had an auction check posted to the account." CAC has told investors that its loans "entail a higher risk of *delinquency, default, and repossession* and higher losses than loans made to consumers with better credit." (Emphasis added; see Exhibit 2 to the Complaint) CAC collects and services its own loans, and as a part of its collection and servicing activities maintains data on the payment and nonpayment of the loans and is aware of the default status of each of its

27

loans. Between 2013 or earlier and the present CAC knew which loans defaulted, how many of the loans defaulted, and the scores of the loans that defaulted. While CAC did not consider or determine the likelihood of default in deciding to approve and fund its loans, when it made the loans (i) CAC knew, based on its own payment data, that the vast majority of its high-risk low-score loans defaulted; (ii) CAC knew that the level of defaults was consistent over time, with little year-to-year variation; and (iii) CAC knew that the nonpayment of loans was closely related to the CAC score (expected collection rate). CAC was aware of the "risk… of default" of its loans.

92.     When it approved and funded its loans to Massachusetts borrowers between 2013 or earlier and the present, CAC had the data, the capability, and the opportunity to determine the likelihood of default for each of its Massachusetts loans—and to decline to fund loans to borrowers who were likely to default or alter loan terms to reduce the likelihood of default. CAC chose not to do so.

93.     CAC also explicitly tracks loan "charge-offs"; a charged-off loan, according to CAC's definition, is a loan that is either unpaid for 90 days or that has had an auction check posted to its account, *i.e.,* virtually identical to CAC's definition of a defaulted loan. CAC calculates charge-off rates in the course of its business, but does not use charge-off rates or the likelihood of charge-off when it decides to approve or fund its loans.

94.     Between 2013 or earlier and the present, CAC knew or should have known that its calculated loan score (expected collection rate) was closely related to the expected default rate of the loans. CAC knew or should have known that the score is mathematically equivalent to:

$$\text{Score} \quad = \quad D\,(A + B) + (1 - D)\,(C),$$

28

where "D" is the percentage of loans that default and "(1 – D)" the percentage of loans that do not default, "A" represents loan payments by defaulting borrowers prior to default, "B" represents repossession and other post-default recoveries, and "C" represents the payments by borrowers who repay their loans in full.[20]

95.    For high-risk loans originated between 2013 and the end of 2015 with CAC scores lower than 70%, the average values of A, B and C were about .32, .18, and .91 respectively, giving an expected default percentage embedded in CAC's score of about 60%.[21]  The actual default rate for 2013-2016 high-risk loans with CAC scores lower than 70% (as of December 31, 2019) was 59.0%.

96.    For high-risk loans originated between 2013 and the end of 2015 with CAC scores lower than 60%, the average values of A, B and C were about .29, .17, and .91 respectively, giving an expected default percentage embedded in CAC's score (expected collection rate) of about 68%.  The actual default rate for 2013-2016 loans with CAC scores lower than 60% (as of December 31, 2019) was 67.8%.

97.    When CAC approved and funded its high-risk low-score loans to Massachusetts borrowers with scores less than 70% between 2013 or earlier and the present, CAC knew or should have known that a substantial majority of these loans were unable to be repaid.  CAC knew or should have known that most of its high-risk low-score loans would default.  CAC had both the means and the opportunity to determine the likelihood of default of each of its high-risk loans—and prior to approving and funding the loan to decline funding, to alter the loan terms,

---

[20] A, B, and C represent percentages of total expected collections in loan dollars; D represents the percentage of loan dollars.

[21] These values and the values in ¶ 96, are based on closed loans.

decrease the loan size, or change the loan approval and funding process in order to reduce or mitigate the risk of default for these high risk borrowers. But CAC did none of these things.

98.     CAC knew or should have known that Massachusetts borrowers with CAC scores lower than 70% were unlikely to repay their loans. CAC knew or should have known that these high-risk borrowers were *more likely than not* to default on their loans.

99.     Loans the lender knew or should have known at origination are unlikely to be repaid are unfair loans.

## C.  CAC'S UNFAIR DEBT COLLECTION PRACTICES

100.     CAC is a creditor and collects debts in Massachusetts. When CAC's Massachusetts borrowers miss loan payments on their CAC loans, CAC's collection employees immediately make a collection call to the borrower, typically within one day of a missed payment due date.

101.     Between 2012 and mid-2018, it was CAC's stated policy to call or attempt to call any individual delinquent borrower as many as 8 times per day. Massachusetts law permits no more than two collection calls per week.

102.     From 2012 through mid-2018, CAC made about 2 million collection calls to about 9,000 delinquent borrowers in Massachusetts, or about 200 collection calls to each borrower, on average, for the purpose of collecting debts. Of the 2 million calls, about 1.7 million, or about 170 per borrower, exceeded the two calls per 7 day period limit required by Massachusetts debt collection regulations. Borrowers received calls, on average, for 74 days, with each (not necessarily consecutive) day having, on average, between 2 and 3 unlawful calls.

**Estimated Total Call Violations**

| Description | Amount |
|---|---|
| 1 Number of Calls | 1,772,145 |
| 2 Number of Delinquent Accounts with Calls | 8,843 |
| 3 Earliest Date of Call in Data | 7/14/2014 |
| 4 Latest date of Call in Data | 6/30/2018 |
| 5 Number of Eligible Calls[22] | 1,675,140 |
| 6 Number of Accounts in (2) w Eligible Calls | 8,700 |
| 7 Number of Violations | 1,533,767 |
| 8 Number of Accounts in (2) w Violations | 8,202 |
| 9 Average Violations Per Account [(7) / (2)] | 173 |
| 10 Average number of Days a Delinquent Account Receives Calls | 74 |
| 11 Number of Violations Per Account Per Day [(9) / (10)] | 2.35 |
| 12 Percent of Calls that were Violations [(7) / (1)] | 86.5% |
| 13 Estimated Additional Calls 1/1/2012 to 7/1/2014 | 227,848 |
| 14 Estimated Additional Violations [(12) x (13)] | 197,200 |
| 15 Total Estimated Violations [(7) + (14)] | 1,730,967 |

103.     Multiple calls each day was the norm for CAC's collection system. About 90% of the time CAC called borrowers at least twice a day. CAC made 5 or more calls in a day to borrowers almost 30% of the time.

| Calls per day per borrower | % of Eligible Calls |
|---|---|
| 2 or more | 89% |
| 3 or more | 70% |
| 4 or more | 42% |
| 5 or more | 28% |

---

[22] An "eligible call" is a call subject to a violation.

104. CAC was aware that consumers found the collection attempts to be oppressive and harassing. One consumer complained to CAC, "I am constantly harassed on a regular basis by this company" and was left "a barrage of ominous voicemails …where nobody said a word." Another stated, "I keep getting collection calls … I am harassed day and night. … I have to call them 1-2 times [a] week begging for the calls to stop." (See Exhibit 3 to the Complaint)

105. About 10% of the borrowers called by CAC received over 500 unlawful calls, with a maximum number of 3,187 violations.

106. CAC's repeated violations of Massachusetts collection call regulations were unfair or deceptive acts or practices.

## D. CAC'S UNFAIR PRE-SALE AND POST-SALE NOTICES OF DEFICIENCY

107. CAC repossesses vehicles from consumers who default on their CAC car loans. When a deficiency remains after the repossession and auction of the vehicle, CAC collects this deficiency from borrowers.

108. Between 2013 or earlier and 2018, CAC provided consumers whose cars were repossessed with pre-sale notices entitled, "NOTICES OF OUR PLAN TO SELL PROPERTY[.]" These notices read, in part:

"We have your vehicle described above because you broke promises in our agreement. We will sell the vehicle at private sale sometime after [*DATE OMITTED*]. A sale could include a lease or license.

The money that we get from the sale (after paying our permitted costs) will reduce the amount you owe. If we get less money than you owe, you may still owe us some or all of the difference. If we get more money than you owe, you will get the extra money, unless we must pay it to someone else.

32

You can get the property back at any time before we sell it by paying us the full amount you owe (not just the past-due payments), including our permitted expenses. To learn the exact amount you must pay, call us at (800) 716-7376.

If you want us to explain to you in writing how we have figured the amount that you owe us, you may call us at (800) 716-7376 or write us at Credit Acceptance Corporation. 25505 West Twelve Mile Road. Attention Redemption Department, Southfield, Michigan 48034 and request a written explanation."

109.    The CAC pre-sale notices describe the deficiency as the difference between the amount owed by the borrower and "[t]he money that we get from the sale (after paying our permitted costs)...." CAC's pre-sale notices did not describe the deficiency amount as based on the "fair market value" of the repossessed vehicle in these notices.

110.    When CAC sold the vehicles it repossessed, CAC provided post-sale notices to the consumers. These notices read, in part:

"NOTICE OF DISPOSITION OF REPOSSESSED VEHICLE. Credit Acceptance Corporation disposed of the above-referenced vehicle on [*DATE OMITTED*] at the following location: [*ADDRESS OMITTED*]

NOTICE OF DEFICIENCY. After applying the proceeds from the disposition of the repossessed vehicle to your payment obligation, a deficiency in the amount of $[*AMOUNT* OMITTED] remains. Unless applicable law provides that you are not liable for the deficiency amount, you are obligated to pay the deficiency amount to Credit Acceptance Corporation. Please call the toll-free number above to make appropriate arrangements.

EXPLANATION OF DEFICIENCY. The amount of the deficiency was calculated as follows:

1. As of [*DATE OMITTED*], the total amount of your obligation was $[*AMOUNT* OMITTED].

2. The amount of proceeds received from the disposition of the vehicle was $[*AMOUNT* OMITTED].

3. The total amount of your obligation after deducting the amount of proceeds received from the disposition of the vehicle is $[*AMOUNT* OMITTED].

4. The total amount of expenses incurred in retaking possession, holding, preparing for disposition, processing, and disposing of the vehicle is $[*AMOUNT* OMITTED].

5. The total amount of credits to your account, which includes any payments received since the date in Item 1 above and other credits to which you are known to be entitled, including rebates of interest (or credit service charges) or ancillary product premiums (such as a service contract or GAP) is $[*AMOUNT* OMITTED].

6. The amount of the deficiency is $[*AMOUNT* OMITTED]."

111.    Between 2013 or earlier and 2018, in its post-sale notices, CAC explained the deficiency as the difference between the amount owed by the borrower and "the amount of the proceeds received from the disposition of the vehicle." The post-sale notices did not describe or explain the deficiency calculation as based on the fair market value of the vehicle.

112.    Under Massachusetts law pre-sale and post-sale deficiency notices to consumers who default on their car loans and whose cars are repossessed and sold by the lender must state that the deficiency (if any) is calculated based on the fair market value of the vehicle. When the lender calculates the deficiency, the lender must use the fair market value of the vehicle in the calculation.

113.    When a deficiency remains after the repossession and auction of the vehicle, CAC collects this deficiency from borrowers. Between 2013 or earlier and 2018, when CAC collected the deficiency amounts from borrowers, it did not calculate the deficiency amounts based on the

fair market value of the repossessed vehicles. CAC did not include a description of the calculation of the deficiency amount based on the fair market value of the repossessed vehicles in the pre-sale notices and a detailed explanation of the same calculation in its post-sale notices. CAC's deficiency notices and collections injured borrowers.

114.    Between 2013 or earlier and 2018, CAC calculated the deficiency amount, and explained the calculation, as the difference between the amount of the proceeds received from the disposition of the repossessed vehicle and the total amount of a consumer's obligation under the defaulted car loan.

115.    CAC's pre-sale and post-sale deficiency notices were in violation of Massachusetts law and were unfair to consumers.

### E. UNFAIR OR DECEPTIVE ACTS OR PRACTICES IN CONNECTION WITH MARKUPS BASED ON CUSTOMERS' CREDIT

116.    The price markups on cars sold to CAC borrowers with low CAC scores are substantially higher than the markups on cars sold to borrowers with higher scores. The markups, which range from about 37% to 68% on average, consistently increase as CAC's expected collection rate decreases, and are highest for borrowers with the lowest CAC scores. These increased markups—and the increase in the prices of low-score borrowers' cars—are based on the poor credit of the borrowers:

**Massachusetts Loans by Score Interval: Vehicle Price to Vehicle Cost**

| Score Interval | Number of Loans (1) | Avg Vehicle Selling Price (2) | Avg Vehicle Cost (3) | Price to Cost Ratio (4) |
|---|---|---|---|---|
| 0 <= Score <0.6 | 3,778 | 10,957 | 6,533 | 1.68 |
| 0.6 <= Score <0.65 | 3,716 | 11,679 | 7,480 | 1.56 |
| 0.65 <= Score <0.7 | 4,498 | 11,990 | 8,148 | 1.47 |
| 0.7 <= Score <0.75 | 4,838 | 11,925 | 8,337 | 1.43 |
| 0.75 <= Score <0.8 | 4,163 | 11,539 | 8,152 | 1.42 |
| 0.8 <= Score <0.85 | 3,442 | 10,920 | 7,789 | 1.40 |
| 0.85 <= Score <1 | 1,552 | 10,013 | 7,284 | 1.37 |
| All Loans | 25,987 | 11,451 | 7,754 | 1.48 |

117.    The increased markups for low-score borrowers are also plainly visible when the retail prices are compared to external indices, such as the Black Book prices.  The markups are consistently higher for low-score borrowers; on average, the lowest-score borrowers receive the highest markup, and the markups decrease in strict linear fashion, so that the highest-score borrowers receive the lowest markups.

**Massachusetts Loans by Score Interval: Vehicle Price to Black Book Retail Value**

| Score Interval | Number of Loans (1) | Avg Vehicle Selling Price (2) | Black Book Retail Value (3) | Price to Black Book Retail Ratio (4) |
|---|---|---|---|---|
| 0 <= Score <0.6 | 3,778 | 10,957 | 10,123 | 1.08 |
| 0.6 <= Score <0.65 | 3,716 | 11,679 | 11,222 | 1.04 |
| 0.65 <= Score <0.7 | 4,498 | 11,990 | 11,875 | 1.01 |
| 0.7 <= Score <0.75 | 4,838 | 11,925 | 12,205 | 0.98 |
| 0.75 <= Score <0.8 | 4,163 | 11,539 | 12,165 | 0.95 |
| 0.8 <= Score <0.85 | 3,442 | 10,920 | 11,907 | 0.92 |
| 0.85 <= Score <1 | 1,552 | 10,013 | 11,345 | 0.88 |
| All Loans | 25,987 | 11,451 | 11,607 | 0.99 |

118.    Dealers increase their markups of the prices of low-score borrowers' cars in order to compensate for the reduction in CAC payments to dealers for the loans of low-score borrowers.  When it funds a loan, CAC's policy is to deliberately and systematically reduce its payment to dealers (the full payment under the Purchase program and the upfront payment under the Portfolio program) as CAC's score drops; on average, CAC's payment to the dealer as a percent of the selling price is 24% lower for loans with CAC scores less than 60% than for scores greater than 80%.  The CAC payment percentage *decreases* for low-score borrowers, and is lowest for the lowest-score borrowers, while the markup *increases* as the score drops and is highest for the lowest-score borrowers:

**Massachusetts Loans by Score Interval: CAC Upfront Dealer Payment to  Vehicle Price**

| Score Interval | Number of Loans (1) | Avg CAC Upfront Dealer Payment (2) | Avg Vehicle Selling Price (3) | CAC Payment to Price Ratio (4) |
|---|---|---|---|---|
| 0 <= Score <0.6 | 3,778 | 5,995 | 10,957 | 0.55 |
| 0.6 <= Score <0.65 | 3,716 | 7,439 | 11,679 | 0.64 |
| 0.65 <= Score <0.7 | 4,498 | 8,150 | 11,990 | 0.68 |
| 0.7 <= Score <0.75 | 4,838 | 8,517 | 11,925 | 0.71 |
| 0.75 <= Score <0.8 | 4,163 | 8,447 | 11,539 | 0.73 |
| 0.8 <= Score <0.85 | 3,442 | 7,935 | 10,920 | 0.73 |
| 0.85 <= Score <1 | 1,552 | 6,973 | 10,013 | 0.70 |
| All Loans | 25,987 | 7,752 | 11,451 | 0.68 |

119.    The differential markups based on the borrowers' credit scores counteract and in some cases eliminate the CAC payment reduction for loans of low-score borrowers.  The effect of the increased retail car prices for low-score borrowers is to level out the spread between the dealer's cost and the dealer's compensation for low-score and high-score loans.

**Massachusetts Loans by Score Interval: CAC Upfront Dealer Payment to Vehicle Cost**

| Score Interval | Number of Loans (1) | Avg CAC Upfront Dealer Payment (2) | Avg Vehicle Cost (3) | CAC Payment to Cost Ratio (4) |
|---|---|---|---|---|
| 0 <= Score <0.6 | 3,778 | 5,995 | 6,533 | 0.92 |
| 0.6 <= Score <0.65 | 3,716 | 7,439 | 7,480 | 0.99 |
| 0.65 <= Score <0.7 | 4,498 | 8,150 | 8,148 | 1.00 |
| 0.7 <= Score <0.75 | 4,838 | 8,517 | 8,337 | 1.02 |
| 0.75 <= Score <0.8 | 4,163 | 8,447 | 8,152 | 1.04 |
| 0.8 <= Score <0.85 | 3,442 | 7,935 | 7,789 | 1.02 |
| 0.85 <= Score <1 | 1,552 | 6,973 | 7,284 | 0.96 |
| All Loans | 25,987 | 7,752 | 7,754 | 1.00 |

120.    The differential markups substantially increase CAC payments for low-score

loans, while reducing the variance of CAC's payments to dealers across expected collection

rates. Regression analysis of these relationships shows just how significant they are. Regressing

the selling price to vehicle costs against CAC scores yields an R squared value of 91%, which

shows a very high correlation between the markups and the borrowers' scores. Regressing the

vehicle selling price to Black Book retail values against CAC scores produces an R squared

value of 97%, showing a nearly perfect linear relationship between the markups and the scores.

The T-Statistic for these regressions shows that there is essentially a 100% probability that the

score and markup are inversely related.

121.    The increased markup of vehicles based on the borrowers' low CAC scores is a

hidden finance charge. The amount of this finance charge is the amount of the markup

attributable to the borrower's score, together with the increased interest resulting from this

markup. This finance charge was not disclosed to CAC borrowers with low scores, who

received inaccurate and understated disclosures of the finance charges of their loans.

122.     In addition, the finance charge attributable to the excess markups must be

included in the calculation of the borrower's interest rate.  Because virtually all of CAC's loans

are made at or very close to the 21% Massachusetts usury ceiling, properly including the amount

of the hidden finance charge attributable to the markup in the calculation of the low-score

borrowers' interest rates results in a recalculated or actual interest rate higher than 21% for

virtually all CAC borrowers whose cars were marked up as a result of their credit scores.

123.     The failure to disclose hidden finance charges in CAC loans is an unfair or

deceptive act or practice.  A loan with an actual interest rate above 21% violates the

Massachusetts usury cap and is unfair.

## F. UNFAIR OR DECEPTIVE ACTS OR PRACTICES IN CONNECTION WITH THE SALE OF VEHICLE SERVICE CONTRACTS

### 1. The Vehicle Service Contract Primarily Benefits CAC

124.     A vehicle service contract ("VSC") is a promise to pay for the repair or

replacement of certain components of the vehicle in the event of a mechanical failure.  CAC

provides dealers with access to VSCs through CAC's agreements with two VSC administrators

(or third-party providers, "TPPs"), and the dealers then sell the VSCs to CAC's borrowers.  The

parties to the VSCs are the TPPs (First Automotive Service Corporation, which is a subsidiary of

SouthwestRe ("SWRE"), and Wynn's Extended Care, Inc.)  and the CAC borrowers.

125.     The VSCs are purchased by CAC's borrowers when they buy their cars, and the

retail cost of the VSC is financed as part of the CAC loan.  CAC only permits dealers to finance

the purchase of VSCs offered by CAC.

126.    When borrowers repair their cars, they submit claims (similar to insurance

claims[23]) to the TPP. The TPP determines whether the claim is covered under the terms of the

VSC. CAC ultimately pays some of the VSC claims itself; a wholly owned subsidiary of CAC,

VSC Re Company, reinsures the VSC claims, and thus collects the entire amount paid by the

borrower for the VSC, less certain administrative costs and fees. CAC participates in profit-

sharing for the remainder of the claims.

127.    The VSC covers only repairs of specific parts directly referred to in the contract

itself. A typical CAC VSC contains the following coverage provision:

> "Subject to the terms and conditions of this **Contract**, **We** will pay, or reimburse **You,**
> for the reasonable costs to repair or replace any or all of the following listed **Covered
> Parts** (for the coverage specified below that **You** have purchased) that fail as the result of
> a **Covered Breakdown**, subject to the exclusions listed in the "**EXCLUSIONS—
> WHAT THIS CONTRACT DOES NOT COVER**" section below. For convenience,
> the **Covered Parts** are listed next to the **Vehicle** systems to which they relate. The
> **Vehicle** systems listed are not **Covered Parts**.
> **STANDARD COVERAGE**
> 1. **Engine** – Engine Block and Cylinder Heads are covered when damaged due to a
> failure of an internally **Lubricated Part**. All internal **Lubricated Parts**, harmonic
> balancer, turbocharger, supercharger, timing gear, chain and bolt, head gasket, timing
> cover, timing belt, intake and exhaust manifolds, valve covers, oil pan and engine
> mounts.
>
> 2. **Transmission** – Transmission case and all internal **Lubricated Parts**, torque
> converter, transmission mounts, flex plate, and vacuum modulator.
> 3. **Drive Axle(s)** – Drive axle housing and all internal **Lubricated Parts**, drive shafts,
> universal joints, and constant velocity joint unless failure was caused by neglected, torn,
> cracked or perforated constant velocity joint boot. See exclusion for constant velocity
> joint boots.
> 4. **Transfer Case** – Transfer case and all internal **Lubricated Parts**.
> 5. **Steering** – Steering gear box, or rack, and all internal **Lubricated Parts**, power
> steering pump, steering column shaft, and steering column shaft couplings, pitman arm,
> idler arm, tie rod end(s), and drag link.
> 6. **Electrical** – Alternator, voltage regulator, starter motor & drive, and starter solenoid,
> Ignition module and windshield wiper motor(s).

---

[23] Unlike insurance, however, VSCs are not regulated.

7. **Air Conditioner** – Condenser, compressor, compressor clutch & pulley, idler pulley & idler pulley bearing, evaporator, receiver dryer and orifice tube, and blower motor. (only if the air conditioner is factory or dealer installed equipment)

8. **Suspension** – Radius arm, control arms, control arm shafts, bearings and bushings, king pin and king pin bushings, strut bar and bushings, stabilizer bar, stabilizer link, stabilizer bushing, spindle, wheel bearings, and torsion bars.

9. **Cooling** – Water pump, engine cooling fan motor, radiator, radiator fan, and fan clutch.

10. **Fuel** – Fuel delivery pump, fuel injectors, and fuel tank.

11. **Brake** – Standard and ABS brake system master cylinder, ABS accumulator, ABS control module, ABS pump, ABS motor, ABS reservoir and ABS wheel speed sensors, power brake cylinder, vacuum assist booster, compensating valve, disc brake caliper(s), wheel cylinder(s), hydraulic lines and hydraulic line fittings.

**High Tech Coverage (Included on all Vehicles with 0 – 100,000 Miles Only)**
12. **High Tech includes components listed under Standard Coverage above plus:**
Power seat motor, power antenna motor, power window motor(s), power door lock actuator, fuel pressure regulator, sunroof motor, convertible top motor, driver information gauge indicators relating to the operation of the **Vehicle** (burned out lights/lamps are not covered), body control module, control dash power supply, cruise control module and servo/transducer, fuel sending unit, fuel gauge, metal fuel delivery lines, idle speed motor, manifold pressure sensor, manifold temperature sensor, throttle position sensor, mass air flow sensor, oxygen sensor, coolant temperature sensor, vehicle speed sensor, camshaft position sensor, crankshaft angle sensor, E.C.M., primary fuel injection computer, and temperature control programmer.

13. **Seals and Gaskets** – Leaking seals and gaskets on any **Covered Part** listed above,

provided that the **Vehicle** had 100,000 miles or less on the **Vehicle Sale Date**.

Minor loss of fluid or seepage is considered normal and not considered a **Covered**

**Breakdown.**"[24]

128.    A typical CAC VSC contains the following exclusions:

"EXCLUSIONS — WHAT THIS CONTRACT DOES NOT COVER
A. This Contract provides no benefits or coverage and We have no obligation under this Contract for:
1. A Breakdown caused by lack of customary, proper or Vehicle Manufacturer's specified maintenance.
2. A Breakdown caused by contamination of or lack of proper fuels, fluids, coolants or lubricants, including a Breakdown caused by a failure to replace seals or gaskets in a timely manner.
3. A Breakdown caused by towing a trailer, another vehicle or any other object unless Your Vehicle is equipped for this use as recommended by the Vehicle Manufacturer.

---

[24] This provision is contained in the contract administered by SWRE. A copy of the complete SWRE VSC is contained in Exhibit 8 to this complaint; a copy of the standard contract used by the other TPP, Wynn's Extended Care, Inc., is contained in Exhibit 9.

4. Repair of any parts in connection with a Covered Repair when those parts are not necessary for the completion of the Covered Repair or were not damaged by the failure of a Covered Part. Such repair or replacement is an improvement to Your Vehicle and is not covered by this Contract.

5. Pre-existing damage, or a Breakdown that occurred before Your purchase of this Contract, either of which would have been obvious and apparent if that component was inspected at time of purchase.

6. A Breakdown caused by or involving modifications or additions to Your Vehicle unless those modifications or additions were performed or recommended by the Vehicle Manufacturer.

7. A Breakdown caused by off-roading, misuse, abuse, racing or any form of competition.

8. Any cost covered by a repair facility's or part supplier's guarantee, or any cost which would normally be covered by a Vehicle Manufacturer's warranty or a dealer warranty required under state law, whether or not such warranty is in force respecting Your Vehicle.

9. Costs of other damages caused by the failure of a part listed in this Contract as an excluded part.

10. Damage to the Vehicle caused by continued Vehicle operation after the Breakdown of a Covered Part.

11. Any liability, cost or damages You incur or may incur to any third parties, other than for Covered Parts.

12. A Breakdown caused by rust or corrosion.

13. A Breakdown caused by collision, fire, electrical fire or meltdown, theft, freezing, vandalism, riot, explosion, lightning, earthquake, windstorm, hail, water, flood or acts of public enemy or any government authority, or for any hazard insurable under standard physical damage insurance policies whether or not such insurance is in force respecting Your Vehicle.

14. A Breakdown outside the continental United States or Canada.

15. Loss of use, loss of time, lost profits or savings, inconvenience, commercial loss, or other incidental or consequential damage or loss that results from a Breakdown.

16. Liability for damage to property, or for injury to, or death of, any person arising out of the operation, maintenance or use of Your Vehicle whether or not related to a Breakdown.

17. Any cost or other benefit for which the Vehicle Manufacturer has announced its responsibility through any means including public recalls or factory service bulletins.

18. Any part not covered, or excluded, by the original Vehicle Manufacturer's warranty.

19. Loss of compression through gradual failure of rings and valves.

20. Constant velocity joint boots.

21. A gradual reduction in performance capability due to day-to-day routine operation.

22. The maintenance services and parts described in paragraph 1 under "Your Obligations" or in the Vehicle Manufacturer's maintenance schedule for Your Vehicle.

23. Other normal maintenance services and parts, including, without limitation, engine tune-up, spark plugs, ignition wires, distributor cap and rotor, carburetor, EGR valve, batteries, filters, lubricants or fluids, air conditioning refrigerant or engine coolant (except when such lubricants, fluids, refrigerant or coolant must be replaced as part of the repair or replacement of a Covered Part), all hoses and belts that are not specifically listed under

"Covered Parts," wiper blades, brake pads and shoes, brake rotors and drums, suspension alignment, tires, wheel balancing, shock absorbers, exhaust system, friction clutch disc and pressure plate, and clutch throw out bearing.

24. Glass, glass framework and fastening adhesives, sealed beam head lamps, light bulbs, lenses, HID assemblies, Safety restraint systems (including air bags), trim, moldings, bright metal, upholstery and carpeting, paint, sheet metal, body panels, structural framework and structural welds.

25. After market accessories or non-original equipment, components and systems not installed by the Vehicle Manufacturer, including, without limitation, antitheft systems, radio/speaker equipment, telephones, cruise control and sunroof.

26. GPS navigation systems and TV/Video/DVD/Entertainment Systems.

27. Damage to a Covered Part caused by a part that is not a Covered Part.

28. Repairs performed without Our prior authorization.

29. To any parts or systems that are considered alternative fuel or electric/hybrid vehicle related.

B. In addition, this Contract provides no benefits or coverage and We have no obligation under this Contract if:

1. The Vehicle odometer fails, or for any reason does not record the actual mileage of Your Vehicle after purchase date and You do not have it repaired and the mileage certified within thirty (30) days of failure date.

2. Your Vehicle is used for business, deliveries, construction or commercial hauling, or as a postal vehicle, taxi, police car or other emergency vehicle.

3. You rent Your Vehicle to someone else.

4. Your Vehicle is equipped with a snow plow or used to plow snow.

5. You are using or have used Your Vehicle in a manner that is not recommended by the Vehicle Manufacturer.

6. Your Vehicle is modified from the Vehicle Manufacturer's original specifications."[25]

129.    Unless the borrower is an expert in car repairs or mechanics, and unless the

borrower understands the relationship between the coverage and exclusion provisions, there is no

way for the borrower to determine what repairs are covered and what repairs are not covered

under the VSC. There is no way for the borrower to determine whether common repairs and

services are covered or not covered by the VSC, how expensive the services are that are covered

and not covered, how much of the cost of repairs the VSC will pay, and whether the purchase of

the VSC is or is not cost-effective.

---

[25] Like the coverage provision, these exclusions appear in the standard SWRE contract. See Exhibit 8.

### i.    Financial Impact of VSC on the Borrower

130.    Between 2013 and 2019, about 80% of eligible CAC borrowers in Massachusetts purchased and financed VSCs as part of their CAC loans.

131.    The average VSC purchased by a Massachusetts CAC borrower between 2013 and 2019 had a retail price to the borrower of about $1,600. All VSCs purchased by CAC borrowers were financed as part of their CAC loans; on average, this added $2,450 to the amount of the loan (the VSC retail price financed, on average, over the 55-month term of the loan).

132.    The VSC purchase increased the amount of an average loan, and of the borrower's average monthly payment, by about 15%.

133.    In the aggregate, VSC purchases added $51 million to the loans of CAC borrowers in Massachusetts between 2013 and 2019 purchasing a VSC.

134.    Based on historical data, over the term of the VSC the average CAC VSC paid an estimated $478 for repairs for each Massachusetts borrower purchasing a VSC. This is slightly less than 20% of the cost of the VSC to the borrower (20 cents for every loan dollar financing the VSC). The remainder of the loan payment attributable to the VSC was split between the dealer, who receives a sales commission for each of the VSC sales, the TPP, and CAC.

135.    About a third of all claims for repairs submitted by borrowers under their VSCs between 2013 and 2019 were denied or unpaid, primarily because the TPP decided they were not covered or were excluded under the terms of the VSC.

### ii.    Financial Impact of VSCs on the Dealer

136.    The VSC purchase affects the dealer's compensation in two ways. First, CAC pays the dealer a sales commission of $385. This is part of the upfront payment to the dealer (the total payment under the Purchase program).

137.    Second, the increased loan amount attributable to the VSC purchase and
financing raises the upfront loan payment to the dealer from CAC (the payment is a percentage
of the total loan amount). Assuming an average dealer upfront payment of 44% of the loan and
an average increase in the loan amount of about $2,450, the dealer receives an additional upfront
payment of about $1,075.[26]

### iii.    Financial Impact of VSC Sales on CAC

138.    During the 2013-2019 period the average expected collection rate for CAC's
Massachusetts loans with VSC's was 70.2%; of the $2,450 loan cost attributable to the VSC
purchase, CAC expected to collect $1,721. CAC used a portion of the borrower's VSC payment
to pay the dealer a $385 sales commission, to pay an $90 administrative fee to the TPP, and
about $40 in ceding costs and taxes, and to cover the average claims cost of $478. Most of the
remainder of the borrower's loan payment attributable to the VSC, or about $727, was retained
by CAC.

**VSC Contribution TO CAC's Return[27]**

| | |
|---|---|
| 1. VSC Portion of Loan | 2,450 |
| 2. VSC Expected Collection | 1,721 |
| 3. Dealer Payment for VSC | 385 |
| 4. TPP Administrative Fee | 90 |
| 5. Ceding Costs and Taxes | 40 |
| 6. VSC Claim Costs | 478 |
| 7. VSC Borrower Payments After Costs | 727 |

---

[26] While the increased upfront payment rate for loans in the Portfolio program did not raise the ultimate compensation to dealers, it shifted "holdback" funds CAC would otherwise have paid the dealer once they were collected to the upfront portion of the dealer's compensation.

[27] Items (3) – (5) are based on CAC Service Contract Program Agreements.

139. Between 2013 and 2019, CAC's income from VSCs contributed substantially to CAC's profit on the loan transaction.

**2. Borrowers Were Required to Purchase VSCs to Obtain CAC Loans**

140. According to CAC's internal policy, a dealer may not require the borrower to purchase a VSC. The purchase of a VSC must be optional. This policy is contained in CAC's internal compliance manual: "[i]t's important that our dealers not require customers to purchase ancillary products. They're optional." (See Exhibit 4 to the complaint.) CAC's policy is communicated to dealers via CAPS (CAC's computer portal) and is stated in the loan contract itself.

141. In spite of CAC's policy, between 2013 or earlier and the present numerous CAC borrowers have been required to purchase VSCs in order to obtain CAC loans. Dealers told borrowers, variously, that "CAC would not approve my loan without purchasing a vehicle service contract," that "my application for my car loan would not be approved unless I purchased the vehicle service contract," and that "the VSC was a mandatory condition of approving my loan." (Sample affidavits of borrowers required to purchase VSCs to obtain their CAC loans are attached to this complaint as Exhibit 5.)

142. Between July 31, 2014 and September 20, 2017 CAC received about 25 complaints directly from Massachusetts consumers who stated that they were required by dealers to purchase VSCs as a condition of obtaining their CAC loans. CAC's compliance manual requires CAC to investigate each such borrower complaint. However, CAC simply refused to believe the complaining borrowers, never interviewed other customers of the dealer to determine whether the dealer required VSC purchases from other consumers, and never questioned the dealer's sales employees about the required VSC purchase. CAC records show only one note

regarding a CAC contact with a representative of a dealer, who stated that the "VSC is included with the loan."

143. CAC determined that none of the complaints from Massachusetts consumers who stated they were required to purchase VSCs "had merit" (CAC's term). CAC's records of the complaints either provide no reason for its "no merit" determination or simply note that the loan contract states the VSC is optional.

144. An internal email provides the only record of a CAC employee's analysis related to one of the complaints; the full text states:

"We received a complaint from a consumer that this dealer advised her that the VSC was a mandatory purchase to get financing (although it is listed on RIC as optional). I checked the dealer's penetration for VSC sales and it appears to consistently be at 100% - indicating they may in fact be telling consumers it is required when it is not. Can you please discuss this with the dealer so that they understand they cannot require a consumer to purchase any of the ancillary products? Please follow up with me once you have had that conversation with the dealer."

(Exhibit 6 to the complaint).

145. Notwithstanding the CAC employee's determination that the dealer's penetration rate was consistently "100%, indicating they may in fact be telling consumers it is required when it is not," CAC found this complaint, like all the others, to be of "no merit."

146. CAC's compliance policy required CAC employees, according to the manual, to review the dealer's VSC "penetration rate" (the percentage of the dealer's CAC borrowers who purchased VSCs) in order to determine "if this complaint is part of a larger trend." From 2013 through 2019, numerous Massachusetts dealers had very high VSC penetration rates between 90% and 100% of their CAC loans. (A complete list of Massachusetts CAC dealers' VSC penetration rates is attached to the complaint as Exhibit 7.) During this period, CAC did not investigate any high-penetration dealers' VSC sales or interview any customers of high-

penetration dealers to determine whether they were required to purchase VSCs. Nor did CAC take any action to remedy the required VSC purchases or to prevent dealers from requiring CAC borrowers to purchase VSCs.

147. As a result of borrowers' statements to CAC and of CAC's knowledge of dealers' VSC penetration rates in Massachusetts, CAC knew or should have known that borrowers were required to purchase VSCs in order to obtain CAC loans.

### 3. The Required Purchase of a VSC to Obtain a CAC Loan Is a Hidden Finance Charge

148. The dealers that required CAC borrowers to purchase VSCs in order to obtain their loans did not require cash payers to purchase VSCs. As a result, the VSC penetration rates for CAC borrowers were often much higher than for cash customers. At one such CAC dealer in Massachusetts, Haddad Auto Group, 100% of CAC borrowers purchased VSCs, while 16% of cash payers purchased VSCs.

149. In some cases, dealers told CAC borrowers that if they increased their cash down-payments, often by several thousand dollars, they would no longer be required to purchase a VSC.

150. The required purchase of a VSC as a condition of obtaining a CAC loan is a hidden finance charge. The amount of this finance charge is the retail cost of the VSC to the borrower, together with interest attributable to this cost. This finance charge was not disclosed to CAC borrowers, who received inaccurate and understated disclosures of the finance charges of their loans.

151. Because the required purchase of a VSC to obtain a CAC loan is a finance charge, the VSC cost must be included in the calculation of the borrower's interest rate on the CAC loan.

48

Virtually all of CAC's loans are made at or very close to the 21% Massachusetts usury ceiling, and properly including the amount of the hidden finance charge attributable to the required VSC purchase in the calculation of the borrower's interest rate results in a recalculated or actual interest rate higher than 21% for practically all CAC borrowers required to purchase VSCs.

152.    The failure to disclose hidden finance charges in CAC loans is an unfair or deceptive act or practice. A loan with an actual interest rate above 21% is unfair.

## G. UNFAIR OR DECEPTIVE ACTS OR PRACTICES IN CONNECTION WITH THE SALE OF CAC'S LOAN SECURITIES

153.    When CAC securitizes its loans and sells them to investors, the offering documents describe the characteristics of the loans in order to disclose to investors the nature of the collateral underlying the securities. Typically, however, the offering documents for CAC's securities only describe the characteristics of a portion of the loans, those committed to the securities before a specified date, referred to in the offering memorandum as the "Cut-off Date," and transferred to the security trust as of the Closing Date of the securitization.   Loans that will be selected after the Closing Date, during what the offering documents refer to as the "Revolving Period," are not described in the offering documents.

154.    Instead, the offering documents typically disclose that loans purchased during the Revolving Period after the Closing Date

"may have characteristics that differ somewhat from the characteristics of the Loans and Contracts as of the initial Cut-off Date… and may be of a different credit quality and seasoning…. The Originator and the Seller *do not expect that the characteristics of the Loans and related Contracts purchased during the Revolving Period will be materially different from those transferred on the Closing Date*…."[28] (Emphasis added)

---

[28] This disclosure is taken from CAALT 2016-3 PPM (Exhibit 10).

155.    According to CAC's offering documents, the characteristics of loans placed
selected by CAC after the Closing Date (and not described in the offering materials) may "differ
somewhat" and "may be of a different credit quality and seasoning" but the offering documents
explicitly state that CAC does not expect the characteristics of these loans to be "materially
different from those transferred on the Closing Date."

156.    In numerous CAC securitizations, however, a key characteristic of the loans CAC
selects after the Closing Date is in fact materially different from the same characteristic of loans
committed before the Closing Date and described in the offering documents. Loans selected by
CAC for its securities after the Closing Date have consistently lower CAC scores or expected
collection rates, on average, than the loans described in the offering documents. (This means
CAC expects at origination that borrowers will repay a smaller portion of the loans.) For seven
securitizations between September 2014 and continuing through the end of 2017, the average
CAC scores of Massachusetts loans placed in the securities trusts in the revolving period was
lower than the average CAC scores of the loans placed in the trusts prior to the Closing Date for
each of the securitizations. The difference in the average CAC scores ranged from 2.8% to
6.0%; overall, the average reduction in the scores for the Massachusetts loans in these
securitizations was about 4.4%.[29]

---

[29] These values are based on data on all loans valued as of October 31, 2017.

#### Average Loan Scores Before and After Closing Date

|  |  | Expected Collection Rate | | |
| --- | --- | --- | --- | --- |
| Security | Closing Date | On or Before (2) | After (2) | Difference |
| (1) | (2) | (3) | (4) | (5) |
| Credit Acceptance Funding LLC 2014-2 | 9/25/2014 | 75.3% | 69.6% | 5.7% |
| Credit Acceptance Funding LLC 2015-1 | 1/29/2015 | 75.9% | 69.9% | 6.0% |
| Credit Acceptance Funding LLC 2015-2 | 8/20/2015 | 73.3% | 70.5% | 2.8% |
| Credit Acceptance Funding LLC 2016-2 | 5/12/2016 | 74.0% | 70.1% | 3.9% |
| Credit Acceptance Funding LLC 2016-3 | 10/27/2016 | 70.2% | 66.8% | 3.4% |
| Credit Acceptance Funding LLC 2017-1 | 2/23/2017 | 71.8% | 68.4% | 3.4% |
| Credit Acceptance Funding LLC 2017-2 | 6/29/2017 | 71.8% | 66.0% | 5.8% |

157. CAC selected the loans for its securitizations both before and after the Closing Date. CAC controlled the selection process, controlled the characteristics and credit quality of the loans it selected, and controlled the disclosures to investors.

158. CAC had complete information concerning the characteristics of the loans selected for inclusion in the securitizations after the Closing Date. This information was non-public, and it was never disclosed to investors.

159. CAC provided data to the Attorney General's Office for all (countrywide) loans in two securitizations, one from 2016 and one from 2017, Credit Acceptance Funding LLC 2016-2 and Credit Acceptance Funding LLC 2017-2. The CAC scores for loans selected by CAC after the Closing Date (and not described in the offering documents) were 3.3 % lower for LLC 2016-2 and 3.0 % lower for LLC 2017-2 than the average scores for the loans selected before the Closing Date.

160. The expected collection rate of CAC's loans is the single most important characteristic in evaluating the underlying credit quality of the loan.

161. In its 10-K CAC considers any deviation from the expected collection rate to be "material" when it is greater than 1%. Discrepancies of 4.2%, 2.3%, 2.5%, 1.5%, and 1.5% are

stated to be "materially better" results, while differences of -2.3% and -1.3% are stated to be "materially worse" results. Discrepancies smaller than 1% are not considered material.

162. The differences in the loan characteristics between the loans selected by CAC for its securitizations before and after the Closing Date are material. These differences should have been disclosed to investors.

163. CAC deliberately and intentionally selected loans after the Closing Date that had credit characteristics that were materially worse than the characteristics of the loans CAC selected and included in the securitization prior to the Closing Date. CAC did so consistently and repeatedly, in successive securitizations. CAC told investors that it did not expect the credit characteristics of the loan to differ materially when CAC knew that the characteristics were materially different because CAC itself selected loans after the Closing Dates with scores that were materially different from the scores of the loans selected prior to the Closing Date. CAC willfully deceived investors concerning the credit characteristics of the loans.

164. CAC knew or should have known that the statements in its offering documents that CAC "does not expect that the characteristics of the Loans and related Contracts purchased during the Revolving Period will be materially different from those transferred on the Closing Date" are materially false and misleading.

165. CAC's false and misleading statements concerning the expected collection rates of loans in its securities and CAC's failure to disclose the material differences in the expected collection rates of the loans CAC placed in the securitizations before and after the Closing Dates are unfair or deceptive acts or practices.

## V.   TOLLING AGREEMENT AND FIVE DAY LETTER

166.   CAC's unfair or deceptive acts or practices continued from 2013 or earlier through the present.

167.   The terms of CAC's loans from 2013 or later continued until 2016 or later.

168.   With respect to the securities claims, the period from January 29, 2018 through the present has been tolled for statute of limitations purposes by a tolling agreement, as amended and extended, entered into between the Office of the Attorney General and CAC.  For all other claims, the period from November 19, 2019 through the present has been tolled for statute of limitations purposes by a tolling agreement, as amended and extended, entered into between the Office of the Attorney General and CAC.  All claims that would be timely if brought on November 19, 2019 are timely as of the date of the filing of this complaint.  Securities claims that would be timely if brought on January 29, 2018 are timely as of the date of the filing of this complaint.

169.   On August 19, 2020, the Attorney General's Office sent CAC a letter in accordance with the provisions of G.L. c. 93A, § 4, paragraph 2.

## VI.  CAUSES OF ACTION

### First Cause of Action

(Unfair Loans; Violation of G.L. c. 93A, 940 C.M.R. 3.16)

170.   The Commonwealth repeats and realleges paragraphs 1 through 169 of the Complaint.

171.   CAC has engaged in unfair or deceptive acts or practices in connection with the approval and funding of high-risk subprime loans in Massachusetts in violation of G. L. c. 93A,

53

§ 2 and 940 C.M.R. 3.16. Such unfair or deceptive acts or practices include, without limitation, the following:

    i.   approving and funding Massachusetts subprime automobile loans in complete and reckless disregard of the risk of default;

    ii.  approving and funding Massachusetts subprime automobile loans when CAC did not reasonably believe at origination that Massachusetts borrowers would be able to repay their loans;

    iii. approving and funding high-risk Massachusetts subprime automobile loans that CAC knew or should have known were unlikely or unable to be repaid in accordance with their terms.

172.    CAC knew or should have known that its acts or practices were in violation of G. L. c. 93A, § 2 and 940 C.M.R. 3.16.

173.    CAC approved and funded loans and acquired payments from consumers by means of its unfair or deceptive acts or practices, causing consumers to suffer an ascertainable loss by paying out funds, incurring debts, and/or incurring the costs and other harm that resulted from default on CAC's loans.

174.    CAC's unfair or deceptive acts or practices resulted in harm to consumers.

## Second Cause of Action

(Unfair collection practices; Violation of G.L. c. 93A, 940 CMR 7.00 et seq., 7.04 (1) (f))

175.    The Commonwealth repeats and realleges paragraphs 1 through 174 of the Complaint.

176. CAC has engaged in unfair or deceptive acts or practices in connection with the collection of loans in Massachusetts in violation of G. L. c. 93A, § 2. Such unfair or deceptive acts or practices include, without limitation, excess contacts and harassment of consumers, and the making of about 1.7 million collection calls in violation of Massachusetts law and regulations.

177. CAC knew or should have known that its acts or practices were in violation of G. L. c. 93A, § 2.

178. CAC acquired payments from consumers by means of its unfair or deceptive acts or practices, causing consumers to suffer an ascertainable loss by paying out funds. CAC caused consumers to experience emotional harm through its harassing acts and practices.

179. CAC's unfair or deceptive acts or practices resulted in harm to consumers.

**Third Cause of Action**

(Unfair repossession collections and notices; Violation of G.L. c. 93A, G.L. c. 106,

G.L. c. 255B)

180. The Commonwealth repeats and realleges paragraphs 1 through 179 of the Complaint.

181. CAC has engaged in unfair or deceptive acts or practices in connection with its loan deficiency collections and its pre-sale and post-sale repossession notices to borrowers in Massachusetts in violation of G. L. c. 93A, § 2, c. 106, § 9-614-616, and c. 255B, §20B. Such unfair or deceptive acts or practices include, without limitation, CAC's failure to calculate the deficiency amounts owed by borrowers based on the fair market value of the repossessed vehicle, CAC's collection of deficiency amounts from borrowers that were not based on the fair

55

market value of the repossessed vehicle, and CAC's failure to include a description of the calculation of the deficiency amount based on the fair market value of the repossessed vehicle in the pre-sale notices and a detailed explanation of the same calculation in its post-sale notices.

182.    CAC knew or should have known that its acts or practices were in violation of G. L. c. 93A, § 2.

183.    CAC acquired payments of deficiency amounts from consumers by means of its unfair or deceptive acts or practices, causing consumers to suffer an ascertainable loss by paying out funds.

184.    CAC's unfair or deceptive acts or practices resulted in harm to consumers.


**Fourth Cause of Action**

(Improper repossession notices; *parens patriae*, Violation of G.L. c. 106)

185.    The Commonwealth repeats and realleges paragraphs 1 through 184 of the Complaint.

186.    G.L. c. 106, §§ 9-614 and 9-616 requires repossession notifications to include certain disclosures to borrowers, including a description of any liability for a deficiency remaining on the borrowers' loans.

187.    CAC did not include a description of the calculation of the deficiency amount based on the fair market value of the repossessed vehicles in the pre-sale notices and a detailed explanation of the same calculation in its post-sale notices. By failing to properly describe the calculation of the deficiency in its notifications to borrowers, CAC failed to comply with G.L. c. 106, §§ 9-614 and 9-616.

188.    Massachusetts consumers are entitled to statutory damages under G. L. c. 106, §
9-625(c)(2) for CAC's improper notices.

**Fifth Cause of Action**

(Unfair markups based on the credit of borrowers; Violation of G.L. c. 93A,

G.L. c. 140D, G.L. c. 255B; assignee liability)

189.    The Commonwealth repeats and realleges paragraphs 1 through 188 of the
Complaint.

190.    CAC has engaged in unfair or deceptive acts or practices in connection with the
markup of vehicle prices for cars sold to CAC borrowers with low expected collection rates (or
CAC scores) that are substantially higher than the markups on cars sold to borrowers with higher
expected collection rates in Massachusetts in violation of G. L. c. 93A, § 2, c. 140D, §§ 4, 5, and
c. 255B, §14. Such unfair or deceptive acts or practices include, without limitation, approving,
funding, and acquiring through assignment automobile loans in Massachusetts that fail to
disclose that the increased markup of vehicle prices based on the credit of the borrower is a
finance charge, and approving, funding, and acquiring through assignment loans that, as a result
of the increased markup of vehicle prices based on the credit of the borrowers, have properly
calculated interest rates in excess of 21%.

191.    CAC knew or should have known that its acts or practices were in violation of G.
L. c. 93A, § 2.

192.    CAC acquired payments from consumers by means of its unfair or deceptive acts
or practices, causing consumers to suffer an ascertainable loss by paying out funds.

193.    CAC's unfair or deceptive acts or practices resulted in harm to consumers.

**Sixth Cause of Action**

(Unfair required purchase of vehicle service contracts; Violation of G.L. c. 93A,

G.L., c. 140D, G.L. c. 255B; assignee liability)

194. The Commonwealth repeats and realleges paragraphs 1 through 193 of the Complaint.

195. CAC has engaged in unfair or deceptive acts or practices in connection with the required purchase of vehicle service contracts in Massachusetts in violation of G. L. c. 93A, § 2, c. 140D, §§ 4, 5, and c. 255B, §14. Such unfair or deceptive acts or practices include, without limitation, approving, funding, and acquiring through assignment automobile loans in Massachusetts that fail to disclose that the required purchase of a vehicle service contract as a condition of obtaining a loan is a finance charge, and approving, funding, and acquiring through assignment loans that, as a result of the required purchase of a vehicle service contract, have properly calculated interest rates in excess of 21%.

196. CAC knew or should have known that its acts or practices were in violation of G. L. c. 93A, § 2.

197. CAC acquired payments from consumers by means of its unfair or deceptive acts or practices, causing consumers to suffer an ascertainable loss by paying out funds.

198. CAC's unfair or deceptive acts or practices resulted in harm to consumers.

**Seventh Cause of Action**

(Deceptive statements in offering documents for securities; Violation of G.L. c. 93A,

940 C.M.R. 3.16)

199.    The Commonwealth repeats and realleges paragraphs 1 through 198 of the
Complaint.

200.    CAC has engaged in unfair or deceptive acts or practices in connection with the
sale of securities to Massachusetts investors in violation of G. L. c. 93A, § 2 and 940 C.M.R.
3.16. Such unfair or deceptive acts or practices include, without limitation, selling, facilitating,
or causing the sale of securities to Massachusetts investors by means of (i) materially false or
misleading statements in the offering documents for such securities that CAC "does not expect
that the characteristics of the Loans and related Contracts purchased during the Revolving Period
will be materially different from those transferred on the Closing Date" and (ii) CAC's failure to
disclose the material differences in the characteristics of the loans selected for the securities
before and after the Closing Dates.

201.    CAC knew or should have known that its acts or practices were in violation of G.
L. c. 93A, § 2 and 940 C.M.R. 3.16.

202.    CAC willfully violated G. L. c. 93A, § 2 and 940 C.M.R. 3.16 with respect to its
securities sales to Massachusetts investors and its securitization of Massachusetts automobile
loans.

203.    CAC acquired payments from Massachusetts investors by means of its unfair or
deceptive acts or practices, causing them to suffer an ascertainable loss by purchasing securities
(i) that were riskier than CAC represented them to be, and/or (ii) they would not have purchased
but for CAC's misrepresentations and nondisclosures, and/or (iii) at higher prices than they

59

would have paid in the absence of CAC's misrepresentations and nondisclosures and/or (iv) that paid lower interest rates than they would have accepted in the absence of CAC's misrepresentations and nondisclosures.

204.    CAC's unfair or deceptive acts or practices resulted in harm to consumers.

## VII.   RELIEF REQUESTED

WHEREFORE, the Commonwealth requests that this Court:

A.    Issue a permanent injunction restraining CAC, its agents, employees, and all other persons and entities, corporate and otherwise, in active concert or participation with any of them from:

> i.      approving and funding subprime automobile loans in Massachusetts in complete and reckless disregard of the risk of default; approving and funding high-risk Massachusetts subprime automobile loans CAC does not reasonably believe at origination that Massachusetts borrowers will be able to repay; approving and funding high-risk Massachusetts subprime automobile loans that CAC knew or should have known are unlikely or unable to be repaid in accordance with their terms;
>
> ii.     approving, funding, or accepting assignment of loans of borrowers who are required as a condition of funding to purchase vehicle service contracts without disclosure of the cost of the required vehicle service contracts as finance charges; approving, funding, or accepting assignment of loans of borrowers who are required as a condition of funding to purchase vehicle service contracts when the actual interest rates of the loans calculated

60

using the cost to borrowers of the required vehicle service contracts
exceed 21%;

iii.    approving, funding, or accepting assignment of loans when the prices of

the vehicle have been marked up based on the borrowers' credit without

disclosure of the markup as a finance charge; approving, funding, or

accepting assignment of loans of borrowers when the prices of the vehicle

have been marked up based on the borrowers' credit and the actual interest

rates of the loans calculated using the cost to borrowers of the markup

exceed 21%;

iv.    making false and/or misleading representations and/or omissions to actual

or potential securities investors in Massachusetts concerning the

characteristics of loans collateralizing CAC's automobile-loan backed

securities.

B.    Order CAC to pay restitution to Massachusetts borrowers harmed by CAC's
misconduct, including but not limited to (i) refunding payments made by borrowers whose
subprime loans are unfair and (ii) paying three times any ascertainable losses of money or
property to Massachusetts securities purchasers.

C.    Order CAC to disgorge all monies collected by CAC as a result of its unfair loan
collection acts and practices (or all monies CAC would not have collected but for its unfair
collection calls) in violation of Massachusetts law.

D.    Order CAC to pay statutory damages to consumers under G. L. c. 106, § 9-
625(c)(2) for CAC's improper repossession notices.

E.     Order CAC to offer to Massachusetts purchasers of CAC's securities the option to tender their securities in exchange for payment or to receive damages payments in the amount that would be provided under M.G.L. c. 110A, § 410(a)(2).

F.     Order CAC to pay the Commonwealth civil penalties of $5,000 for each violation of G. L. c. 93A, § 2, and costs, including reasonable attorneys' fees, pursuant to G. L. c. 93A, § 4.

G.     Grant such other and further relief as this Court deems just and proper.

Dated:  August 28, 2020

<div style="margin-left:40%;">

COMMONWEALTH OF MASSACHUSETTS
MAURA HEALEY
ATTORNEY GENERAL

_Deane Hooley_

Glenn Kaplan BBO #567308
Peter Leight BBO #631580
Madonna Cournoyer BBO # 642060
Diana Hooley BBO # 685418
David Lim BBO # 685364
Michael Sugar BBO # 683901
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
617-963-2240
Glenn.Kaplan@mass.gov
Peter.Leight@mass.gov
Madonna.Cournoyer@mass.gov
Diana.Hooley@mass.gov
David.Lim@mass.gov
Michael.Sugar@mass.gov

</div>

# EXHIBITS

URL: https://www.creditacceptance.com/your-credit-approval

Last Accessed: August 28, 2020



Credit<br>
Acceptance<br>
We change lives!

Customers   Dealers   About Us   Contact Us   Login   🔍

## BAD CREDIT? NO CREDIT?

Learn about your vehicle financing options

[ Find a dealer near you ]

## Your credit approval

Credit Acceptance empowers car dealers nationally to help people with bad credit or no credit buy a new or used car. If you need a car and are having difficulty getting approved for a car loan or financing, a dealer enrolled with Credit Acceptance can help.

**Start Your Credit Approval Today ›**

## Approval for Everyone

We believe everyone deserves a second chance, which is why we enable dealers enrolled with Credit Acceptance to approve everyone, including customers with any of the following:

- Bad credit history
- No credit history
- Fixed income
- Unemployment income
- Multiple open auto loans
- Multiple repossessions
- Self-employed income
- Temporary income
- Bankruptcy Chapter 7
- Bankruptcy Chapter 13 (with court/trustee approval)

If you want to get in touch with a dealer enrolled with Credit Acceptance, fill out the Find Your Credit Approval form to receive contact information of car dealers in your area.

Exhibit 1



# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549
# FORM 10-K

(Mark One)

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
   **For the fiscal year ended December 31, 2016**

                              OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
   **For the transition period from _____ to _____**

Commission file number 000-20202

# CREDIT ACCEPTANCE CORPORATION
*(Exact name of registrant as specified in its charter)*

| Michigan | 38-1999511 |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |

**25505 W. Twelve Mile Road**
**Southfield, Michigan**                                        **48034-8339**
*(Address of principal executive offices)*                          *(Zip Code)*

Registrant's telephone number, including area code: **(248) 353-2700**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock | The NASDAQ Stock Market |

Securities registered pursuant to section 12(g) of the Act:
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act (Check one):

| Large accelerated filer ☑ | Accelerated filer ☐ | Non-accelerated filer ☐ | Smaller reporting company ☐ |
|---|---|---|---|
| | | (Do not check if a smaller reporting company) | |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☑

The aggregate market value of 7,743,497 shares of the Registrant's common stock held by non-affiliates on June 30, 2016 was approximately $1,433.2 million. For purposes of this computation all officers, directors and 10% beneficial owners of the Registrant are assumed to be affiliates. Such determination should not be deemed an admission that such officers, directors and beneficial owners are, in fact, affiliates of the Registrant.

At February 3, 2017, there were 19,877,856 shares of the Registrant's common stock issued and outstanding.

### DOCUMENTS INCORPORATED BY REFERENCE
Portions of the Registrant's definitive Proxy Statement pertaining to the 2017 Annual Meeting of Shareholders (the "Proxy Statement") filed pursuant to Regulation 14A are incorporated herein by reference into Part III of this Annual Report on Form 10-K (this "Form 10-K").

                                        CACMA00097463

**Available Information**

Our Internet address is *creditacceptance.com*. We make available, free of charge on the web site, copies of reports we file with or furnish to the Securities and Exchange Commission ("SEC") as soon as reasonably practicable after we electronically file or furnish such reports.

## ITEM 1A.    RISK FACTORS

**Our inability to accurately forecast and estimate the amount and timing of future collections could have a material adverse effect on results of operations.**

Substantially all of the Consumer Loans assigned to us are made to individuals with impaired or limited credit histories or higher debt-to-income ratios than are permitted by traditional lenders. Consumer Loans made to these individuals generally entail a higher risk of delinquency, default and repossession and higher losses than loans made to consumers with better credit. Since most of our revenue and cash flows from operations are generated from these Consumer Loans, our ability to accurately forecast Consumer Loan performance is critical to our business and financial results. At the time of assignment, we forecast future expected cash flows from the Consumer Loan. Based on these forecasts, which include estimates for wholesale vehicle prices in the event of vehicle repossession and sale, we make an advance or one-time purchase payment to the related Dealer at a level designed to maximize economic profit, a non-GAAP financial measure. We continue to forecast the expected collection rate of each Consumer Loan subsequent to assignment. These forecasts also serve as a critical assumption in our accounting for recognizing finance charge income and determining our allowance for credit losses. Please see the Critical Accounting Estimates – Finance Charge Revenue & Allowance for Credit Losses section in Item 7 of this Form 10-K, which is incorporated herein by reference. Actual cash flows from any individual Consumer Loan are often different than cash flows estimated at the time of assignment. There can be no assurance that our forecasts will be accurate or that Consumer Loan performance will be as expected. In periods with changing economic conditions, accurately forecasting the performance of Consumer Loans is more difficult. In the event that our forecasts are not accurate, our financial position, liquidity and results of operations could be materially adversely affected.

**We may be unable to execute our business strategy due to current economic conditions.**

Our financial position, liquidity and results of operations depend on management's ability to execute our business strategy. Key factors involved in the execution of our business strategy include achieving our desired Consumer Loan assignment volume, continued and successful use of CAPS and pricing strategy, the use of effective credit risk management techniques and servicing strategies, continued investment in technology to support operating efficiency and continued access to funding and liquidity sources. Although our pricing strategy is intended to maximize the amount of economic profit we generate, within the confines of capital and infrastructure constraints, there can be no assurance that this strategy will have its intended effect. Please see the Consumer Loan Volume section in Item 7 of this Form 10-K, which is incorporated herein by reference. Our failure or inability to execute any element of our business strategy could materially adversely affect our financial position, liquidity and results of operations.

**We may be unable to continue to access or renew funding sources and obtain capital needed to maintain and grow our business.**

We use debt financing to fund new Loans and pay Dealer Holdback. We currently utilize the following primary forms of debt financing: (1) a revolving secured line of credit; (2) revolving secured warehouse ("Warehouse") facilities; (3) asset-backed secured financings ("Term ABS"); and (4) senior notes. We cannot guarantee that the revolving secured line of credit or the Warehouse facilities will continue to be available beyond their current maturity dates, on acceptable terms, or at all, or that we will be able to obtain additional financing on acceptable terms or at all. The availability of additional financing will depend on a variety of factors such as market conditions, the general availability of credit, our financial position, our results of operations, and the capacity for additional borrowing under our existing financing arrangements. If our various financing alternatives were to become limited or unavailable, we may be unable to maintain or grow Consumer Loan volume at the level that we anticipate and our operations could be materially adversely affected.

13

CACMA00097475





Better Business Bureau

20300 W 12 Mile Rd, Ste 202
Southfield MI 48076-6409
(248) 223-9400
bbb.org/detroit

**Case #:**

**Sent to Business on:** 01/26/2017

**Business Info:**
Credit Acceptance Corporation
25505 West 12 Mile Road, Suite 3000
Southfield, MI 48034
(586) 461-1002

**Consumer Info:**



**Nature of the Complaint:** Billing or Collection Issues

**Consumer's Original Complaint:**
This is the absolute worst loan provider to deal with. I would never recommend this
company to anyone. Their entire purpose is to take advantage of desperate people in
difficult situations.

The employees are trained to talk down to us. Every single time I speak to a
representative, they are rude and disrespectful no matter what the reason is for the call.

I keep getting collections calls even after I make a payment. I am harassed day and
night. I even receive calls after 9pm. I have to call them 1-2 times week begging for the
calls to stop. I've had to reset up auto-pay a total of six times because my payments
would mysteriously stop and all of a sudden have a pile of invalid late fees. Even after
making payments on time, it's being reported as late to the credit bureaus. I can't see
my transaction history online and it takes two weeks to arrive in the mail. By the time is
arrives something has already changed. The last three times I called and requested my
history, the representatives flat out refused. I was literally arguing with a woman for 25
minutes about why I'm not allowed to view my transaction history. At this point I'm
making blind payments. I don't know what my balance is and I don't know how many late
fees were added. I've tried to pay off the loan early in one lump sum a few times and I'm
always quoted 1500 more than it should be and they refuse to take anything less.
Apparently they keep the entire interest amount of the original loan even if you're paying
it off early. They literally call it quote because it changes after a week.

**Consumer's Desired Resolution:**

I believe the best resolution is to have my credit report corrected. I want to have access to my transaction at all times. I want to the collections calls to stop! I deserve compensation after the amount of stress this company has cause me. Their collection calls have also interfere with my job and caused me to use a few sales. Something needs to be done.

Complaint Message

Page 1 of 3





BBB of Detroit & Eastern Michigan
26777 Central Park Blvd, Ste. 100
Southfield, MI 48076-4163
Phone: (248)223-9400 | Fax: (248)356-5156
www.easternmichiganbbb.org

07/23/2014

Complaint Resolution Team
Credit Acceptance Corporation
25505 West 12 Mile Road, Suite 3000
Southfield MI 48034

Dear Complaint Resolution Team :

The Better Business Bureau has received a complaint about your business. The complaint was
submitted on 7/21/2014 2:57:04 PM and was assigned an ID of ▮▮▮▮▮▮. The complaint was
filed by ▮▮▮▮▮▮▮. The consumer's complete contact information appears below.

Please review this information and respond within the next seven (7) calendar days. Our goal is
to assist you in retaining the business of your customer by resolving this dispute.

If you received this complaint via email simply click on the **"Respond to this Complaint"**, link
located on the left, when you are ready to answer.

If complaint was received via postal mail, please state your position in a typed or handwritten
letter and fax or mail back to the BBB.

Please understand that when you respond to a complaint, your response will be submitted
directly to the customer.

Regards,

Better Business Bureau
Constance Stevens
248-799-0327
Fax: 248-356-5156

Confidential

CACMA00355813



**COMPLAINT INFORMATION:**

**BBB Case #** [redacted] **- Credit Acceptance Corporation**

**Customer Information:**



Daytime Phone:
Evening Phone:
E-mail:

**The details of this matter are as follows:**

**Complaint Involves:**
Billing or Collection Issues

**Customer's Statement of the Problem:**
·I am constantly harassed on a regular basis by this company. They claim I have missed payments totaling over 700 dollars, but have yet to prove it to me, and my bank statements do not back that up. They stated they would send me a letter saying exactly what months I missed, but they have yet to send that information. It's been over a month. My monthly payments started off at $355 a month at 25 percent interest. In the month of june, I paid $375 to them, and received a call at the end of the month saying that if I wanted to keep my account active, I still owed them $280. They are bullies, and quite possibly the worst lender I have ever come across in my life. They threaten to reposses my car without giving any sort of proof at all that I am actually behind in my payments, and they continue to call asking for more and more money, as if I never talked to any of their reps in the first place. After a barrage of ominous voicemails they left me where nobody said a word, I spoke to a rep for the 4th time to try and work out a weekly payment schedule to get me back on track, and the next time I spoke to them they said they have no record of the conversation ever having taken place, even though they claim every phone call is recorded. Something is very wrong here. They are gouging me, harassing me, and constantly trying everything they can to make me give them every dime I have. Somebody needs to look into this unethical business and find out what's going on, because I know I cannot possibly be the only person having major problems with these people.

**Complaint Background:**
**Product/Service:** 2009 Chevy Aveo
**Account Number:** [redacted]

**Name of Salesperson:**

**Desired Settlement:**
Investigate them. Find out if their records of payment from customers are accurate, if somebody is stealing money from customers (I believe this to be true), go through every single peice of paperwork involved and discover what and how they have been doing this to people like me for as long as they have. I refuse to be pushed around anymore and I want an answer as to where all of my money is going.

Confidential                                                                                           CACMA00355814

*Note: Please understand that the customer's complaint and your response may be publicly posted on the website(s) of BBB (BBB also reserves the right to not post complaint detail, in accordance with BBB policy). Please do not include any information that personally identifies your customer. By submitting your response, you are representing that it is a truthful account of your experience with this customer. The BBB may edit the complaint of your response to protect privacy rights and to remove inappropriate language.*

CACMA00355815

Compliance Manual - Page 0606 of 1255



| Primary Affected Area | Dealer Compliance | **Job Aid** |
|---|---|---|
| Topic | Compliance | |
| Date of Most Recent Publication | 7/21/17 | |
| QA Compliance Review Date | NA | |

This job aid describes the steps that Team Members take after a failed audit to propose an action plan for a Dealer to their supervisor.

| | DEALER AUDIT – MANAGING DEALER CONDUCT |
|---|---|
| **Steps** | **Action** |
| 1 | **a. Review the following factors to assess the risk of the audit findings:**<br><br>• The nature and number of discrepancies discovered during the audit.<br>• The severity of the discrepancies discovered during the audit.<br>• The Advances paid on the accounts with discrepancies. This information may identify a pattern of fraud to obtain higher Advances.<br>• Dealer involvement. Assess whether the Dealer is involved in deceptive conduct, and whether the deceptive behavior is isolated to a particular Dealer employee or known by the Dealer principals.<br>• Customer Harm and/or potential for customer harm resulting from Dealer conduct. *Immediately escalate accounts where customer harm exists to the Compliance Department.*<br>• Previous audit failures for similar reasons<br>• Time elapsed since last audit failures<br><br>**b. Determine the risk level of the Dealer's conduct based upon your audit findings. Use the chart in <u>Step 3</u> to categorize your findings as low, medium, or high risk for the Company to assess next steps for the Dealer.** |
| 2 | **a. Review the following factors to assess the risk of the Dealer's conduct outside of the audit:**<br><br>• Number and nature of customer complaints (review the Artiva notes in order to find the account's complaint history, refer to <u>Escalating a Customer Request or Complaint Job Aid</u> for additional actions on viewing complaint history or escalating a complaint correctly).<br>• Dealer's rating and performance with the Company, including equity.<br>• Tenure (the length of time the Dealer has been doing business with the Company). This information may be helpful to assess whether the Dealer may have a bad employee or has a more systemic issue.<br>• Review the Bad Dealer List in the Dealer Monitoring System ("DMS") to identify whether the dealer (or any employees working at the dealership) have been previously added as a bad dealer.<br>• Volume of business (number of contracts the Dealer assigns to the Company). This information may be helpful to provide context around the data. For example, if the Dealer has four complaints, but has assigned 200 contracts to the Company, it may not suggest an issue. If the Dealer has four complaints, but has assigned 6 contracts to the Company, this likely indicates a higher risk circumstance.<br>• Audit history (trends in failed audits)<br>• Information provided by the Sales Team. Sales team members can provide observations from Dealer visits and discussions. Oftentimes, Sales team members can and will proactively identify a Dealer who may be at the end of its lifecycle<br>• Unusual deal structure behavior on the Dealer Dashboard (ancillary product, Autopay or GPS-SID penetration, high claims ratio, payment to income ratio, etc.)<br>• Compliance with Title Transfer Policy<br>• Compliance with the Company's Policies and Dealer Funding Standards<br>• Compliance with the Dealer Service Agreement<br><br>**b. Determine the risk level of the Dealer based upon the Dealer's historical behavior and performance with the Company. Use the table in <u>Step 3</u> to categorize your findings as low, medium, or high risk for the Company to continue working with the Dealer.** |

THIS DOCUMENT CONTAINS INFORMATION PROPRIETARY TO CREDIT ACCEPTANCE CORPORATION. ANY USE OR REPRODUCTION IN ANY FORM, WITHOUT WRITTEN PERMISSION OF CREDIT ACCEPTANCE IS PROHIBITED.

©2017 Credit Acceptance Corporation. All Rights Reserved.

Page 1 of 4

Confidential

 **Complaint Escalation – Investigating Dealer Conduct Complaints Job Aid**

| | Resolve the complaint. To attempt to resolve the complaint, ask the customer what relief they would consider reasonable in this situation: |
|---|---|

| If | Then |
|---|---|
| 17 | |

| If | Then |
|---|---|
| Customer wants to keep the vehicle and requests a credit to their principle balance | 1. Determine an appropriate amount for the credit. For example, review the vehicle's Black Book value at the correct and incorrect mileages and propose a credit for the difference<br>c. Obtain Supervisor or Manager approval before proposing credits over $500.00.<br>d. Send the customer a letter confirming this is their desired relief and they have refused cancellation of the Contract<br>e. If you determine that the dealer engaged in fraud, follow the instruction in the Managing Dealer Conduct Job Aid |
| Customer does not want to keep the vehicle | 1. Attempt to facilitate a settlement:<br>　a. Dealer agrees to unwind the contract (return the customer's down payment and repay their Credit Acceptance advance), and Customer agrees to return the vehicle to the dealer.<br>　b. If the dealer agrees, draft a settlement agreement and forward to the dealer and customer to sign<br>2. If the dealer does not agree:<br>　a. Initiate a settlement agreement with the customer<br>　b. Arrange for the customer to surrender the vehicle to Credit Acceptance and for the account to be closed upon its receipt<br>　c. Escalate the account to the Complaint Escalation Supervisor and/or Manager for potential additional action |

| | Refer to Managing Dealer Conduct Job Aid to assess the risk of the dealer's behavior |
|---|---|

## Allegation - Customer Was Required To Finance VSC Or GAP

| Steps | We allow our customers to finance certain vehicle service contracts ("VSC") and GAP. It's important that our dealers do not require customers to purchase those ancillary products. They're optional. If a customer alleges that she was required to finance a VSC or GAP, we will investigate in the following manner: |
|---|---|
| 18 | Review the account in Artiva and / or App Xtender to verify whether the customer purchased a VSC and / or GAP |
| 19 | Offer to cancel the unwanted ancillary product(s) and follow the Ancillary Product Cancellation Job Aid<br>• If they were forced to purchase the ancillary product, we can coordinate with Operations Support to cancel as of the date of purchase rather than the cancellation date as long as the customer did not use the product |
| 20 | a. Review the dealer's penetration rate for these products on the Credit Acceptance Business Intelligence (CABI) tool<br>b. Try to detect if this complaint is an isolated event or part of a larger trend<br>　• If part of a larger trend, go to the Managing Dealer Conduct Job Aid |
| 21 | Apply CLO action code to return the account to normal collection status |
| 22 | Contact the dealer's MAM to alert them to any issues they might want to discuss with the dealer<br>• The Company will not continue to re-train a dealer who continues to violate policy<br>Refer to the Managing Dealer Conduct Job Aid to assess the risk of the dealer's behavior |

## Allegation - Selling Price Dispute

| Steps | This complaint type applies when the customer alleges that the dealer advertised a vehicle at cash price and then increased that cash price at the time of sale *because the customer financed the vehicle.* |
|---|---|
| 23 | a. Review the contract file in App Xtender and compare the cash price on the contract to the cash price included on the bill of sale to determine if there is a discrepancy<br>b. Ask the customer to provide a copy of the advertisement (if applicable, including the date) that supports their allegation within 10 days<br>c. Click on *Set Review Date* link in the left side menu in Artiva to set a corresponding review date<br>d. a corresponding review date<br>e. If the customer does not have a copy of the advertisement and the bill of sale includes a lower cash price than the contract, proceed to **Step 25**, Section entitled *Sale Price Was Increased* |

THIS DOCUMENT CONTAINS INFORMATION PROPRIETARY TO CREDIT ACCEPTANCE CORPORATION. ANY USE OR REPRODUCTION IN ANY FORM, WITHOUT WRITTEN PERMISSION OF CREDIT ACCEPTANCE IS PROHIBITED.

©2016 Credit Acceptance Corporation. All Rights Reserved.

Confidential

**STATEMENT OF** ▮▮▮▮▮

1. My name is ▮▮▮▮▮ I am a resident of ▮▮▮▮▮ I have personal knowledge of the facts set forth herein and am competent to testify thereto.

2. In or around January 2017, I visited an auto dealership called Marx Enterprises located in Dartmouth, Massachusetts. During this visit, I decided to purchase a 2011 Volvo S80. The dealer informed me that the only financing option available to me was Credit Acceptance Corporation ("CAC").

3. When I was finalizing the deal, I noticed that the paperwork stated that the purchase of a Vehicle Service Contract ("VSC") was optional. Despite this, the dealer told me that VSC was required if I wanted to purchase the vehicle with financing. When I asked why, the dealer told me that CAC would not approve my auto loan without a VSC. According to the dealer, CAC requires borrowers to purchase VSCs to decrease the probability of a borrower abandoning the vehicle if it breaks down and defaulting on the loan.

4. The VSC cost approximately $2,600. I did not want to purchase the VSC, but I was told that the VSC was a mandatory condition of approving my loan. CAC was the only financing option available due to my poor credit at the time, which was a result of being unemployed for a year. I needed the vehicle and had no leverage to negotiate, so if I wanted to purchase this vehicle, I had to agree to the terms with CAC for financing.

5. Sometime after I purchased my 2011 Volvo S80, the vehicle needed repairs. The repairs were covered under the VSC, but the VSC provider tried to only pay for cheap, after-market parts. My mechanic fought hard to secure original equipment manufacturer parts for the repairs and eventually succeeded. My mechanic made it very clear to me that dealing with the VSC provider was a very unpleasant experience.

6. On January 30, 2020, I contacted CAC directly, and simply asked if it was mandatory to agree to a VSC as a condition for loan approval. I was told it was purely optional. This is the complete opposite of what I was told my Marx Auto, regardless of what the contract says. A copy of this correspondence was forwarded under separate cover as proof of the same.

Sworn to under penalties of perjury this __9th__ day of __March__, 2020.

**STATEMENT OF**

1. My name is ▮▮▮▮. I am a resident of ▮▮▮▮▮▮ I have personal knowledge of the facts set forth herein and am competent to testify thereto.

2. On or around March 10, 2017, I purchased a 2008 BMW X3 from Milford Auto Mall located in Milford, MA.

3. The vehicle cost approximately $8,995, but the listing price was approximately $8,555. The vehicle service contract cost approximately $1,954. The total purchase price was approximately $14,723.25.

4. After the application was completed, I noticed the total purchase price included the cost of the vehicle service contract. I told the representative, named Andreia, that I did not want to purchase a vehicle service contract. Andreia told me that my application for my car loan would not be approved unless I purchased the vehicle service contract. Andreia told me that I could cancel the vehicle service contract approximately six months later. However, when I called to cancel the vehicle service contract, I was told that I could not cancel it.

Sworn to under penalties of perjury this 3 day of February 2020.

<u>**STATEMENT OF**</u> ▮▮▮▮▮▮

1. My name is ▮▮▮▮▮. I am a resident of ▮▮▮▮▮▮▮▮. I have personal knowledge of the facts set forth herein and am competent to testify thereto.

2. On or around April 29, 2016, I visited an auto dealership called Paragon Auto located in Brockton, Massachusetts. During my visit, I decided to purchase a 2011 Hyundai Sonata.

3. I asked the dealer for financing options, and the dealer proceeded to check my credit score. According to the dealer, the only financing available for me was through Credit Acceptance Corporation ("CAC").

4. After checking my credit score, the dealer also further increased the purchase price of the vehicle to approximately $11,000, from their advertised price of approximately $9,660. They told me that this markup was necessary because I was not able to afford the initial down-payment amount required to purchase the car at the advertised price.

5. The dealer also stated that CAC would not approve my loan without purchasing a vehicle service contract ("VSC"). I asked the dealer why I would need to purchase an additional warranty through CAC if the vehicle already came with a 30- or 90-day manufacturer's warranty. The dealer told me that based on my credit score, CAC would not approve my loan unless I either make a significantly larger down-payment or purchase the VSC.

Sworn to under penalties of perjury this _14_ day of _January_ , 2020.

▮▮▮▮▮▮▮

**To:**      Mike Miket[mmiket@creditacceptance.com]
**From:**    Ryan Doyle
**Sent:**    Tue 3/8/2016 5:51:15 PM
**Importance:**      Normal
**Subject:** Fwd: LANDES ENTERPRISES LLC - LOT HPB
**Received:**        Tue 3/8/2016 5:51:16 PM

Good day sir, does this result in an audit? Where to go with? I'm meeting tomorrow to discuss thought I'd get your take, when you have a sec thanks.

Ryan Doyle
Market Area Manager
Credit Acceptance Corporation
P-(781)-857-8368
F-(844) 467-8459

Sent from my iPhone

Begin forwarded message:

**From:** Shannon Rodgers <srodgers@creditacceptance.com>
**Date:** March 8, 2016 at 11:21:01 AM EST
**To:** Ryan Doyle <rdoyle@creditacceptance.com>
**Subject: LANDES ENTERPRISES LLC - LOT HPB**

Hi Ryan
We received a complaint from a consumer that this dealer advised her that the VSC was a mandatory purchase to get financing (although it is listed on RIC as optional). I checked the dealer's penetration for VSC sales and it appears to consistently be at 100% - indicating they may in fact be telling consumers it is required when it is not. Can you please discuss this with the dealer so that they understand they cannot require a consumer to purchase any of the ancillary products? Please follow up with me once you have had that conversation with the dealer. Thanks!

**Shannon Rodgers**

**Legal Assistant**
**Complaint Escalation Team**
Corporate Legal
25505 West Twelve Mile Road ~ Southfield ~ MI 48034
Phone 855-862-5100 ext:4216 Fax 855-772-7799
Email:  srodgers@creditacceptance.com





PrideNet ☑ | 🏆 CREDIT ACCEPTANCE          Corporate Legal ▸ Pre Dispute Complaints: ████████   [in] [f]
                 ONE OF AMERICA'S BEST WORKPLACES!

| | |
|---|---|
| Account Number | ████████ |
| Customer Name | ████████ |
| Source | Phone Complaint |
| Primary Issue | Vehicle Service Contract Coverage |
| Secondary Issue | Dealer Issue - Contract Problem - Fraud or Second Contract |
| Systemic Issue | No |
| Person Assigned to | Shannon Donkerbrook |
| Date Assigned | 3/3/2016 |
| Customer Attorney Contact Information | |
| Strategy | Finalizing resolution with customer |
| Describe Alleged Facts/Conversations with Customer | 4/13/16**ptm***SPK WITH CMKR ADVISED OF INVEST RESULTS. CMKR OKAY JUST WANTED TO MAKE SURE IT WAS ADDRESSED WITH DLR. STATES WILL FILE BBB COMPL AGAINST DLR. |

3/11/16 - SR4 - CALLED CMKR - LMOM

3/8/16 - sr4 - called cmkr - lmom

3/8/16 - SR4 - CHECKED CABI FOR DLR VSC PENETRATION RATE - CONSISTENTLY 100%. EMAILED MAM TO DISCUSS THIS WITH DLR

EMAIL TO MAM
Hi Ryan
We received a complaint from a consumer that this dealer advised her that the VSC was a mandatory purchase to get financing (although it is listed on RIC as optional). I checked the dealer's penetration for VSC sales and it appears to consistently be at 100% - indicating they may in fact be telling consumers it is required when it is not. Can you please discuss this with the dealer so that they understand they cannot require a consumer to purchase any of the ancillary products? Please follow up with me once you have had that conversation with the dealer. Thanks!

ESCALATION: MKR SAYS DLRSHP TOLD HER IT WAS MANDATORY SHE GET THE VSC. PLEASE RVW (MKR HAS SEVERAL REPAIRS SHE STATES VSC DENIED)

| | |
|---|---|
| Merit of Complaint | No Merit |
| Resolution | Closed with Explanation |
| Resolution Narrative | Closed with explanation |
| Complaint Close Date | 3/17/2016 |
| Supervisor - Merit Summary | |
| Supervisor - Attorney Assigned to | |
| Supervisor Narrative | |

Created at 3/8/2016 11:25 AM by Shannon Donkerbrook
Last modified at 4/13/2016 1:30 PM by Pamela Thompson

[ Close ]

| SHAREPOINT | APPLICATIONS | RESOURCES | SUPPORT | MAGAZINES | ASSOCIATIONS |
|---|---|---|---|---|---|
| PDL Library | Workday | Retail Store | IT Helpdesk | Used Car News | NIADA |
| Phone Directory | Oracle Financials | Logos/Branded Documents | Disaster Recovery | Automotive News | NABD |
| Team Sites | e-Time | SAS Reports | Workday Work Instructions | | AFSA |
| BIP | BlackBook | CreditAcceptance.com | Facilities Request Form | | |
| Org Charts | LSS | Travel Policies/Forms | Purchase Request Form | | |
| Published Document Library | SPS | All CA Active Projects | Secured Printing | | |

**Exhibit 7**

**VSC Penetration Rates By Dealer & Origination Year**

| Dealer | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total | Number of Eligible Loans |
|---|---|---|---|---|---|---|---|---|---|
| ABDI ARDEHALI | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 326 |
| HADDAD MOTOR GROUP INC | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 212 |
| STEVE'S AUTO SALES, INC. | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 132 |
| KEVIN R. HOWE | | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 131 |
| FAFAMA AUTO SALES INC | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | | 100.0% | 76 |
| MIGE AUTOMOTIVE GROUP INC | | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 65 |
| MARSHALL'S AUTO SALES LLC | 100.0% | | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 63 |
| EMPIRE HYUNDAI, INC. | | | | | 100.0% | 100.0% | | 100.0% | 60 |
| CRIMSON AUTO SALES | | | | | 100.0% | | | 100.0% | 60 |
| LYNNWAY AUTO SALES INC | | | | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 57 |
| BERNARDI BROCKTON, LLC | 100.0% | 100.0% | 100.0% | 100.0% | | | | 100.0% | 53 |
| THE GARAGE CARS LLC | | 100.0% | 100.0% | 100.0% | 100.0% | | 100.0% | 100.0% | 52 |
| STOUGHTON MOTOR MART, INC. | 100.0% | 100.0% | | | | | 100.0% | 100.0% | 51 |
| BERKSHIRE CAR COMPANY, INC. | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | | 100.0% | 100.0% | 41 |
| JOHN BROWNELL | 100.0% | 100.0% | | 100.0% | 100.0% | | | 100.0% | 38 |
| MWAG AUTO, INC. | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | | 100.0% | 35 |
| CAPPO MANAGEMENT XLVII LLC | | | | | | 100.0% | 100.0% | 100.0% | 28 |
| CAR CITY INC. | | | | | 100.0% | 100.0% | 100.0% | 100.0% | 26 |
| COLONIAL IMPORTS SOUTH, INC. | 100.0% | 100.0% | 100.0% | | | | | 100.0% | 24 |
| ALL STAR AUTO CYCLES SALES INC | | | | | 100.0% | 100.0% | 100.0% | 100.0% | 24 |
| PRIDE CHEVROLET INC | 100.0% | 100.0% | | | 100.0% | 100.0% | | 100.0% | 23 |
| ABINGTON AUTO MALL LLC | 100.0% | 100.0% | 100.0% | 100.0% | | | | 100.0% | 20 |
| ALFONSO WOODS | | | 100.0% | 100.0% | 100.0% | | | 100.0% | 20 |
| TRI-STATE AUTOMOTIVE ASSOCIATES INC | | 100.0% | 100.0% | | | | | 100.0% | 19 |
| TRACY MOTORS INC | | | | | | 100.0% | | 100.0% | 19 |
| VILLAGE IMPORTS INC. | 100.0% | 100.0% | 100.0% | 100.0% | | | | 100.0% | 19 |
| LORD AUTOMOTIVE INC. | | | | | 100.0% | 100.0% | | 100.0% | 18 |
| RICKY SMITH PONTIAC INC | 100.0% | | | | | | | 100.0% | 16 |
| ALL STAR AUTO SALES, INC. | 100.0% | 100.0% | | | | | | 100.0% | 15 |
| BLUESTONE MANAGEMENT CORP. | 100.0% | 100.0% | 100.0% | | | | | 100.0% | 13 |
| VACHON MOTOR COMPANY, INC | 100.0% | 100.0% | | | | | 100.0% | 100.0% | 12 |

**VSC Penetration Rates By Dealer & Origination Year**

| Dealer | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total | Number of Eligible Loans |
|---|---|---|---|---|---|---|---|---|---|
| CONWAY CHEVROLET BUICK, INC. | 100.0% | 100.0% | 100.0% | | | | | 100.0% | 12 |
| A AND E AUTO REPAIR, INC | | 100.0% | | | | | | 100.0% | 11 |
| SELECT USED CARS CORP | | 100.0% | 100.0% | 100.0% | 100.0% | | | 100.0% | 11 |
| EDWARD DELLO IACONO SR | | | | | | 100.0% | | 100.0% | 11 |
| FIRST HOT LINE AUTO SALES INC | | | | | 100.0% | 100.0% | | 100.0% | 11 |
| RIVER AUTO SALES INC | 100.0% | 100.0% | | | | | | 100.0% | 11 |
| JAY MAN AUTO SALES, INC. | | | 100.0% | 100.0% | 100.0% | | | 100.0% | 9 |
| TOP GEAR MOTOR GROUP CORP | | | | | 100.0% | 100.0% | | 100.0% | 9 |
| MIKE'S MOTOR GROUP LLC | 100.0% | 100.0% | 100.0% | | | | | 100.0% | 8 |
| ASHLEY FORD SALES INC | 100.0% | 100.0% | | | | | | 100.0% | 8 |
| UNLIMITED AUTO SALE LLC | 100.0% | | | | | 100.0% | 100.0% | 100.0% | 8 |
| SHELBY MOTOR CARS LLC | 100.0% | 100.0% | | | | | | 100.0% | 8 |
| MILFORD AUTO CLINIC, INC | 100.0% | | | | 100.0% | 100.0% | 100.0% | 100.0% | 7 |
| HORSENECK AUTO SALES INC | 100.0% | | | | | | | 100.0% | 7 |
| STANLEY KISILYWICZ | | | | | | 100.0% | 100.0% | 100.0% | 7 |
| DONE DEAL MOTORS, INC. | | 100.0% | | | | | | 100.0% | 7 |
| SEAN AND MICHAEL MCGEE, INC. | | | | 100.0% | 100.0% | 100.0% | | 100.0% | 7 |
| N & ED ENTERPRISE INC | | | | 100.0% | 100.0% | | | 100.0% | 6 |
| BEST VALUE AUTO INC | | | | | 100.0% | 100.0% | | 100.0% | 6 |
| HERB CHAMBERS 1186 INC. | | | | | | | 100.0% | 100.0% | 6 |
| HAVERHILL MOTORCARS INC | | | | | 100.0% | 100.0% | | 100.0% | 6 |
| DANNY'S AUTO SALES, INC. | 100.0% | | | | | | | 100.0% | 6 |
| MATRIX AUTO GROUP, INC. | | 100.0% | 100.0% | | | | | 100.0% | 6 |
| FORZA AUTOGROUP INC | | | | | | | 100.0% | 100.0% | 6 |
| DAVID C. QUINN | 100.0% | 100.0% | | | | | | 100.0% | 6 |
| CAPPO MANAGEMENT LII, LLC | | | | | | | 100.0% | 100.0% | 6 |
| ANGELO'S AUTO REPAIR & CAR SALES, INC. | | | | | | 100.0% | 100.0% | 100.0% | 5 |
| CEDAR AUTO SALES, LLC | | | | | | 100.0% | | 100.0% | 5 |
| EMPIRE FORD OF NEW BEDFORD, INC. | | | | | | 100.0% | 100.0% | 100.0% | 5 |
| AOK USED CARS LLC | 100.0% | | | | | | | 100.0% | 5 |
| PYNCHON MOTOR SALES, LLC | | | | 100.0% | 100.0% | | | 100.0% | 5 |

**VSC Penetration Rates By Dealer & Origination Year**

| Dealer | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total | Number of Eligible Loans |
|---|---|---|---|---|---|---|---|---|---|
| TOPHAM AUTOMOTIVE, INC | | | | | | | 100.0% | 100.0% | 5 |
| BOB PION BUICK-GMC, INC. | | | | 100.0% | 100.0% | | | 100.0% | 5 |
| JMM ENTERPRISES INC | | | 100.0% | 100.0% | | | | 100.0% | 5 |
| FATHERS & SONS, INC. | | | | | 100.0% | | 100.0% | 100.0% | 5 |
| AUTO RELATED INC. | | | | | | 100.0% | 100.0% | 100.0% | 5 |
| AMR AUTO HOLDINGS - TY, LLC | 100.0% | 100.0% | | | | | | 100.0% | 4 |
| FULLER MOTORS INC | | 100.0% | | | | | | 100.0% | 4 |
| SMART BUY AUTO GROUP INC. | | | | | | 100.0% | 100.0% | 100.0% | 4 |
| BLACKSTONE SUBARU INC | | | | | | 100.0% | | 100.0% | 4 |
| EDU AUTO SALES INC | | 100.0% | | | | | | 100.0% | 4 |
| WILBRAHAM IMPORT CARS INC | | 100.0% | | | 100.0% | | 100.0% | 100.0% | 4 |
| VICTORYA'S CAR LOAN AND SALES INC | | | | | | 100.0% | | 100.0% | 4 |
| PRIDE HYUNDAI OF LYNN INC. | | | | | | 100.0% | | 100.0% | 4 |
| SOUTH SHORE AUTOLINES INC | 100.0% | | | | | | | 100.0% | 4 |
| DEALS ON WHEELS AND SERVICE INC | | | | | 100.0% | | | 100.0% | 3 |
| NORTH QUINCY AUTO SALES AND REPAIRS, LLC | | | | | | | 100.0% | 100.0% | 3 |
| ABSOLUTE MOTORS INC | | | | | 100.0% | | | 100.0% | 3 |
| GLEISOM LEANDRO PINHO | | 100.0% | 100.0% | | | | | 100.0% | 3 |
| VILLAGE AUTOMOTIVE GROUP, INC. | 100.0% | | | | | | | 100.0% | 3 |
| TIMOTHY CLARK | | 100.0% | | | | | | 100.0% | 3 |
| EVERETT USED CARS INC | | | | | | | 100.0% | 100.0% | 3 |
| SULLIVAN BROS. NISSAN LINCOLN INC. | 100.0% | 100.0% | | | | | | 100.0% | 3 |
| BERTERA AUTOMOTIVE CORP | | | | | 100.0% | | 100.0% | 100.0% | 3 |
| NEW BEGINNING AUTO SERVICE INC | | | | | 100.0% | | | 100.0% | 3 |
| DIAMOND CHEVROLET, INC. | | 100.0% | | | | | 100.0% | 100.0% | 3 |
| THOMAS COVIELLO | | | | | 100.0% | 100.0% | | 100.0% | 3 |
| ALBERT SLINEY | | | | | | 100.0% | | 100.0% | 3 |
| CHOICE AUTO CENTER LLC | | | | | | | 100.0% | 100.0% | 2 |
| ROSLINDALE AUTO SALES INC | | | | | | | 100.0% | 100.0% | 2 |
| ALL WHEELS DETAILING & AUTO SALES INC | | | | | | 100.0% | | 100.0% | 2 |
| PRIME CARS AUTO SALES INC. | | | | | | 100.0% | | 100.0% | 2 |

**VSC Penetration Rates By Dealer & Origination Year**

| Dealer | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total | Number of Eligible Loans |
|---|---|---|---|---|---|---|---|---|---|
| EASTERN SALES INC. | | | | | | | 100.0% | 100.0% | 2 |
| MILFORD DCH, INC. | | | | | | | 100.0% | 100.0% | 2 |
| KIN'S AUTO SALES, LLC | | | | | | | 100.0% | 100.0% | 2 |
| EMPIRE MOTORS INC | | | 100.0% | | | | | 100.0% | 2 |
| TOP QUALITY AUTO SALES INC | | | | 100.0% | | | | 100.0% | 2 |
| B1 AUTO TRADE CENTER, LP | 100.0% | | | | | | | 100.0% | 2 |
| AFFORDABLE AUTO CREDIT, INC. | 100.0% | 100.0% | | | | | | 100.0% | 2 |
| DYNASTY AUTO GROUP INC | | | | | | | 100.0% | 100.0% | 2 |
| SHAUN MACPHERSON | 100.0% | | | | | | | 100.0% | 2 |
| CITYLINE AUTOBROKERS LTD | | | | | 100.0% | | | 100.0% | 2 |
| MASS CAR MART LLC | | | | 100.0% | | | | 100.0% | 2 |
| PRESTIGE MOTORS OF MALDEN INC | | | | 100.0% | 100.0% | | | 100.0% | 2 |
| PRIME AUTO MALL INC. | | | | | | 100.0% | | 100.0% | 2 |
| F1 MOTORS CORP | | | | | | | 100.0% | 100.0% | 2 |
| AMR AUTO HOLDINGS-CH, LLC | | | | | | | 100.0% | 100.0% | 2 |
| THE JOHNSON DEALERSHIPS, INC. | | | | | 100.0% | | | 100.0% | 2 |
| INSTANBUL LLC | | | 100.0% | | | | | 100.0% | 1 |
| BEVERLY AUTO & TRUCK REPAIR, INC. | | | | | | | 100.0% | 100.0% | 1 |
| MATTHEW G. GAETA & CARMEN P. GAETA, LLC | | | | | | 100.0% | | 100.0% | 1 |
| LAURANCE AULO | | | | | | | 100.0% | 100.0% | 1 |
| GLENDALE GAS & SERVICE INC | | | | | 100.0% | | | 100.0% | 1 |
| ADAO AUTOMOTIVE GROUP INC | | | | | | | 100.0% | 100.0% | 1 |
| PERFORMANCE FH INC | | | 100.0% | | | | | 100.0% | 1 |
| ATALA CORPORATION | | | | | | 100.0% | | 100.0% | 1 |
| ROUTE 1 AUTO SALES INC | | | | 100.0% | | | | 100.0% | 1 |
| ACME AUTO & RADIATOR INC. | | | | 100.0% | | | | 100.0% | 1 |
| GREEN LIGHT AUTO SALES INC | | | | | | 100.0% | | 100.0% | 1 |
| KRISTINE BENITEZ | | 100.0% | | | | | | 100.0% | 1 |
| RAYMOND TIRADO | 100.0% | | | | | | | 100.0% | 1 |
| T & J FINE AUTO LLC | | | | | | | 100.0% | 100.0% | 1 |
| ANTONIO MEDINA | | | | | | 100.0% | | 100.0% | 1 |

**VSC Penetration Rates By Dealer & Origination Year**

| Dealer | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total | Number of Eligible Loans |
|---|---|---|---|---|---|---|---|---|---|
| ARTHUR D. TRIPP AND STEPHEN M. TRIPP | | | 100.0% | | | | | 100.0% | 1 |
| MAIN STREET MOTORS AUTO CENTER INC | | | 100.0% | | | | | 100.0% | 1 |
| WESTBOROUGH BUICK PONTIAC GMC INC | | 100.0% | | | | | | 100.0% | 1 |
| CARS 4 U, LLC | 100.0% | | | | | | | 100.0% | 1 |
| CARLIDER USA LLC | | | | | | 100.0% | | 100.0% | 1 |
| AUTO BAZAAR CORP | | | | | | 100.0% | | 100.0% | 1 |
| MANSFIELD GAS & SERVICE INC | 100.0% | | | | | | | 100.0% | 1 |
| GREENLEAF AUTO ENTERPRISES INC | | 100.0% | | | | | | 100.0% | 1 |
| AUTOMIX MOTOR GROUP, LLC. | | | 100.0% | | | | | 100.0% | 1 |
| JG AND J CORP | | | | | | 100.0% | | 100.0% | 1 |
| JP AUTO SALES INC. | | | | | | 100.0% | | 100.0% | 1 |
| JLE AUTO GROUP LLC | | | | | | | 100.0% | 100.0% | 1 |
| DETOUR CARS LLC | | | | 100.0% | | | | 100.0% | 1 |
| BEST PRICE AUTO SALES, INC | | | | | | | 100.0% | 100.0% | 1 |
| VENE AUTO SALES & SERVICE INC. | | | | | | | 100.0% | 100.0% | 1 |
| MEEHAN AUTOMOBILES, INC. | | | | | | | 100.0% | 100.0% | 1 |
| NORTH END AUTO SALES LLC | | | | | | | 100.0% | 100.0% | 1 |
| JN GROUP LLC | | | | 100.0% | | | | 100.0% | 1 |
| M. GRIECO ENTERPRISES, INC. | | 100.0% | | | | | | 100.0% | 1 |
| METRO IMPORTS INC | | 100.0% | | | | | | 100.0% | 1 |
| RON BOUCHARD DODGE LLC | 100.0% | | | | | | | 100.0% | 1 |
| BRISTOL COUNTY AUTO INC | | | | | | 100.0% | | 100.0% | 1 |
| TRAVIS C. JOHNSON | | 100.0% | | | | | | 100.0% | 1 |
| NORTH END MOTORS INC | 100.0% | 97.7% | 100.0% | 100.0% | 100.0% | 100.0% | | 99.7% | 345 |
| LEWIS SERVICENTER & HARRY'S AUTO SALES | 100.0% | 100.0% | 100.0% | 95.5% | 100.0% | 100.0% | 100.0% | 99.5% | 216 |
| COMMONWEALTH AUTO SALES CORP. | 100.0% | 96.9% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 99.4% | 172 |
| EDWARD BORLEN | 96.4% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | | 99.1% | 114 |
| BERTERA CHEVROLET INC | 97.7% | 100.0% | 100.0% | 100.0% | | | 100.0% | 98.9% | 87 |
| 1050 MONTELLO, INC | 100.0% | 100.0% | 100.0% | 100.0% | 90.9% | 100.0% | 100.0% | 98.8% | 81 |
| ROUTE 14 MOTORS, LLC | 98.4% | 100.0% | 100.0% | 91.7% | 100.0% | 97.8% | | 98.7% | 453 |
| FORTUNA AUTO SALES, INC. | 100.0% | 100.0% | 100.0% | 92.9% | 97.8% | 97.8% | 100.0% | 98.5% | 205 |

**VSC Penetration Rates By Dealer & Origination Year**

| Dealer | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total | Number of Eligible Loans |
|---|---|---|---|---|---|---|---|---|---|
| BERNARDI BROCTON, LLC | 100.0% | 94.4% | 100.0% | 100.0% | 98.7% | 100.0% | 96.4% | 98.5% | 65 |
| HARR IMPORTS, INC | 100.0% | 94.4% | 100.0% | 97.7% | 100.0% | 100.0% | 100.0% | 98.3% | 402 |
| COHA AUTOMOTIVE GROUP INC | | 97.0% | 100.0% | 97.2% | 100.0% | 100.0% | 91.7% | 98.2% | 56 |
| SUNLITE AUTO SALES, INC. | 100.0% | | 100.0% | 100.0% | | 100.0% | | 98.1% | 108 |
| VITALE FAMILY AUTO, LLC | 92.3% | 100.0% | 100.0% | | | | | 98.1% | 54 |
| CHRIS AUTO SALES, INC | 99.3% | 98.5% | 97.3% | 98.3% | 97.6% | 100.0% | 93.4% | 97.8% | 946 |
| CLERVILLE LLC | 100.0% | 100.0% | 100.0% | 100.0% | 90.9% | 93.8% | 90.0% | 97.7% | 133 |
| ANIBAL BARROSO | 85.7% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | | 97.7% | 44 |
| MARX ENTERPRISES INC | 96.6% | 90.9% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 97.7% | 261 |
| PARAGON AUTO INC | | 90.5% | 98.0% | 97.8% | 95.7% | 100.0% | 100.0% | 97.6% | 330 |
| N&S AUTO LLC | | 100.0% | 88.2% | 100.0% | 100.0% | 100.0% | 100.0% | 97.5% | 157 |
| EMPIRE HYUNDAI, INC | 100.0% | 100.0% | 97.3% | 94.2% | 95.8% | 100.0% | 100.0% | 97.3% | 329 |
| MASTERKARS INC | | | | | 96.0% | 100.0% | | 97.2% | 36 |
| GLOBAL VENTURES GROUP INC. | | | | | 93.8% | 100.0% | 100.0% | 97.2% | 36 |
| WILLIAM M MORIARTY JR. | 96.2% | 97.2% | 96.4% | 91.7% | 100.0% | 100.0% | 100.0% | 97.1% | 173 |
| LOWELL AUTOMATIC TRANSMISSION COMPAN | 92.3% | 100.0% | 100.0% | 100.0% | | | | 97.1% | 34 |
| CURRY AUTOMOTIVE LLC | 100.0% | 100.0% | 90.5% | 90.3% | 94.7% | 88.9% | 100.0% | 97.0% | 231 |
| AVON AUTO BROKERS, INC | 100.0% | 97.9% | 92.0% | 84.6% | 90.9% | 100.0% | | 96.8% | 221 |
| VENTURA'S AUTO CENTER, INC. | | | | | 93.8% | 96.2% | 100.0% | 96.8% | 63 |
| AVON AUTO BROKERS INC | 94.7% | 98.0% | 100.0% | 100.0% | | 95.7% | 100.0% | 96.8% | 62 |
| GATEWAY ENTERPRISES AUTO SALES INC | 97.0% | 100.0% | 100.0% | 92.0% | 96.0% | 94.7% | 92.9% | 96.7% | 240 |
| ANTHONY SERGIO | | | 100.0% | 66.7% | | | | 96.7% | 30 |
| FAST LANE AUTO SALES & SERVICE, INC | 100.0% | | 75.0% | 86.4% | 100.0% | 100.0% | 100.0% | 96.6% | 145 |
| BEZEMA MOTORS CORPORATION | 100.0% | 100.0% | 100.0% | 100.0% | 88.9% | | | 96.6% | 58 |
| KLEEN KARS INC. | 100.0% | 97.1% | 92.0% | | | | | 96.5% | 172 |
| GAME 7 ENTERPRISES, LLC | 100.0% | 100.0% | 100.0% | 89.5% | 100.0% | 100.0% | 83.3% | 96.5% | 86 |
| FDAS CORP | 100.0% | 97.1% | 94.3% | 95.4% | 93.0% | | | 96.5% | 342 |
| DETOUR CARS, LLC | 98.1% | 97.1% | 89.2% | 98.2% | 98.6% | 99.2% | 100.0% | 96.4% | 898 |
| DEBRA A. SOUZA | 100.0% | 95.7% | 93.3% | 100.0% | | | | 96.1% | 51 |
| THE HARR MOTOR COMPANY | 100.0% | 100.0% | 96.6% | 50.0% | | | | 96.0% | 50 |
| IRAM MOTORS INC | 96.0% | | | | | | | 96.0% | 25 |

**VSC Penetration Rates By Dealer & Origination Year**

| Dealer | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total | Number of Eligible Loans |
|---|---|---|---|---|---|---|---|---|---|
| SOPHIA'S AUTO SALES INC | 97.1% | 95.1% | 100.0% | 75.0% | 94.1% | 100.0% | 100.0% | 95.9% | 147 |
| EXPRESS MOTORS INCORPORATED | | 100.0% | 94.3% | 100.0% | | | | 95.9% | 49 |
| EXPRESSWAY MOTORS INC | 100.0% | 94.9% | 100.0% | 98.9% | 97.6% | 88.8% | 82.4% | 95.9% | 774 |
| WILLIAM MATTE | 100.0% | 95.0% | 100.0% | | | | | 95.7% | 23 |
| COMPLETE AUTO, INC | 100.0% | 87.5% | | | | | | 95.7% | 23 |
| PIERROT ABIRAMIA | 100.0% | 100.0% | | 94.1% | 93.9% | 92.6% | | 95.5% | 110 |
| KLM AUTO REPAIR INC | 91.7% | 96.6% | 100.0% | | | | | 95.5% | 44 |
| CHARLES DAHER'S COMMONWEALTH MOTORS | 100.0% | 90.3% | 94.1% | 91.2% | 92.6% | 97.6% | 98.8% | 95.4% | 327 |
| 181 SOUTH MAIN STREET INC | 95.1% | 100.0% | | | | | | 95.2% | 104 |
| JORDAN MOTORS INC | | | | | 94.4% | 100.0% | 0.0% | 95.1% | 41 |
| E & J AUTO SALES INC | 73.7% | 100.0% | 100.0% | 100.0% | 91.4% | 100.0% | 100.0% | 95.0% | 161 |
| RIVERVIEW AUTO SALES, LLC. | | 100.0% | 100.0% | 66.7% | 100.0% | | | 95.0% | 20 |
| COUNTRY HYUNDAI, INC. | | | | 50.0% | 100.0% | 100.0% | 100.0% | 94.9% | 79 |
| WILLIAMS AUTO SALES INC | 100.0% | 100.0% | 100.0% | 81.5% | 97.6% | 100.0% | 100.0% | 94.7% | 113 |
| MIDWAY AUTOMOTIVE CORP | 98.4% | 90.6% | 94.4% | 94.0% | 92.5% | 93.3% | 100.0% | 94.6% | 607 |
| RALLYE AUTOMOTIVE, L.L.C. | 100.0% | 91.9% | 90.0% | 95.0% | 100.0% | 100.0% | 100.0% | 94.5% | 128 |
| TOMMY CAR CORP. | | | | | 100.0% | 66.7% | 100.0% | 94.4% | 18 |
| DIESEL MOTOR GROUP LLC | | 100.0% | 92.9% | 100.0% | | | | 94.4% | 18 |
| K & S AUTO SALES, INC | | 100.0% | 100.0% | 92.6% | 100.0% | | | 94.3% | 70 |
| KKQB, INC. | 95.0% | 100.0% | 100.0% | 60.0% | | | | 94.1% | 68 |
| MILFORD AUTO MALL, INC | | | | | | | 94.1% | 94.1% | 17 |
| VITALE FAMILY AUTO SALES, INC. | | | | 100.0% | 85.7% | 100.0% | 100.0% | 93.9% | 33 |
| NEW ENGLAND AUTO MAX INC | 90.0% | 100.0% | 66.7% | 100.0% | | | | 93.9% | 33 |
| AMESBURY CHEVROLET INC | | | | | 92.3% | 96.8% | 80.0% | 93.9% | 49 |
| EMILIO NETTO | 97.4% | 95.5% | 100.0% | 89.5% | 78.6% | 93.9% | 100.0% | 93.8% | 146 |
| IRVING C SMALL III | 100.0% | 100.0% | 82.6% | 91.3% | 100.0% | 92.3% | 100.0% | 93.8% | 113 |
| VEHICLE TRANSPORT LLC | 85.7% | 100.0% | 86.7% | 100.0% | 100.0% | | | 93.8% | 48 |
| PREOWNED FACTORY INC | | 100.0% | 81.3% | 95.7% | 100.0% | | | 93.7% | 63 |
| HILARIO'S AUTO SALES INC | 98.1% | 96.7% | 71.4% | 75.0% | 96.0% | 88.2% | 100.0% | 93.3% | 225 |
| E AND M AUTO CONSULTING, INC | 100.0% | 93.9% | 88.9% | 100.0% | 100.0% | | 100.0% | 93.3% | 90 |
| MAIN AUTO MALL INC | | | 88.9% | 100.0% | | | | 93.3% | 15 |

**VSC Penetration Rates By Dealer & Origination Year**

| Dealer | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total | Number of Eligible Loans |
|---|---|---|---|---|---|---|---|---|---|
| JAMES A. LORING | | | 100.0% | 88.9% | | | | 93.3% | 15 |
| O'HARA MOTORS INC | 100.0% | 75.0% | 100.0% | | | | | 93.3% | 15 |
| SS AUTO INC | 100.0% | 81.8% | 50.0% | 66.7% | 100.0% | 100.0% | 100.0% | 93.0% | 43 |
| CARIDDI AUTO AGENCY | | | 87.8% | 100.0% | 100.0% | 94.7% | 94.4% | 93.0% | 229 |
| CONNOLLY BUICK CO., INC. | 100.0% | 100.0% | 100.0% | 94.1% | 89.5% | 95.0% | 90.9% | 93.0% | 71 |
| ADVANCED AUTO SALES, LLC | 100.0% | 100.0% | 100.0% | 75.0% | 0.0% | | | 92.9% | 28 |
| MCCOUBREY ENTERPRISES, INC. | | | | | 87.5% | 100.0% | | 92.9% | 14 |
| LANDES ENTERPRISES LLC | | 100.0% | 100.0% | 86.7% | 0.0% | | | 92.7% | 41 |
| EDD'S AUTO SALES, INC. | 100.0% | 85.0% | 100.0% | | | | | 92.5% | 40 |
| LEANDRO R. DIAS | 87.5% | 100.0% | | | | | | 92.3% | 26 |
| FAMILY FORD OF NORTHAMPTON, INC. | | | 100.0% | 83.3% | 100.0% | 100.0% | 100.0% | 92.3% | 13 |
| BAY AUTO SALES, CORP | | | | | 100.0% | 83.3% | 96.0% | 92.3% | 13 |
| STATELINE AUTO BROKERS INC. | | | | 100.0% | 87.9% | 87.1% | | 92.1% | 114 |
| WILLIAM R BAYTON | 95.5% | 81.8% | 100.0% | | 100.0% | | | 92.1% | 38 |
| AVON AUTO BROKERS, INC. | 62.5% | 89.7% | 84.2% | 100.0% | 93.8% | 100.0% | 93.5% | 91.6% | 155 |
| NAVIN BUCHOON | | | 100.0% | 87.5% | 100.0% | | | 91.3% | 23 |
| AMR AUTO HOLDINGS-HD-LLC | 92.3% | 83.3% | 100.0% | 100.0% | | | | 91.2% | 34 |
| F & R AUTO SALES, INC. | 95.8% | 75.0% | 66.7% | | | | | 90.3% | 31 |
| PIKESIDE AUTOMOTIVE LLC | 85.7% | 100.0% | 100.0% | 100.0% | 60.0% | 75.0% | 100.0% | 90.2% | 41 |
| MIGUEL BETANCOURT | 90.0% | | | | | | | 90.0% | 20 |
| UNIQUE AUTO, INC. | | | | 100.0% | 80.0% | 85.7% | 100.0% | 90.0% | 20 |
| NORTH SHORE AUTO, LLC | 100.0% | 100.0% | 76.5% | 91.4% | 81.3% | 92.0% | 92.9% | 89.9% | 159 |
| SONIA'S AUTO SALES INC | 94.6% | 93.7% | 89.1% | 90.1% | 78.3% | 97.4% | 95.2% | 89.9% | 1,360 |
| PK MOTORCARS, INC. | 84.4% | 91.7% | 93.8% | 87.5% | 100.0% | 100.0% | 100.0% | 89.7% | 97 |
| MCGEE WHOLESALE CARS INC | | 66.7% | 87.5% | 100.0% | 100.0% | 100.0% | 100.0% | 89.7% | 29 |
| OSCAR REYES | | 100.0% | 86.3% | 70.6% | 97.1% | 100.0% | 91.9% | 89.5% | 200 |
| CHARBEL AUTOMOTIVE LLC | | | | | 75.0% | 95.0% | 90.0% | 89.5% | 38 |
| RON BOUCHARD'S AUTO SALES INC | 100.0% | 86.7% | 83.3% | 100.0% | | | | 89.5% | 38 |
| TOP CARS AUTO MALL, INC. | | | | | 89.5% | | | 89.5% | 38 |
| TASCA AUTOMOTIVE GROUP INC | | | | | | 100.0% | 80.0% | 88.9% | 9 |
| DM MOTORS LLC | | | | | 100.0% | 100.0% | 66.7% | 88.9% | 9 |

## VSC Penetration Rates By Dealer & Origination Year

| Dealer | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total | Number of Eligible Loans |
|---|---|---|---|---|---|---|---|---|---|
| PSR AUTO SALES, INC. | 87.5% | 100.0% | | | | | | 88.9% | 9 |
| JOSELINO BOURNIGAL | 92.5% | 93.4% | 78.1% | 76.3% | 91.3% | 91.9% | 97.2% | 88.6% | 370 |
| VISTA MOTORS LLC | | 100.0% | 84.4% | 100.0% | | | | 88.6% | 44 |
| CARS SOLUTIONS AUTO SALES INC. | | | | | 100.0% | 76.9% | | 88.0% | 25 |
| TITAN AUTO GROUP, LLC | | 100.0% | 70.0% | 100.0% | | | | 88.0% | 25 |
| BWF INC | 81.8% | 75.0% | 100.0% | 86.4% | 66.7% | 100.0% | 100.0% | 87.7% | 57 |
| FRAMINGHAM AUTO MALL, INC. | 85.7% | 90.9% | 78.6% | 100.0% | 100.0% | | | 87.7% | 219 |
| TJ AUTOMOTIVE INC | 87.5% | | | | | | | 87.5% | 16 |
| ANGEL REGALADO | | | | 50.0% | | | 100.0% | 87.5% | 8 |
| ED HOLEWIAKS | | 100.0% | 66.7% | | | | | 87.5% | 8 |
| GINA TOMACCHIO | | 86.7% | 84.2% | 88.7% | 84.6% | | | 87.1% | 163 |
| SPIRO'S AUTO SALES, INC. | | | 75.0% | 50.0% | 100.0% | 94.7% | 100.0% | 86.9% | 61 |
| CHOICE AUTO CENTER, LLC | | | 85.7% | 100.0% | | 66.7% | | 85.7% | 14 |
| JAD INOVA, INC. | | 100.0% | 66.7% | | 100.0% | | | 85.7% | 7 |
| ROXBURY MOTORS INC | | | 100.0% | 0.0% | 100.0% | | | 85.7% | 7 |
| CITY LINE AUTO INC | | | | | | 85.7% | | 85.7% | 7 |
| A WHEELS INC | | | | | 100.0% | 0.0% | | 85.7% | 7 |
| MASS BEST MOTORS INC | | | 96.2% | 82.6% | 0.0% | | | 85.1% | 74 |
| LTL AUTOMOTIVE LLC | | | 75.0% | 100.0% | 100.0% | 80.0% | 83.3% | 85.0% | 20 |
| MICHAEL'S MOTOR SALES, INC. | | | | | 50.0% | 85.7% | 100.0% | 84.6% | 13 |
| JP MOTORS INC | | | 100.0% | 71.4% | | | | 84.6% | 13 |
| JOE SMALLEY AUTO SALES INC | 93.5% | 88.9% | | 20.0% | | | | 84.4% | 45 |
| AUGUSTO C NETTO / CLAUDIO A NETTO | | | | | 80.0% | 81.8% | 100.0% | 84.0% | 25 |
| PRE-OWNED AUTO SALES INC | | | | | 100.0% | 100.0% | 0.0% | 83.3% | 12 |
| KEVIN FRANCIS GERVAIS AUTOMOTIVE LLC | | 83.3% | | | | | | 83.3% | 12 |
| MICHAEL IRISH | 94.1% | 78.6% | 71.4% | | | | | 82.7% | 52 |
| PAUL J LAPOINTE | | | | 81.8% | | | | 81.8% | 11 |
| CASINO AUTO SALES INC. | 100.0% | | | | | 80.0% | 100.0% | 81.8% | 11 |
| MIDDLESEX AUTO SALES, CORP. | | 100.0% | 75.4% | 56.0% | | | | 81.6% | 141 |
| MOTOR CITY AUTOMOTIVE GROUP MA, LLC | | | 50.0% | 68.2% | 100.0% | 91.7% | 100.0% | 81.5% | 54 |
| SALVADORE AUTO EXCHANGE INC | | | 80.0% | 80.0% | 100.0% | | | 81.5% | 27 |

**VSC Penetration Rates By Dealer & Origination Year**

| Dealer | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total | Number of Eligible Loans |
|---|---|---|---|---|---|---|---|---|---|
| MD MOTORS, INC. | 69.6% | 95.0% | 66.7% | 100.0% | | | | 81.3% | 48 |
| GARY ROME HYUNDAI, INC. | | | 71.4% | 100.0% | 100.0% | | | 81.0% | 21 |
| BERNARDI AUTOMALL TRUST | 100.0% | 84.8% | 47.4% | 89.7% | | | | 80.4% | 92 |
| CGC EXPRESS INC | | | 90.0% | 71.4% | 50.0% | 100.0% | 100.0% | 80.3% | 66 |
| UNIQUE MOTORS, INC. | 85.7% | 100.0% | 94.6% | 92.5% | 44.8% | 75.0% | 47.1% | 80.2% | 187 |
| LIA NORTHAMPTON INC | | | 62.5% | 70.7% | 76.7% | 100.0% | 100.0% | 80.2% | 111 |
| RONALD J. MCDONALD III | 85.7% | 78.1% | 77.8% | | | | | 80.0% | 80 |
| ALLY MOTORS, INC. | | | 90.0% | 75.0% | 0.0% | | | 80.0% | 15 |
| WAGNER AUTOMOTIVE ENT., LLC | | | | | | 80.0% | | 80.0% | 10 |
| POINT AUTO SALES, INC. | | | | | 80.0% | | | 80.0% | 5 |
| USA AUTO SALES LLC | | | | | 50.0% | 100.0% | | 80.0% | 5 |
| F & I OUTSOURCE LLC | | | | | 100.0% | 66.7% | | 80.0% | 5 |
| RICHARD M RYAN INC. | 94.1% | 69.2% | 66.7% | 66.7% | 83.3% | 84.2% | 71.4% | 79.2% | 77 |
| PLANTIUM CARS, INC. | | | | 0.0% | 75.0% | 100.0% | | 77.8% | 18 |
| RIVERSIDE AUTO SALES INC | | 100.0% | 80.0% | 50.0% | | | | 75.0% | 16 |
| AUTO HAUS INC | | | 100.0% | 72.7% | | | | 75.0% | 12 |
| DANVERS T III INC. | | 83.3% | 50.0% | | | | | 75.0% | 8 |
| RENZO MEJIA | | | 75.0% | | | | | 75.0% | 4 |
| LIA AUTOMOTIVE, INC. | | 75.0% | | | | | | 75.0% | 4 |
| MIKE'S ENTERPRISES, INC | 75.0% | | | | | | | 75.0% | 4 |
| EXCELLENCE AUTO EXCHANGE INC | | 73.3% | 73.3% | 75.6% | 100.0% | | | 74.8% | 103 |
| CAPE COD CARZ LLC | | 100.0% | 87.3% | 76.3% | 31.9% | 86.0% | 88.7% | 74.1% | 437 |
| FAR EAST EXPORTS INC | 71.9% | 75.0% | | | | | | 72.7% | 44 |
| ABSOLUTE AUTO SALES, INC. | 87.5% | 33.3% | | | | | | 72.7% | 11 |
| FAMILY AUTO MALL INC | | | | | | 100.0% | 57.1% | 72.7% | 11 |
| FALCOR AUTO SALES, INC. | 94.1% | 85.2% | 60.0% | 21.4% | | | | 72.4% | 127 |
| DRIFTWAY AUTO INC | 70.0% | 75.0% | | | | | | 72.2% | 18 |
| PREMIUM AUTO GROUP OF BOSTON INC | 88.9% | 100.0% | 83.3% | 63.3% | 66.7% | 46.2% | | 71.6% | 95 |
| PACIFIC AUTO SALES, INC | | | | 71.4% | | | | 71.4% | 7 |
| AGM AUTO SALES INC | | | | | 50.0% | 80.0% | | 71.4% | 7 |
| DELUXE AUTO SALES, INC | | | | | 50.0% | 83.3% | | 70.0% | 10 |

**VSC Penetration Rates By Dealer & Origination Year**

| Dealer | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total | Number of Eligible Loans |
|---|---|---|---|---|---|---|---|---|---|
| TOURIYA AITELHADJ | 71.4% | | | | 72.6% | 44.4% | 71.4% | 69.4% | 85 |
| KNOCKOUT DEALS AUTO SALES INC | | | | 68.0% | 29.2% | 50.0% | 95.7% | 68.0% | 25 |
| BERKSHIRE AUTO GROUP LLC | 71.4% | 100.0% | 64.1% | 80.0% | | | 66.7% | 67.7% | 158 |
| REAL AUTO SHOP, INC. | | | | | | | 66.7% | 66.7% | 9 |
| ELISANDRO S. CUEVAS | | | | 80.0% | 0.0% | | | 66.7% | 6 |
| ERIC AMEWUGAH | 66.7% | | | | | | | 66.7% | 3 |
| MALDEN AUTO BROKERS INC | | | | | | 66.7% | | 66.7% | 3 |
| RIVER AUTO SALES INCORPORATED | | | | | | 66.7% | | 66.7% | 3 |
| MICHAEL JACKSON | | 50.0% | 100.0% | | | | | 66.7% | 3 |
| CJ MOTORS INC. | | | | | | 100.0% | 0.0% | 66.7% | 3 |
| PEPPERELL AUTO SALES, INC | 66.7% | | | | | | | 66.7% | 3 |
| PARKWAY AUTO SALES INC | | | | | | 66.7% | | 66.7% | 3 |
| GENERATION 2000 AUTO SALES, LLC | | 33.3% | 8.3% | 38.9% | 55.8% | 77.7% | 96.3% | 66.5% | 248 |
| RIO AUTO GROUP CO | 67.3% | 71.1% | 34.4% | 82.6% | 77.5% | 85.7% | 77.8% | 65.8% | 260 |
| T & C AUTOCORP | | | | 40.0% | 66.7% | 100.0% | 75.0% | 64.7% | 17 |
| SOUTHERN STATES USED CARS, INC. | | | 100.0% | 50.0% | 50.0% | | | 63.6% | 11 |
| NH AUTOWHOLESALERS LLC | | | 60.0% | 100.0% | | | | 63.6% | 11 |
| RALLY MOTORSPORTS INC | 92.9% | 66.7% | 31.3% | 66.7% | | | | 62.7% | 51 |
| SARAT FORD SALES, INC. | | | | 60.0% | 100.0% | | | 62.5% | 8 |
| ALTERNATIVE MOTORS OF ADAMS, INC. | | 60.0% | 55.0% | 36.8% | 51.4% | 75.2% | 94.6% | 62.0% | 597 |
| ASSR ENTERPRISES INC | 61.5% | | | | | | | 61.5% | 13 |
| LYNN AUTO PERFORMANCE, INC. | | | | | | 60.0% | | 60.0% | 5 |
| RAMON SANTANA | | | | 60.0% | | | | 60.0% | 5 |
| GRACE QUALITY USED CARS INC | 0.0% | 85.4% | 33.3% | 44.4% | 55.6% | 52.9% | 57.1% | 59.7% | 134 |
| AUTO NUMBER ONE INC | 68.2% | 56.3% | 37.5% | | | | | 58.7% | 46 |
| GERALDO MAGELA DEALMEIDA | 100.0% | 100.0% | 53.8% | 48.3% | 100.0% | 0.0% | | 58.5% | 53 |
| LIA NORTHAMPTON CJDR, LLC | | | | | 100.0% | 50.0% | 50.0% | 58.3% | 12 |
| PIERRE I EL HAYEK | | | 100.0% | 100.0% | 48.4% | 50.0% | 77.8% | 56.5% | 85 |
| VALQUIRO LEANDRO | 50.0% | 100.0% | 0.0% | 66.7% | 25.0% | 60.0% | 100.0% | 55.6% | 18 |
| NORTHAMPTON CJD, LLC | 100.0% | 52.9% | | | | | | 55.6% | 18 |
| D&D AUTO SALES, LLC | 99.1% | 98.8% | 60.6% | 31.3% | 0.0% | 0.0% | 0.0% | 54.7% | 466 |

**VSC Penetration Rates By Dealer & Origination Year**

| Dealer | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total | Number of Eligible Loans |
|--------|------|------|------|------|------|------|------|-------|--------------------------|
| MAXIMA AUTO SALES CORP | | | | 100.0% | 33.3% | 75.0% | | 54.5% | 11 |
| MICHAEL MOTORS LLC | 66.7% | 85.7% | 72.7% | 25.0% | 0.0% | 0.0% | 0.0% | 53.8% | 39 |
| MASS MOTORS LLC | | | 38.5% | 100.0% | | | | 52.9% | 17 |
| SMART MOTORS AUTO SALES & SERVICE, INC. | 80.0% | 14.3% | 100.0% | 0.0% | | | | 52.6% | 19 |
| MCGEE MOTORCARS INC | | 27.3% | 31.6% | 57.1% | 28.6% | 64.3% | 93.3% | 52.1% | 73 |
| GLYNNE KALIL | 90.9% | 66.7% | 28.6% | 33.3% | | | | 51.9% | 52 |
| KELLY DOYLE | | | 41.2% | 54.5% | 50.0% | | | 50.0% | 66 |
| MICHAEL JACKSON & OBILIO RODRIQUEZ | | | 50.0% | 50.0% | | | | 50.0% | 12 |
| TOP END AUTO LLC | 100.0% | 0.0% | | | | | | 50.0% | 10 |
| BUYER'S CHOICE AUTO SALES, LLC | | | | | 50.0% | | | 50.0% | 6 |
| IMAD SAKER | | | | | 33.3% | 66.7% | | 50.0% | 6 |
| NEEKA INC. | | | | | | | 50.0% | 50.0% | 4 |
| DARIO INC | 100.0% | 0.0% | 0.0% | | | | | 50.0% | 4 |
| KAMBERI FAMILY LLC | | | | 50.0% | | | | 50.0% | 4 |
| CLEAR AUTO DARTMOUTH INC | | | | | 100.0% | 33.3% | | 50.0% | 4 |
| MAG MOTORS II INC | | 66.7% | 0.0% | | | | | 50.0% | 4 |
| SHALOM AUTO SALES INC | | 100.0% | 0.0% | | | | | 50.0% | 2 |
| MAXIMUS AUTO SALES, LLC | | | 50.0% | | | | | 50.0% | 2 |
| ROSY GAS, LLC | | | | | | 0.0% | 100.0% | 50.0% | 2 |
| SAMI ABDEL-GHANI | | | 50.0% | | | | | 50.0% | 2 |
| GLOBAL VENTURES BROCKTON INC | | | | | | 0.0% | 100.0% | 50.0% | 2 |
| RAYONIA MOTORS, LLC | | | | | 0.0% | 100.0% | | 50.0% | 2 |
| PHILIP SMITH | | 83.3% | 51.9% | 33.3% | 0.0% | 0.0% | | 49.1% | 57 |
| N&J AUTO BODY INC | | | 52.6% | 35.7% | 40.0% | 100.0% | 100.0% | 47.6% | 63 |
| BEST PRICE AUTO SALES, INC | 17.1% | 4.6% | 17.1% | 35.8% | 58.5% | 79.8% | 90.0% | 45.4% | 513 |
| TIMOTHY P. ROBERTS | | | 71.4% | 33.3% | 12.5% | 100.0% | 66.7% | 41.9% | 31 |
| JOHN'S AUTO SALES INC. | | | 42.9% | 33.3% | | | | 41.2% | 17 |
| ALLAN AUTO SALES LLC | | 100.0% | 25.0% | | | | | 40.0% | 5 |
| DIRCELIO BELUCO | | | 50.0% | 28.6% | 50.0% | | | 38.5% | 13 |
| SEGA AUTO SALES & SERVICE INC | | | | | 14.3% | 66.7% | 37.5% | 38.1% | 21 |
| UNITED AUTO ASSOCIATES, INC. | | | 25.0% | 16.7% | 55.6% | | | 36.8% | 19 |

**VSC Penetration Rates By Dealer & Origination Year**

| Dealer | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total | Number of Eligible Loans |
|---|---|---|---|---|---|---|---|---|---|
| DEALS 4 WHEELS, INC. | 6.1% | 20.3% | 52.5% | 59.4% | 40.0% | 30.8% | 40.0% | 35.8% | 296 |
| COMPARE AUTO SALES INC | | | | 33.3% | | | | 33.3% | 9 |
| ADRIANA FERNANDEZ | 50.0% | 0.0% | | | | | | 33.3% | 3 |
| CUSTOMER FIRST AUTOGROUP INC | | | | 33.3% | | | | 33.3% | 3 |
| CESAR CARS AUTO SALES CORPORATION | | | | 0.0% | 100.0% | | | 33.3% | 3 |
| UNION AUTO TOWING, INC. | | | 35.7% | 37.5% | 0.0% | 0.0% | 66.7% | 30.3% | 33 |
| PIONEER MOTOR GROUP, LLC | | | | 26.9% | 100.0% | | | 29.6% | 27 |
| CARLOS CASTANO | | | 61.9% | 25.0% | 14.3% | 36.0% | 14.3% | 29.3% | 123 |
| BERTERA MOTORS OF WEST SPRINGFIELD, INC. | 100.0% | 78.6% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 26.9% | 52 |
| S & E AUTO SERVICE & SALES, INC. | | | | | 33.3% | 0.0% | | 25.0% | 4 |
| SUNNY AROUSTAMIAN | | | | 25.0% | | | | 25.0% | 4 |
| QUALITY AUTO CENTER, INC. | 100.0% | 5.6% | 0.0% | | | | | 23.1% | 26 |
| MASS AUTO OUTLET INC | 31.0% | 3.3% | 2.1% | 3.5% | 11.7% | 35.7% | 71.4% | 16.7% | 372 |
| AMADOU BARRY | | | | | 25.0% | | | 16.7% | 6 |
| DAVID DUCHARME | 6.5% | 1.2% | 1.2% | 0.0% | 0.0% | 0.0% | 0.0% | 1.4% | 556 |
| FELIX POLONIA | | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 30 |
| BONNETTE'S AUTOMOTIVE, INC. | | | | | 0.0% | 0.0% | 0.0% | 0.0% | 23 |
| INTELLY MOTORS INC | | | | | | 0.0% | | 0.0% | 14 |
| MEMMO ENTERPRISES, INC. | | 0.0% | | | | | | 0.0% | 2 |
| MR. H AUTO SALES, INC | | | | 0.0% | | | | 0.0% | 2 |
| PG AUTO INC | | | | | | 0.0% | 0.0% | 0.0% | 2 |
| COMPARE MOTORS INC | | | | 0.0% | | | | 0.0% | 1 |
| LOUIS JAMES FALZONE JR. | | | | | 0.0% | | | 0.0% | 1 |
| CLAY CHEVROLET, INC. | | | | 0.0% | | | | 0.0% | 1 |
| YORK FORD INC | | | | | | | 0.0% | 0.0% | 1 |
| SUPREME CARS, INC | | | 0.0% | | | | | 0.0% | 1 |
| DR AUTO & TIRE SERVICE INC. | | | | 0.0% | | | | 0.0% | 1 |
| MAXIMA AUTO SALES CORP. | | | | | | 0.0% | | 0.0% | 1 |
| RYAN ZACARIAS | 0.0% | | | | | | | 0.0% | 1 |
| INTERNATIONAL AUTO SALES CORPORATION | | | | | 0.0% | | | 0.0% | 1 |
| VINICIUS DEOLIVEIRA SOUZA | | | 0.0% | | | | | 0.0% | 1 |

**VSC Penetration Rates By Dealer & Origination Year**

| Dealer | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total | Number of Eligible Loans |
|---|---|---|---|---|---|---|---|---|---|
| OFF LEASE AUTO SALES INC. | | | | | | | 0.0% | 0.0% | 1 |
| CEDT INC | | | 0.0% | | | | | 0.0% | 1 |
| COREY MOTORS LLC | | | | 0.0% | | | | 0.0% | 1 |
| GJINKO ENTERPRISES INC | | 0.0% | | | | | | 0.0% | 1 |
| CENTRAL DODGE INC | | | | | | | 0.0% | 0.0% | 1 |
| JACK MADDEN FORD SALES, INC | 0.0% | | | | | | | 0.0% | 1 |
| Total | 90.8% | 86.1% | 79.4% | 78.4% | 78.5% | 86.5% | 87.0% | 83.5% | 24,690 |



**CONTRACT NO.:  SP-**

CA Approval #

**Toll Free Number: 1-866-410-6748**
**VEHICLE SERVICE CONTRACT**

**Purchase of the Service Contract is not required in order to purchase or obtain financing for a motor Vehicle**

The words in boldface type (other than the headings in this Contract) are defined in the "Definitions" section.

**CUSTOMER INFORMATION**

| Name, Last | | Name, First |
|---|---|---|
| Address | | |
| City | State | Zip |
| Telephone | | |

**SELLING DEALER**

| Name | | |
|---|---|---|
| Address | | |
| City | State | Zip |
| Telephone | Dealer Account No. | |

**VEHICLE INFORMATION**

| Vehicle Identification Number (VIN) | | | | Current Odometer Reading _____ Miles | New ☐        Used ☐ |
|---|---|---|---|---|---|
| Year | Make | Model | Class | Contract Price $ | Vehicle / Contract Sale Date |
| **Lien Holder – Credit Acceptance ( CA )** **25505 West Twelve Mile Road, Southfield, MI 48034** | | | | Term of Installment Contract | Vehicle Purchase Price $ |

**CONTRACT INFORMATION**

| **Deductible:  $100** **Per Visit** | If the eligible **Vehicle** has less than or equal to 100,000 miles on it, **High Tech Coverage** will apply. If the eligible **Vehicle** has between 100,001 and 175,000 miles on it, **Standard Coverage** will apply. If no term information is filled in the term will be 24 months or 24,000 miles, whichever occurs first. |
|---|---|

| **Coverage Type:** | **High Tech  0-100,000 Miles Only** | **Standard  100,001 to 175,000 Miles Only** |
|---|---|---|

In order for this **Contract** to be valid, the following terms must be clear, legible, without correction, and available for use on the **Selling Dealer's** currently installed rate card.

_____ Months _____ Miles

Coverage begins on the **Vehicle / Contract Sale Date** and at the mileage shown on the odometer on that date and expires upon the addition of the number of months or miles specified here, whichever occurs first.   Note: This **Contract** *must* be purchased on the **Vehicle Sale Date**.

| SURCHARGES / OPTIONS    (check all that apply): | Extended Eligibility (Standard Coverage Only) |
|---|---|
| 4X4 / All Wheel Drive _____        Turbocharger _____        Supercharger _____        One Ton _____ | 100,001 – 125,000 Miles (Standard Only) _____ |
| Diesel _____                All Wheel Steering _____ | 125,001 – 150,000 Miles (Standard Only) _____ |
| 11 Model Years* _____        12 Model Years* _____        13 Model Years* _____ | 150,001 – 175,000 Miles (Standard  Only – 24/24 Max Term) _____ |
| *Based on current calendar year | |

**Vehicles** with more than 100,000 miles on the odometer on the **Vehicle / Contract Sale Date** are ineligible for High Tech coverage.

I have read and understand this **Contract**. I understand the above information is subject to verification and this **Contract** may be rejected if any of the above information is incorrect or if the above **Vehicle** is ineligible for the term or coverage written as determined by the **Administrator Obligor** in its sole discretion.

_____        _____
CUSTOMER SIGNATURE                AUTHORIZED REPRESENTATIVE OF **SELLING DEALER**

Date: _____                Date: _____

**ADMINISTRATOR OBLIGOR: First Automotive Service Corporation, 2400 Louisiana Blvd. NE, Building 4, Albuquerque, NM 87110, 1-866-410-6748.**
**This is a Contract between You and the Administrator Obligor.** The **Administrator Obligor's** performance under this **Contract** is insured by an insurance policy issued by Dealers Assurance Company, P. O. Box 21185, Upper Arlington, OH 43221, Telephone: 614-459-0364. If a **Covered Repair** is not paid within sixty (60) days after proof of loss has been filed, **You** may file a claim with Dealers Assurance Company at the address listed herein.

SWRE_01_0013

## WHAT TO DO IF YOU HAVE A BREAKDOWN:

1. Take immediate action to prevent further damage to Your Vehicle.
2. Take Your Vehicle, or if unable to drive, have it towed to the nearest licensed repair facility.
3. Before beginning any repair work on Your Vehicle, call 1-866-410-6748.

## YOUR OBLIGATIONS

In order for this **Contract** to remain in force, **You** must:

- Change the oil and oil filter in the **Vehicle** at least every six (6) months or 5,000 miles whichever comes first, or at the intervals specified by the **Vehicle Manufacturer**, whichever is less.
- Replace the timing belt in the **Vehicle** at the intervals specified by the **Vehicle Manufacturer**
- Perform all other maintenance and servicing of the **Vehicle** as recommended by the **Vehicle Manufacturer**
- Keep, and make available to the **Administrator** upon request, verifiable signed receipts that show that the above required maintenance and services were timely performed.

In order for a claim payment to be made under this **Contract**:

- **You** must have **Your** repair facility obtain an authorization number from the **Administrator** prior to beginning any repair to a **Covered Part**
- **You** must pay the **Deductible** (if any) for all **Covered Repairs** performed in a single visit to a repair facility
- **You** are responsible for authorizing and paying for any teardown or diagnostic time needed to determine if **Your Vehicle** has a **Covered Breakdown**. If the **Administrator** determines that there is a **Covered Breakdown**, then **We** will pay for the reasonable cost of the teardown and diagnostic time as part of the **Covered Repair**.
- **You** must send all repair documentation requested by the **Administrator** to the following address:

First Automotive Service Corporation, P O Box 30250, Albuquerque, NM 87190-0250

To make a claim, call the **Administrator** toll-free at 1-866-410-6748. Claims Department hours are Monday through Friday, 7 a.m. to 7 p.m., Saturday 8 a.m. to 2 p.m., Central Time. **CLAIMS MUST BE SUBMITTED WITHIN SIXTY (60) DAYS FROM AUTHORIZATION TO QUALIFY FOR REIMBURSEMENT.**

**EMERGENCY REPAIRS:** If emergency repairs covered by this **Contract** are required outside the **Selling Dealer's** or **Administrator's** business hours, **You** should deliver **Your Vehicle** to a licensed repair facility and have the necessary repairs performed at a reasonable and customary charge. On the next business day, **You** should report the repairs to the **Administrator**. To report an emergency repair and obtain a reimbursement, please call the claims number below for instructions. Emergency repairs are only those repairs, which, if not performed, would render **Your Vehicle** inoperable or unsafe to drive and impair its future operation.

## OUR OBLIGATIONS

1. **Covered Breakdowns (Deductible** Applies). If a **Covered Part** experiences a **Breakdown** during the term of this **Contract**, **We** will pay **You** or the repair facility, less the **Deductible** (if any), up to the **Limits of Liability**, for the repair or replacement, as the **Administrator** deems appropriate, of the **Covered Part(s)** that caused the **Breakdown**, but only if:

- **You** have met **Your** obligations as described in this **Contract**; and
- The **Breakdown** is not one of the excluded **Breakdowns** listed under the heading "EXCLUSIONS—WHAT THIS CONTRACT DOES NOT COVER" below.

This **Contract** refers to a **Breakdown** that is covered as a "**Covered Breakdown**." Replacement parts can be of like kind and quality. They may include new, re-manufactured or used parts as determined by the **Administrator**. The use of non-original manufacturer's parts is permitted. **Administrator** reserves the right to inspect any **Vehicle** prior to authorization of a claim.

2. Additional Benefits (No **Deductible**)

- Rental Car. We will reimburse **You** for a rental car at a rate of up to $30.00 for every eight (8) hours of labor time required to complete a **Covered Repair**, up to a maximum of $150.00 per **Covered Breakdown**. If there is a verifiable delay in obtaining a part needed to complete a **Covered Repair**, **We** will reimburse **You** for a rental car for up to an additional two (2) days. Labor time required is determined from the national repair manual in use by the repair facility. **You** must provide the **Administrator** with a valid receipt from a licensed rental agency to obtain reimbursement for a rental car.
- Towing. **We** will reimburse **You** for towing if the **Vehicle** is disabled due to a **Covered Breakdown**, up to a maximum of $50 per **Covered Breakdown**. **You** must provide the **Administrator** with a valid receipt to obtain reimbursement for towing.

## COVERED PARTS

Subject to the terms and conditions of this **Contract**, **We** will pay, or reimburse **You**, for the reasonable costs to repair or replace any or all of the following listed **Covered Parts** (for the coverage specified below that **You** have purchased) that fail as the result of a **Covered Breakdown**, subject to the exclusions listed in the "EXCLUSIONS—WHAT THIS CONTRACT DOES NOT COVER" section below. For convenience, the **Covered Parts** are listed next to the **Vehicle** systems to which they relate. The **Vehicle** systems listed are not **Covered Parts**.

### STANDARD COVERAGE

1. **Engine** – Engine Block and Cylinder Heads are covered when damaged due to a failure of an internally **Lubricated Part**. All internal **Lubricated Parts**, harmonic balancer, turbocharger, supercharger, timing gear, chain and bolt, head gasket, timing cover, timing belt, intake and exhaust manifolds, valve covers, oil pan and engine mounts.
2. **Transmission** – Transmission case and all internal **Lubricated Parts**, torque converter, transmission mounts, flex plate, and vacuum modulator.
3. **Drive Axle(s)** – Drive axle housing and all internal **Lubricated Parts**, drive shafts, universal joints, and constant velocity joint unless failure was caused by neglected, torn, cracked or perforated constant velocity joint boot. See exclusion for constant velocity joint boots.
4. **Transfer Case** – Transfer case and all internal **Lubricated Parts**.
5. **Steering** – Steering gear box, or rack, and all internal **Lubricated Parts**, power steering pump, steering column shaft, and steering column shaft couplings, pitman arm, idler arm, tie rod end(s), and drag link.
6. **Electrical** – Alternator, voltage regulator, starter motor & drive, and starter solenoid, Ignition module and windshield wiper motor(s).
7. **Air Conditioner** – Condenser, compressor, compressor clutch & pulley, idler pulley & idler pulley bearing, evaporator, receiver dryer and orifice tube, and blower motor. (only if the air conditioner is factory or dealer installed equipment)
8. **Suspension** – Radius arm, control arms, control arm shafts, bearings and bushings, king pin and king pin bushings, strut bar and bushings, stabilizer bar, stabilizer link, stabilizer bushing, spindle, wheel bearings, and torsion bars.
9. **Cooling** – Water pump, engine cooling fan motor, radiator, radiator fan, and fan clutch.
10. **Fuel** – Fuel delivery pump, fuel injectors, and fuel tank.
11. **Brake** – Standard and ABS brake system master cylinder, ABS accumulator, ABS control module, ABS pump, ABS motor, ABS reservoir and ABS wheel speed sensors, power brake cylinder, vacuum assist booster, compensating valve, disc brake caliper(s), wheel cylinder(s), hydraulic lines and hydraulic line fittings.

### High Tech Coverage      (Included on all Vehicles with 0 – 100,000 Miles Only)

12. **High Tech** includes components listed under Standard Coverage above plus: Power seat motor, power antenna motor, power window motor(s), power door lock actuator, fuel pressure regulator, sunroof motor, convertible top motor, driver information gauge indicators relating to the operation of the **Vehicle** (burned out lights/lamps are not covered), body control module, control dash power supply, cruise control module and servo/transducer, fuel sending unit, fuel gauge, metal fuel delivery lines, idle speed motor, manifold pressure sensor, manifold temperature sensor, throttle position sensor, mass air flow sensor, oxygen sensor, coolant temperature sensor, vehicle speed sensor, camshaft position sensor, crankshaft angle sensor, E.C.M., primary fuel injection computer, and temperature control programmer.
13. **Seals and Gaskets** – Leaking seals and gaskets on any **Covered Part** listed above, provided that the **Vehicle** had 100,000 miles or less on the **Vehicle Sale Date**. Minor loss of fluid or seepage is considered normal and not considered a **Covered Breakdown**.

**Note:** Fluids are covered when required as part of the repair or replacement of a **Covered Part**.

FORM AWA-XX-XX-05                                   P.2                                   REV 02.15.12

## EXCLUSIONS — WHAT THIS CONTRACT DOES NOT COVER

A. This Contract provides no benefits or coverage and We have no obligation under this Contract for:
1. A Breakdown caused by lack of customary, proper or Vehicle Manufacturer's specified maintenance.
2. A Breakdown caused by contamination of or lack of proper fuels, fluids, coolants or lubricants, including a Breakdown caused by a failure to replace seals or gaskets in a timely manner.
3. A Breakdown caused by towing a trailer, another vehicle or any other object unless Your Vehicle is equipped for this use as recommended by the Vehicle Manufacturer.
4. Repair of any parts in connection with a Covered Repair when those parts are not necessary for the completion of the Covered Repair or were not damaged by the failure of a Covered Part. Such repair or replacement is an improvement to Your Vehicle and is not covered by this Contract.
5. Pre-existing damage, or a Breakdown that occurred before Your purchase of this Contract, either of which would have been obvious and apparent if that component was inspected at time of purchase.
6. A Breakdown caused by or involving modifications or additions to Your Vehicle unless those modifications or additions were performed or recommended by the Vehicle Manufacturer.
7. A Breakdown caused by off-roading, misuse, abuse, racing or any form of competition.
8. Any cost covered by a repair facility's or part supplier's guarantee, or any cost which would normally be covered by a Vehicle Manufacturer's warranty or a dealer warranty required under state law, whether or not such warranty is in force respecting Your Vehicle.
9. Costs of other damages caused by the failure of a part listed in this Contract as an excluded part.
10. Damage to the Vehicle caused by continued Vehicle operation after the Breakdown of a Covered Part.
11. Any liability, cost or damages You incur or may incur to any third parties, other than for Covered Parts.
12. A Breakdown caused by rust or corrosion.
13. A Breakdown caused by collision, fire, electrical fire or meltdown, theft, freezing,
vandalism, riot, explosion, lightning, earthquake, windstorm, hail, water, flood or acts of public enemy or any government authority, or for any hazard insurable under standard physical damage insurance policies whether or not such insurance is in force respecting Your Vehicle.
14. A Breakdown outside the continental United States or Canada.
15. Loss of use, loss of time, lost profits or savings, inconvenience, commercial loss, or other incidental or consequential damage or loss that results from a Breakdown.
16. Liability for damage to property, or for injury to, or death of, any person arising out of the operation, maintenance or use of Your Vehicle whether or not related to a Breakdown.
17. Any cost or other benefit for which the Vehicle Manufacturer has announced its responsibility through any means including public recalls or factory service bulletins.
18. Any part not covered, or excluded, by the original Vehicle Manufacturer's warranty.
19. Loss of compression through gradual failure of rings and valves.
20. Constant velocity joint boots.
21. A gradual reduction in performance capability due to day-to-day routine operation.
22. The maintenance services and parts described in paragraph 1 under "Your Obligations" or in the Vehicle Manufacturer's maintenance schedule for Your Vehicle.
23. Other normal maintenance services and parts, including, without limitation, engine tune-up, spark plugs, ignition wires, distributor cap and rotor, carburetor, EGR valve, batteries, filters, lubricants or fluids, air conditioning refrigerant or engine coolant (except when such lubricants, fluids, refrigerant or coolant must be replaced as part of the repair or replacement of a Covered Part), all hoses and belts that are not specifically listed under "Covered Parts," wiper blades, brake pads and shoes, brake rotors and drums, suspension alignment, tires, wheel balancing, shock absorbers, exhaust system, friction clutch disc and pressure plate, and clutch throw out bearing.
24. Glass, glass framework and fastening adhesives, sealed beam head lamps, light bulbs, lenses, HID assemblies, Safety restraint systems (including air bags), trim, moldings, bright metal, upholstery and carpeting, paint, sheet metal, body panels, structural framework and structural welds.
25. After market accessories or non-original equipment, components and systems not installed by the Vehicle Manufacturer, including, without limitation, anti-theft systems, radio/speaker equipment, telephones, cruise control and sunroof.
26. GPS navigation systems and TV/Video/DVD/Entertainment Systems.
27. Damage to a Covered Part caused by a part that is not a Covered Part.
28. Repairs performed without Our prior authorization.
29. To any parts or systems that are considered alternative fuel or electric/hybrid vehicle related.

B. In addition, this Contract provides no benefits or coverage and We have no obligation under this Contract if:
1. The Vehicle odometer fails, or for any reason does not record the actual mileage of Your Vehicle after purchase date and You do not have it repaired and the mileage certified within thirty (30) days of failure date.
2. Your Vehicle is used for business, deliveries, construction or commercial hauling, or as a postal vehicle, taxi, police car or other emergency vehicle.
3. You rent Your Vehicle to someone else.
4. Your Vehicle is equipped with a snow plow or used to plow snow.
5. You are using or have used Your Vehicle in a manner that is not recommended by the Vehicle Manufacturer.
6. Your Vehicle is modified from the Vehicle Manufacturer's original specifications.

## CANCELLATION OF THIS CONTRACT

### By You
If the Contract Price was financed, You may cancel this Contract by contacting the Administrator. If the Contract Price was not financed, You may cancel the Contract by contacting the Selling Dealer.

### By Us
We reserve the right to cancel this Contract and will not pay for a Covered Breakdown if:
- The Vehicle odometer fails or for any reason does not record the actual mileage of Your Vehicle after purchase date, and You do not have it repaired and the mileage certified within thirty (30) days of failure date.
- Your Vehicle is used for business, deliveries, construction or commercial hauling, or as a postal vehicle, taxi, police car or other emergency vehicle.
- You rent Your Vehicle to someone else.
- Your Vehicle is equipped with a snow plow or used to plow snow.
- You are using or have used Your Vehicle in a manner that is not recommended by the Vehicle Manufacturer.
- Your Vehicle is modified from the Vehicle Manufacturer's original specifications.

### By the Lien Holder
You understand and acknowledge that the Lien Holder (if any) has the right to cancel this Contract if the Vehicle is repossessed or destroyed or You are otherwise in default of Your obligations to repay the amount financed by the Lien Holder.

### Refunds and Charges
If the Contract price was financed, You will be entitled to a full refund of the Contract Price, less a $50 cancellation fee, if You provide a written notice of cancellation to the Administrator within the first thirty (30) days after the Contract Sale Date, and if You have not filed a claim under this Contract. If the Contract Price was not financed, You will be entitled to a full refund of the Contract Price, less a $50 cancellation fee, if You provide a written notice of cancellation to the Selling Dealer within the first thirty (30) days after the Contract Sale Date, and if You have not filed a claim under this Contract. If You provide a written notice of cancellation to the Administrator after the first thirty (30) days after the Contract Sale Date, or if We or the Lien Holder cancels this Contract at any time, You will be entitled to a prorated refund of the Contract Price (less a $50.00 cancellation fee) based on the greater of the number of days the Contract was in force or the miles driven compared to the total time or Vehicle mileage specified on the first page of this Contract under "Coverage Term." Your cancellation notice must be accompanied by a copy of an odometer disclosure statement or equivalent document verifying the current mileage of the Vehicle. The term of this Contract for cancellation purposes will be based on the date You purchased Your Contract and the Vehicle mileage on the date purchased. If the Contract Price was financed, any and all refunds will be paid to the Lien Holder. Any and all refunds will be paid to You by the Selling Dealer in the case that this Contract was not financed.

SWRE_01_0015

## DEFINITIONS

- "**Administrator Obligor** and **Administrator**" means First Automotive Service Corporation.
- "**Breakdown**" means the total failure of any **Covered Part** to work as it was designed to work in normal service.
- "**Contract**" means this **Contract**. "**Contract Price**" means the price of this **Contract** as specified on the first page of this **Contract**.
- "**Covered Breakdown**" means a **Breakdown** that is covered by this **Contract**.
- "**Covered Part**" means an item listed as a **Covered Part** in the "**Covered Parts**" section.
- "**Covered Repair**" means a repair to a **Covered Part** approved by the **Administrator**.
- "**Deductible**" means the deductible, if any, shown on the first page of this **Contract**.
- "**Installment Contract**" means the agreement **You** sign with the **Selling Dealer** whereby **You** agree to buy the **Vehicle** Identified on the first page of the **Contract**.
- "**Lien Holder**" means the entity (if any) to whom the **Selling Dealer** assigned the **Installment Contract** as identified on the first page of the **Contract**.
- "**Limits of Liability**" has the meaning given to such term in the "Other Important **Contract** Provisions/Limitations — Limits of **Our** Liability" section on this page.
- "**Lubricated Part**" means a part that requires lubrication to perform its function.
- "**Selling Dealer**" means the automobile dealer identified on the first page of this **Contract**.
- "**Term of Installment Contract**" means the period of time during which **You** will pay for the **Vehicle**.
- "**Vehicle**" means the **Vehicle** covered by this **Contract**, as identified on the first page of this **Contract**.
- "**Vehicle Manufacturer**" means the manufacturer of the **Vehicle**.
- "**Vehicle / Contract Sale Date**" means the date the **Vehicle** and this **Contract** were purchased.
- "**Vehicle Purchase Price**" means the price paid for the **Vehicle** excluding dealer prep, tax and additional products
- "**We**," "**Us**" and "**Our**" refers to the **Administrator /Obligor** shown on the first page of this **Contract**.
- "**You**," "**Your**," "**Yours**" and "**I**" refer to the customer identified on the first page of this **Contract**.

## OTHER IMPORTANT CONTRACT PROVISIONS/LIMITATIONS

### Limits of Our Liability
THIS **CONTRACT** IS NOT AN INSURANCE POLICY. IT IS A SERVICE **CONTRACT** BETWEEN **YOU** AND THE **ADMINISTRATOR**.
The **total** benefits payable for a single **Covered Repair** or repair visit shall not exceed the Actual Cash Value (ACV) of the covered **Vehicle** immediately preceding the **Covered Breakdown**. The aggregate of all benefits payable shall not exceed the purchase price of the covered **Vehicle**, excluding any and all fees or other optional products and or services. The Actual Cash Value (ACV) is determined by the Average Trade-In value as indicated in the most current NADA Used Vehicle pricing guide.

### Our Rights Against Others
If **You** receive any benefits under this **Contract**, **We** will be entitled to all **Your** rights of recovery against any manufacturer, repairer or other party who may be responsible to **You** for the costs covered by this **Contract** or for any other payment made by **Us**. If **We** ask, **You** agree to help **Us** enforce these rights. **You** also agree to cooperate and help **Us** in any other matter concerning this **Contract**.

### Entire Agreement
This **Contract** contains the entire agreement between **You** and **Us** and supersedes any and all prior and contemporaneous agreements (both written and verbal) between **You** and **Us** concerning the subject matter of this **Contract**. This **Contract** is not valid unless signed by both **You** and an authorized representative of the **Selling Dealer**.

### When this **Contract** will End
- This **Contract** will terminate when:
- **Your Vehicle** reaches the time or mileage limitation specified on the first page of this **Contract**
- **You** sell **Your Vehicle** unless this **Contract** is properly transferred as provided in the section of this **Contract** entitled "HOW COVERAGE MAY BE TRANSFERRED"
- This **Contract** is cancelled as outlined in the "**CANCELLATION OF THIS CONTRACT**" section.

## HOW COVERAGE MAY BE TRANSFERRED

- If **You** sell **Your Vehicle**, **You** may transfer this **Contract** to the transferee, but only if:
- **You** are the first holder of this **Contract**
- **Your Vehicle** is sold to a private party
- The **Administrator** receives from **You** the completed transfer application (see below) within thirty (30) days after the date **You** sell **Your Vehicle**
- **You** pay the **Administrator** a $50.00 transfer fee
- **You** provide the transferee and **Administrator** with copies of all **Vehicle** maintenance and service receipts as required by this **Contract** (see "**YOUR OBLIGATIONS**").

The transfer will be effective when **You** receive a transfer confirmation letter from the **Administrator**. If the purchase of **Your Vehicle** was financed and **Your Vehicle** is a total loss or is repossessed, **Your** rights and obligations under this **Contract** immediately and automatically transfer to the **Lien Holder**

## TRANSFER APPLICATION
To transfer this **Contract**, complete the form on the bottom of this page and mail it with copies of **Your** maintenance records and **Your** copy of this **Contract** to the **Administrator** at the following address:

First Automotive Service Corporation, P O Box 30250, Albuquerque, NM 87190-0250
Note: The **Administrator** may reject any application for transfer at their discretion.

**Administrator Obligor:**

I, _____ (transferor), am transferring this **Contract** in accordance with the provisions stated in this **Contract**. I am enclosing a $50.00 check or money order payable to First Automotive Service Corp. I have provided to the new transferee, and **Administrator Obligor**, copies of all receipts for the maintenance and servicing of the **Vehicle** as required by this **Contract**.

| | | |
|---|---|---|
| Name of Transferee _____ | Contract # _____ | VIN # _____ |
| Address _____ | City _____ | State _____ Zip _____ |
| Date of Transfer _____ | Odometer Mileage on Date of Transfer _____ | |
| Signature of Transferee _____ | Date _____ | |
| Signature of Transferor _____ | Date _____ | |

## STATE LAW DISCLOSURES
(Revised 03/01/09)
FASC-CUS02-4

Some of the states in which **We** are selling **Vehicle Service Contracts** require that **We** make certain additional disclosures to **You** or require that some of the terms and conditions of this **Contract** be different from the standard terms and conditions specified above. These additional disclosures and different terms and conditions are set forth below. They apply to **You** if **You** purchased this **Contract** in one of the states specified below:

### ALABAMA
The paragraph under "**Cancellation of this Contract**—Refunds and Charges" is replaced in its entirety with the following: "**You** will be entitled to a full refund of the **Contract** price if **You** provide a written notice of cancellation to the **Selling Dealer** within the first thirty (30) days after the **Contract** purchase date, and if **You** have not filed a claim under this **Contract**. If **You** provide a written notice of cancellation to the **Selling Dealer** after the first thirty (30) days after the **Contract** purchase date, or if **We** or the **Lien Holder** cancels this **Contract** at any time, **You** will be entitled to a prorated refund of the **Contract** price (less a cancellation fee up to $25.00) based on the greater of the number of days the **Contract** was in force or the miles driven compared to the total time or **Vehicle** mileage specified on the first page of this **Contract** under 'Coverage Term.' **Your** cancellation notice must be accompanied by a copy of an odometer disclosure statement or equivalent document verifying the current mileage of the **Vehicle**. The term of this **Contract** for cancellation purposes will be based on the date **You** purchased **Your Contract** and the **Vehicle** mileage on the date purchased. If the **Contract** price was financed, any and all refunds will be paid to the **Lien Holder**. A ten percent (10%) penalty per month will be added to any refund that is not paid or credited within forty-five (45) days after the **Selling Dealer** receives **Your** request for cancellation. If the **Contract** price was not financed, any and all refunds will be paid to **You** by the **Selling Dealer**."

### ARIZONA
The following paragraph is deleted in its entirety from the first page "I have read and understand this **Contract**. **I** understand the above information is subject to verification and this **Contract** may be rejected if any of the above information is incorrect or if the above **Vehicle** is ineligible for the term or coverage written as determined by the **Administrator Obligor** in its sole discretion".

Under "**Exclusions – What this Contract does not Cover**": Item A.5 is deleted. Items A.23 through A.26 are amended as follows:
A.23. Other normal maintenance services and parts, including, without limitation, **ENGINE TUNE-UP, SPARK PLUGS, IGNITION WIRES, DISTRIBUTOR CAP AND ROTOR, CARBURETOR, EGR VALVE, BATTERIES, FILTERS, LUBRICANTS OR FLUIDS, AIR CONDITIONING REFRIGERANT OR ENGINE COOLANT** (except when such lubricants, fluids, refrigerant or coolant must be replaced as part of the repair or replacement of a Covered Part), **ALL HOSES AND BELTS THAT ARE NOT SPECIFICALLY LISTED UNDER "COVERED PARTS," WIPER BLADES, BRAKE PADS AND SHOES, BRAKE ROTORS AND DRUMS, SUSPENSION ALIGNMENT, TIRES, WHEEL BALANCING, SHOCK ABSORBERS, EXHAUST SYSTEM, FRICTION CLUTCH DISC AND PRESSURE PLATE, AND CLUTCH THROW OUT BEARING.**
A.24. **GLASS, GLASS FRAMEWORK AND FASTENING ADHESIVES, SEALED BEAM HEAD LAMPS, LIGHT BULBS, LENSES, HID ASSEMBLIES, SAFETY RESTRAINT SYSTEMS (INCLUDING AIR BAGS), TRIM, MOLDINGS, BRIGHT METAL, UPHOLSTERY AND CARPETING, PAINT, SHEET METAL, BODY PANELS, STRUCTURAL FRAMEWORK AND STRUCTURAL WELDS.**
A.25. After market accessories or non-original equipment, components and systems not installed by the **Vehicle Manufacturer**, including, without limitation, **ANTI-THEFT SYSTEMS, RADIO/SPEAKER EQUIPMENT, TELEPHONES, CRUISE CONTROL AND SUNROOF.**
A.26. **GPS NAVIGATION SYSTEMS AND TV/VIDEO/DVD/ENTERTAINMENT SYSTEMS.**

### ARKANSAS
1. The following sentence is added at the top of the first page of this **Contract**: "Purchase of this **Contract** is not required in order to purchase or obtain financing for a motor vehicle."
2. The paragraph at the bottom of the first page of this **Contract** is replaced with the following paragraph: "THIS **SERVICE CONTRACT** IS INSURED FOR ITS LIABILITY UNDER A **SERVICE CONTRACT** REIMBURSEMENT INSURANCE POLICY ISSUED BY **DEALERS ASSURANCE COMPANY**. IF **WE** DO NOT SETTLE **YOUR** CLAIM(S), AS **ADMINISTRATOR** WITHIN SIXTY (60) DAYS OF **OUR** RECEIPT OF **YOUR** PROOF OF LOSS, **YOU** MAY MAKE A CLAIM DIRECTLY AGAINST: Dealers Assurance Company, PO Box 21185, Upper Arlington, OH 43221 The toll free number is 1-614-459-0367.

### CONNECTICUT
**Arbitration and Resolution of Disputes for Connecticut Residents:** If there is a dispute regarding the terms of this **Service Contract** or the coverage of any claim filed with **Us**, **We** will make a reasonable effort to resolve the dispute with **You**. If **We** are unable to resolve the dispute, **You** may file a formal written complaint with the Consumer Affairs Division of the Connecticut Insurance Department. The complaint must contain a short and plain description of the dispute, including the efforts made to resolve the dispute and the results of those efforts, the purchase price or lease price of **Your Covered Vehicle**, the cost of any disputed repairs, and a copy of this **Service Contract** document. The complaint should be mailed to State of Connecticut, Insurance Department, P.O. Box 816, Hartford, CT 06142-0816, Attention: Consumer Affairs.

**Your** complaint will be reviewed by an examiner, who will attempt to mediate the dispute. If the mediation efforts are unsuccessful, **Your** complaint will be referred to the Arbitration Unit of the Connecticut Insurance Department for further resolution through arbitration. Unless either party objects to binding arbitration of the dispute by filing a written objection with the examiner within ten (10) days after notice that the matter has been referred to arbitration, the decision of the arbitrator will be binding on both parties. A more detailed description of the arbitration procedure is set forth in Sections 42-260-1 through 42-260-5 of the Connecticut Administrative Code.

**You** have a right to cancel this **Service Contract** if **You** return the **Vehicle**; the **Vehicle** is sold, lost, stolen or destroyed. If this **Service Contract** is for less than one year of coverage, this **Contract** will be extended while **Your Vehicle** is being repaired. This **Service Contract** does not include in-home service. The costs of transporting the **Vehicle** will not be paid for by the **Administrator**.

### GEORGIA
1. Unless otherwise specified on the first page of this **Contract**, **You** paid for this **Contract** in cash. If **You** financed the **Contract** price, the terms of the financing are contained in the **Service Contract** entered into between **You** and the **Selling Dealer**.
2. The section entitled "**Cancellation of this Contract** — Refunds and Charges" is replaced in its entirety with the following: "**You** will be entitled to a full refund of the **Contract** price if **You** provide a written notice of cancellation to the **Selling Dealer** within the first thirty (30) days after the **Contract** purchase date. If **You** provide a written notice of cancellation to the **Selling Dealer** after the first thirty (30) days after the **Contract** purchase date **You** will be entitled to a prorated refund of the **Contract Price** based on the greater of the number of days the **Contract** was in force or the miles driven compared to the total time or **Vehicle** mileage specified on the first page of this **Contract** under 'Coverage Term.' **Your** cancellation notice must be accompanied by a copy of an odometer disclosure statement or equivalent document verifying the current mileage of the **Vehicle**. The term of this **Contract** for cancellation purposes will be based on the date **You** purchased **Your Vehicle** and the **Vehicle** mileage on the date purchased. If the **Contract Price** was financed, any and all refunds will be paid to the **Lien Holder**. If the **Contract Price** was not financed, any and all refunds will be paid to **You** by the **Selling Dealer**."
3. The section entitled "Cancellation of this **Contract** — By **Us**" is replaced with the following: "**We** reserve the right to cancel this **Contract** and will not pay for a **Covered Breakdown** if (i) **We** discover fraud or material misrepresentation in connection with **Your** obtaining this **Contract** or a claim made under this **Contract**, or (ii) the **Lien Holder** advises **Us** that **You** have defaulted in **Your** obligation to repay the amount financed by the **Lien Holder**. In general, if **We** cancel this **Contract**, **We** will mail to **You** written notice of cancellation at least thirty (30) days before the cancellation date. However, if **We** cancel this **Contract** for any reason other than non-payment, **You** will receive written notice of cancellation at least thirty (30) days before the cancellation date and **Your** refund of the unearned consideration will be 100% pro-rata with no cancellation/administrative fee or claims paid deducted from any refund. However, if **We** cancel this **Contract** because **You** have defaulted in **Your** obligation to repay the amount financed by the **Lien Holder**, **We** will mail to **You** written notice of cancellation at least ten (10) days before the cancellation date."
4. No cancellation/administrative fee or claims paid will be deducted from any cancellation.
5. Misrepresentation of the odometer reading at the time of effective coverage may result in denial of coverage under this **Service Contract**.
6. Exclusion A.6 is amended to read: "A **Breakdown** caused by or involving modifications or additions to **Your Vehicle** made by **You** or with **Your** knowledge, and those modifications or additions were performed or recommended by the **Vehicle Manufacturer**."
7. Exclusion B.6 is amended to read: "**Your Vehicle** is modified by **You** or with **Your** knowledge from the **Vehicle Manufacturer's** original specifications."
8. At the sole discretion of the **Administrator**, a replacement of any part may be made with new parts, remanufactured parts or with parts of like kind and quality at the time of the breakdown.

SWRE_01_0017

9. Within the "Cancellation of this **Contract** — By The **Lien Holder**" section of this **Contract**, the following sentence(s) is added: "The **Lien Holder** must hold a power of attorney in order to cancel this **Contract** due to **Your** default in **Your** obligations to such **Lien Holder**."

#### IDAHO
1. The following sentence is added at the top of the first page of this **Contract**: "Purchase of this **Contract** is not required either to purchase or to obtain financing for a motor vehicle."
2. The paragraph at the bottom of the first page of this **Contract** is replaced with the following paragraph: "THIS **SERVICE CONTRACT** IS INSURED FOR ITS LIABILITY UNDER A **SERVICE CONTRACT** REIMBURSEMENT INSURANCE POLICY ISSUED BY **DEALERS ASSURANCE COMPANY**. IF **WE** DO NOT SETTLE **YOUR** CLAIM(S), AS **ADMINISTRATOR** WITHIN SIXTY (60) DAYS OF **OUR** RECEIPT OF **YOUR** PROOF OF LOSS, **YOU** MAY MAKE A CLAIM DIRECTLY AGAINST: Dealers Assurance Company, PO Box 21185, Upper Arlington, OH 43221. The toll free number is 1-800-282-8913.
3. Coverage afforded under this **Contract** is not guaranteed by the Idaho Insurance Guarantee Association.
4. The following language is added at the end of paragraph 2 under "**Your** Obligations:"
   "If a **Covered Part** has a **Covered Breakdown** at any time outside of Claims Department regular business hours, **You** may take one of the following steps: (1) Wait until regular business hours and then follow the normal claims procedure outlined above; or (2) Authorize and pay for any teardown or diagnostic time needed to determine whether **Your Vehicle** has a **Covered Breakdown**. If **You** reasonably determine that **You** have a **Covered Breakdown** and **You** choose to have **Your Vehicle** repaired, **You** are responsible for paying for the repair. **You** must then call the **Administrator** during the next available regular business hours so that the **Administrator** may determine whether there was a **Covered Breakdown**. If the **Administrator** determines that there was a **Covered Breakdown**, then **We** will pay **You** in accordance with the terms and conditions of this **Contract**."

#### ILLINOIS
1. The **Administrator Obligor** is First Automotive Service Corporation, a New Mexico Corporation, located at 2400 Louisiana Blvd. NE, Albuquerque, NM 87110, 1-800-634-4333.
2. The section entitled "**Cancellation of this Contract** — By **You**" is replaced with the following: "**You** may cancel this **Contract** by contacting **Us** through the **Selling Dealer**."
3. The section entitled "**Cancellation of this Contract** - Refunds and Charges" is replaced in its entirety with the following: "**You** will be entitled to a full refund of the Contract Price if **You** provide a written notice of cancellation to the **Selling Dealer** within the first thirty (30) days after the **Contract** purchase date, and if **You** have not filed a claim under this **Contract**. If **You** provide a written notice of cancellation to the **Selling Dealer** after the first thirty (30) days of the **Contract** purchase date, or if **We** or the **Lien Holder** cancels this **Contract** at any time, **You** will be entitled to a prorated refund of the **Contract** price based on the greater of the number of days the **Contract** was in force or the miles driven compared to the total time or **Vehicle** mileage specified on the first page of this **Contract** under 'Coverage Term,' less a cancellation fee equal to the lesser of $50.00 or ten percent (10%) of the amount of the prorated refund." **Your** cancellation notice must be accompanied by a copy of an odometer disclosure statement or equivalent document verifying the current mileage of the **Vehicle**.
4. Under "**Exclusions — What this Contract does not Cover**," Item A.21 is replaced with the following: "21. A gradual reduction in operating performance due to normal wear and tear."

#### IOWA
1. Unless otherwise specified on the first page of this **Contract**, **You** paid for this **Contract** in cash. If **You** financed the **Contract** price, the terms of the financing are contained in the **Service Contract** entered into between **You** and the **Selling Dealer**.
2. For Iowa Residents only: If **You** have problems or questions about this **Contract**, **You** may contact the Commissioner of Insurance of the State of Iowa or the Iowa Securities Bureau at (515) 281-4441. The address is: Iowa Securities Bureau, 340 East Maple Street, Des Moines, Iowa 50319-0066.
3. The "**Cancellation of this Contract** — Refunds and Charges" section of this **Contract** is amended as follows: If this **Contract** is originally delivered to **You** by mail, **You** may cancel this **Contract** within 20 days after the date the **Contract** was mailed to **You** and receive a full refund of the **Contract** price provided no claim has been made under the **Contract**. If this **Contract** was delivered to **You** at the time of sale, **You** may cancel this **Contract** within 10 days after the date of the **Contract** and receive a full refund of the **Contract** price provided no claim has been made under the **Contract**. If a full refund is due to **You** under this **Contract**, a 10% penalty per month will be added to the refund if it is not made within 30 days of return of the **Contract** to **Us**.
4. The third paragraph under "**Our** Obligations—Covered Breakdowns (**Deductible** Applies)" is replaced in its entirety by the following: "Replacement parts can be of like kind and quality and may include new, remanufactured or used parts as determined by the **Administrator**, except that: (i) used parts may only be used with **Your** prior written authorization to do so, and (ii) rebuilt parts may only be used if the parts are rebuilt according to national standards recognized by the insurance division (Commissioner of Insurance of the State of Iowa/Iowa Securities Bureau)."

#### MASSACHUSETTS
NOTICE TO CUSTOMER: PURCHASE OF THIS **CONTRACT** IS NOT REQUIRED IN ORDER TO REGISTER OR FINANCE A **VEHICLE**. THE BENEFITS PROVIDED MAY DUPLICATE EXPRESS MANUFACTURER'S OR SELLER'S WARRANTIES THAT COME AUTOMATICALLY WITH EVERY SALE. THE SELLER OF THIS COVERAGE IS REQUIRED TO INFORM **YOU** OF ANY WARRANTIES AVAILABLE TO **YOU** WITHOUT THIS **CONTRACT**.
Chapter 90, Section 7N1/4 of Massachusetts General Laws requires an automobile dealer to provide a warranty covering certain classes of used motor vehicles as follows:
• Used vehicles with less than 40,000 miles at the time of sale are covered for 90 days or 3,750 miles, whichever comes first.
• Used vehicles with 40,000 miles or more, but less than 80,000 miles, at the time of sale are covered for 60 days or 2,500 miles, whichever comes first.
• Used vehicles with 80,000 miles or more, but less than 125,000 miles, at the time of sale are covered for 30 days or 1,250 miles, whichever comes first.
The **Vehicle You** have purchased may be covered by this law. If so, the following is added to this **Contract**: In addition to the dealer warranty required by this law, **You** have elected to purchase this **Contract**, which may provide **You** with additional protection during the dealer warranty period and provides protection after the dealer warranty has expired. You have been charged separately only for this **Contract**. The required dealer warranty is provided free of charge. Furthermore, the definition, coverage, and exclusions stated in this **Contract** apply only to this **Contract** and are not the terms of the required dealer warranty.

#### MINNESOTA
1. Paragraph 1 under "**Your Obligations**" is replaced with the following: "In order for this **Contract** to remain in force, **You** must:
   • Change the oil and oil filter in the **Vehicle** at least every six (6) months or 5,000 miles, whichever comes first;
   • Replace the timing belt in the **Vehicle** at least every 90,000 miles;
   • Keep and make available to the **Administrator** upon request, verifiable signed receipts that show that the above required maintenance and servicing was timely performed."
2. Under "**Exclusions — What this Contract does not Cover**":
   a. Item A.1 is replaced with the following: "1. A **Breakdown** caused by lack of customary or proper maintenance."
   b. Item A.5 is replaced with the following: "5. Fraud, material misrepresentation or material omission made by **You** in pursuing a claim under this **Contract**."
   c. Item A.12, A.22 and A.27 are deleted in their entirety.
   d. Item A.17 is replaced with the following: "17. Any cost or other benefit that the **Vehicle** manufacturer will pay as a result of a public recall or factory service bulletin.
   e. Item B.5 is deleted.
3. There is no exclusion for pre-existing conditions, normal wear and tear or repairs caused to a covered part by a non-covered part or by "consequential" damage from a non-covered part. Exclusion of coverage for odometer tampering in any form applies only if it occurs and **You** fail to repair while the **Vehicle** is owned by **You**. There is no exclusion for repairs or replacements of motor **Vehicle** components which were not operating properly in accordance with manufacturer's specifications at the time of sale of this **Service Contract** or if the manufacturer has "branded" the title (cancelled the factory warranty).
4. As required by Section 325F. 662 of the Minnesota Statutes, the **Selling Dealer** is providing to **You** the coverage listed below at no charge if the **Vehicle** has less than 75,000 miles at the time **You** purchased the **Vehicle** or if the purchase price of the **Vehicle** is $3,000 or more (including the trade-in value of any **Vehicle** traded in by **You**, but excluding tax, license fees, registration fees, and finance charges) or if the **Vehicle** does not fall within any of the other exclusions listed under Subdivision 3 of Section 325F.662 of the Minnesota Statutes. The term of such coverage is based upon the mileage of the **Vehicle** at the time of purchase and is as follows:
   a. Used **Vehicles** with less than 36,000 miles are covered for 60 days or 2,500 miles, whichever comes first.
   b. Used **Vehicles** with 36,000 miles or more, but less than 75,000 miles, are covered for 30 days or 1,000 miles, whichever comes first.
The following parts are covered by the **Selling Dealer's** limited warranty:
1. Engine: All lubricated parts, intake manifolds, engine block, cylinder head, rotary engine housings;
2. Transmission: Automatic transmission case, internal parts, and the torque converter, or the manual transmission case and the internal parts;
3. Drive Axle: Axle housings and internal parts, axle shafts, drive shafts output shafts, and universal joints; the secondary drive axle on vehicles other than passenger vans is excluded for coverage;

SWRE_01_0018

4.   Brakes: Master cylinder, vacuum assist booster, wheel cylinders, hydraulic lines and fittings, and disc brakes calipers;
5.   Steering: Steering gear housing and all internal parts, power steering pump, valve body, and piston;
6.   Water pump;
7.   Externally-mounted mechanical fuel pump.

In addition, the following parts are covered if the **Vehicle** has less than 36,000 miles: Steering rack, radiator, alternator, generator, and starter.  The above coverage is excluded from this **Contract** during the applicable warranty period unless the **Selling Dealer** is unable to meet its obligations. **Your** rights and obligations regarding this coverage are more fully explained in the used **Vehicle Service Contract** document provided to **You** by the **Selling Dealer**.

### MISSISSIPPI

1. Unless otherwise specified on the first page of this **Contract**, **You** paid for this **Contract** in cash: If **You** financed the **Contract Price**, the terms of financing are contained in the **Service Contract** entered into between **You** and the **Selling Dealer**.

2. The following language is added at the end of paragraph 2 under "**Your Obligations**": "If a **Covered Part** has a **Covered Breakdown** at any time outside of Claims Department regular business hours, **You** may take one of the following steps:
   * Wait until regular business hours and then follow the normal claims procedure outlined above; or
   * Authorize and pay for any teardown or diagnostic time needed to determine whether **Your Vehicle** has a **Covered Breakdown**. If **You** reasonably determine that **You** have a **Covered Breakdown** and **You** choose to have **Your Vehicle** repaired, **You** are responsible for paying for the repair. **You** must then call the **Administrator** during the next available regular business hours so that the **Administrator** may determine whether there was a **Covered Breakdown**. If the **Administrator** determines that there was a **Covered Breakdown**, then **We** will pay **You** in accordance with the terms and conditions of this **Contract**."

### MISSOURI

The cancellation section of this **Contract** is amended to include the following:  If this **Contract** is originally delivered to **You** by mail, **You** may cancel this **Contract** within twenty (20) days after the date the **Contract** was mailed to **You** or within ten (10) days if the **Contract** is delivered at the time of sale and receive a full refund of the **Contract** price provided no claim has been made under the **Contract**.  If a full refund is due to **You** under this **Contract**, a ten (10%) penalty per month will be added to the refund if it is not made within thirty (30) days of return of the **Contract** to **Us**.  A written notice will be mailed to the **Contract Holder** within fifteen days (15) of the date of cancellation by the **Contract Holder**.  This **Contract** is non-renewable.   The "**What To Do If You Have A Breakdown**" provision is amended by adding the following: In the event of an emergency situation essential to public health, safety or welfare and the **Administrator** cannot be reached, proceed with repairs. But, payment will be made in accordance with the **Contract** and as soon as reasonably possible, **You** should report the repairs to the **Administrator**.

### MONTANA

The section entitled "Arbitration" is deleted. If **We** cancel this **Contract**, **We** will mail written notice to **You** within at least five (5) days prior to the cancellation. Prior notice is not required for cancellation of nonpayment of the provider fee, a material misrepresentation by **You** to **Us**, or substantial breach of duties by **You** relating to the covered product or its use.

### NEVADA

1. The following language is added to the section entitled "**Cancellation of this Contract— By Us**":
"Notwithstanding the foregoing, if this **Contract** has been in effect for at least seventy (70) days, **We** will not be entitled to cancel it before the expiration of the term of this **Contract** or for one (1) year after the **Sale Date** of this **Contract**, whichever occurs first, except on any of the following grounds:
(a) Failure by **You** to pay an amount when due; (b) Conviction of **You** of a crime that results in an increase in the service required under this **Contract**; (c) Discovery of fraud or material misrepresentation by **You** in obtaining this **Contract**, or in presenting a claim for service under this **Contract**; (d) Discovery of:  (1) An act or omission by **You**; or (2) A violation by **You** of any condition of this **Contract**, which occurred after the **Sale Date** of this **Contract** and which substantially and materially increases the service required under this **Contract**; or (e) A material change in the nature or extent of the required service or repair that occurs after the **Sale Date** of this **Contract** and that causes the required service or repair to be substantially and materially increased beyond that contemplated at the time that this **Contract** was issued or sold. If **We** cancel this **Contract**, **We** will mail to **You** written notice of cancellation (stating the date of and reason for the cancellation) at least fifteen (15) days before the cancellation date."

2. The paragraph under "**Cancellation of this Contract**—Refunds and Charges" is replaced in its entirety with the following:
"**You** will be entitled to a full refund of the **Contract Price** if **You** provide a written notice of cancellation to the **Selling Dealer** within the first thirty (30) days after the **Contract** purchase date, if **You** have not filed a claim under this **Contract**. If **You** provide a written notice of cancellation to the **Selling Dealer** after the first thirty (30) days after the **Contract Sale Date**, or if **We** or the **Lien Holder** cancels this **Contract** at any time, **You** will be entitled to a prorated refund of the **Contract** price (less a $50.00 cancellation fee, unless **We** cancel this **Contract**, in which case no fee will be deducted) based on the greater of the number of days the **Contract** was in force or the miles driven compared to the total time or mileage specified on the first page of this **Contract** under 'Coverage Term.' **Your** cancellation notice must be accompanied by a copy of an odometer disclosure statement or equivalent document verifying the current mileage of the **Vehicle**. The term of this **Contract** for cancellation purposes will be based on the date **You** purchased **Your Contract** and the **Vehicle** mileage on the date purchased. If the **Contract** price was financed, any and all refunds will be paid to the **Lien Holder**. If the **Contract** price was not financed, any and all refunds will be paid to **You** by the **Selling Dealer**. In that case, **We** will provide **You** with a refund within forty-five (45) days after the **Selling Dealer** receives **Your** written notice of cancellation, and if **We** fail to do so within that time, **We** will pay **You** a penalty of 10 percent of the **Contract** price for each thirty (30) day period or portion of thereof that the refund and any accrued penalties remain unpaid."

3. The following language is added to the end of the last sentence of paragraph 1 under "**Our Obligations**":
", and may include parts that are not made for or by the original manufacturer of the **Vehicle**."
This **Contract** is not renewable.

4. The following language is deleted from "EXCLUSIONS — WHAT THIS CONTRACT DOES NOT COVER": "B. In addition, this Contract provides no benefits or coverage and We have no obligation under this Contract if: 5. You are using or have used Your Vehicle in a manner that is not recommended by the Vehicle Manufacturer.; 6. Your Vehicle is modified from the Vehicle Manufacturer's original specifications."

5. The following language is added to this **Contract** "This **Contract** will not cover any unauthorized or non-manufacturer-recommended modifications to **Your Vehicle**, or any damages arising from such unauthorized or non-manufacturer-recommended modifications. However, if **Your Vehicle** is modified in a manner that is not recommended by the manufacturer of **Your Vehicle**, the **Obligor** will not automatically suspend all coverage. Rather, this **Contract** will continue to provide any applicable coverage that is not related to the unauthorized or non-manufacturer-recommended modification or any damages arising therefrom, unless such coverage is otherwise excluded by the terms of this **Contract**."

### NEW YORK

A ten (10%) percent penalty per month shall be added to a refund that is not made within thirty days (30) of return of the **Contract** to the Administrator. **We** will mail a written notice with the reason for cancellation to **You** at least fifteen (15) days prior to the cancellation by **Us**.  Written notice is not required if the reason for cancellation is nonpayment of the cost of this Contract, a material misrepresentation, or a substantial breach of duties by **You** relating to the covered property or its use.

### NORTH CAROLINA

1. There shall be added to the first page of this **Contract** in the signature box just above the signature line the following:  "THE PURCHASE OF THIS CONTRACT IS NOT REQUIRED EITHER TO PURCHASE OR TO OBTAIN FINANCING FOR A MOTOR VEHICLE."

2. The section entitled "**Cancellation of this Contract** — Refunds and Charges" is replaced in its entirety with the following:
"**You** will be entitled to a full refund of the **Contract** price if **You** provide a written notice of cancellation to the **Selling Dealer** within the first thirty (30) days after the **Contract** purchase date, and if **You** have not filed a claim under this **Contract**. If **You** provide a written notice of cancellation to the **Selling Dealer** after the thirty (30) days after the **Contract** purchase date, or if **We** or the **Lien Holder** cancels this **Contract** at any time, **You** will be entitled to a prorated refund of the **Contract** price (less a cancellation fee equal to the lesser of $50.00 or ten percent (10%) of the amount of the prorated refund) based on the greater of the number of days the **Contract** was in force or the miles driven compared to the total time or **Vehicle** mileage specified on the first page of this **Contract** under 'Coverage Term.' **Your** cancellation notice must be accompanied by a copy of an odometer disclosure statement or equivalent document verifying the current mileage of the **Vehicle**. The term of this **Contract** for cancellation purposes will be based on the date **You** purchased **Your Vehicle** and the **Vehicle** mileage on the date purchased. If the **Contract** price was financed, any and all refunds will be paid to the **Lien Holder**. If the **Contract** price was not financed, any and all refunds will be paid to **You** by the **Selling Dealer**."

### OKLAHOMA

1. The section entitled "**Cancellation of this Contract** — Refunds and Charges" is replaced in its entirety with the following:

**FORM AWA-XX-XX-05**                                          **P.7**                                          **REV 02.15.12**

"**You** will be entitled to a full refund of the **Contract** price if **You** provide a written notice of cancellation to the **Selling Dealer** within the first thirty (30) days after the **Contract** purchase date. If **You** provide a written notice of cancellation to the **Selling Dealer** after the first thirty (30) days after the **Contract** purchase date, **Your** refund will be based upon ninety percent (90%) of the unearned pro rata premium. If the **Contract** price was financed, any and all refunds will be paid to the **Lien Holder**. If the **Contract Price** was not financed, any and all refunds will be paid to **You** by the **Selling Dealer**."

2. In the event the **Contract** is canceled by **Us**, refund will be based upon one hundred percent (100%) of unearned pro rata premium.

3. The section entitled "Arbitration" is deleted.

4. The following disclosure statement is added to the first page of this **Contract**: "THIS SERVICE CONTRACT IS NOT ISSUED BY THE MANUFACTURER OR WHOLESALE COMPANY MARKETING THE PRODUCT. THIS CONTRACT WILL NOT BE HONORED BY SUCH MANUFACTURER OR WHOLESALE COMPANY."

**OREGON**

The following language is added at the end of paragraph 2 under "**Your Obligations**:"

c.   "If a **Covered Part** has a **Covered Breakdown** at any time outside of Claims Department regular business hours, **You** may take one of the following steps:

• Wait until regular business hours and then follow the normal claims procedure outlined above; or

• Authorize and pay for any teardown or diagnostic time needed to determine whether **Your Vehicle** has a **Covered Breakdown**. If **You** reasonably determine that **You** have a **Covered Breakdown** and **You** choose to have **Your Vehicle** repaired, **You** are responsible for paying for the repair. **You** must then call the **Administrator** during the next available regular business hours so that the **Administrator** may determine whether there was a **Covered Breakdown**. If the **Administrator** determines that there was a **Covered Breakdown**, then **We** will pay **You** in accordance with the terms and conditions of this **Contract**."

**SOUTH CAROLINA**

1. Unless otherwise specified on the first page of this **Contract**, **You** paid for this **Contract** in cash. If **You** financed the **Contract Price**, the terms of financing are contained in the **Installment Contract** entered into between **You** and the **Selling Dealer**.

2. Any unresolved complaints or questions about this **Contract** may be addressed to:  South Carolina Department of Insurance, P.O. Box 100105, Columbia, SC 29202-3105, (803) 737-6134

3. The section entitled "Cancellation of this Contract—Refunds and Charges" is replaced in its entirety with the following:  "**You** will be entitled to a full refund of the **Contract** price if **You** provide a written notice of cancellation to the **Selling Dealer** within the first thirty (30) days after the **Contract** purchase date, and if **You** have not filed a claim under this **Contract**. In that case, **We** will provide **You** with a refund within 45 days after the **Selling Dealer** receives **Your** written notice of cancellation, and if we fail to do so within that time, **We** will pay **You** a penalty of 10 percent of the **Contract** price for each month that the refund remains unpaid. If **You** provide a written notice of cancellation to the **Selling Dealer** after the first thirty (30) days after the **Contract** purchase date, or if **We** or the **Lien Holder** cancels this **Contract** at any time, **You** will be entitled to a prorated refund of the **Contract Price** based on the greater of the number of days the **Contract** was in force or the miles driven compared to the total time or **Vehicle** mileage specified on the first page of this **Contract** under 'Coverage Term.' **Your** cancellation notice must be accompanied by a copy of an odometer disclosure statement or equivalent document verifying the current mileage of the **Vehicle**. The term of this **Contract** for cancellation purposes will be based on the date **You** purchased **Your Contract** and the **Vehicle** mileage on the date purchased. If the **Contract Price** was financed, any and all refunds will be paid to the **Lien Holder**. If the **Contract** price was not financed, any and all refunds will be paid to **You** by the **Selling Dealer**."

4. The following paragraph is added to the section entitled "**Cancellation of this Contract— By Us**":

"If **We** cancel this **Contract**, **We** will mail a written notice to **You** at **Your** last known address contained in **Our** records at least fifteen (15) days prior to cancellation. The notice will state the effective date of cancellation and the reason for cancellation. **We** will not send **You** advance notice if the reason for cancellation is nonpayment of the **Contract** price, a material misrepresentation by **You** to **Us**, or a substantial breach of duties by **You** relating to the **Vehicle** or its use."

**TEXAS**

1. Unless otherwise specified on the first page of this **Contract**, **You** paid for this **Contract** in cash. If **You** financed the **Contract Price**, the terms of financing are contained in the **Contract** entered into between **you** and the **Selling Dealer**.

2. The following paragraph is added to the section entitled "**Cancellation of this Contract — By Us**": "If **We** cancel this **Contract**, **We** will mail a written notice to **You** at **Your** last known address contained in **Our** records at least six (6) days prior to cancellation. The notice will state the effective date of cancellation and the reason for cancellation. **We** will not send **You** advance notice if the reason for cancellation is nonpayment of the **Contract Price**, a material misrepresentation by **You** to **Us**, or a substantial breach of duties by **You** relating to the **Vehicle** or its use."

3. The following sentence is inserted after the first sentence under "**Cancellation of this Contract** — Refunds and Charges": "In that case, **We** will provide **You** with a refund within forty-five (45) days after the **Selling Dealer** receives **Your** written notice of cancellation, and if **We** fail to do so within that time, **We** will pay **You** a penalty of ten (10%) percent of the **Contract Price** for each month that the refund remains unpaid. Pursuant to Section 1304.158, **You** may request reimbursement directly from the insurer if a refund or credit is not paid before the forty-sixth (46th) day after the date on which the **Contract** is returned to the **Administrator**.

4. Any unresolved complaints concerning **Us** or questions concerning the regulation of service contract providers may be addressed to the Texas Department of Licensing and Regulation at the following address and telephone numbers: Texas Department of Licensing and Regulation, P.O. Box 12157, Austin, TX 78711, (800) 803-9202/(512) 463-6599

**UTAH**

1. Coverage afforded under this **Contract** is not guaranteed by the Property and Casualty Guaranty Association.

2. The **Contract** purchase price is payable, in full, at the time of purchase.

3. The following language is added at the end of paragraph 2 under "**Your Obligations**.": If a **Covered Part** has a **Covered Breakdown** at any time outside of Claims Department regular business hours, **You** should report the repairs to the **Administrator** as soon as reasonably possible.

4. The following sentence is added to the section entitled "**Cancellation of this Contract — By Us**": **We** may only cancel this **Contract**, for material misrepresentation or substantial breaches of contractual duties, conditions, or warranties, **We** will mail to **You** written notice of cancellation at least thirty (30) days before the cancellation date. However, if **We** cancel this **Contract** for nonpayment of the amount financed by the **Lien holder**, **We** will mail to **You** written notice of cancellation at least ten (10) days before the cancellation date.

5. Under the emergency repairs section of this **Contract**, "On the next business day, **You** should report the repairs to the **Administrator**" is amended as follows, "As soon as reasonably possible, **You** should report the repairs to the **Administrator**."

6. The toll-free number for Dealers Assurance Company is 1-800-282-8913.

7. This Service **Contract** is subject to limited regulation by the Utah Insurance Department.  To file a complaint, contact the Utah Insurance Department.

**VIRGINIA**

The definition of "**We**," "**Us**" and "**Our**" under "**Definitions**" is replaced with the following: "**We**," "**Us**" and "**Our**" refers to Superior Protection Plan.

**WISCONSIN**

1. THIS SERVICE CONTRACT IS SUBJECT TO LIMITED REGULATION BY THE OFFICE OF THE COMMISSIONER OF INSURANCE.

2. The following sentences are added to the first bullet point in item 2 under "**Your Obligations**" and to item A.28 under "**Exclusions — What this Contract does not Cover**":

"However, the failure by **You** to obtain an authorization number from the **Administrator** prior to beginning a repair will not invalidate or reduce a claim unless **We** are prejudiced by **Your** failure to obtain an authorization number. In other words, **We** will not deny a claim solely because **You** or **Your** repair facility failed to obtain an authorization number before beginning a repair."

3. The first sentence under "**Other Important Contract Provisions/Limitations** —Our Rights Against Others" is replaced with the following:

"If **You** receive any benefits under this **Contract**, **We** will be entitled to all **Your** rights of recovery against any manufacturer, repairer or other party who may be responsible to **You** for the costs covered by this **Contract** or for any other payment made by **Us**, but only after **You** have been made whole for **Your** loss (i.e., **You** have been fully compensated for **Your** damages)."

4. Once authorization is obtained, and the repair is completed, all repair invoices and documentation must be submitted to the **Administrator** as soon reasonably possible.

5. **You** may reject and return this **Contract** within fifteen (15) calendar days of the delivery of this **Contract** for a full refund, less actual costs and/or charges needed to issue and service this **Contract**.

6. Within the "**Your Obligations**" section, the following sentence(s) is amended: "To make a claim, call the **Administrator** toll-free at 1-866-410-6748. Claims Department hours are Monday through Friday, 7 a.m. to 7 p.m., Saturday 8 a.m. to 2 p.m., Central Time. CLAIMS MUST BE SUBMITTED AS SOON AS REASONABLE POSSIBLE AND WITHIN ONE (1) YEAR FROM AUTHORIZATION TO QUALIFY FOR REIMBURSEMENT."

SWRE_01_0020

7. The section entitled "**Your Obligations — Emergency Repairs**" is amended with the following: "If emergency repairs covered by this **Contract** are required outside the **Selling Dealer's** or **Administrator's** business hours, **You** should deliver **Your Vehicle** to a licensed repair facility and have the necessary repairs performed at a reasonable and customary charge. As soon as reasonably possible and within one (1) year, **You** should report the repairs to the **Administrator**. Failure by **You** to give notice or proof within the time required does not invalidate or reduce the claim unless **You** are prejudiced by the failure to give notice. To report an emergency repair and obtain a reimbursement, please call the claims number below for instructions. Emergency repairs are only those repairs, which, if not performed, would render **Your Vehicle** inoperable or unsafe to drive and impair its future operation."

### WYOMING

1. Unless otherwise specified on the first page of this **Contract**, **You** paid for this **Contract** in cash. If **You** financed the **Contract** price, the terms of financing are contained in the **Service Contract** entered into between **You** and the **Selling Dealer**.

2. The following paragraph is added to the section entitled "Cancellation of this **Contract** — By **Us**".: "If **We** cancel this **Contract**, **We** will mail a written notice to **You** at **Your** last known address contained in **Our** records at least ten (10) days prior to cancellation. The notice will state the effective date of cancellation and the reason for cancellation. **We** will not send **You** advance notice if the reason for cancellation is nonpayment of the **Contract Price**, a material misrepresentation by **You** to **Us**, or a substantial breach of duties by **You** relating to the **Vehicle** or its use."

3. If there is a **Lien Holder**, the refund less a cancellation fee will be paid to **You** and the **Lien Holder**.

4. Arbitration will take place in accordance with the Wyoming Arbitration Act.

5. The following paragraph is deleted from the section entitled "**Cancellation of this Contract**— By the **Lien Holder**": ""**You** understand and acknowledge that the **Lien Holder** (if any) has the right to cancel this **Contract** if the **Vehicle** is repossessed or destroyed or **You** are otherwise in default of **Your** obligations to repay the amount financed by the **Lien Holder**."

6. The following paragraph is added to the section entitled "Cancellation of this **Contract**": Service contracts shall require the provider to permit the original service contract holder to return the service contract within twenty (20) days of the date the service contract was mailed to the service contract holder or within ten (10) days of delivery if the service contract is delivered to the service contract holder at the time of sale or within a longer time period permitted under the service contract. Upon return of the service contract to the provider within the applicable time period, if no claims have been made under the service contract prior to its return to the provider, the service contract is void and the provider shall refund the service contract holder, or credit the account of the service contract holder, with the full purchase price of the service contract. The right to void the service contract provided in this subsection is not transferable and shall apply only to the original service contract purchaser, and only if no claim has been made prior to its return to the provider. A ten percent (10%) penalty per month shall be added to a refund that is not paid or credited within forty-five (45) days after return of the service contract to the provider. A cancellation fee is not allowed if the service contract is cancelled during the "free look" period.



SWRE_01_0021

**WYNN'S EXTENDED CARE, INC.***
6303 Blue Lagoon Dr., Suite 225, Miami, FL 33126
*Not affiliated with Wynn Oil Company

**CONTRACT NO: CAP**

# WYNN'S PLUS+
## VEHICLE SERVICE CONTRACT/APPLICATION

This document is an **Application** for a vehicle service contract. If this **Application** is accepted by **Us**, then it will become **Your Contract**.
**THE PURCHASE OF THIS CONTRACT IS NOT REQUIRED EITHER TO PURCHASE OR TO OBTAIN FINANCING FOR A MOTOR VEHICLE.**

| CUSTOMER INFORMATION | SELLING DEALER |
|---|---|
| Customer Name (Contract Holder) | Dealer Name |
| Address | Address |
| City          State          Zip | City          State          Zip |
| Telephone | Telephone          Dealer Account Number |

| VEHICLE INFORMATION | |
|---|---|
| Vehicle Identification Number (VIN) | Current Odometer Reading          Miles (Not to exceed 175,000 miles) |
| Year     Make     Model | Vehicle Purchase Price $ |

| CONTRACT INFORMATION | | |
|---|---|---|
| Lienholder - Credit Acceptance Corporation | CA Approval # | Contract Price $ |

**COVERAGE/TERM**

Coverage: Wynn's Plus+ Deluxe          **Deductible: $100.00**          Term: _____ Months/_____ Miles
*(This Contract Must Be Purchased On Date Of Vehicle Sale.)*          *(Whichever Occurs First.)*

[  ] **Extended Coverage (In-Service Date Required )**          [  ] **Standard Coverage**

**Extended Coverage** begins on the date that the **Manufacturer's Warranty** expires and ends with the passing of the "Term" listed herein.

**Standard Coverage** begins on the **Contract Purchase Date** and ends with the passing of the "Term" listed herein.

Manufacturer's Warranty In-Service Date: _____

Manufacturer's Warranty Expiration Date: _____, or

Manufacturer's Warranty Expiration Miles: _____

**Note All Coverages:** Seals and Gaskets and High-Tech Coverage is included on vehicles with 100,000 miles or less on the odometer on **Contract Purchase Date.**

This Applies To The State Of Washington Only.
**THAT THE IMPLIED WARRANTY OF MERCHANTABILITY ON THE MOTOR VEHICLE IS NOT WAIVED IF THE CONTRACT HAS BEEN PURCHASED WITHIN NINETY (90) DAYS OF THE PURCHASE DATE OF THE MOTOR VEHICLE FROM A PROVIDER WHO ALSO SOLD THE MOTOR VEHICLE COVERED BY THE CONTRACT. INITIALS _____**

**CONTRACT OBLIGOR (OUR, US, or WE): ADMINISTRATOR**

I hereby agree to and acknowledge the terms and conditions of this Contract, including but not limited to the maintenance schedule, the claim process, the coverage provided, the time and mileage limitations, the exclusions of coverage, the cancellations provisions of this Contract, the "Dispute Resolution" section including the arbitration provision, the "Other Important Contract Provisions/ Limitations" section, and have read and understood said provisions, which are incorporated herein by reference. It is understood that the purchase of this Vehicle Service Contract is NOT a requirement to purchase or obtain financing. I understand that the above information may be subject to verification and that this Application may be rejected if any of the above information is incorrect or if the above Vehicle is not eligible for the term or coverage written as determined by the Administrator in its sole discretion. For residents of the State of Arizona, this Service Contract Agreement shall be effective from the date of Sale of the agreement and the agreement is additionally subject to all the provisions of Arizona Administrative Code rule number R20-6-407(E)(4).

CUSTOMER NAME (CONTRACT HOLDER'S) SIGNATURE _____          AUTHORIZED REPRESENTATIVE OF SELLING DEALER _____

Purchase Date: _____          Date: _____

THIS SERVICE **CONTRACT** IS INSURED FOR ITS LIABILITY UNDER A SERVICE CONTRACT REIMBURSEMENT INSURANCE POLICY ISSUED BY **NATIONAL CASUALTY COMPANY**, A MEMBER COMPANY OF THE Nationwide® Insurance group. IF **WE** DO NOT SETTLE **YOUR** CLAIM(S), AS **ADMINISTRATOR** WITHIN SIXTY (60) DAYS (THIRTY (30) DAYS IN ARIZONA) OF **OUR** RECEIPT OF **YOUR** PROOF OF LOSS, **YOU** MAY MAKE A CLAIM DIRECTLY AGAINST: **NATIONAL CASUALTY COMPANY**, P.O. BOX 4110, SCOTTSDALE, AZ 85261-4110, (800) 423-7675.

**BEFORE BEGINNING ANY REPAIR WORK ON YOUR VEHICLE CALL WYNN'S EXTENDED CARE* AT (800) 901-6182**

Protection under this **Contract** is the primary responsibility of NATIONAL CASUALTY COMPANY.

**We** agree that in return for an administrative fee paid by **You**, this **Contract** will be administered on **Your** behalf. Please refer to the "**4. YOUR OBLIGATIONS**" section below.

### 1. DEFINITIONS

- **Administrator, Our, Us,** and We means Wynn's Extended Care, Inc.[+]
- **Application** means this **Application** for a **Contract**.
- **Breakdown** means the total failure of any **Covered Part** to perform its function due solely to defect in workmanship or material.
- **Contract** means this **Application** once it is accepted by **Administrator** (if at all). For **Contract Holders** in the state of Washington, **Service Contract** means a **Contract** or agreement for consideration over and above the lease or purchase price of the **Motor Vehicle** for a specific duration of time and/or mileage to perform the repair or replacement for **Breakdowns** due to a defect in materials or workmanship, or normal wear and tear and may provide incidental payment of indemnity under limited circumstances including towing, services, or other expenses relating to the failure of the **Motor Vehicle** or of a component part thereof.
- **Contract Holder** and **Service Contract Holder** means the person who is the purchaser or holder of a Service Contract.
- **Contract Price** means the price of this **Contract** as specified on Page 1 of this **Contract**. For **Contract Holders** in the state of Washington, Provider Fee means the price a consumer paid for a Service Contract.
- **Contract Purchase Date** means the date **You** purchased this **Contract**.
- **Contract Obligor** means the **Administrator**.
- **Covered Breakdown** means a **Breakdown** that is covered by this **Contract**, as specified in the "**5. OUR OBLIGATIONS**" section below.
- **Covered Part** means an item listed as a **Covered Part** in the "**6. COVERED PARTS**" section on Page 3.
- **Covered Repair** means a repair to a **Covered Part** approved by the **Administrator**.
- **Deductible** means the **Deductible** shown on Page 1 of this **Contract**.
- **Installment Contract** means the agreement **You** sign with the **Selling Dealer** whereby **You** agree to buy the **Vehicle** on credit.
- **Lienholder** means the entity to whom the **Selling Dealer** assigns an **Installment Contract** as identified on Page 1 of this **Contract**.
- **Limits of Liability** has the meaning given to such term in the "**10. OTHER IMPORTANT CONTRACT PROVISIONS/LIMITATIONS - LIMITS OF OUR LIABILITY**" on Page 5.
- **Lubricated Part** means a part that requires lubrication to perform its function.
- **Manufacturer's Warranty** means the basic "bumper-to-bumper" limited warranty provided by the **Vehicle Manufacturer** to repair **Your Vehicle.**
- **Manufacturer's Warranty In-Service Date"** means the **Manufacturer's Warranty** start date.
- **Motor Vehicle** for **Contract Holders** in the state of Washington means a **Vehicle** subject to registration under chapter 46.16 RCW.
- **Selling Dealer** means the automobile dealer identified on Page 1 of this **Contract**.
- **Service Contract Provider** for **Contract Holders** in the state of Washington, means a person who is contractually obligated to the **Service Contract Holder** under the terms of the **Contract** is the **Administrator**, Wynn's Extended Care, Inc.*, 6303 Blue Lagoon Drive, Suite 225, Miami, FL 33126; (800) 901-6182.
- **Vehicle** means the **Vehicle** covered by this **Contract**, as identified in the "Vehicle Information" section on Page 1 of this **Contract**.
- **Vehicle Manufacturer** means the manufacturer of the **Vehicle.**
- **You, Your, Yours** and I means the customer identified in the "Customer Information" section on Page 1 of this **Contract**.

### 2. TERMS AND CONDITIONS

This **Contract** is subject to the following terms, conditions, limitations, and exclusions. No party has the right to change this **Contract** or to waive any of the terms and conditions herein except, however, **Administrator** may in its sole discretion modify the type of coverage between Extended and Standard, as identified on Page 1 in the "Coverage/Term", based upon **Vehicle** eligibility. This **Contract** is for the sole benefit of the **Contract Holder** as identified on Page 1 in the "Customer Information" section of this **Contract** and applies only to the **Vehicle** as identified in the "Vehicle Information" section on Page 1.

### 3. COVERAGE PERIOD

**Application Acceptance:** This document is an **Application** for coverage under a vehicle service contract. Upon acceptance by the **Administrator**, this **Contract/Application** will become **Your Contract.** In the event that **Your Application** is not accepted, **You** will receive a refund of the **Contract Price** of this Contact. A **Contract** must be purchased on the **Vehicle** purchase date. **Your** coverage becomes effective as follows:

The type of coverage as identified on Page 1 in the "Coverage/Term" section are described below. **Administrator** reserves the right to change the type of coverage based upon Vehicle eligibility. Any such changes will be at no additional charge to **You.**

- **Extended Coverage**

This coverage is only available for vehicles with **Manufacturer's Warranty** remaining on the **Contract Purchase Date.** Until the expiration of the **Manufacturer's Warranty**, there is no coverage under this **Contract.** Coverage under this **Contract** begins on the day the **Manufacturer's Warranty** expires by either time or miles. Coverage under this **Contract** expires upon the passing of the number of months or miles, whichever occurs first, as specified in the "Coverage/Term" section on Page 1.

Based on information available to **Us**, the **Manufacturer's Warranty** will expire upon the passing of the date or miles, whichever occurs first, as specified in the "Coverage/Term" section on Page 1. **We** will use that date and those miles to process claims and cancellations under this **Contract.** However, if **You** are able to provide reasonable proof to **Us** that the actual expiration of the **Manufacturer's Warranty** is different from the date or miles specified in the "Coverage/Term" section on Page 1, and that claimed expiration is confirmed by **Us**, then that revised expiration will be used to determine the beginning of coverage and to process claims and cancellations under this **Contract.**

Call the **Administrator** toll-free at (800) 901-6182 if **You** have questions regarding the beginning or expiration of coverage.

- **Standard Coverage**

Upon acceptance by **Administrator**, coverage begins on the **Contract Purchase Date** and at the mileage on the **Vehicle's** odometer as of the **Contract Purchase Date.** Coverage expires upon the passing of the number of months or miles, whichever occurs first, as specified in the "Coverage/Term" section on Page 1.

### 4. YOUR OBLIGATIONS

1. In order for this **Contract** to remain in force, **You** must:
   - Change the oil and oil filter in the **Vehicle** at least every six (6) months or 5,000 miles, whichever comes first, or at the intervals specified by the **Vehicle Manufacturer**;
   - Replace the timing belt in the **Vehicle** at the intervals specified by the **Vehicle Manufacturer**;
   - Perform all other maintenance and servicing of the **Vehicle** as recommended by the **Vehicle Manufacturer**; and
   - Keep and make available to **Administrator** upon request, verified signed repair orders issued by a repair facility performing the above required maintenance and servicing that show that the above required maintenance and servicing were performed on a timely basis. Each repair order must contain the then-current date, then-current odometer reading, and a detailed list of each and every service performed on the **Vehicle** and the parts replaced.

2. In order for a claim payment to be made under this **Contract**, **You** must take the **Vehicle** to any licensed repair facility and abide by the following:

**BEFORE BEGINNING ANY REPAIR WORK ON YOUR VEHICLE CALL WYNN'S EXTENDED CARE* AT (800) 901-6182**

**You** must advise the repair facility that **You** have this **Contract** and have them call (800) 901-6182 to obtain an authorization number from the **Administrator** prior to beginning any repair(s) to a **Covered Part**.

- Once **Your** claim has been authorized, **You** will be responsible for the one hundred dollar ($100.00) **Deductible** as stated in the "Customer Information" section on Page 1 for each visit to the repair facility.

- **You** are responsible for authorizing and paying for any teardown costs and diagnostic time to determine if the **Vehicle** has a **Covered Breakdown**. If **Administrator** determines that there is a **Covered Breakdown**, then **We** will pay for the reasonable cost of the teardown and diagnostic time as part of the **Covered Repair**.

- Upon completion of a **Covered Repair** payment can be made directly to the repair facility or **You** can send all repair documentation requested by **Administrator** to the following address:

**WYNN'S EXTENDED CARE, INC.***
**6303 Blue Lagoon Dr., Suite 225, Miami, FL 33126**

To make a claim, call the Administrator toll-free at (800) 901-6182
Claims Department hours are Monday through Friday, 8 a.m. to 7 p.m., EST

CLAIMS MUST BE SUBMITTED WITHIN 180 DAYS FROM
AUTHORIZATION TO QUALIFY FOR REIMBURSEMENT

## 5. OUR OBLIGATIONS

1. **Covered Breakdown (Deductible Applies).** If a **Covered Part** has a **Breakdown** during the term of this **Contract**, **We** will pay **You** or the repair facility, less the **Deductible**, up to the **Limits of Liability**, for the repair or replacement, as the **Administrator** deems appropriate, of the **Covered Part**(s) that caused the **Breakdown**, but only if:

   - **You** have met **Your** obligations as described in this **Contract**; and

   - The **Breakdown** is not one of the excluded **Breakdowns** listed under the heading "**7. EXCLUSIONS - WHAT THIS CONTRACT DOES NOT COVER**" on Page 3 of this **Contract**.

Replacement parts can be of like kind and quality. They may include new, remanufactured or used parts as determined by the **Administrator**. The use of non-original manufacturer's parts is permitted.

**Administrator** reserves the right to inspect any **Vehicle** prior to authorization of a claim.

## 2. Additional Benefits (No Deductible Applies)

**Note: Extended Coverage only:** Rental Car and Towing will become effective upon the expiration of **Your Vehicle's Manufacturer's Warranty**.

- **Rental Car**

   We will reimburse **You** for a rental car at a rate of up to thirty dollars ($30.00) for every eight (8) hours of labor time required to complete a **Covered Repair**, up to a maximum of one hundred fifty ($150.00) dollars per **Covered Breakdown**. If there is a verifiable delay in obtaining a part needed to complete a **Covered Repair**, **We** will reimburse **You** for a rental car for up to an additional two (2) days. Labor time required is determined from the national repair manual in use by the repair facility. **You** must provide the **Administrator** with a valid receipt from a licensed rental agency to obtain reimbursement for a rental car.

- **Towing.**

   **We** will reimburse **You** for towing if the **Vehicle** is disabled due to **Covered Breakdown**, up to a maximum of fifty dollars ($50.00) per occurrence. **You** must provide the **Administrator** with a valid receipt to obtain reimbursement for towing.

## 6. COVERED PARTS

Subject to the terms and conditions of this **Contract**, **We** will pay or reimburse **You** for the reasonable costs to repair or replace any or all of the following listed **Covered Parts** (for the coverage specified below that **You** have purchased) that fail as the result of a **Covered Breakdown**, subject to the exclusions listed in the "**7. EXCLUSIONS - WHAT THIS CONTRACT DOES NOT COVER**" section below. For convenience, the **Covered Parts** are listed next to the vehicle systems to which they relate. The vehicle systems listed are not **Covered Parts**.

## WYNN'S PLUS+ DELUXE COVERAGE

1. **Engine** - All internal **Lubricated Parts**, Cylinder Block; Cylinder Head(s); Engine Mounts; Harmonic Balancer; Head Gasket; Intake and Exhaust Manifolds; Oil Pan; Supercharger; Timing Belt; Timing Cover; Timing Gear, Chain and Bolt; Turbocharger; and Valve Covers.

2. **Transmission** - Transmission Case and all internal **Lubricated Parts**; Flex Plate; Torque Converter Transmission Mounts; and Vacuum Modulator.

3. **Drive Axle(s)** - Drive Axle Housing and all internal **Lubricated Parts**; Drive Shafts; Universal Joints; and Constant Velocity Joint (unless failure was caused by neglected, torn, cracked, or perforated Constant Velocity Joint Boot).

4. **Transfer Case** - Transfer Case and all internal **Lubricated Parts**.

5. **Steering** - Steering Gear Box or Rack and all internal **Lubricated Parts**; Draglink; Electric Steering Gear; Electric Steering Motor; Electric Rack and Pinion; Idler Arm; Pitman Arm; Power Steering Pump; Steering Column Shaft; Steering Column Shaft Couplings; and Tie Rod Ends.

6. **Electrical** - Alternator; Ignition Coil; Ignition Module; Pole Pieces; Starter Motor; Starter Solenoid; Voltage Regulator; and Windshield Wiper Motors.

7. **Air Conditioner** - Blower Motor; Compressor; Compressor Clutch; Condenser; Evaporator; and Pulley; (Only if the Air Conditioner is factory or dealer installed equipment).

8. **Suspension** - Bearings and Bushings; Control Arms; Control Arm Shafts; Radius Arm; Radius Arm Bushing; Spindle; Stabilizer Bar; Stabilizer Bushing; Stabilizer Link; Torsion Bars; and Wheel Bearings.

9. **Cooling** - Engine Cooling Fan Motor; Radiator; Radiator Fan and Fan Clutch; and Water Pump.

10. **Fuel** - Fuel Delivery Pump; Fuel Injectors; and Fuel Tank.

11. **Brake** - Standard and ABS Brake System Master Cylinder; ABS Accumulator; ABS Control Module; ABS Motor; ABS Pump; ABS Reservoir and ABS Wheel Speed Sensors; Compensating Valve; Disc Brake Calipers; Hydraulic Lines; Hydraulic Line Fittings; Power Brake Cylinder; Vacuum Assist Booster; Vacuum Brake Booster Pump; and Wheel Cylinders.

12. **Seals and Gaskets** - Leaking Seals and Gaskets on any **Covered Part** listed above; provided that the **Vehicle** has 100,000 odometer miles or less on the **Contract Purchase Date**. Minor loss of fluid or seepage is considered normal and is not considered a **Covered Breakdown**.

13. **High-Tech Coverage** is included on vehicles with 100,000 odometer miles or less on **Contract Purchase Date**. Body Control Module (BCM); Camshaft; Control Dash Power Supply; Convertible Top Motor; Coolant Temperature; Crankshaft Angle Sensors; Cruise Control Module and Servo/Transducer; Driver Information Gauge Indicators relating to the operation of the **Vehicle** (Burned Out Lights/Lamps are not covered); Engine Control Module (E.C.M); Fuel Gauge; Fuel Pressure Regulator; Fuel Sending Unit; Idle Speed Motor; Manifold Pressure Sensors; Manifold Temperature Sensors; Mass Air Flow Sensor; Metal Fuel Delivery Lines; Oxygen Sensor; Power Antenna Motor; Power Door Lock Actuator; Power Seat Motor; Power Window Motors; Primary Fuel Injection Computer; Sunroof Motor; Temperature Control Programmer; Throttle Position Sensor; and Vehicle Speed Sensor.

**Covered Parts** include fluids when required as part of the repair or replacement of another **Covered Part**.

## 7. EXCLUSIONS - WHAT THIS CONTRACT DOES NOT COVER

**A.** This Contract provides no benefits or coverage and We have no obligation under this Contract for:

1. A **Breakdown** caused by lack of customary, proper or Vehicle Manufacturer's specified maintenance.

2. A **Breakdown** caused by contamination of or lack of proper fuels, fluids, coolants or lubricants, including a Breakdown caused by a failure to replace seals or gaskets in a timely manner.

3. A **Breakdown** caused by towing a trailer, another vehicle or any other object unless Your Vehicle is equipped for this use as recommended by the Vehicle Manufacturer.

4. Repair of any parts in connection with a Covered Repair when those parts are not necessary for the completion of the Covered Repair or were not damaged by the failure of a Covered Part. Such repair or replacement is an improvement to Your Vehicle and is not covered by this Contract.

5. **Pre-existing damage or a Breakdown that occurred before Your purchase of this Contract, either of which would have been obvious and apparent if that component was inspected at time of purchase.**
6. A Breakdown caused by or involving modifications or additions to Your Vehicle unless those modifications or additions were performed or recommended by the Vehicle Manufacturer.
7. A Breakdown caused by off-roading, misuse, abuse, racing or any form of competition.
8. Any cost covered by a repair facility's or part supplier's guarantee, or any cost which would normally be covered by a Manufacturer's Warranty or a dealer warranty required under state law, whether or not such warranty is in force respecting Your Vehicle.
9. Costs or other damages caused by the failure of a part listed in this Contract as a excluded part.
10. Damage to the Vehicle caused by continued Vehicle operation after the Breakdown of a Covered Part.
11. Any liability, cost or damages You incur or may incur to any third parties, other than for Covered Parts.
12. A Breakdown caused by overheating, rust or corrosion.
13. A Breakdown caused by collision, fire, electrical fire or meltdown, theft, freezing, vandalism, riot, explosion, lightning, earthquake, windstorm, hail, water, flood, acts of public enemy or any government authority, or for any hazard insurable under standard physical damage insurance policies whether or not such insurance is in force respecting Your Vehicle.
14. A Breakdown not occurring in the continental United States, Alaska, Hawaii or Canada.
15. Loss of use, loss of time, lost profits or savings, inconvenience, commercial loss, or other incidental or consequential damages or loss that results from a Breakdown.
16. Liability for damage to property, or for injury to or death of any person arising out of the operation, maintenance or use of Your Vehicle whether or not related to a Breakdown.
17. Any cost or other benefit for which the Vehicle Manufacturer has announced its responsibility through any means including public recalls or factory service bulletins.
18. Any part not covered or excluded by the original Manufacturer's Warranty.
19. Loss of compression through gradual failure of rings and valves.
20. A gradual reduction in performance capability due to day-to-day routine operation.
21. The maintenance services and parts described in paragraph 1 under "4. YOUR OBLIGATIONS" on Page 2 or in the Vehicle Manufacturer's maintenance schedule for Your Vehicle.
22. Other normal maintenance services and parts, including, without limitation, engine tune-up, spark plugs, ignition wires, distributor cap and rotor, carburetor, EGR valve, batteries, filters, lubricants or fluids, air conditioning refrigerant or engine coolant (except when such lubricants, fluids, refrigerant or coolant must be replaced as part of the repair or replacement of a Covered Part), all hoses and belts that are not specifically listed under "6. COVERED PARTS," wiper blades, brake pads and shoes, brake rotors and drums, suspension alignment, tires, wheel balancing, shock absorbers, exhaust system, friction clutch disc and pressure plate, and clutch throw out bearing.
23. Glass, glass framework and fastening adhesives, sealed beam headlamps, light bulbs, lenses, trim, moldings, bright metal, upholstery and carpeting, paint, sheet metal, body panels, structural framework and structural welds.
24. Aftermarket accessories or non-original equipment, components and systems not installed by the Vehicle Manufacturer, including, without limitation, anti-theft systems, radio/speaker equipment, telephones, cruise control and sunroof.
25. GPS navigation systems and TV/Video/Entertainment Systems.
26. Damage to a Covered Part caused by a part that is not a Covered Part.
27. Repairs performed without Your prior authorization.

28. Alternative fuel, Electric, or Hybrid vehicle specific parts, components, or systems, as identified in the Manufacturer's Warranty, including but not limited to batteries and battery packs.

B. In addition, this Contract provides no benefits or coverage and We have no obligation under this Contract if:
1. The Vehicle odometer fails, or for any reason does not record the actual mileage of Your Vehicle after the Contract Purchase Date, and You do not have it repaired and the mileage certified within thirty (30) days of failure date.
2. Your Vehicle is used for business, deliveries, construction or commercial hauling, or as a postal vehicle, taxi, police car or other emergency vehicle.
3. You rent Your Vehicle to someone else.
4. Your Vehicle is equipped with a snowplow or used to plow snow.
5. You are using or have used Your Vehicle in a manner that is not recommended by the Vehicle Manufacturer.
6. Your Vehicle is modified from the Vehicle Manufacturer's original specifications.
7. Your Vehicle is equipped to use fuel other than gasoline or diesel.
8. The Vehicle has a salvage title or is a grey market vehicle.

## 8. TRANSFER OF COVERAGE

### How Coverage May Be Transferred

This Contract covers the original Contract Holder and is transferable to a subsequent Vehicle owner if You sell the Vehicle, but only if:
1. You are the first holder of this Contract;
2. The Vehicle is sold to a private purchaser of the Vehicle. (Transfer rights are voided when the Vehicle is sold, traded, or put on consignment to an individual or entity engaged in the wholesale or retail sale, leasing or rental of vehicles.);
3. Administrator receives from You the complete Transfer Information section (see below) within thirty (30) days after the date You sell the Vehicle;
4. You pay Administrator a fifty dollar ($50.00) transfer fee; and
5. You provide the new owner with copies of all Vehicle maintenance and service records required by this Contract. (Refer to the 4. YOUR OBLIGATIONS section on Page 2.)

The transfer will be effective when You receive a transfer confirmation letter from Administrator. If the purchase of the Vehicle was financed and the Vehicle is a total loss or is repossessed, Your rights and obligations under this Contract immediately and automatically transfer to the Lienholder.

### TRANSFER INFORMATION

To transfer this Contract, You must contact Administrator and submit the following:
1. A letter requesting We transfer the Contract to the new owner.
2. A fifty dollar ($50.00) check or money order payable to Wynn's Extended Care, Inc.
3. Documentation verifying a change of ownership of the Vehicle, including the following: Name of the New Owner; Address; City, State, Zip; Date of Transfer; Odometer Mileage on Date of Transfer; Signature of New Owner; and Signature of Vehicle Seller.
4. A photocopy of the front of the Contract.
5. Submit all of the above stated information to:

**Wynn's Extended Care, Inc.***
**6303 Blue Lagoon Drive, Suite 225, Miami, FL 33126**

## 9. CANCELLATION OF THIS CONTRACT

### By You

You may cancel this Contract by contacting the Administrator or Lienholder.

### By Us

We reserve the right to cancel this Contract and will not pay for a Covered Breakdown if:
- The Vehicle odometer fails, or for any reason does not record the actual mileage of Your Vehicle after the Contract Purchase Date and You do not have it repaired and the mileage certified within thirty (30) days of failure date.

---

**BEFORE BEGINNING ANY REPAIR WORK ON YOUR VEHICLE CALL WYNN'S EXTENDED CARE* AT (800) 901-6182**

- **Your Vehicle** is used for business, deliveries, construction or commercial hauling, or as a postal vehicle, taxi, police car or other emergency vehicle.
- **You** rent **Your Vehicle** to someone else.
- **Your Vehicle** is equipped with a snowplow or used to plow snow.
- **You** are using or have used **Your Vehicle** in a manner that is not recommended by the **Vehicle Manufacturer.**
- **Your Vehicle** is modified from the **Vehicle Manufacturer's** original specifications.
- The **Vehicle** has a salvage title or is a grey market vehicle.

### By the Lienholder

**You** understand and acknowledge that the **Lienholder** (if any) has the right to cancel this **Contract** if the **Vehicle** is repossessed or destroyed or **You** are otherwise in default of **Your** obligations to repay the amount financed by the **Lienholder.**

### Refunds and Charges

**You** may cancel this **Contract** by providing verbal or written notice to the **Lienholder** or to **Us.** If the **Contract Price** was financed, any and all refunds will be paid to the **Lienholder.** **Your** cancellation notice must be accompanied by the then current **Vehicle** mileage.

- **Extended Coverage Contracts**

If **You** or the **Lienholder** provide notice of cancellation of the **Contract** to **Administrator** or if **We** cancel the **Contract** within the first thirty (30) days from the **Contract Purchase Date**, **You** will be entitled to a full refund of the **Contract Price.**

If **You** or the **Lienholder** provide notice of cancellation of the **Contract** to **Administrator** or if **We** cancel the **Contract** after the first thirty (30) days after the **Contract Purchase Date**, but before the expiration of the **Manufacturer's Warranty**, **You** will be entitled to a full refund of the **Contract Price** less a fifty dollar ($50.00) cancellation fee.

If **You** or the **Lienholder** provide notice of cancellation of the **Contract** to **Administrator** or if **We** cancel the **Contract** after the first thirty (30) days from the **Contract Purchase Date** and after the expiration of the **Manufacturer's Warranty**, **You** will be entitled to a prorated refund of the **Contract Price** based on the greater of the number of days the **Contract** was in force or the miles driven compared to the total time or mileage specified under the "Coverage/Term" section on Page 1 of this **Contract**, less a fifty dollar ($50.00) cancellation fee.

- **Standard Coverage Contracts**

If **You** or the **Lienholder** provide notice of cancellation to **Administrator** or if **We** cancel the **Contract** within the first thirty (30) days after the **Contract Purchase Date**, **You** will be entitled to a full refund of the **Contract Price.** If **You** or the **Lienholder** provide notice of cancellation of the **Contract** or if **We** cancel the **Contract** after the first thirty (30) days from the **Contract Purchase Date**, **You** will be entitled to a prorated refund of the **Contract Price** based on the greater of the number of days the **Contract** was in force or the miles driven compared to the total time or mileage specified under the "Coverage/Term" section on Page 1 of this **Contract**, less a fifty dollar ($50.00) cancellation fee.

### 10. OTHER IMPORTANT CONTRACT PROVISIONS/LIMITATIONS

#### Limits Of Our Liability

The **Limit of Our Liability** for any **Covered Breakdown** or series of **Covered Breakdowns** related in time or cause shall not exceed the actual cash value of **Your Vehicle** at the time of **Covered Breakdown** as determined by the **Administrator** in its sole discretion in accordance with the then current National Auto Dealers Association (NADA) Appraisal Guide Trade in Price. The **Limit of Our Liability** for all **Covered Breakdowns** occurring during the term of this **Contract** is the amount of the **Vehicle** purchase price. These limits are referred to in this **Contract** as **Limits of Liability.**

#### Our Rights Against Others

If **You** receive any benefits under this **Contract**, **We** will be entitled to all **Your** rights of recovery against any manufacturer, repairer or other party who may be responsible to **You** for the costs covered by this **Contract** or for any other payment made by **Us.** If **We** ask, **You** agree to help **Us** enforce these rights. **You** also agree to cooperate and help **Us** in any other matter concerning this **Contract.**

### Entire Agreement

This **Contract** contains the entire agreement between **You** and **Us** and supersedes any and all prior and contemporaneous agreements (both written and verbal) between **You** and **Us** concerning the subject matter of this **Contract**. This **Contract** is not valid unless signed by both **You** and an authorized representative of the **Selling Dealer.**

### When This Contract Will End

This **Contract** will terminate when:
- **Your Vehicle** exceeds the Term specified in the "Coverage/Term" section on Page 1.
- **You** sell **Your Vehicle** unless this **Contract** is properly transferred as provided in the section of this **Contract** entitled "**8. TRANSFER OF COVERAGE**"; or
- This **Contract** is cancelled as outlined in the "**9. CANCELLATION OF THIS CONTRACT**" section on Page 4 of this **Contract.**

### DISPUTE RESOLUTION

1. **ARBITRATION.** READ THIS ARBITRATION PROVISION CAREFULLY, AS IT INVOLVES THE WAIVER OF RIGHTS TO ACCESS AND MAINTAIN OTHER AVAILABLE DISPUTE RESOLUTION PROCESSES, SUCH AS A COURT ACTION OR ADMINISTRATIVE PROCEEDING. SPECIFICALLY, INSTEAD OF SUING IN COURT, DISPUTES ARE RESOLVED THROUGH AN ARBITRATION PROCESS WHERE THE RULES ARE DIFFERENT, AND NEITHER **YOU** NOR **US** WILL HAVE THE RIGHT TO ACCESS A JUDGE OR JURY, OR PARTICIPATE AS ANY MEMBER OF A CLASS, AND JUDICIAL REVIEW AND CERTAIN LEGAL RIGHTS, ALONG WITH DAMAGES, MAY BE LIMITED.

If a dispute between **You** and **Us** arises under the **Contract** which cannot be resolved amicably by **You** and **Us** through reasonable cooperation, upon election of either Party, any and all unresolved claims, counterclaims, disputes or controversies of any nature whatsoever (whether in tort, contract or otherwise) and including statutory law (including any and all so called consumer fraud and protection statutes), common law, fraud (whether based on misrepresentation or omission) or other intentional tort, property or equitable claims arising out of, relating to, under or in connection with this **Contract** (or the dissemination, display, offer, purchase or sale thereof), or the validity, scope, interpretation and enforcement of any provision of this **Contract** (Dispute), shall be settled exclusively through confidential binding arbitration in accordance with the provisions hereunder and the then in effect Expedited Procedures of either (i) the American Arbitration Association's (AAA) Commercial Arbitration Rules (the AAA Rules) or (ii) the JAMS Comprehensive Arbitration Rules (the JAMS Rules), as elected by whoever first files an action, unless **You** and **Us** agree otherwise in a writing signed by both. The arbitration shall be conducted before one (1) arbitrator selected in accordance with either the AAA Rules or the JAMS Rules. The provisions in this **Contract** shall govern and control over any inconsistency or conflict between them and either the AAA Rules or the JAMS Rules. The addresses and websites of the relevant arbitration organizations are: (i) AAA, 335 Madison Ave., Floor 10, New York, New York 10017-4605, www.adr.org; and (ii) JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, www.jamsadr.com. If neither AAA nor JAMS is able or willing to serve, and **You** and **Us** cannot otherwise agree on a substitute administrator or arbitrator, then a court of competent jurisdiction shall appoint an arbitrator. **We** will consider any good faith request **You** make to **Us** to pay the arbitrator's filing, administrative, hearing and/or other fees if **You** cannot obtain a waiver of such fees from the arbitrator and, if granted in **Our** sole discretion, **We** will not seek or accept reimbursement of any such fees. **We** will bear any fees and costs required of **Us** under applicable law.

Notwithstanding the foregoing and without modifying anything herein, this agreement is not intended to and shall not alter, amend or supersede the agreement to arbitration in the **Installment Contract**. In the event that a dispute arises under the **Contract** between **You**, on the one hand, and the **Lienholder** and **Us**, on the other hand, whether or not the **Lienholder** or **We** are named as a party upon commencement of any proceedings or by joinder thereafter, the arbitration provision contained in the **Installment Contract** shall govern the resolution of such dispute. For purposes of clarification, any dispute under this **Contract** solely between **You** and **Us** shall be governed by the arbitration provisions in this **Contract**, and any dispute under this **Contract** that involves the **Lienholder** shall be governed by the arbitration provisions in the **Installment Contract**.

---

**BEFORE BEGINNING ANY REPAIR WORK ON YOUR VEHICLE CALL WYNN'S EXTENDED CARE* AT (800) 901-6182**

a. **Governing Law; Venue; Decision.** The arbitration provisions in this **Contract** shall be governed by the Federal Arbitration Act, 9 U.S.C. §§1 et seq. (the FAA) and not by any state arbitration law, and it is expressly agreed that this **Contract** evidences a transaction in interstate commerce. The interpretation and enforcement of the substantive provisions of this **Contract** and the resolution of any Dispute shall be governed by the law of the state in which **You** purchased this **Contract**. The applicable rules of evidence shall be the U.S. Federal Rules of Evidence. All statutes of limitation that otherwise would apply to an action brought in court will apply in arbitration. The arbitrator shall be authorized to award all remedies permitted by the substantive law that would apply if the action were pending in court. Any arbitral award may be entered and enforced by any court of competent jurisdiction. The arbitration shall take place Miami-Dade County, Florida, or in the state and county in which this **Contract** was executed by **You**, unless **You** and **Us** otherwise agree in a writing signed by both. **You** and **Us** consent to the personal jurisdiction of and laying of venue before any court located in the state in which the arbitration is held, for purposes of enforcement of any arbitral award. The arbitrator may decide that an in-person hearing is unnecessary and that the arbitrator can resolve a Dispute based on the papers submitted by **You** and **Us** and/or through a telephonic hearing. However, any arbitration hearing that **You** attend will take place at a location that is reasonably convenient to **You**, and notice of the time, date and location thereof shall be provided to **You** and **Us** under the applicable arbitration rules. The arbitrator's decision is final and binding, except for any right of appeal provided by the FAA. However, if the amount in controversy in a Dispute exceeds $50,000 or involves a request for injunctive or declaratory relief where it is foreseeable to involve a cost or benefit to either **You** or **Us** exceeding $50,000, then either **You** or **Us** may appeal the award to a panel consisting of three arbitrators and administered by either AAA or JAMS, as the case may be, which panel shall reconsider any aspect of the initial award as requested by **You** or **Us**, and the decision of such panel shall be by majority vote, final and binding except for any right of appeal provided by the FAA. All references to arbitrator herein shall, in such instance, mean to apply to such panel of arbitrators. The costs of such appeal will be borne in accordance with the provisions of this section that describe who will bear the costs for the initial arbitration proceeding and, as applicable, as set forth in the FAA.

b. **Limitation on Damages.** Unless otherwise expressly permitted under applicable state law, in which case the arbitrator shall have the authority to award such damages as expressly permitted thereunder, the arbitrators shall not have authority to award consequential, punitive, moral or other exemplary damages, attorneys' fees and costs, or interest, including pre-award interest, in any arbitration proceedings hereunder, and any court of competent jurisdiction entering or enforcing any such award shall not have the authority to modify such award to include any such damages or amounts. For purposes of clarification, in the event that a court of competent jurisdiction finds that an applicable federal or state statute precludes such limitation of any of the foregoing damages, or finds otherwise that the **We** must bear **Your** attorneys' fees and costs if you prevail in

order to enforce the arbitration provisions herein, then the arbitrator and court shall treat any such limitation as severed herefrom without affecting the validity of any other provision of this **Contract**, and such limitation shall not form the basis of any action by **You** under applicable law.

c. **JURY WAIVER.** EACH PARTY HEREBY AGREES THAT IT IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS ADDENDUM.

d. **CLASS ACTION WAIVER.** FURTHER, ANY DISPUTE RELATED HERETO SHALL PROCEED SOLELY ON AN INDIVIDUAL BASIS WITHOUT THE RIGHT FOR ANY CLAIMS TO BE ARBITRATED OR LITIGATED ON A CLASS ACTION BASIS OR ON BASES INVOLVING CLAIMS BROUGHT INA PURPORTED REPRESENTATIVE CAPACITY ON BEHALF OF OTHERS. AWARDS SHALL BE LIMITED TO CLAIMS BETWEEN **YOU** AND **US**. CLAIMS MAY NOT BE JOINED OR CONSOLIDATED UNLESS AGREED TO IN WRITING BY ALL RELEVANT PARTIES. NO AWARD OR DECISION WILL HAVE ANY PRECLUSIVE EFFECT AS TO ISSUES OR CLAIMS IN ANY DISPUTE WITH ANYONE WHO IS NOT A NAMED PARTY TO THE PROCEEDING. THE ARBITRATOR SHALL HAVE NO POWER OR AUTHORITY TO CONDUCT A CLASS-WIDE ARBITRATION, PRIVATE ATTORNEY GENERAL ARBITRATION OR JOINED OR CONSOLIDATED ARBITRATION.

e. **Severability.** If one or more of the provisions of this section are held to be invalid by a court of competent jurisdiction, then such provision or provisions shall be severed herefrom and shall be inoperable with no effect upon the validity of the remaining provisions hereof, and the remaining provisions hereof will continue in full force and effect for all purposes. In addition, and notwithstanding anything to the contrary in this **Contract**, in the event that the class action waiver in this section is determined to be invalid or unenforceable by a court of competent jurisdiction, then, subject to the right to appeal such a ruling, any class action, if allowed to proceed, shall proceed only before a court of competent jurisdiction and not in class-wide arbitration. The right to participate in arbitration, in such case, shall be automatically null and void, and the remaining provisions of this section will continue in force and effect for all purposes before the court.

f. **Small Claims Court Exception.** Notwithstanding anything to the contrary in this **Contract**, if available in accordance with applicable law and rules, either Party may bring an individual action in small claims court (or the applicable state equivalent) located in the jurisdiction where **You** purchased this **Contract**, and in such event the arbitration provisions of this **Contract** shall have no effect unless such action is transferred or removed to a different court, in which case the arbitration provisions of this **Contract** shall control for all purposes, provided that nothing herein shall be construed as limiting any right of appeal of **You** or **Us** related to any decision by a small claims court (or applicable state equivalent).

This **Contract** may be subject to applicable state endorsements for the State in which **You** purchased this **Contract**. Any applicable endorsements will be attached hereto on the following page(s).

**ALABAMA (NATL ACCT 280 AL (02/17))**

1. **Under the section entitled "9. CANCELLATION OF THIS CONTRACT - Refunds and Charges"** the paragraph is amended to read as follows:

• **Extended Coverage Contracts**

If **You** or the **Lienholder** provide notice of cancellation of the **Contract** to **Administrator** or if **We** cancel the **Contract** within the first thirty (30) days from the **Contract Purchase Date**, **You** will be entitled to a full refund of the **Contract Price**.

If **You** or the **Lienholder** provide notice of cancellation of the **Contract** to **Administrator** or if **We** cancel the **Contract** after the first thirty (30) days after the **Contract Purchase Date**, but before the expiration of the **Manufacturer's Warranty**, **You** will be entitled to a full refund of the **Contract Price** less a twenty-five dollar ($25.00) cancellation fee.

If **You** or the **Lienholder** provide notice of cancellation of the **Contract** to **Administrator** or if **We** cancel the **Contract** after the first thirty (30) days from the **Contract Purchase Date** and after the expiration of the **Manufacturer's Warranty**, **You** will be entitled to a prorated refund of the **Contract Price** based on the greater of the number of days the **Contract** was in force or the miles driven compared to the total time or mileage specified under the "Coverage/Term" section on Page 1 of this **Contract**, less a twenty-five dollar ($25.00) cancellation fee.

**You** will be provided with the applicable cancellation refund within forty-five (45) days after the **Administrator** or **Lienholder** receives **Your** notice of cancellation; if **We** fail to do so within that time, **We** will pay **You** a penalty of 10 percent (10%) of the cancellation refund amount for each month that the refund remains unpaid.

• **Standard Coverage Contracts**

If **You** or the **Lienholder** provide notice of cancellation to **Administrator** or if **We** cancel the **Contract** within the first thirty (30) days after the **Contract Purchase Date You** will be entitled to a full refund of the **Contract Price**. If **You** or the **Lienholder** provide notice of cancellation of the **Contract** or if **We** cancel the **Contract** after the first thirty (30) days from the **Contract Purchase Date, You** will be entitled to a prorated refund of the **Contract Price** based on the greater of the number of days the **Contract** was in force or the miles driven compared to the total time or mileage specified under the "Coverage/Term" section on Page 1 of this **Contract**, less a twenty- five dollar ($25.00) cancellation fee.

**You** will be provided with the applicable cancellation refund within forty-five (45) days after the **Administrator** or **Lienholder** receives **Your** notice of cancellation; if **We** fail to do so within that time, **We** will pay **You** a penalty of 10 percent (10%) of the cancellation refund amount for each month that the refund remains unpaid.

**ALASKA (NATL ACCT 280 AK (02/17))**

1. The section entitled "9. CANCELLATION OF THIS CONTRACT - Refund and Charges" is amended to read as follows:

• **Extended Coverage Contracts**

If **You** or the **Lienholder** provide notice of cancellation of the **Contract** to **Administrator** or if **We** cancel the **Contract** within the first thirty (30) days from the **Contract Purchase Date, You** will be entitled to a full refund of the **Contract Price**.

If **You** or the **Lienholder** provide notice of cancellation of the **Contract** to **Administrator** or if **We** cancel the **Contract** after the first thirty (30) days after the **Contract Purchase Date**, but before the expiration of the **Manufacturer's Warranty, You** will be entitled to a full refund of the **Contract Price** less a cancellation fee equal to the lesser of fifty dollars ($50.00) or seven and a half percent (7.5%) of the **Contract Price**.

If **You** or the **Lienholder** provide notice of cancellation of the **Contract** to **Administrator** or if **We** cancel the **Contract** after the first thirty (30) days from the **Contract Purchase Date** and after the expiration of the **Manufacturer's Warranty, You** will be entitled to a prorated refund of the **Contract Price** based on the greater of the number of days the **Contract** was in force or the miles driven compared to the total time or mileage specified under the "Coverage/Term" section on Page 1 of this **Contract**, less a cancellation fee equal to the lesser of fifty dollars ($50.00) or seven and a half percent (7.5%) of the **Contract Price**.

**You** will be provided with the applicable cancellation refund within forty-five (45) days after the **Administrator** or **Lienholder** receives **Your** notice of cancellation; if **We** fail to do so within that time, **We** will pay **You** a penalty of 10 percent (10%) of the cancellation refund amount for each month that the refund remains unpaid.

• **Standard Coverage Contracts**

If **You** or the **Lienholder** provide notice of cancellation to **Administrator** or if **We** cancel the **Contract** within the first thirty (30) days after the **Contract Purchase Date You** will be entitled to a full refund of the **Contract Price**. If **You** or the **Lienholder** provide notice of cancellation of the **Contract** or if **We** cancel the **Contract** after the first thirty (30) days from the **Contract Purchase Date, You** will be entitled to a prorated refund of the **Contract Price** based on the greater of the number of days the **Contract** was in force or the miles driven compared to the total time or mileage specified under the "Coverage/Term" section on Page 1 of this **Contract**, less a cancellation fee equal to the lesser of fifty dollars ($50.00) or seven and a half percent (7.5%) of the **Contract Price**.

**You** will be provided with the applicable cancellation refund within forty-five (45) days after the **Administrator** or **Lienholder** receives **Your** notice of cancellation; if **We** fail to do so within that time, **We** will pay **You** a penalty of 10 percent (10%) of the cancellation refund amount for each month that the refund remains unpaid.

**ARIZONA (NATL ACCT 280 AZ R(02/17))**

1. The section entitled "1. DEFINITIONS", "Contract" is amended to include: This **Vehicle** Service **Contract** agreement is effective on the date of sale by the **Selling Dealer** and any cancellation of the **Contract** or the **Contract's** coverage(s) are subject to all the provisions stated by the Arizona Administrative Code ("A.A.C.") rule number R20-6-407(E)(4).
2. Under the section entitled "7. EXCLUSIONS - WHAT THIS CONTRACT DOES NOT COVER," Item A.2 under is amended to read:
   "2. A **Breakdown** caused by contamination of or lack of proper fuels, coolants, or lubricants, including a **Breakdown** caused by a failure to replace seals or gaskets in a timely manner after **You** purchased the **Vehicle** from the **Selling Dealer**."
3. Under the section entitled "7. EXCLUSIONS - WHAT THIS CONTRACT DOES NOT COVER" Item A.5 is deleted in its entirety.
4. Under the section entitled "7. EXCLUSIONS - WHAT THIS CONTRACT DOES NOT COVER," Item A.6. is amended to read:
   "6. A. **Breakdown** caused by or involving modification or additions to **Your Vehicle** by **You** or with **Your** knowledge unless those modifications or additions were performed or recommended by the **Vehicle Manufacturer**."
5. Under the section entitled "7. EXCLUSIONS - WHAT THIS CONTRACT DOES NOT COVER," Item A.7. is amended to read:
   "7. A **Breakdown** caused by off-roading, misuse, abuse, racing, or any form of competition after **You** purchased the **Vehicle** from the **Selling Dealer**."
6. Under the section entitled "7. EXCLUSIONS - WHAT THIS CONTRACT DOES NOT COVER," Item B. 6. is amended to read:
   "6. **Your Vehicle** is modified from the **Vehicle Manufacturer's** original specifications by **You** or with **Your** knowledge."
7. Under the section entitled "7. EXCLUSIONS - WHAT THIS CONTRACT DOES NOT COVER," Item B. 8. is deleted.
8. Under the section entitled "9. CANCELLATION OF THIS CONTRACT - By Us,"the last bullet is amended to read: •**Your Vehicle** is modified by **You** or with **Your** knowledge from the **Vehicle Manufacturer's** original specifications.
9. Under the section entitled "9. CANCELLATION OF THIS CONTRACT – By Us" the last bullet point "The **Vehicle** has a salvage title or is a grey market vehicle" is deleted.
10. Under the section entitled "9. CANCELLATION OF THIS CONTRACT - Refunds and Charges"the following is amended to include:
    "No claim incurred or paid shall be deducted from the amount to be refunded. State Law and Administrative Code supersede any other provisions herein. **We** are primarily responsible for providing any refund to **You** to which **You** may be entitled under this **Contract**."
11. Under the section entitled "10. OTHER IMPORTANT CONTRACT PROVISIONS/LIMITATIONS", "DISPUTE RESOLUTION – 1. Arbitration" the second sentence under the first bullet point •Governing Law; Venue; Decision is amended to read: "The arbitration shall take place in Arizona.
12. Under the section entitled "10. OTHER IMPORTANT CONTRACT PROVISION/LIMITATIONS" the following is added to the "DISPUTE RESOLUTION –1. Arbitration" section: "Arbitration does not prevent **You** from **Your** rights to file a complaint with the Arizona Department of Insurance (A.D.O.I.) for any remedy, including those subject to the provisions stated by A.R.S. §§20-1095.04 and 20-1095.09. **You** may contact the A.D.O.I. at 1-800-325-2548.The A.D.O.I. address is 2910 N.44th St. Suite 210, Phoenix, AZ 85018-7256 Attention: Consumer Affairs Division."

**ARKANSAS (NATL ACCT 280 AR (02/17))**

1. The section entitled "**10. OTHER IMPORTANT CONTRACT PROVISIONS/LIMITATIONS, DISPUTE RESOLUTION – Our Rights Against Others**" is amended to include:
   "We are entitled to recovery only after **You** have been fully compensated by the loss sustained under the terms and conditions of this **Contract**."
2. The section entitled "**10. OTHER IMPORTANT CONTRACT PROVISIONS/LIMITATIONS, DISPUTE RESOLUTION – 1. Arbitration**" is amended to include:
   a. Arbitration in Arkansas is voluntary and this provision is non-binding and shall not be construed as depriving **You** of a trial by Jury.
   b. Exemplary or Punitive Damages as used in this provision shall be defined as "Those damages imposed to punish a wrongdoer and to deter others from similar conduct."
3. Under the section entitled "**10. OTHER IMPORTANT CONTRACT PROVISIONS/LIMITATIONS – 1. Arbitration**" sub-section "**c. JURY WAIVER**" is deleted in its entirety.

**CALIFORNIA (NATL ACCT 280 CA (02/17))**

1. Performance to **You** under this **Contract** is guaranteed by a California approved insurance company. **You** may file a claim with this insurance company if any promise made in the **Contract** has been denied or has not been honored within sixty (60) days from the date proof of loss was filed. The name and address of the insurance company is **NATIONAL CASUALTY COMPANY**, P.O. Box 4110, Scottsdale, AZ 85261-4110 (800) 423-7675. If **You** are not satisfied with the insurance company's response, **You** may contact the California Department of Insurance at (800) 927-4357.
2. The **Contract Obligor** is Wynn's Extended Care, Inc.*, 6303 Blue Lagoon Dr., Suite 225, Miami, FL 33126, (800) 901-6182. **Our** California Vehicle Service Contract Provider License number is 0C32110.
3. **You** may contact the California Department of Insurance toll free at (800) 927-4357, or on the web site at www.insurance.ca.gov
4. Under the section entitled "**9. CANCELLATION OF THIS CONTRACT – Refunds and Charges**" is amended to read as follows:

   • **Extended Coverage Contracts**
   If **You** or the **Lienholder** provide notice of cancellation of the **Contract** to **Administrator** or if **We** cancel the **Contract** within the first notice of cancellation to **Us** within the first sixty (60) days after the **Contract Purchase Date** for **New Vehicles** and sixty (60) days for **Used Vehicles** after the **Contract Purchase Date**, **You** will be entitled to a full refund of the **Contract Price**.

   If **You** or the **Lienholder** provide notice of cancellation of the **Contract** to **Administrator** or if **We** cancel the **Contract** after the first sixty (60) days from the **Contract Purchase Date** for **New Vehicles** and thirty (30) days for **Used Vehicles** from the **Contract Purchase Date**, but before the expiration of the **Manufacturer's Warranty**, **You** will be entitled to a full refund of the **Contract Price** less a cancellation fee equal to the lesser of twenty-five dollars ($25.00) or ten percent (10%) of the **Contract Price**.

   If **You** or the **Lienholder** provide notice of cancellation of the **Contract** to **Administrator** or if **We** cancel the **Contract** after the first sixty (60) days from the **Contract Purchase Date** for **New Vehicles** and thirty (30) days for **Used Vehicles** from the **Contract Purchase Date** and after the expiration of the **Manufacturer's Warranty**, **You** will be entitled to a prorated refund of the **Contract Price** based on the greater of the number of days the **Contract** was in force or the miles driven compared to the total time or mileage specified under the "Coverage/Term" section on Page 1 of this **Contract**, less a cancellation fee equal to the lesser of twenty-five dollars ($25.00) or ten percent (10%) of the **Contract Price**.

   • **Standard Coverage Contracts**
   If **You** or the **Lienholder** provide notice of cancellation to **Administrator** or if **We** cancel the **Contract** within the first sixty (60) days after the **Contract Purchase Date** for **New Vehicles** and thirty (30) days for **Used Vehicles** after the **Contract Purchase Date**, **You** will be entitled to a full refund of the **Contract Price**. If **You** or the **Lienholder** provide notice of cancellation of the **Contract** or if **We** cancel the **Contract** after the first sixty (60) days from the **Contract Purchase Date** for **New Vehicles** and thirty (30) days for **Used Vehicles** from the **Contract Purchase Date**, **You** will be entitled to a prorated refund of the **Contract Price** based on the greater of the number of days the **Contract** was in force or the miles driven compared to the total time or mileage specified under the "Coverage/Term" section on Page 1 of this **Contract**, less a cancellation

fee equal to the lesser of twenty-five dollars ($25.00) or ten percent (10%) of the **Contract Price**.

5. Under the section entitled "**10. OTHER IMPORTANT CONTRACT PROVISIONS/LIMITATIONS**", the "**DISPUTE RESOLUTION – 1. Arbitration**" section is amended to include:
   "**You** may first file a complaint with the Insurer and the California Department of Insurance. If **Your** complaint is not settled, then the California Arbitration Act will apply.

**CONNECTICUT (NATL ACCT 280 CT R(02/17))**

1. Under the section entitled "1. Definitions" **Administrator**, **Our**, **Us**, and **We** means Wynn's Extended Care, Inc., 6303 Blue Lagoon Drive, Suite 225, Miami, FL 33126, Telephone (800) 922-4392.
2. Connecticut Public Act, 87-393, Laws 1987, requires an automobile dealer to provide a warranty covering certain classes of used motor Vehicles as follows:
   **Used Vehicles** with a sale price of $3,000 but less than $5,000 Provides Coverage for 30 days or 1,500 miles, whichever occurs first.
   **Used Vehicles** with a sale price of $5,000 or more

   The **Vehicle You** have purchased may be covered by this law. If so, the following is added to this **Contract**: In addition to the dealer warranty required by this law, **You** have elected to purchase this **Contract**, which may provide **You** with additional protection during the dealer warranty period and provides protection after the dealer warranty has expired. **You** have been charged separately only for this **Contract**. The required dealer warranty is provided free of charge. Furthermore, the definitions, component coverage, and exclusions stated in this **Contract** apply only to this **Contract** and are not the terms of the required dealer warranty.

   **You** may pursue mediation to resolve disputes between **You** and the **Administrator**. If a dispute arises between **Us** and **You**, in the event that the parties cannot reach an agreement, **You** may file a formal written complaint containing a description of the dispute, and the results of such attempts, the purchase or lease price of the Vehicle, the cost of the repair of the **Vehicle** and a copy of **Your** Agreement. The complaint shall be mailed to: State of Connecticut, Insurance Department, P.O. Box 816, Hartford, CT 06142-0816, Attention: Consumer Affairs Division

3. If **Your Contract** expires while **Your Vehicle** is being repaired due to an approved claim by the **Administrator**, and **Your** "Coverage Term" is only for one year, the **Contract** will remain in effect until **Your Vehicle** is repaired by the repair facility that initiated the approved claim.
4. The first paragraph, last sentence on Page 2 "Protection under this **Contract** is the primary responsibility of NATIONAL CASUALTY COMPANY" is deleted in its entirety.
5. If **Your Contract** expires while **Your Vehicle** is being repaired due to an approved claim by the **Administrator** and **Your** Term Time/Term Mileage is only for one year, the **Contract** will remain in effect until **Your Vehicle** is repaired by the repair facility that initiated the approved claim.
6. Under the section entitled "**9. CANCELLATION OF THIS CONTRACT – By You**," is amended to read:
   **By You**
   "**You** may cancel this **Contract** if the **Vehicle** is returned, sold, lost, stolen, or destroyed, or at any time by contacting the **Administrator** or **Lienholder**."

**GEORGIA (NATL ACCT 280 GA R(02/17))**

1. Unless otherwise specified on Page 1 of this **Contract**, **You** paid for this **Contract** in cash. If **You** financed the **Contract Price**, the terms of the financing are contained in a separate agreement entered into between **You** and the **Lienholder**.
2. Under the section entitled "**7. EXCLUSIONS - WHAT THIS CONTRACT DOES NOT COVER**": the following items are amended to read:
   1. A. 5. "Pre-existing damage or a **Breakdown** known to **You** that occurred before **Your** purchase of the **Contract**, either of which would have been obvious and apparent if that component was inspected at time of purchase."
   2. A. 6. is amended to read:" A6. A **Breakdown** caused by or involving modifications or additions to **Your Vehicle** made by or known to **You**, unless those modifications or additions were performed or recommended by the **Vehicle Manufacturer**.'
   3. B.6 is amended to read: "B.6. **Your Vehicle** is modified by **You** or with **Your** knowledge from the **Vehicle Manufacturer's** original specifications."
3. The section entitled "**9. CANCELLATION OF THIS CONTRACT – By You** is amended to include: "**You** may cancel this **Contract** at any time and receive a refund of the total **Contract Price** subject to the refund

provisions set forth in the "**9. CANCELLATION OF THIS CONTRACT - Refund and Charges**"section. The deduction of claims paid is not allowed. The **Contract Administrator** may only cancel the **Contract** for fraud, material misrepresentation or for nonpayment and issue a pro rata refund of the total **Contract Price** based on the greater of days in force or the miles driven compared to the total **Contract** term.

4. The section entitled "**9. CANCELLATION OF THIS CONTRACT - By Us**" is replaced in its entirety with the following: **By Us**

"**We** reserve the right to cancel this **Contract** and will not pay for a **Covered Breakdown** if **We** discover fraud or material misrepresentation in connection with **Your** obtaining this **Contract** or a claim made under this **Contract**, or (ii) the **Lienholder** advises **Us** that **You** have defaulted in **Your** obligation to repay the amount financed by the **Lienholder**. In general, if **We** cancel this **Contract**, **We** will mail to **You** written notice of cancellation at least thirty (30) days before the cancellation date. However, if **We** cancel this **Contract** for any reason within the first sixty (60) days after the **Contract Purchase Date**, or if **We** cancel this **Contract** because **You** have defaulted in **Your** obligation to repay the amount financed by the **Lienholder**, **We** will mail to **You** written notice of cancellation at least ten (10) days before the cancellation date. The notice of cancellation must be in writing and comply with 33-34-44 of the Georgia Code. If a refund is not paid or credited within sixty (60) days after proof of loss is filed, The **Contract Holder** may file a claim with the insurance company. For cancellations by **Us** there is no cancellation fee."

5. The section entitled "**9. CANCELLATION OF THIS CONTRACT – By The Lienholder**" is amended to include:

"The **Lienholder** must hold a power of attorney in order to cancel the **Contract** due to **Your** default in **Your** obligations to such **Lienholder**."

6. The section entitled "**9. CANCELLATION OF THIS CONTRACT - Refund and Charges**" is amended to read as follows:

· **Extended Coverage Contracts**

If **You** or the **Lienholder** provide notice of cancellation of the **Contract** to **Administrator** or if **We** cancel the **Contract** within the first thirty (30) days from the **Contract Purchase Date**, **You** will be entitled to a full refund of the **Contract Price**.

If **You** or the **Lienholder** provide notice of cancellation of the **Contract** to **Administrator** or if **We** cancel the **Contract** after the first thirty (30) days after the **Contract Purchase Date**, but before the expiration of the **Manufacturer's Warranty**, **You** will be entitled to a full refund of the **Contract Price** less a cancellation fee equal to the lesser of fifty dollars ($50) or ten percent (10%) of the **Contract Price** (if **We** cancel the **Contract**, no cancellation fee will be charged).

If **You** or the **Lienholder** provide notice of cancellation of the **Contract** to **Administrator** or if **We** cancel the **Contract** after the first thirty (30) days from the **Contract Purchase Date** and after the expiration of the **Manufacturer's Warranty**, **You** will be entitled to a prorated refund of the **Contract Price** based on the greater of the number of days the **Contract** was in force or the miles driven compared to the total time or mileage specified under the "Coverage/Term"section on Page 1 of this **Contract**, less a cancellation fee equal to the lesser of fifty dollars ($50) or ten percent (10%) of the prorated refund (if **We** cancel the **Contract**, no cancellation fee will be charged).

· **Standard Coverage Contracts**

If **You** or the **Lienholder** provide notice of cancellation to **Administrator** or if **We** cancel the **Contract** within the first thirty (30) days after the **Contract Purchase Date** or if **We** cancel the **Contract** after the first thirty (30) days from the **Contract Purchase Date**, **You** will be entitled to a prorated refund of the **Contract Price** based on the greater of the number of days the **Contract** was in force or the miles driven compared to the total time or mileage specified under the "Coverage/Term"section on Page 1 of this **Contract**, less a cancellation fee equal to the lesser of fifty dollars ($50) or ten percent (10%) of the prorated refund (if **We** cancel the **Contract**, no cancellation fee will be charged).

7. Under the section entitled "**10. OTHER IMPORTANT CONTRACT PROVISIONS/LIMITATIONS, "DISPUTE RESOLUTION – 1. Arbitration**" is deleted in its entirety.

**HAWAII (NATL ACCT 280 HI (02/17))**

1. Under the section entitled "**9. CANCELLATION OF THIS CONTRACT - By Us**," the following paragraph is added:

**By Us**

"If **We** cancel this **Contract**, **We** will mail a written notice to **You** at **Your** last known address  contained in **Our** records at least five (5) days prior to cancellation. The notice will state the effective date of cancellation and the reason for cancellation. **We** will not send **You** advance notice if the reason for cancellation is nonpayment of the **Contract Price**, a material misrepresentation by **You** to **Us**, or a substantial breach of **Your** duties under this **Contract** relating to the **Vehicle** or its use."

2. Under the section entitled "**9. CANCELLATION OF THIS CONTRACT - Refund and Charges**" the following is added at the end of the first paragraph:

"In that case, **We** will provide **You** with a refund within forty-five (45) days after the **Administrator** or **Lienholder** receive **Your** written notice of cancellation, and if **We** fail to do so within that time, **We** will pay **You** a penalty of 10 percent (10%) of the **Contract Price** for each month that the refund remains unpaid."

**IDAHO (NATL ACCT 280 ID (02/17))**

1. Coverage afforded under this **Contract** is not guaranteed by the Idaho Insurance Guarantee Association.

2. Under the section entitled "**4. YOUR OBLIGATIONS**" the following language is added after Item 2:

3. If a **Covered Part** has a **Covered Breakdown** at any time outside of Claims Department regular business hours, **You** may take one of the following steps:

· Wait until regular business hours and then follow the normal claims procedure outlined above; or

· Authorize and pay for any tear down or diagnostic time needed to determine whether **Your Vehicle** has a **Covered Breakdown**. If **You** reasonably determine that **You** have a **Covered Breakdown** and **You** choose to have **Your Vehicle** repaired, **You** are responsible for paying for the repair. **You** must then call the **Administrator** during the next available regular business hours so that the **Administrator** may determine whether there was a **Covered Breakdown**. If the **Administrator** determines that there was a **Covered Breakdown**, then **We** will pay **You** in accordance with the terms and conditions of this **Contract**."

**ILLINOIS (NATL ACCT 280 IL (02/17))**

1. Under the section entitled "**7. EXCLUSIONS - WHAT THIS CONTRACT DOES NOT COVER**," Item A. 20 is replaced with the following:

"20. A gradual reduction in operating performance due to normal wear and tear."

2. The section entitled "**9. CANCELLATION OF THIS CONTRACT - Refund and Charges**" is amended to read as follows:

· **Extended Coverage Contracts**

If **You** or the **Lienholder** provide notice of cancellation of the **Contract** to **Administrator** or if **We** cancel the **Contract** within the first thirty (30) days from the **Contract Purchase Date**, **You** will be entitled to a full refund of the **Contract Price**.

If **You** or the **Lienholder** provide notice of cancellation of the **Contract** to **Administrator** or if **We** cancel the **Contract** after the first thirty (30) days after the **Contract Purchase Date**, but before the expiration of the **Manufacturer's Warranty**, **You** will be entitled to a full refund of the **Contract Price** less a cancellation fee equal to the lesser of fifty dollars ($50.00) or ten percent (10%) of the **Contract Price**.

If **You** or the **Lienholder** provide notice of cancellation of the **Contract** to **Administrator** or if **We** cancel the **Contract** after the first thirty (30) days from the **Contract Purchase Date** and after the expiration of the **Manufacturer's Warranty**, **You** will be entitled to a prorated refund of the **Contract Price** based on the greater of the number of days the **Contract** was in force or the miles driven compared to the total time or mileage specified under the "Coverage/Term" section on Page 1 of this **Contract**, less a cancellation fee equal to the lesser of fifty dollars ($50.00) or ten percent (10%) of the **Contract Price**.

· **Standard Coverage Contracts**

If **You** or the **Lienholder** provide notice of cancellation to **Administrator** or if **We** cancel the **Contract** within the first thirty (30) days after the **Contract Purchase Date You** will be entitled to a full refund of the **Contract Price**. If **You** or the **Lienholder** provide notice of cancellation of the **Contract** or if **We** cancel the **Contract** after the first thirty (30) days from the **Contract Purchase Date**, **You** will be entitled to a prorated refund of the **Contract Price** based on the greater of the number of days the **Contract** was in force or the miles driven compared to the total time

or mileage specified under the "Coverage/Term" section on Page 1 of this **Contract**, less a cancellation fee equal to the lesser of fifty dollars ($50.00) or ten percent (10%) of the **Contract Price**.

### INDIANA (NATL ACCT 280 IN (02/17))

1. **Your** proof of payment for this **Contract** shall be considered proof of payment to the Insurance Company that guarantees **Our** obligations to **You**, providing such insurance was in affect at the time **You** purchased this **Contract.**
2. This **Service Contract** is not insurance and is not subject to Indiana insurance law.
3. The section entitled " **7. EXCLUSIONS- WHAT THIS CONTRACT DOES NOT COVER**," Item A. 5. is replaced in its entirety with the following:
   "5. Those Pre-existing damage(s) or **Breakdown(s)** known to the **Contract Holder**.

### IOWA (NATL ACCT 280 IA R(02/17))

1. Unless otherwise specified on the first page of this **Contract**, **You** paid for this **Contract** in cash. If "**You** financed the **Contract Price**, the terms of the financing are contained in the **Installment Contract** entered into between **You** and the **Selling Dealer.**"
2. **For Iowa Residents only: If You** have problems or questions about this **Contract**, **You** may contact The Iowa Commissioner of Insurance at the following address: Iowa Insurance Division, Two Ruan Center, 601 Locust Street, 4th Floor, Des Moines, Iowa 50309-3738, (515) 281-5705.
3. Under the section entitled "**5. OUR OBLIGATIONS" - Covered Breakdown (Deductible Applies)**" paragraph three (3) is replaced in its entirety with the following:
   "**Replacement parts can be of like kind and quality and may include new, remanufactured or used parts as determined by the Administrator, except that: (i) used parts may only be used with Your prior written authorization to do so, and (ii) rebuilt parts may only be used if the parts are rebuilt according to national standards recognized by the insurance division (Commissioner of Insurance of the State of Iowa/Iowa Securities Bureau).**"
4. Under the section entitled "**9. CANCELLATION OF THIS CONTRACT - Refund and Charges**" the following language is added at the end of the first paragraph:
   "A ten percent (10%) penalty shall be added each month to a refund that is not paid to **You** within thirty (30) days. The **Administrator** is primarily responsible for providing any refund to **You** to which **You** may be entitled
5. Under the section entitled "**9. CANCELLATION OF THIS CONTRACT** under this **Contract** - By **You**" the following language is added at the end of the first paragraph: **If You**, cancel the service contract, the service contract company shall mail a written notice of termination to the **Service Contact Holder** within fifteen (15) days of the date of termination.

### MARYLAND (NATL ACCT 280 MD (02/17))

1. THIS SERVICE CONTRACT IS INSURED FOR ITS LIABILITY UNDER A SERVICE CONTRACT REIMBURSEMENT INSURANCE POLICY ISSUED BY **SCOTTSDALE INSURANCE COMPANY**, A MEMBER COMPANY OF THE Nationwide® Insurance group.
2. Under the section entitled "**9. CANCELLATION OF THIS CONTRACT – Refund And Charges**" the following is inserted after the third sentence of the first paragraph:
   "In that case, **We** will provide **You** with a refund within forty-five (45) days and if **We** fail to do so within that time, **We** will pay **You** a penalty of ten percent (10%) of the **Contract Price** for each month that the refund remains unpaid."

### MASSACHUSETTS (NATL ACCT 280 MA (02/17))

1. "NOTICE TO CUSTOMER: PURCHASE OF THIS CONTRACT IS NOT REQUIRED IN ORDER TO REGISTER OR FINANCE A VEHICLE. THE BENEFITS PROVIDED MAY DUPLICATE EXPRESS MANUFACTURER'S OR SELLER'S WARRANTIES THAT COME AUTOMATICALLY WITH EVERY SALE. THE SELLER OF THIS COVERAGE IS REQUIRED TO INFORM YOU OF ANY WARRANTIES AVAILABLE TO YOU WITHOUT THIS CONTRACT."

   Chapter 90, Section 7N1/4 of Massachusetts General Laws requires an automobile dealer to provide a warranty covering certain classes of used motor vehicles as follows:
   - **Used Vehicles** with less than 40,000 miles at the time of sale are covered for 90 days or 3,750 miles, whichever comes first.
   - **Used Vehicles** with 40,000 miles or more, but less than 80,000 miles, at the time of sale are covered for 60 days or 2,500 miles, whichever comes first.
   - **Used Vehicles** with 80,000 miles or more, but less than 125,000 miles, at the time of sale are covered for 30 days or 1,250 miles, whichever comes first.

   The **Vehicle You** have purchased may be covered by this law. If so, the following is added to this **Contract**: In addition to the dealer warranty required by this law, **You** have elected to purchase this **Contract**, which may provide **You** with additional protection during the dealer warranty period and provides protection after the dealer warranty has expired. **You** have been charged separately only for this **Contract**. The required dealer warranty is provided free of charge. Furthermore, the definitions, coverages, and exclusions stated in this **Contract** apply only to this **Contract** and are not the terms of the required dealer warranty."

### MINNESOTA (NATL ACCT 280 MN (02/17))

1. Under the section entitled "**4. YOUR OBLIGATIONS**", Item 1. is replaced with the following:
   1. In order for this **Contract** to remain in force, **You** must:
      - Change the oil and oil filter in the **Vehicle** at least every six (6) months or five thousand (5,000) miles, whichever comes first;
      - Replace the timing belt in the **Vehicle** at least every ninety thousand (90,000) miles; and
      - Keep and make available to the **Administrator** upon request verifiable signed receipts that show that the above required maintenance and servicing was timely performed."
2. Under the section entitled "**7. EXCLUSIONS - WHAT THIS CONTRACT DOES NOT COVER**":
   a. Item A.1. is replaced with the following:
      "1. A **Breakdown** caused by lack of customary or proper maintenance."
   b. Item A. 5. is replaced with the following:
      "5. Fraud, material misrepresentation or material omission made by **You** in pursuing a claim under this **Contract**."
   c. Item A. 17. is replaced with the following:
      "17. Any cost or other benefit that the **Vehicle Manufacturer** will pay as a result of a public recall or factory service bulletin.
   d. Item A. 21. is deleted.
   e. Item B. 5. is deleted.
3. Under the section entitled "**9. CANCELLATION OF THIS CONTRACT - Refunds and Charges**", the first paragraph is amended to include the following:
   "If the **Contract** is cancelled within the first thirty (30) days, **You** will be provided with the applicable cancellation refund within forty-five (45) days after the **Administrator** or **Lienholder** receives **Your** notice of cancellation; if **We** fail to do so within that time, **We** will pay **You** a penalty of 10 percent (10%) of the cancellation refund amount for each month that the refund remains unpaid."
4. Under the section entitled "**10. OTHER IMPORTANT CONTRACT PROVISIONS/LIMITATIONS, DISPUTE RESOLUTION – 1. Arbitration**" is amended to include the following:
   "This Section is subject to the rules and regulations set forth in the Minnesota Uniform Arbitration Act, §572B.01 et. seq."
5. As required by Section 325F. 662 of the Minnesota Statutes, the **Selling Dealer** is providing to **You** the coverage listed below at no charge if the **Vehicle** has less than seventy-five thousand (75,000) miles at the time **You** purchased the **Vehicle** or if the purchase price of the **Vehicle** is three thousand ($3,000) or more (including the trade-in value of any vehicle traded in by **You**, but excluding tax, license fees, registration fees, and finance charges) or if the **Vehicle** does not fall within any of the other exclusions listed under Subdivision 3 of Section 325F.662 of the Minnesota Statutes. The term of such coverage is based upon the mileage of the **Vehicle** at the time of purchase and is as follows:
   - **Used Vehicles** with less than thirty-six thousand (36,000) miles are covered for sixty (60) days or two thousand five hundred (2,500) miles, whichever comes first.
   - **Used Vehicles** with thirty-six thousand (36,000) miles or more, but less than seventy-five (75,000) miles, are covered for three (3) days or one-thousand (1,000) miles, whichever comes first.

The following parts are covered by the **Selling Dealer's** limited warranty:

1. **Engine:** All **Lubricated Parts**, intake manifolds, engine block, cylinder engine housings, and ring gear;
2. **Transmission:** Automatic transmission case, internal parts, and the torque converter; or the manual transmission case and the internal parts;

3. **Drive Axle:** Axle housings and internal parts, axle shafts, drive shafts and output shafts, and universal joints; but excluding the secondary drive axle on vehicles, other than passenger vans, mounted on a truck chassis;

4. **Brakes:** Master cylinder, vacuum assist booster, wheel cylinders, hydraulic lines and fittings, and disc brakes calipers;

5. **Steering:** Steering gear housing and all internal parts, power steering pump, valve body, and piston;

6. **Water Pump;** and

7. **Externally Mounted Mechanical Fuel Pump.**

In addition, the following parts are covered if the **Vehicle** has less than thirty-six thousand (36,000) miles: Steering rack, radiator, alternator, generator, and starter.

The above coverage is excluded from this **Contract** during the applicable warranty period unless the **Selling Dealer** is unable to meet its obligations. **Your** rights and obligations regarding this coverage are more fully explained in the used vehicle limited warranty document provided to **You** by the **Selling Dealer.**

## MISSISSIPPI (NATL ACCT 280 MS (12/17))

1. Unless otherwise specified on the first page of this **Contract**, **You** paid for this **Contract** in cash. If **You** financed the **Contract Price**, the terms of the financing are contained in the **Installment Contract** entered into between **You** and the **Selling Dealer.**

2. In the section under "**4. YOUR OBLIGATIONS**" the following language is added at the end of Item 2: "3. If a **Covered Part** has a **Covered Breakdown** at any time outside of Claims Department regular business hours, **You** may take one of the following steps:
   - Wait until regular business hours and then follow the normal claims procedure outlined above; or
   - Authorize and pay for any teardown or diagnostic time needed to determine whether **Your Vehicle** has a **Covered Breakdown.** If **You** reasonably determine that **You** have a **Covered Breakdown** and **You** choose to have **Your Vehicle** repaired, **You** are responsible for paying for the repair. **You** must then call the **Administrator** during the next available regular business hours so that the **Administrator** may determine whether there was a **Covered Breakdown.** If the **Administrator** determines that there was a **Covered Breakdown,** then **We** will pay **You** in accordance with the terms and conditions of this **Contract.**

3. The section entitled "**5. OUR OBLIGATIONS – 1. Covered Breakdown**" is amended to read as follows: Replacement parts can be of like kind and quality; this means that the replacement parts can be the same age as the failed parts at the time of the **Breakdown** based upon time or mileage – replacement parts will not be older than the failed parts. They may include new, remanufactured, or used parts as determined by the **Administrator** and dependent upon the **Limits of Liability.** The use of non-original manufactured parts is permitted. Like kind and quality parts will be utilized unless such parts are unavailable or will not properly repair the **Vehicle,** as determined by the **Administrator. You** may apply the approved dollar amount for a **Covered Breakdown** towards the cost to use new parts to repair the **Vehicle** when used or remanufactured parts were approved, in which case **You** will be responsible for any additional amounts greater than the approved dollar amount.this **Contract.**

4. The section entitled "**9. CANCELLATION OF THIS CONTRACT - Refund and Charges**" is amended to read as follows:

   - **Extended Coverage Contracts**

   If **You** or the **Lienholder** provide notice of cancellation of the **Contract** to **Administrator** or if **We** cancel the **Contract** within the first thirty (30) days from the **Contract Purchase Date, You** will be entitled to a full refund of the **Contract Price.** A ten percent (10%) penalty per month shall be added to a refund for a cancellation made within the first thirty (30) days that is not received within forty-five (45) days after cancellation of the **Contract.**

   If **You** or the **Lienholder** provide notice of cancellation of the **Contract** to **Administrator** or if **We** cancel the **Contract** after the first thirty (30) days after the **Contract Purchase Date,** but before the expiration of the **Manufacturer's Warranty, You** will be entitled to a full refund of the **Contract Price** less a cancellation fee equal to the lesser of fifty dollars ($50.00) ten percent (10%) of the gross service contract provider fee paid by **You.**

If **You** or the **Lienholder** provide notice of cancellation of the **Contract** to **Administrator** or if **We** cancel the **Contract** after the first thirty (30) days from the **Contract Purchase Date** and after the expiration of the **Manufacturer's Warranty, You** will be entitled to one hundred percent (100%) of the unearned pro rata purchase price of the **Contract Price,** less a cancellation fee equal to the lesser of fifty dollars ($50.00) or ten percent (10%) of the gross service contract provider fee paid by **You.**

   - **Standard Coverage Contracts**

If **You** or the **Lienholder** provide notice of cancellation to **Administrator** or if **We** cancel the **Contract** within the first thirty (30) days after the **Contract Purchase Date You** will be entitled to a full refund of the **Contract Price.** If **You** or the **Lienholder** provide notice of cancellation of the **Contract** or if **We** cancel the **Contract** after the first thirty (30) days from the **Contract Purchase Date, You** will be entitled to one hundred percent (100%) of the unearned pro rata purchase price of the **Contract Price,** less a cancellation fee equal to the lesser of fifty dollars ($50.00) or ten percent (10%) of the gross service contract provider fee paid by **You.** A ten percent (10%) penalty per month shall be added to a refund for a cancellation made within the first thirty (30) days that is not received within forty-five (45) days after cancellation of the **Contract.**

5. Under the section entitled "**10. OTHER IMPORTANT CONTRACT PROVISIONS/LIMITATIONS, DISPUTE RESOLUTION – 1. Arbitration**" is deleted.

## MISSOURI (NATL ACCT 280 MO (02/17))

1. Under the section entitled "**4. YOUR OBLIGATIONS**" the following language is added at the end of Item 2:

   "3. If a **Covered Part** has a **Covered Breakdown** at any time outside of Claims Department regular business hours, **You** may take one of the following steps:
   - Wait until regular business hours and then follow the normal claims procedure outlined above; or
   - Authorize and pay for any teardown or diagnostic time needed to determine whether **Your Vehicle** has a **Covered Breakdown.** If **You** reasonably determine that **You** have a **Covered Breakdown** and **You** choose to have **Your Vehicle** repaired, **You** are responsible for paying for the repair. **You** must then call the **Administrator** during the next available regular business hours so that the **Administrator** may determine whether there was a **Covered Breakdown.** If the **Administrator** determines that there was a **Covered Breakdown,** then **We** will pay **You** in accordance with the terms and conditions of this **Contract.**"

2. Under the section entitled "**9. CANCELLATION OF THIS CONTRACT – By Us**" : the following language is added :
   **By Us**
   "If **We** cancel this **Contract, We** will mail a written notice to **You** at **Your** last known address contained in **Our** records at least forty-five (45) days prior to cancellation."

3. Under the section entitled "**9. CANCELLATION OF THIS CONTRACT – Refund and Charges**" the following language is added after the third sentence of the first paragraph:
   A ten percent (10%) penalty per month will be added to any refund that is not paid or credited within thirty (30) days after the **Administrator** receives **Your** request for cancellation."

4. This **Contract** is not an insurance contract.

## MONTANA (NATL ACCT 280 MT (02/17))

1. Under the section entitled "**10. OTHER IMPORTANT CONTRACT PROVISIONS/LIMITATIONS, DISPUTE RESOLUTION – 1. Arbitration**" is deleted.

## NEBRASKA (NATL ACCT 280 NE (02/17))

1. Under the section entitled "**10. OTHER IMPORTANT CONTRACT PROVISIONS/LIMITATIONS - DISPUTE RESOLUTION – 1. Arbitration**" is replaced in its entirety with the following:
   "Subject to Nebraska statute 25-2602.01, If claim settlement cannot be reached, the parties may elect arbitration by mutual agreement at the time of the dispute after the claimant has exhausted all internal appeals and can be binding by consent of the insured person. Arbitration takes place under the laws of the State of Nebraska and is held in the insured's county or any other county in this state agreed to by both parties."

## NEVADA (NATL ACCT 280 NV (07/18))

1. Under the section, entitled "**5. OUR OBLIGATIONS**" the following language is added to the end of the last sentence of Item 1. Paragraph 3;

   "**and may include parts that are not made for or by the original manufacturer of the Vehicle.**"

2. Under the section entitled "**7. EXCLUSIONS – WHAT THIS CONTRACT DOES NOT COVER.**" subsection A. 8. is amended to read:

   "**8. Any cost covered by a repair facility or part suppliers guarantee or warranty, or any cost that would normally be covered by a Vehicle Manufacturer's warranty or a dealer warranty required under state law, whether or not such warranty is in force respecting the Vehicle. This Contract will provide coverage once the limits of any existing Contract have been reached providing it is a Covered Part(s) as stated in terms of the Contract.**"

3. Under the section entitled "**7. EXCLUSIONS – WHAT THIS CONTRACT DOES NOT COVER.**" subsection B. 6. Is deleted in its entirety and replaced with the following:

   "**6. If the Vehicle is modified from the Vehicle manufacturer's original specifications. We will not provide coverage to any Covered Part that is modified or any Covered Part or Vehicle System that is impacted by the improper modification. The Contract will remain in force and provide any applicable coverage for a Covered Breakdown that is not related to or impacted by the improper Vehicle modifications.**"

4. Under the section entitled "**9. CANCELLATION OF THIS CONTRACT - By Us**": the following language is added:

   **By Us**

   "Notwithstanding the foregoing, if this **Contract** has been in effect for at least seventy (70) days, **We** will not be entitled to cancel it before the expiration of the term of this **Contract** or for one (1) year after the effective date of this **Contract**, whichever occurs first, except on any of the following grounds:

   (a) Failure by **You** to pay an amount when due;
   (b) Conviction of **You** of a crime that results in an increase in the service required under this **Contract**;
   (c) Discovery of fraud or material misrepresentation by **You** in obtaining this **Contract**, or in presenting a claim for service under this **Contract**;
   (d) Discovery of:
       (1) An act or omission by **You**; or
       (2) A violation by **You** of any condition of this **Contract**, which occurred after the effective date of this **Contract** and which substantially and materially increases the service required under this **Contract**; or
   (e) A material change in the nature or extent of the required service or repair that occurs after the effective date of this **Contract** and that causes the required service or repair to be substantially and materially increased beyond that contemplated at the time that this **Contract** was issued or sold.

   If **We** cancel this **Contract** at any time based upon the foregoing terms (a) through (e), then no cancellation fee will be charged.

   If **We** cancel this **Contract**, **We** will mail to **You** written notice of cancellation (stating the date and reason for the cancellation) at least fifteen (15) days before the cancellation date."

5. Under the section entitled "**9. CANCELLATION OF THIS CONTRACT - Refund and Charges**" is amended to include the following:

   If **We** cancel **Your Contract** at any time, then no cancellation fee will be charged. We will provide **You** with a refund within forty-five (45) days after the **Administrator** or **Lienholder** receives **Your** written notice of cancellation, and if **We** fail to do so within that time, **We** will pay **You** a penalty of ten (10%) percent of the **Contract Price** for each thirty (30) day period or portion thereof that the refund and any accrued penalties remain unpaid.

6. This **Contract** is not renewable.

7. Wynn's Extended Care, Inc., is the "Provider" obligated to the Holder as defined in NRS 690C.070 and this **Contract** is backed by a Service Contract Reimbursement Insurance Policy issued by National Casualty Company/Scottsdale Insurance Company, P.O. Box 4110, Scottsdale, AZ 85261- 4110. Toll-Free (800) 423-7675.

8. If **You** are not satisfied with **Our** handling of **Your** claim, **You** may contact the Commissioner of Insurance at the Nevada Division of Insurance toll-free at (800) 872-3234.

## NEW HAMPSHIRE (NATL ACCT 280 NH (02/17))

1. Under the section entitled "**10. OTHER IMPORTANT CONTRACT PROVISIONS/LIMITATIONS,**" "**DISPUTE RESOLUTION – 1. Arbitration**" the first sentence is revised to read:
   • "Any dispute arising out of or relating to this **Contract** shall be settled by arbitration, unless the parties agree otherwise."

2. The seventh sentence under the first bullet point • **Governing Law; Venue; Decision** is revised to read:
   • "The arbitration shall take place in New Hampshire, unless the parties agree otherwise."

3. In the event **You** do not receive satisfaction under the **Contract**, **You** may contact the New Hampshire Insurance Department at 21 South Fruit Street, Suite 14, Concord, NH 03301 or phone (800) 852-3416.

## NEW JERSEY (NATL ACCT 280 NJ (12/17))

1. The section entitled "**9. CANCELLATION OF THIS CONTRACT – By Us**" is amended to include the following
   "If **We** cancel the **Contract** at any time, written notice of that cancellation identifying the effective date of the cancellation and the reason for such cancellation shall be delivered to you no less than five (5) days prior to the effective date of the cancellation. No written notice will be provided if **We** cancel the **Contract** for nonpayment of the provider fee, a material misrepresentation or omission, or a substantial breach of the contractual obligations concerning the property or its use.

2. The section entitled "**9. CANCELLATION OF THIS CONTRACT - Refund and Charges**" is amended to include the following:

   • **Extended Coverage Contracts**
     A ten percent (10%) per month penalty, based upon the **Contract Price**, shall be added to a refund for a cancellation made within the first thirty (30) days that is not received within forty-five (45) days after cancellation of the **Contract**.

   • **Standard Coverage Contracts**
     A ten percent (10%) per month penalty, based upon the **Contract Price**, shall be added to a refund for a cancellation made within the first thirty (30) days that is not received within forty-five (45) days after cancellation of the **Contract**.

## NEW MEXICO (NATL ACCT 280 NM (12/17))

1. The last paragraph on Page 1 is deleted and replaced with the following: This service contract is insured by National Casualty Company, a member company of The Nationwide® Insurance Group. If the **We** fail to pay **You** or otherwise provide **You** with the covered service within sixty (60) days of **Your** submission of a valid claim, **You** may submit **Your** claim to National Casualty Company, P.O. Box 4110, Scottsdale, AZ 85261-4110, (800) 423-7675. If **You** have any concerns regarding the handling of **Your** claim, **You** may contact the Office of Superintendent of Insurance at 855-427-5674.

## NEW YORK (NATL ACCT 280 NY (02/17))

1. Unless otherwise specified on the first page of this **Contract**, **You** paid for this **Contract** in cash. If **You** financed the **Contract Price**, the terms of the financing are contained in the **Installment Contract** entered into between **You** and the **Selling Dealer**.

2. The section entitled "**9. CANCELLATION OF THIS CONTRACT— Refunds and Charges**" is amended to include the following:
   A ten percent (10%) penalty per month will be added to any refund that is not paid within thirty (30) days after the **Administrator** receives **Your** request for cancellation.

## OKLAHOMA (NATL ACCT 280 OK (02/17))

1. Under the "**9. CANCELLATION OF THIS CONTRACT**"- Refunds and Charges" is amended to read as follows:

   • **Extended Coverage Contracts**
     If **You** or the **Lienholder** provide notice of cancellation of the **Contract** to **Administrator** or if **We** cancel the **Contract** within the first thirty (30) days from the **Contract Purchase Date**, **You** will be entitled to a full refund of the **Contract Price**.

     If **You** or the **Lienholder** provide notice of cancellation of the **Contract** to **Administrator** or if **We** cancel the **Contract** after the first thirty (30) days after the **Contract Purchase Date**, but before the expiration of the **Manufacturer's Warranty**, **You** will be entitled to a full refund of the **Contract Price**.

     If **You** or the **Lienholder** provide notice of cancellation to **Administrator** or if **We** cancel the **Contract** after the first thirty (30) days from the

**Contract Purchase Date** and after the expiration of the **Manufacturer's Warranty**, **You** will be entitled to a refund of the **Contract Price** based upon 100% of the unearned pro rata **Contract Price**, based upon the greater of the number of days the **Contract** was in force or the miles driven compared to the total time or mileage specified under the "Coverage/Term" section on Page 1 of this **Contract**.

· **Standard Coverage Contracts**

If **You** or the **Lienholder** provide notice of cancellation to **Administrator** or if **We** cancel the **Contract** after the first thirty (30) days from the **Contract Purchase Date**, **You** will be entitled to a refund of the **Contract Price** based upon 100% of the unearned pro rata **Contract Price**, based upon the greater of the number of days the **Contract** was in force or the miles driven compared to the total time or mileage specified under the "Coverage/Term" section on Page 1 of this **Contract**.

2. Under the section entitled "**10 OTHER IMPORTANT CONTACT PROVISIONS/LIMITATIONS, DISPUTE RESOLUTION – 1. Arbitration**" is deleted.

3. The following disclosure statement is added to the first page of this **Contract**:
"**THIS SERVICE WARRANTY IS NOT ISSUED BY THE MANUFACTURER OR WHOLESALE COMPANY MARKETING THIS PRODUCT. THIS WARRANTY WILL NOT BE HONORED BY SUCH MANUFACTURER OR WHOLESALE COMPANY.**"

4. **Contract Obligor** means Phoenix American Warranty Company, Inc., License Number 861289.

5. This is not an Insurance Contact. The coverage afforded under this Contact is not guaranteed by the Oklahoma Insurance Guaranty Association. Oklahoma service warrant Statutes do not apply to commercial use.

**OREGON (NATL ACCT 280 OR R(02/17))**
1. Under the section entitled "**4. YOUR OBLIGATIONS**": the following language is added after Item. 2.:
"3. If a **Covered Part** has a **Covered Breakdown** at any time outside of Claims Department regular business hours, **You** may take one of the following steps:
· Wait until regular business hours and then follow the normal claims procedure outlined above; or
· Authorize and pay for any teardown or diagnostic time needed to determine whether **Your Vehicle** has a **Covered Breakdown**. If **You** reasonably determine that **You have a Covered Breakdown** and **You** choose to have **Your Vehicle** repaired, **You** are responsible for paying for the repair. **You** must then call the **Administrator** during the next available regular business hours so that the **Administrator** may determine whether there was a **Covered Breakdown**. If the **Administrator** determines that there was a **Covered Breakdown**, then **We** will pay **You** in accordance with the terms and conditions of this **Contract**."

**You** may address any unresolved complaints to the Division of Financial Regulation, Consumer Advocacy Unit, 350 Winter St., NE. Room 440, P.O. Box 14480, Salem, OR 97309-0405.

2. Under the section entitled "**10. OTHER IMPORTANT CONTRACT PROVISIONS/LIMITATIONS, DISPUTE RESOLUTION – 1. Arbitration**" is replaced in its entirety with the following:
"Subject to ORS 36.600-36.740, If claim settlement cannot be reached, the parties may elect arbitration by mutual agreement at the time of the dispute after the claimant has exhausted all internal appeals and can be binding by consent of the insured person. Arbitration takes place under the laws of the State of Oregon and is held in the insured's county or any other county in this state agreed to by both parties."

**SOUTH CAROLINA (NATL ACCT 280 SC (02/17))**
1. Unless otherwise specified on the first page of this **Contract**, **You** paid for this **Contract** in cash. If **You** financed the **Contract Price**, the terms of the financing are contained in a separate agreement entered into between **You** and the **Lienholder**.
2. Any unresolved complaints or questions about this **Contract** may be addressed to:
South Carolina Department of Insurance,
P.O. Box 100105, Columbia, SC 29202-3105
(803) 737-6134
3. Under the section entitled "**9. CANCELLATION OF THIS CONTRACT - Refund and Charges**" is amended to include the following after the third sentence in the first paragraph:
**We** will provide **You** with a refund within forty-five (45) days after the

**Administrator** receives **Your** notice of cancellation, and if **We** fail to do so within that time, **We** will pay **You** a penalty of ten percent (10%) of the **Contract Price** for each month that the refund remains unpaid.
4. Under the section entitled "**9. CANCELLATION OF THIS CONTRACT - By Us**" the following paragraph is added after the last bullet point:
"If **We** cancel this **Contract**, **We** will mail a written notice to **You** at **Your** last known address contained in **Our** records at least fifteen (15) days prior to cancellation. The notice will state the effective date of cancellation and the reason for cancellation. **We** will not send **You** advance notice if the reason for cancellation is nonpayment of the **Contract Price**, a material misrepresentation by **You** to **Us**, or a substantial breach of duties by **You** relating to the **Vehicle** or its use.

**TEXAS (NATL ACCT 280 TX (02/17))**
1. Unless otherwise specified on the first page of this **Contract**, **You** paid for this **Contract** in cash. If **You** financed the **Contract Price**, the terms of the financing are contained in the **Installment Contract** entered into between **You** and the **Selling Dealer**.
2. Under the section entitled "**9. CANCELLATION OF THIS CONTRACT— By Us**" the following paragraph is added:
**By Us**
"If **We** cancel this **Contract**, **We** will mail a written notice to **You** at **Your** last known address contained in **Our** records at least six (6) days prior to cancellation. The notice will state the effective date of cancellation and the reason for cancellation. **We** will not send **You** advance notice if the reason for cancellation is nonpayment of the **Contract Price**, a material misrepresentation by **You** to **Us**, or a substantial breach of duties by **You** relating to the **Vehicle** or its use."
3. Under the section entitled "**9. CANCELLATION OF THIS CONTRACT — Refund and Charges**" is amended to include the following after the third sentence in the first paragraph:
"We will provide **You** with a refund within forty-five (45) days after the **Administrator receives** notice of cancellation, and if **We** fail to do so within that time, **We** will pay **You** a penalty of ten percent (10%) of the **Contract Price** for each month that the refund remains unpaid. If the refund is not paid before the 46th day after the date **You** cancelled the **Contract**, **You** may apply for reimbursement directly to the insurer."
4. Any unresolved complaints concerning **Us** or questions concerning the regulation of service Contract providers may be addressed to Office of Consumer Credit Commissioner (OCCC) is located at 2601 N. Lamar Blvd., Austin, Texas 78705. Direct general inquiries to 512.936.7600 or to Toll-free Consumer Helpline number is 800.538.1579.Website: http://www.occc.texas.gov/.

**UTAH (NATL ACCT 280 UT R(02/17))**
1. Coverage afforded under this **Contract** is not guaranteed by the Property and Casualty Guaranty Association.
2. This **Contract** shall be paid in full on **Contract Purchase Date**. **You** may pay the full amount by check, or **You** may purchase the **Contract** via the loan agreement.
3. Under the section entitled "**4. YOUR OBLIGATIONS**," the last sentence of the last paragraph is deleted in its entirety:
"**Claims must be submitted within one-hundred eighty (180) days from Wynn's Extended Care, Inc. authorization date to qualify for reimbursement**"
4. If a **Covered Part** has a **Covered Breakdown** at any time outside of Claims Department regular business hours, **You** may take one of the following steps:
· Wait until regular business hours and then follow the normal claims procedure outlined above; or
· Authorize and pay for any teardown or diagnostic time needed to determine that **Your Vehicle** has a **Covered Breakdown**. If **You** reasonably determine that **You** have a **Covered Breakdown** and **You** choose to have **Your Vehicle** repaired, **You** are responsible for paying for the repair. **You** must then call the **Administrator** during regular business hours so that the **Administrator** may determine whether there was a **Covered Breakdown**. If the **Administrator** determines that there was a **Covered Breakdown**, then **We** will pay **You** in accordance with the terms and conditions of this **Contract**.
5. Under the section entitled "**9. CANCELLATION OF THIS CONTRACT - By Us**" the following language deleted in its entirety and replaced with the following:
**We** reserve the right to cancel this **Contract** and will not pay for a **Covered Breakdown** if:
· There is a material misrepresentation.
· There is a substantial change in risk assumed, unless the insurer

should reasonably have foreseen the change or contemplated the risk when entering into the **Contract**.

· There is a failure to pay the premium required for coverage under this **Contract**.

6. The section entitled "**9. CANCELLATION OF THIS CONTRACT - By Us**" the following sentence is added:

**By Us**

"If **We** cancel this **Contract**, the cancellation will be effective no sooner than thirty (30) days after the delivery or first-class mailing of written notice to **Contract Holder**. If **We** cancel the **Contract** due to nonpayment of premium the cancellation will be effective no sooner than ten (10) days after or first class mailing of a written notice to **Contract Holder**.

7. Failure to give any notice or file any proof of loss required by this **Contract** within the time specified in this **Contract** does not invalidate a claim made by **You**, if **You** show that it was not reasonably possible to give the notice or file the proof of loss within the prescribed time and that the notice was given or proof of loss filed as soon as reasonably possible.

8. Under the section entitled "**10. OTHER IMPORTANT CONTRACT PROVISIONS/LIMITATIONS, "DISPUTE RESOLUTION –1. Arbitration**" is amended to include:

ANY MATTER IN DISPUTE BETWEEN **YOU** AND THE COMPANY MAY BE SUBJECT TO ARBITRATION AS AN ALTERNATIVE TO COURT ACTION PURSUANT TO THE RULES OF (THE AMERICAN ARBITRATION ASSOCIATION OR OTHER RECOGNIZED ARBITRATOR), A COPY OF WHICH IS AVAILABLE ON REQUEST FROM THE COMPANY. ANY DECISION REACHED BY ARBITRATION SHALL BE BINDING UPON BOTH **YOU** AND THE COMPANY. THE ARBITRATION AWARD MAY INCLUDE ATTORNEY'S FEES IF ALLOWED BY STATE LAW AND MAY BE ENTERED AS A JUDGEMENT IN ANY COURT OF PROPER JURISDICTION.

**VERMONT (NATL ACCT 280 VT (02/17))**

1. Under the section entitled "**10. OTHER IMPORTANT CONTRACT PROVISIONS/LIMITATIONS," Item 1. a. Governing Law; Venue; Decision**, the seventh sentence is revised to read:

"If the **Contract Holder** is a Vermont resident, arbitration will be held in Vermont. If the **Contract Holder** is not a Vermont resident, arbitration will be held in Miami-Dade County Florida."

**WASHINGTON (NATL ACCT 280 WA (02/17))**

1. The paragraph under the Customer Signature Section on Page 1 is replaced with the following: "THIS **SERVICE CONTRACT** IS GUARANTEED FOR ITS LIABILITY UNDER A SERVICE CONTRACT REIMBURSEMENT INSURANCE POLICY ISSUED BY **NATIONAL CASUALTY COMPANY**, A MEMBER COMPANY OF The Nationwide® Insurance group. **YOU** MAY MAKE A CLAIM DIRECTLY AGAINST NATIONAL CASUALTY COMPANY, P.O. BOX 4110, SCOTTSDALE, AZ 85261-4110, (800) 423-7675. The policy number is SC-1270."

2. Under the section entitled "**1. DEFINITIONS**" the following definition is added:

"**Reimbursement Insurance Policy**" means a policy of insurance that is issued to a **Service Contract Provider** to provide reimbursement to the **Service Contract Provider** or to pay on behalf of the **Service Contract Provider** all contractual obligations incurred by the **Service Contract Provider** under the terms of the insured **Service Contracts** issued or sold by the **Service Contract Provider**."

3. Under the section entitled "**4. YOUR OBLIGATIONS**" the following language is added after Item 2: "3. If a **Covered Part** has a **Covered Breakdown** at any time outside of Claims Department regular business hours, **You** may take one of the following steps:

· Wait until regular business hours and then follow the normal claims procedure outlined above; or

· Authorize and pay for any teardown or diagnostic time needed to determine whether **Your Vehicle** has a **Covered Breakdown**. If **You** reasonably determine that **You** have a **Covered Breakdown** and **You** choose to have **Your Vehicle** repaired, **You** are responsible for paying for the repair. **You** must then call the **Administrator** during the next available regular business hours so that the **Administrator** may determine whether there was a **Covered Breakdown**. If the **Administrator** determines that there was a **Covered Breakdown**, then **We** will pay **You** in accordance with the terms and conditions of this **Contract**."

4. Under the section entitled "**7. EXCLUSIONS — WHAT THIS CONTRACT DOES NOT COVER**": Item A. 1 is replaced with the following:

"1. A **Breakdown** caused by lack of customary, proper or **Vehicle Manufacturer's** specified maintenance of the failed **Covered Part(s)**."

5. The section entitled "**9. CANCELLATION OF THIS CONTRACT — By Us**" is replaced in its entirety with the following:

"We have sixty (60) days from the date of the sale of the **Service Contract** to determine whether or not the **Vehicle** qualifies for coverage under the **Service Contract** program. If **We** have not cancelled **Your Service Contract** within sixty (60) days, **We** may not cancel this **Contract** and are fully obligated under the terms of the **Contract** sold to **You**, except for the following:

· The **Vehicle** odometer fails, or for any reason does not record the actual mileage of **Your Vehicle** after purchase date, and **You** do not have it repaired and the mileage certified within thirty (30) days of failure date.

· Fraud, material misrepresentation or non-payment."

6. The section entitled "**9. CANCELLATION OF THIS CONTRACT — Refunds And Charges**" is replaced in its entirety and replaced with the following:

"**You** may cancel this **Contract** by providing verbal or written notice to the **Lienholder** or to **Us**. If the **Contract Price** was financed, any and all refunds will be paid to the **Lienholder**. **Your** cancellation notice must be accompanied by the then current **Vehicle** mileage. A ten percent (10%) penalty will be added to any refund that is not paid within thirty (30) days after **We** received **Your** request for cancellation. Written notice of cancellation by **Us** shall include the actual reason for cancellation and shall be mailed or delivered to **You** no less than ten (10) days prior to the effective date of cancellation where such cancellation is for nonpayment of the **Contract**, and no less than forty-five (45) days prior to the effective date of cancellation, where such cancellation is for any other reason.

· **Extended Coverage Contracts**

If **You** or the **Lienholder** provide notice of cancellation of the **Contract** to **Administrator** or if **We** cancel the **Contract** within the first thirty (30) days from the **Contract Purchase Date**, **You** will be entitled to a full refund of the **Contract Price**.

If **You** or the **Lienholder** provide notice of cancellation of the **Contract** to **Administrator** or if **We** cancel the **Contract** after the first thirty (30) days after the **Contract Purchase Date**, but before the expiration of the **Manufacturer's Warranty**, **You** will be entitled to a full refund of the **Contract Price** less a cancellation fee of twenty-five dollars ($25.00).

If **You** or the **Lienholder** provide notice of cancellation of the **Contract** to **Administrator** or if **We** cancel the **Contract** after the first thirty (30) days from the **Contract Purchase Date** and after the expiration of the **Manufacturer's Warranty, You** will be entitled to a prorated refund of the **Contract Price** based on the greater of the number of days the **Contract** was in force or the miles driven compared to the total time or mileage specified under the "Coverage/Term" section on Page 1 of this **Contract**, less a cancellation fee equal to twenty-five dollars ($25.00).

· **Standard Coverage Contracts**

If **You** or the **Lienholder** provide notice of cancellation to **Administrator** or if **We** cancel the **Contract** within the first thirty (30) days after the **Contract Purchase Date You** will be entitled to a full refund of the **Contract Price**. If **You** or the **Lienholder** provide notice of cancellation of the **Contract** or if **We** cancel the **Contract** after the first thirty (30) days from the **Contract Purchase Date**, **You** will be entitled to a prorated refund of the **Contract Price** based on the greater of the number of days the **Contract** was in force or the miles driven compared to the total time or mileage specified under the "Coverage/Term" section on Page 1 of this **Contract**, less a cancellation fee equal to twenty-five dollars ($25.00)."

7. Under the section entitled "**10. OTHER IMPORTANT CONTRACT PROVISIONS/LIMITATIONS — Our Rights Against Others**" is replaced in its entirety with the following:

"**Our Rights Against Others**"

If **You** receive any benefits under this **Contract**, **We** will be entitled to **Your** rights of recovery for the amount due **Us** per the conditions of this **Contract**) against any manufacturer, repairer or other party who may be responsible to **You** for the costs covered by this **Contract** or for any other payment made by **Us**. If **We** ask, **You** agree to help **Us** enforce these rights. **You** also agree to cooperate and help **Us** in any other matter concerning this **Contract**. **Our** rights of recovery exist only after **You** have been made whole under Washington law.

8. Under the section entitled "**10. OTHER IMPORTANT CONTRACT PROVISIONS/LIMITATIONS**" the section entitled **1. Arbitration** is deleted in its entirety.

9. The following is added to this **Contract**:
"Any civil action in connection with this **Contract** will be handled under the jurisdiction of the State of Washington."

**WISCONSIN (NATL ACCT 280 WI (02/17))**

1. **THIS WARRANTY IS SUBJECT TO LIMITED REGULATION BY THE OFFICE OF THE COMMISSIONER OF INSURANCE.**
2. Under the section entitled "**4. YOUR OBLIGATIONS**," the last sentence of the last paragraph "**CLAIMS MUST BE SUBMITTED WITH 180 DAYS FROM AUTHORIZATION TO QUALIFY FOR REIMBURSEMENT**" is deleted in its entirety and replaced with the following:
"Notice of loss should be made as soon as reasonably possible and within one year after the time it was required by the policy."
3. The following sentences are added to the first bullet point Item 2. under "**4. YOUR OBLIGATIONS**" and to Item A. 27 under "**7. EXCLUSIONS - What This Contract Does Not Cover**":
"However, the failure by **You** to obtain an authorization number from the **Administrator** prior to beginning a repair will not invalidate or reduce a claim unless **We** are prejudiced by **Your** failure to obtain an authorization number. In other words, **We** will not deny a claim solely because **You** or **Your** repair facility failed to obtain an authorization number before beginning a repair."
4. Under the section entitled "**10. OTHER IMPORTANT CONTRACT PROVISIONS/LIMITATIONS - Our Rights Against Others**" the first sentence is replaced with the following:
"If **You** receive any benefits under this **Contract**, **We** will be entitled to all **Your** rights of recovery against any manufacturer, repairer or other party who may be responsible to **You** for the costs covered by this **Contract** or for any other payment made by **Us**, but only after **You** have been made whole for **Your** loss (i.e., **You** have been fully compensated for **Your** damages)."
5. Under the section entitled "**10. OTHER IMPORTANT CONTRACT PROVISIONS/LIMITATIONS**," the first paragraph of the subsection entitled "**DISPUTE RESOLUTION - 1. Arbitration**" is amended to read:
"Any dispute arising out of or relating to this **Contract** can be settled by final and binding arbitration. In order for arbitration to take place, **You** and **We** must agree that the matter be arbitrated. This **Contract** is subject to the applicable Wisconsin laws."

**WYOMING (NATL ACCT 280 WY (02/17))**

1. Unless otherwise specified on Page 1 of this **Contract**, **You** paid for this **Contract** in cash. If **You** financed the **Contract Price**, the terms of the financing are contained in a separate agreement entered into between **You** and the **Lienholder**.
2. Under the section entitled "**9. CANCELLATION OF THIS CONTRACT - By Us**" the following paragraph is added:
**By Us**
"If **We** cancel this **Contract**, **We** will mail a written notice to **You** at **Your** last known address contained in **Our** records at least ten (10) days prior to cancellation. The notice will state the effective date of cancellation and the reason for cancellation. **We** will not send **You** advance notice if the reason for cancellation is nonpayment of the **Contract Price**, a material misrepresentation by **You** to **Us**, or a substantial breach of duties by **You** relating to the **Vehicle** or its use.
3. The section entitled "**9. CANCELLATION OF THIS CONTRACT - By The Lienholder**" is amended to read:
**By Lienholder**
"**You** understand and acknowledge that the **Lienholder** (if any) has the right to cancel this **Contract** if the **Vehicle** is repossessed or destroyed.
4. Under the section entitled "**9. CANCELLATION OF THIS CONTRACT - Refund and Charges**" the second sentence of the first paragraph is amended to read as follows:
"If the **Contract Price** has been financed, any refund will be made payable jointly to the **Lienholder** and **You** except, if **Your Vehicle** has been repossessed or is a total loss, the refund may be made payable solely to the **Lienholder**."
5. Under the section entitled "**9. CANCELLATION OF THIS CONTRACT - Refund and Charges**" the following is added after the third sentence of the first paragraph:
"A ten percent (10%) penalty per month shall be added to a refund that is not paid or credited within forty-five (45) days after return of the service contract to the provider."



PRIVATE PLACEMENT MEMORANDUM                                                    STRICTLY CONFIDENTIAL



*We change lives!*

# CREDIT ACCEPTANCE AUTO LOAN TRUST 2016-3
## $350,000,000 ASSET BACKED NOTES

The Issuer will offer the following securities:

|  | Principal Amount | Interest Rate | Final Scheduled Distribution Date |
|---|---|---|---|
| Class A Notes | $227,500,000 | 2.15% | April 15, 2024 |
| Class B Notes | $ 67,900,000 | 2.94% | October 15, 2024 |
| Class C Notes | $ 54,600,000 | 3.60% | April 15, 2025 |

The Issuer will pay interest monthly on the 15th of the month, subject to the business day rule set forth in this Private Placement Memorandum. The first interest payment will be made on November 15, 2016.

---

### CREDIT ACCEPTANCE AUTO LOAN TRUST 2016-3,
*the Issuer*

### CREDIT ACCEPTANCE FUNDING LLC 2016-3,
*the Seller*

### CREDIT ACCEPTANCE CORPORATION,
*the Servicer*

### WELLS FARGO BANK, NATIONAL ASSOCIATION,
*the Trust Collateral Agent/Indenture Trustee/Backup Servicer*

Credit enhancement for the Notes includes overcollateralization, subordination and the reserve account.

No person has been authorized to give any information or to make any representations other than those contained in this Private Placement Memorandum and, if given or made, such information or representations must not be relied upon. The delivery of this Private Placement Memorandum at any time does not imply that the information herein is correct as of any time subsequent to its date.

The Class A Notes, the Class B Notes and the Class C Notes (collectively, the "Notes") will be sold to Wells Fargo Securities, LLC, BMO Capital Markets Corp., and Fifth Third Securities, Inc. (collectively, the "Initial Purchasers") on the Closing Date and may be offered by the Initial Purchasers to a limited number of prospective investors from time to time in one or more negotiated transactions or otherwise at varying prices to be determined at the time of sale. There is currently no secondary market for the Notes and there is no assurance that any such market, if established, will continue or that any investor will be able to sell any of such Notes at a price equal to or greater than the price at which they were purchased.

The information contained herein is confidential and may not be reproduced in whole or in part.

THE NOTES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS. THE NOTES ARE BEING SOLD BY THE INITIAL PURCHASERS EXCLUSIVELY TO PERSONS BELIEVED BY THE INITIAL PURCHASERS TO BE (I) "QUALIFIED INSTITUTIONAL BUYERS" WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT OR (II) SOLELY IN THE CASE OF INITIAL INVESTORS IN THE NOTES, INSTITUTIONAL "ACCREDITED INVESTORS" MEETING THE REQUIREMENTS OF RULE 501(a)(1), (2), (3) OR (7) OF REGULATION D UNDER THE SECURITIES ACT PURSUANT TO AN EXEMPTION UNDER THE SECURITIES ACT. THE NOTES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. ACCORDINGLY, THE NOTES ARE NOT TRANSFERABLE EXCEPT IN ACCORDANCE WITH THE RESTRICTIONS DESCRIBED HEREIN. SEE "NOTICE TO INVESTORS" HEREIN.

The Notes are offered by the Initial Purchasers when, as and if issued by the Issuer and accepted by the Initial Purchasers and subject to the right of the Initial Purchasers to reject orders in whole or in part. It is expected that the Notes will be delivered in book-entry form through the facilities of The Depository Trust Company on or about October 27, 2016.

The Issuer may rely on the exemption from registration under the Investment Company Act of 1940, as amended (the "Investment Company Act"), provided by Section 3(c)(5) thereof or Rule 3a-7 thereunder, and accordingly, the Issuer does not rely on Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act for its exemption from registration under the Investment Company Act. The Issuer was structured so as not to constitute a "covered fund" for purposes of the Volcker Rule under the Dodd-Frank Act (each, as defined herein).

## Wells Fargo Securities
Sole Bookrunner and Lead Manager

### BMO Capital Markets
Senior Co-Manager

### Fifth Third Securities
Co-Manager

The date of this Private Placement Memorandum is October 19, 2016

the Dealer Loans transferred to the Issuer. To the extent any Dealer is the subject of a voluntary or involuntary bankruptcy, a creditor of the Dealer, the bankruptcy trustee, or the Dealer itself as debtor-in-possession could take the position that Collections on the Dealer Loan Contracts are property of the Dealer's bankruptcy estate (as the Dealer retains ownership of the Contracts) and be subject to the automatic stay under the Bankruptcy Code. Collections on the Dealer Loan Contracts, and in turn, payments on the Dealer Loans, may be delayed, which could result in delays in payment or losses on the Notes. The Seller has structured the transaction to mitigate this risk by establishing Dealer concentration limits relating to the portion of the Aggregate Outstanding Net Eligible Loan Balance relating to each Dealer individually and the top 20 Dealers as a group. However, there can be no assurance that the voluntary or involuntary bankruptcy of a Dealer will not result in delays in payment or losses on the Notes.

Dealer Collections Purchases. During its ordinary course of business in managing its portfolio of dealer loans, Credit Acceptance may from time to time agree to purchase a dealer's rights in and entitlement to the dealer collections (i.e., dealer holdback) with respect to one or more of its pools of underlying contracts. If Credit Acceptance makes such a purchase with respect to a Dealer Loan which is held by the Issuer, such Dealer Loans (including the rights to the related Dealer Loan Collections thereunder) will be deemed to be satisfied and the Dealer will no longer have any interest in the related Dealer Loan Contracts. Pursuant to the Sale and Contribution Agreement and the Sale and Servicing Agreement, the Dealer Loan Contracts that previously secured such Dealer Loans will be automatically assigned by Credit Acceptance to the Seller and by the Seller to the Issuer as Purchased Loan Contracts and the advances by Credit Acceptance thereon shall be deemed Purchased Loans. See "The Dealer Loans, the Purchased Loans and the Contracts—Dealer Collections Purchases" herein. During the Amortization Period, Dealer Collections Purchases may result in an acceleration of the rate of principal amortization of the Notes because Dealer Collections, that would otherwise be payable to the related Dealers, will be retained by the Issuer with respect to the Dealer Loans subject to the Dealer Collections Purchases and the Issuer will thus retain all Collections on the Purchased Loan Contracts arising from the Dealer Collections Purchases.

Geographic Concentration of the Dealer Loans and Purchased Loans. As of the initial Cut-off Date, states with the highest concentrations of Dealer Loans (based on the Aggregate Outstanding Net Eligible Loan Balance and the location of the related Dealers as of the initial Cut-off Date) were Michigan, New York, Texas, Maryland and Ohio with 12.14%, 8.74%, 8.31%, 7.40% and 6.78% of the $397,119,167.07 Aggregate Outstanding Net Eligible Loan Balance with respect to the Dealer Loans, respectively. As of the initial Cut-off Date, states with the highest concentrations of Purchased Loans (based on the Aggregate Outstanding Net Eligible Loan Balance and the location of the related Obligors as of the initial Cut-off Date) were Ohio, New Jersey, Arkansas, Alabama and Wisconsin with 22.88%, 6.83%, 5.91%, 5.87% and 5.37% of the $40,653,991.86 Aggregate Outstanding Net Eligible Loan Balance with respect to the Purchased Loans, respectively. Adverse economic conditions or other factors, including natural disasters, inclement weather or civil unrest, particularly affecting any of these states could adversely affect the loan loss experience of the Issuer with respect to the Loans.

Significant Increase in Newly-Enrolled Dealers. The number of new Dealers enrolling in Credit Acceptance's programs increased significantly in recent years. This is due primarily to Credit Acceptance's decision to increase loan originations in a competitive market environment by enrolling new dealers in its program. There can be no assurance that the significant increase in the number of newly-enrolled dealers will not have a material adverse effect on Credit Acceptance's financial condition, results of operations, servicing capabilities or the performance of the Loans.

Addition of Loans During the Revolving Period. This Private Placement Memorandum describes only the characteristics of the Loans as of the initial Cut-off Date. On each Distribution Date during the

Revolving Period, a portion of Collections will be distributed to the Issuer in order for it to purchase additional Eligible Loans from the Seller. See "Description of the Transaction Documents—The Revolving Period and Early Amortization Events" herein. These Loans will be pledged by the Issuer to the Indenture Trustee as collateral for the Notes. These Loans, and the related Contracts securing or evidencing these Loans, may have characteristics that differ somewhat from the characteristics of the Loans and Contracts as of the initial Cut-off Date described in this Private Placement Memorandum. The Loans and Contracts purchased by the Issuer during the Revolving Period may have been originated pursuant to different credit criteria from the criteria applied to the Loans and Contracts transferred on the Closing Date and may be of a different credit quality and seasoning. In addition, the Loans purchased by the Issuer during the Revolving Period may reflect a different proportion of Dealer Loans to Purchased Loans than the proportion reflected in the Loans as of the initial Cut-off Date described in this Private Placement Memorandum. The Originator and the Seller do not expect that the characteristics of the Loans and related Contracts purchased during the Revolving Period will be materially different from those transferred on the Closing Date, and each Dealer, Dealer Loan, Dealer Agreement, Purchased Loan, Purchase Agreement and Contract must satisfy the eligibility criteria specified in the Transaction Documents.

Features of the Purchased Loans contained in the Trust Property May Result in Losses. Because the advance rate in respect of Purchased Loans is greater (all other things being equal) than that for Dealer Loans, defaults relating to Purchased Loan Contracts are likely to have a more significant adverse effect on the performance of the Notes than similar defaults in respect of Dealer Loan Contracts.

Used Motor Vehicles Collateralizing Loans included in the Contract Pool May Incur Higher Losses Upon Liquidation Than New Motor Vehicles. Substantially all of the assets of the Issuer relate to Contracts to finance the purchase of used vehicles. Because the value of a used vehicle is more difficult to determine than the value of a new vehicle, upon sale of a repossessed used vehicle, a greater loss may be incurred. The market value of used vehicles is affected by supply and demand for such vehicles, which in turn is affected by consumer tastes, economic factors, fuel costs, the introduction and pricing of new car models and other factors, such as the introduction of new vehicle sales incentives and legislation relating to emissions and fuel efficiency. A decrease in demand for used vehicles, including if an unusually high number of used vehicles come off lease in a particular period, or decline in the prices at which vehicles may be sold, is likely to result in increased losses on the related Defaulted Contracts.

Inadequate Insurance on Vehicles May Cause Losses. A Contract may or may not require the related Obligor to maintain insurance covering physical damage to the vehicle in an amount not less than the unpaid principal balance of the Contract with the Originator or the Servicer named as a loss payee. Since the Obligors select their own insurers to provide the coverage, the specific terms and conditions of their policies vary.

In addition, although each Contract generally gives the Servicer the right to obtain force-placed insurance coverage in the event the physical damage insurance on a vehicle is not maintained by an Obligor, the Servicer is not obligated to obtain force-placed coverage and, in most cases, it is not obtained. To the extent insurance coverage is not maintained by Obligors and coverage is not force placed, then insurance recoveries may be limited in the event of losses or casualties to vehicles included in the Trust Property, which may adversely affect the timing and amount of funds available for distribution to the Noteholders.

## THE ISSUER

The Issuer, Credit Acceptance Auto Loan Trust 2016-3, is a statutory trust formed on May 17, 2016, pursuant to an interim trust agreement dated as of May 17, 2016, under the laws of the State of