UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

PALM TRAN, INC. AMALGAMATED      :
TRANSIT UNION LOCAL 1577         :
PENSION PLAN, Individually and On :
Behalf of All Others Similarly Situated, :
                                 :
            Plaintiff,            :   Case No.:
                                 :   2:20-cv-12698-LVP-EAS
      v.                         :
                                 :   Hon. Linda V. Parker
CREDIT ACCEPTANCE                :
CORPORATION, BRETT A. ROBERTS,   :
and KENNETH S. BOOTH,            :
                                 :
            Defendants.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**DEFENDANTS' MOTION TO DISMISS
<u>PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT [ECF No. 31]</u>**

Pursuant to Rules 8(a), 9(b) and 12(b)(6) of the Federal Rules of Civil Proce-

dure and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 78u-4

*et seq.*, Defendants Credit Acceptance Corporation ("CAC" or the "Company"),

Brett A. Roberts and Kenneth S. Booth (collectively, "Defendants") move this Court

to dismiss, with prejudice, Plaintiffs' Amended Class Action Complaint for Viola-

tions of the Federal Securities Laws (ECF No. 31, PageID.432-519 (the "AC")) for

failure to state a claim upon which relief can be granted.  On August 31, 2021, there

was a conference between attorneys for the parties, during which Defendants ex-

plained the nature of the Motion and its legal basis and requested, but did not obtain,

concurrence in the relief sought.  *See* L.R. 7.1(a).

WHEREFORE, for the reasons stated in the accompanying Brief, and based on all pleadings and papers filed in this action, all matters of which this Court may take judicial notice, including those set forth in the exhibits attached to this Motion, and such additional papers and arguments as may be presented at or in connection with a hearing on this Motion, Defendants respectfully request that the Court dismiss the AC in its entirety and with prejudice.

Dated:  September 2, 2021

Respectfully submitted:

**SKADDEN, ARPS, SLATE
    MEAGHER & FLOM LLP**

**DICKINSON WRIGHT PLLC**

By:   *s/ Thomas G. McNeill*

Scott D. Musoff
Robert A. Fumerton
Patrick G. Rideout
One Manhattan West
New York, New York 10001
(212) 735-3000
scott.musoff@skadden.com
robert.fumerton@skadden.com
patrick.rideout@skadden.com

Thomas G. McNeill (P36895)
500 Woodward Avenue, Suite 4000
Detroit, Michigan 48226
(313) 223-3500
tmcneill@dickinsonwright.com

Scott R. Knapp (P61041)
123 W. Allegan Street, Suite 900
Lansing, Michigan 48933
(517) 371-1730
sknapp@dickinsonwright.com

*Counsel for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 2, 2021, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel of record.

<div style="margin-left:40%">

By:   *s/ Thomas G. McNeill*
Thomas G. McNeill (P36895)
DICKINSON WRIGHT PLLC
500 Woodward Avenue, Suite 4000
Detroit, Michigan 48226
(313) 223-3500
tmcneill@dickinsonwright.com

*Counsel for Defendants*

</div>

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PALM TRAN, INC. AMALGAMATED          :
TRANSIT UNION LOCAL 1577             :
PENSION PLAN, Individually and On    :
Behalf of All Others Similarly Situated,  :
                                     :
                Plaintiff,           :   Case No.:
                                     :   2:20-cv-12698-LVP-EAS
        v.                           :
                                     :   Hon. Linda V. Parker
CREDIT ACCEPTANCE                    :
CORPORATION, BRETT A. ROBERTS,       :
and KENNETH S. BOOTH,                :
                                     :
                Defendants.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO
<u>DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT</u>**

## STATEMENT OF ISSUES PRESENTED

1. Should the Court dismiss the claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder, because Plaintiffs' Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 31, PageID.432-519 (the "AC")) fails to allege with particularity facts showing any material misstatement or omission, including because (i) the AC does not allege that any statement was false when made, (ii) the alleged misrepresentations are non-actionable corporate puffery and (iii) the AC fails to identify a duty to disclose any allegedly omitted information?

   Defendants say:  YES.

2. Should the Court dismiss the claims under Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder, because the AC fails to state with particularity facts giving rise to a strong inference of scienter that is cogent and at least as compelling as any opposing inference of nonfraudulent intent?

   Defendants say:  YES.

3. Should the Court dismiss the claims under Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder, because the AC fails to allege a causal connection between the alleged misrepresentations and omissions and the alleged loss?

   Defendants say:  YES.

4. Should the Court dismiss the claims under Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c), promulgated thereunder, because the AC fails to plead with the requisite particularity any common plan, fraudulent scheme or unlawful course of conduct that was intended to deceive the investing public?

   Defendants say:  YES.

5. Should the Court dismiss the "control person" claims under Section 20(a) of the Exchange Act because the AC does not sufficiently allege facts establishing any underlying violation of the federal securities laws?

   Defendants say:  YES.

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

15 U.S.C. § 78u-4

Fed. R. Civ. P. 9(b)

*Benzon v. Morgan Stanley Distributors, Inc.*,
> 420 F.3d 598 (6th Cir. 2005)

*Bovee v. Coopers & Lybrand C.P.A.*,
> 272 F.3d 356 (6th Cir. 2001)

*Byrd v. ViSalus, Inc.*,
> No. 17-cv-12626,
> 2018 WL 1637948 (E.D. Mich. Apr. 5, 2018) (Leitman, J.)

*City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*
> 752 F.3d 173 (2d Cir. 2014)

*In re Credit Acceptance Corp. Securities Litigation*,
> 50 F. Supp. 2d 662 (E.D. Mich. 1999) (Edmunds, J.)

*Doshi v. General Cable Corp.*,
> 823 F.3d 1032 (6th Cir. 2016)

*Dura Pharmaceuticals, Inc. v. Broudo*,
> 544 U.S. 336 (2005)

*In re Ford Motor Co. Securities Litigation*,
> 381 F.3d 563 (6th Cir. 2004)

*Indiana State District Council of Laborers & HOD Carriers Pension & Welfare Fund v. Omnicare, Inc.*,
> 583 F.3d 935 (6th Cir. 2009)

*In re KBC Asset Management N.V.*,
> 572 F. App'x 356 (6th Cir. 2014)

*Konkol v. Diebold, Inc.*,
    590 F.3d 390, 401 (6th Cir. 2009),
    *abrogated in part on other grounds by*
    *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011).

*Lubbers v. Flagstar Bancorp Inc.*,
    162 F. Supp. 3d 571 (E.D. Mich. 2016) (Friedman, J.)

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015)

*In re Omnicare, Inc. Securities Litigation*,
    769 F.3d 455 (6th Cir. 2014)

*In re Sofamor Danek Group, Inc.*,
    123 F.3d 394 (6th Cir. 1997)

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)

*In re United American Healthcare*,
    No. 2:05-CV-72112 (LPZ/RSW),
    2007 WL 313491 (E.D. Mich. Jan. 30, 2007) (Zatkoff, J.), *aff'd sub nom.*
    *Zaluski v. United American Healthcare Corp.*, 527 F.3d 564 (6th Cir. 2008)

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019)

*Zaluski v. United American Healthcare Corp.*,
    527 F.3d 564 (6th Cir. 2008)

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ vii

PRELIMINARY STATEMENT ......................................................... 1

FACTUAL BACKGROUND .............................................................. 5

    A.    CAC and the Individual Defendants ................................. 5

    B.    CAC's Extensive Disclosures During the Putative Class Period .......... 6

        1.    CAC Fully Discloses Its Regulatory Risk ................................. 6

        2.    CAC Fully Discloses All Ongoing Regulatory Matters ............ 8

        3.    The Market Was Fully Apprised of CAC's Regulatory Risk ....................................... 11

        4.    CAC Timely Discloses the Filing of the MA AGO's Lawsuit ............................................... 12

    C.    Plaintiffs File This Action ................................................... 12

    D.    CAC Vigorously Contests the MA AGO's Lawsuit ........................... 12

    E.    CAC Settles the MA AGO's Lawsuit ................................................. 13

ARGUMENT ...................................................................................... 14

I.    The AC Must Be Analyzed Under Exacting Pleading Standards ................. 14

II.    Plaintiffs Fail to State a Claim Under Section 10(b) and Rule 10b-5 ........... 15

    A.    Plaintiffs Fail to Plead an Actionable Misstatement or Omission ...... 16

        1.    Plaintiffs Do Not Allege a Misrepresentation or Omission Concerning the Opportunity CAC Provides Consumers ......... 17

        2.    CAC's "Generic Risk Warnings" and Compliance Opinions Are Not Actionable ............................. 21

        3.    Plaintiffs' Quibbles with CAC's Descriptions of Its Collection Efforts and Ancillary Products Offerings .............. 28

B.    Plaintiffs' Attempt to Plead Scienter Fails as a Matter of Law ..........30

1.    Viewed Holistically, Plaintiffs Fail to Plead Scienter .............31

2.    Plaintiffs' Boilerplate Scienter Theories Fail ..........................35

C.    Plaintiffs Have Failed to Plead Loss Causation ..................................42

III.    Plaintiffs' Duplicative "Scheme
Liability" Claim Is Legally Insufficient ........................................................44

IV.    Plaintiffs Have Failed to State a Section 20(a) Claim...................................46

CONCLUSION ......................................................................................................46

# TABLE OF AUTHORITIES

## CASES

*Ashland, Inc. v. Oppenheimer & Co.*,
    648 F.3d 461 (6th Cir. 2011) ...........................................................................31

*In re Bank of America AIG Disclosure Securities Litigation*,
    980 F. Supp. 2d 564 (S.D.N.Y. 2013),
    *aff'd*, 566 F. App'x 93 (2d Cir. 2014) ...........................................................22

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)..........................................................................................43

*Benzon v. Morgan Stanley Distributors, Inc.*,
    420 F.3d 598 (6th Cir. 2005) ..........................................................21, 29, 45

*Bondali v. Yum! Brands, Inc.*,
    620 F. App'x 483 (6th Cir. 2015)....................................................18, 21, 26

*Bovee v. Coopers & Lybrand C.P.A.*,
    272 F.3d 356 (6th Cir. 2001) ...............................................................15, 23

*Byrd v. ViSalus, Inc.*,
    No. 17-cv-12626,
    2018 WL 1637948 (E.D. Mich. Apr. 5, 2018) .................................44, 45, 46

*Campbell v. Lexmark International Inc.*,
    234 F. Supp. 2d 680 (E.D. Ky. 2002)............................................................41

*In re Century Business Services Securities Litigation*,
    No. 1:99CV02200, 2002 WL 32254513 (N.D. Ohio June 27, 2002) ...........40

*City of Pontiac General Employees' Retirement System v. Stryker Corp.*,
    865 F. Supp. 2d 811 (W.D. Mich. 2012).................................................38, 39

*City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*7,
    52 F.3d 173 (2d Cir. 2014) .......................................................................3, 27

*In re Comshare Inc. Securities Litigation*,
    183 F.3d 542 (6th Cir. 1999) .................................................................14, 39

*In re Credit Acceptance Corp. Securities Litigation*,
    50 F. Supp. 2d 662 (E.D. Mich. 1999) .......................................15, 39, 41, 42

*Credit Acceptance Corp. v. Healey*,
    No. 20-11572-NMG, 2021 WL 2403810 (D. Mass. June 10, 2021) ...........13

*D.E. & J Ltd. Partnership v. Conaway*,
    284 F. Supp. 2d 719 (E.D. Mich. 2003),
    *aff'd*, 133 F. App'x 994 (6th Cir. 2005).........................................................37

*D.E. & J Ltd. Partnership v. Conaway*,
    133 F. App'x 994, 1000 (6th Cir. 2005).........................................................44

*In re Diebold Securities Litigation*,
    No. 5:05CV2873, 2008 WL 3927467 (N.D. Ohio Aug. 22, 2008),
    *aff'd sub nom. Konkol v. Diebold, Inc.*, 590 F.3d 390 (6th Cir. 2009) .........32

*Diehl v. Omega Protein Corp.*,
    339 F. Supp. 3d 153 (S.D.N.Y. 2018) ...........................................................26

*Doshi v. General Cable Corp.*,
    No. 2:14-cv-22 (WOB-CJS),
    2015 WL 366644 (E.D. Ky. Jan. 27, 2015),
    *aff'd*, 823 F.3d 1032 (6th Cir. 2016) ...........................................................37

*Doshi v. General Cable Corp.*,
    823 F.3d 1032 (6th Cir. 2016) ....................................................31, 32, 35, 46

*Doshi v. General Cable Corp.*,
    386 F. Supp. 3d 815 (E.D. Ky. 2019).....................................................36, 40

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005).......................................................................................44

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan
Chase Co.*, 553 F.3d 187 (2d Cir. 2009) ......................................................26

*In re EveryWare Global, Inc. Securities Litigation*,
    175 F. Supp. 3d 837 (S.D. Ohio 2016),
    *aff'd sub nom. IBEW Local No. 58 Annuity Fund
v. EveryWare Global, Inc.*, 849 F.3d 325 (6th Cir. 2017).............................34

*In re Federal-Mogul Corp. Securities Litigation*,
    166 F. Supp. 2d 559 (E.D. Mich. 2001) ........................................................36

*FindWhat Investor Group v. FindWhat.com*,
    658 F.3d 1282 (11th Cir. 2011) ....................................................................43

*In re Ford Motor Co. Securities Litigation*,
    381 F.3d 563 (6th Cir. 2004) ................................................................19, 26

*Gibbs v. Bank of America, N.A.*,
    No. 15-cv-10688, 2015 WL 4645009 (E.D. Mich. Aug. 5, 2015) ...........5, 15

*Gordon v. Royal Palm Real Estate Investment Fund I, LLLP*,
    No. 09-11770, 2020 WL 2836312 (E.D. Mich. May 31, 2020)....................44

*Grillo v. Tempur-Pedic International, Inc.*,
    553 F. Supp. 2d 809 (E.D. Ky. 2008).........................................................40

*Gruhn v. Tween Brands, Inc.*,
    No. 2:07-cv-852, 2009 WL 1542795 (S.D. Ohio June 2, 2009) ..................39

*In re Hertz Global Holdings Inc.*,
    905 F.3d 106 (3d Cir. 2018) .........................................................................42

*Hess v. American Physicians Capital Inc.*,
    No. 5:04-CV-31, 2005 WL 459638 (W.D. Mich. Jan. 11, 2005) ................37

*In re Huntington Bancshares Inc. Securities Litigation*,
    674 F. Supp. 2d 951 (S.D. Ohio 2009)..................................................34, 40

*I.B.E.W. Local 697 Pension Fund v. Ltd. Brands, Inc.*,
    788 F. Supp. 2d 609 (S.D. Ohio 2011)..................................................26, 40

*Indiana State District Council of Laborers &*
    *Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*,
    583 F.3d 935 (6th Cir. 2009) ..............................................................*passim*

*In re ITT Educational Services, Inc. Securities &*
    *Shareholder Derivatives Litigation*,
    859 F. Supp. 2d 572 (S.D.N.Y. 2012) ........................................................19

*In re KBC Asset Management N.V.*,
    572 F. App'x 356 (6th Cir. 2014).................................................................43

*Konkol v. Diebold, Inc.*,
        590 F.3d 390 (6th Cir. 2009) .................................................................*passim*

*Louisiana School Employees' Retirement System v. Ernst & Young, LLP*,
        622 F.3d 471 (6th Cir. 2010) .........................................................................35

*Lubbers v. Flagstar Bancorp. Inc.*,
        62 F. Supp. 3d 571 (E.D. Mich. 2016) ...................................................*passim*

*Massachusetts v. Credit Acceptance Corp.*,
        No. 2084CV01954-BLS2,
        2021 WL 1147444 (Mass. Super. Ct. Mar. 15, 2021) ...................................13

*Meyer v. Greene*,
        710 F.3d 1189 (11th Cir. 2013) ....................................................................44

*Nguyen v. Endologix, Inc.*,
        962 F.3d 405 (9th Cir. 2020) ...................................................................4, 32

*Norfolk County Retirement System v. Tempur-Pedic International, Inc.*,
        22 F. Supp. 3d 669 (E.D. Ky. 2014), *aff'd sub nom.*
        *Pension Fund Group v. Tempur-Pedic International, Inc.*,
        614 F. App'x 237 (6th Cir. 2015) .................................................................41

*In re Omnicare, Inc. Securities Litigation*,
        769 F.3d 455 (6th Cir. 2014) .................................................................*passim*

*Omnicare, Inc. v. Laborers District Council*
        *Construction Industry Pension Fund*,
        575 U.S. 175 (2015) ...............................................................................23, 24

*Pittman v. Unum Group*,
        No. 20-5710, 2021 WL 2646065 (6th Cir. June 28, 2021) ...........................32

*Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*,
        No. 20-3231, 2021 WL 3744894 (2d Cir. Aug. 25, 2021) ......................27, 45

*PR Diamonds, Inc. v. Chandler*,
        364 F.3d 671 (6th Cir. 2004) ..................................................................37, 39

*Santa Fe Industries, Inc. v. Green*,
        430 U.S. 462 (1977)......................................................................................27

*Silsby v. Icahn*,
  17 F. Supp. 3d 348 (S.D.N.Y. 2014), *aff'd sub nom.*
  *Lucas v. Icahn*, 616 F. App'x 448 (2d Cir. 2015) ........................................33

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019) ...........................................................................1

*Stein v. U.S. Express Enters., Inc.*,
  No. 1:19-cv-98, 2020 WL 3584800 (E.D. Tenn. June 30, 2020)..................36

*In re Sofamor Danek Group, Inc.*,
  123 F.3d 394 (6th Cir. 1997) ...................................................................16, 26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).............................................................................*passim*

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016) .........................................................................24

*In re United American Healthcare Corp. Securities Litigation*,
  No. 2:05-CV-72112 (LPZ/RSW),
  2007 WL 313491 (E.D. Mich. Jan. 30, 2007),
  *aff'd sub nom. Zaluski v. United American Healthcare Corp.*,
  527 F.3d 564 (6th Cir. 2008) ...................................................................27, 28

*USM Holdings Inc. v. Simon*,
  No. 15-14251, 2016 WL 4396061 (E.D. Mich. Aug. 18, 2016) ..................30

*USM Holdings, Inc. v. Simon*,
  No. 15-14251, 2017 WL 4005939 (E.D. Mich. Sept. 12, 2017)..................33

*Veal v. LendingClub Corp.*,
  423 F. Supp. 3d 785 (N.D. Cal. 2019)....................................................20, 28

*West Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
  495 F. Supp. 3d 622 (N.D. Ill. 2020)............................................................23

*Younger v. Harris*,
  401 U.S. 37 (1971).........................................................................................13

*Zaluski v. United American Healthcare Corp.*,
  527 F.3d 564 (6th Cir. 2008) ...................................................................20, 30

**STATUTES**

15 U.S.C. § 78u-4...............................................................................16, 22, 30

## PRELIMINARY STATEMENT

Plaintiffs[1] impermissibly attempt to manufacture a securities fraud claim out of nothing more than the announcement of a consumer protection complaint (the "MA Complaint") filed by the Massachusetts Attorney General's Office ("MA AGO") on the last day of the alleged Class Period.  In support, Plaintiffs merely parrot the MA AGO's allegations of purported unfair practices in Massachusetts and collect a variety of vague and unremarkable statements issued by CAC over a multi-year period.  Unfortunately for Plaintiffs, the Sixth Circuit has squarely rejected attempts to "[s]eiz[e] on a few vague statements from management [to] try to turn bad corporate news into a securities class action," concluding that the Private Securities Litigation Reform Act of 1995 ("PSLRA") "forbids such alchemy."  *Ind. State Dist. Council of Laborers & HOD Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 938 (6th Cir. 2009) ("*ISDC*"); *see also Singh v. Cigna Corp.*, 918 F.3d 57, 59-60 (2d Cir. 2019) (rejecting "creative attempt to recast corporate mismanagement as securities fraud" by "attempt[ing] to rel[y] on a simple equation:  first, point

---

[1] As used herein, "Plaintiffs" refers to Lead Plaintiffs Ontario Provincial Council of Carpenters' Pension Trust Fund and Millwright Regional Counsel of Ontario Pension Trust Fund, "Individual Defendants" refers to Messrs. Roberts and Booth and "Defendants" refers collectively to the Individual Defendants and Credit Acceptance Corporation ("CAC" or the "Company").  Plaintiffs' Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 31, PageID.432-519) is referred to herein as the "AC."  Unless otherwise stated, all emphasis is added and internal citations and quotation marks are omitted.

to banal and vague corporate statements affirming the importance of regulatory compliance; next, point to significant regulatory violations; and voila, you have a prima facie case of securities fraud!").

CAC is a national indirect auto finance company based in Southfield, Michigan.  Without CAC's financing programs, consumers are often unable to purchase vehicles, or they purchase unreliable ones.  CAC operates in a highly regulated consumer finance industry and is subject to routine regulatory oversight and scrutiny, including government investigations and, on occasion, enforcement proceedings.  To keep investors informed, CAC transparently discloses: (i) the various legal risks to which it is exposed, (ii) the various regulatory inquiries to which it is subject and (iii) the potential material adverse impact that these risks and inquiries could have on its business.  Plaintiffs' claim that these mere disclosures constitute securities fraud fails for several separate and independent reasons:

*First*, Plaintiffs have not alleged any facts—much less facts with particularity—showing that any of the statements made by CAC were false when made.  (*See infra* § II(A).)  Instead, Plaintiffs hinge their claims on (i) vague marketing statements of puffery and corporate optimism concerning the "opportunity" CAC provides to consumers to "improve their lives"; (ii) admittedly "generic" statements regarding CAC's regulatory risk and belief that it was operating in substantial compliance with applicable laws; and (iii) quibbles over CAC's description of its collection

2

call practices and the ancillary products that it makes available to car dealers for financing. (*See* AC ¶¶ 88-104.) Plaintiffs then assert, based on unadjudicated allegations in a single state-law complaint, that these unremarkable statements (mostly opinions) must have been false when made. But Plaintiffs do not explain how any of the statements were false, particularly in the context of CAC's robust disclosures.

Nor can Plaintiffs identify a duty to disclose anything more than CAC disclosed to investors. Courts routinely reject the notion that a company has a duty to opine on the outcome of pending regulatory proceedings or confess to unproven allegations of wrongdoing. *See ISDC*, 583 F.3d at 946 (no obligation to disclose "soft" information regarding legal compliance absent particularized allegations "that defendants knew their statements of 'legal compliance' were false when made"); *see also City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (rejecting argument that "defendants were required to disclose that UBS was, in fact, engaged in an ongoing tax evasion scheme" because "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing").

*Second*, Plaintiffs have not adequately pled scienter. (*See infra* § II(B).) In lieu of particularized facts to support an inference of scienter that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007), Plaintiffs offer sheer speculation and conjecture. Plaintiffs' theory of scienter also makes

3

no sense.  According to Plaintiffs, Defendants defrauded investors by disclosing in painstaking detail each regulatory investigation and material litigation involving CAC, including the MA AGO's investigation, as well as the attendant risks.  Then, while supposedly engaging in fraud to inflate the price of CAC's stock, both CAC and its CFO ***purchased*** many of those shares with full knowledge that they were trading at purportedly inflated prices.  And while Plaintiffs tout the fact that one of the Defendants (Mr. Roberts) sold a small portion of his CAC holdings during the Class Period, they conspicuously omit that his net holdings ***increased*** during that same period, and that the value of his holdings declined far more than the alleged gain that Plaintiffs selectively highlight in the AC.  Where, as here, an alleged inference of scienter lacks any "basis in logic or common experience," it should be rejected.  *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 408 (9th Cir. 2020).

*Third*, Plaintiffs' theory of loss causation is legally insufficient.  (*See infra* § II(C).)  The MA Complaint did not "correct" any prior statement, particularly given CAC already had disclosed that the MA AGO had expressed its belief that CAC may have engaged in violations of law during the putative Class Period.

*Finally*, Plaintiffs' "scheme liability" claim fails because, *inter alia*, the alleged "scheme" is wholly duplicative of Plaintiffs' disclosure-based claim, and thus is insufficient as a matter of law.  (*See infra* § III.)  Likewise, Plaintiffs' "control person" claim under Section 20(a) fails because the AC does not allege any primary

violation of the securities laws.  (*See infra* § IV.)

## FACTUAL BACKGROUND[2]

**A.    CAC and the Individual Defendants**

CAC is a Michigan-based, national indirect financing company operating in all 50 states that accepts assignment of retail installment contracts entered into between used car dealers and consumers for the purchase of vehicles ("Consumer Loans").  (*See* AC ¶ 28.)  Since its founding in 1972, CAC has offered financing programs that enable automobile dealers to sell vehicles to consumers who otherwise may be unable to purchase vehicles, or would purchase unreliable ones.  (*See id.* ¶ 90.)  Further, because CAC reports to the three national credit reporting agencies, "an important ancillary benefit of [its] programs is that [CAC] provides consumers with an opportunity to improve their lives by improving their credit score and move on to more traditional sources of financing."  (*Id.* ¶ 88.)

Both of the Individual Defendants are long-time CAC executives.  (*See, e.g.*, *id.* ¶¶ 84, 93.)  Mr. Roberts joined CAC in 1991 and became CAC's CEO in 2002.  (Ex. A at 2.)  Mr. Roberts served as CAC's CEO for 19 years, until his retirement

---

[2] The well-pleaded facts in the AC are accepted as true solely for purpose of this motion. *Tellabs*, 551 U.S. at 322.  But the Court need not accept conclusory allegations, nor those that are contradicted by documents incorporated by reference into the AC.  *See Gibbs v. Bank of Am., N.A.*, No. 15-cv-10688, 2015 WL 4645009, at *4 (E.D. Mich. Aug. 5, 2015) (Levy, J.) (collecting cases).  On a motion to dismiss, "courts must consider . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs*, 551 U.S. at 322.

on May 3, 2021.  (*See* AC ¶ 84.)  Mr. Booth joined CAC in 2004 and became CAC's CFO later that year.  (*See* Ex. A at 3.)  Mr. Booth remained CFO until he was elected and appointed to serve as CAC's CEO following Mr. Roberts's retirement.  (*See id.*)

**B.    CAC's Extensive Disclosures During the Putative Class Period**

### 1.    CAC Fully Discloses Its Regulatory Risk

The auto finance industry is heavily regulated, with comprehensive state and federal regimes governing virtually every facet of the industry.  (*See* AC ¶¶ 92-96; *see also* Ex. B at 11, 17, 21, 86.)  To ensure that investors fully appreciate the regulatory risk it faces, CAC regularly publishes robust disclosures around the issue.

To that end, the day before the start of the alleged Class Period, CAC explained in no uncertain terms that "'*[t]he regulation to which we are or may become subject could result in a material adverse effect on our business*;' and '*[l]itigation we are involved in from time to time may adversely affect our financial condition, results of operations and cash flows*.'"  (AC ¶ 92 (emphasis in original).)  "On the same day, Credit Acceptance filed its 1Q 2018 10-Q, which repeated verbatim the statements above" (*id.*), and contained an additional regulatory and litigation risk disclosure, only partially quoted by Plaintiffs in the AC:

> In the normal course of business and as a result of the consumer-oriented nature of the industry in which we operate, ***we and other industry participants are frequently subject to various consumer claims, litigation and regulatory investigations seeking damages, fines and statutory penalties***.  The claims allege, among other theories of liability, violations of state, federal and foreign ***truth-in-lending***, credit

availability, credit reporting, **consumer protection**, warranty, **debt collection**, insurance and other consumer-oriented laws and regulations, including claims seeking damages for alleged physical and mental harm relating to the repossession and sale of consumers' vehicles and other debt collection activities.  As the assignee of Consumer Loans originated by Dealers, we may also be named as a co-defendant in lawsuits filed by consumers principally against Dealers. . . .  **The damages, fines and penalties that may be claimed . . . in these types of matters can be substantial.**  The relief requested by plaintiffs varies but may include requests for compensatory, statutory and punitive damages and injunctive relief, and plaintiffs may seek treatment as purported class actions. **An adverse ultimate disposition in any action to which we are a party or otherwise subject could have a material adverse impact on our financial position, liquidity and results of operations**.

(Ex. C at 36.)  Plaintiffs acknowledge (as they must) that CAC reiterated this risk disclosure throughout the alleged Class Period.  (*See* AC ¶ 92.)

This was far from the only disclosure CAC made concerning the regulatory risks inherent in its business.  For example, CAC's Annual Report for the year ending 2018 contained detailed disclosures regarding the regulatory landscape and the effect that new or changing laws or regulations could have on CAC's business:

Our business is subject to laws and regulations, including the Truth in Lending Act, the Equal Credit Opportunity Act, the Fair Credit Reporting Act and various other state and federal laws and regulations.  These laws and regulations, among other things, require licensing and qualification; limit interest rates, fees and other charges associated with the Consumer Loans assigned to us; require specified disclosures by Dealers to consumers; govern the sale and terms of ancillary products; and define the rights to repossess and sell collateral.  **Failure to comply with these laws or regulations could have a material adverse effect on us by, among other things, limiting the jurisdictions in which we may operate, restricting our ability to realize the value of the collateral securing the Consumer Loans, making it more costly or burdensome to do business or resulting in potential liability.  The volume of new or**

> ***modified laws and regulations has increased in recent years and has increased significantly in response to issues arising with respect to consumer lending.*** From time to time, legislation and regulations are enacted which increase the cost of doing business, limit or expand permissible activities or affect the competitive balance among financial services providers. Proposals to change the laws and regulations governing operations and taxation of financial institutions and financial services providers are frequently made in the U.S. Congress, in the state legislatures and by various regulatory agencies. ***This legislation may change our operating environment in substantial and unpredictable ways and may have a material adverse effect on our business.***

(Ex. D at 11.)  While omitted from the AC, CAC explained: "[S]tate attorneys general and state regulators have authority under their respective rules and laws to investigate and/or regulate aspects of the business. . . .  ***We expect that regulatory investigations by both state and federal agencies will continue and that the results of these investigations could have a material adverse impact on us***."  (*Id.*)  These robust disclosures were also included in the Company's 2019 Annual Report.  (*See* AC ¶ 98; *see also* Ex. B at 11-12, 16-17.)

### 2.     CAC Fully Discloses All Ongoing Regulatory Matters

CAC's disclosures are not limited to detailed discussion of the regulatory risks to which it (and its investors) are exposed.  CAC also discloses in every quarterly filing the current status of any significant litigation to which it is a party and any material developments in ongoing regulatory investigations.  (*See* AC ¶ 133.)

Almost 3.5 years before the start of the putative Class Period, on December 12, 2014, CAC timely disclosed that it had received a civil investigative demand

from the MA AGO "relating to the origination and collection of non-prime loans in Massachusetts," and that it "intends to cooperate with the[] inquir[y]."  (Ex. E at 2.)

In the Form 10-Q filed the day before the beginning of the alleged Class Period, CAC disclosed the status of numerous ongoing regulatory investigations. These disclosures included, among others, the current status of ongoing investigations by the MA AGO, the Attorneys General of the States of Mississippi, Maryland and New York, the Bureau's Office of Fair Lending and Equal Opportunity, the Federal Trade Commission and the U.S. Department of Justice.  (*See* Ex. C at 36-37.)  CAC further advised that it could not predict the scope, duration or outcome of these matters, and that an adverse ultimate disposition in any matter could have a material adverse impact on its business.  (*See id.*)

Throughout the putative Class Period, CAC timely updated these disclosures with developments to existing matters and new matters.  (*See* AC ¶ 133.)  Among these developments, CAC provided additional details as the MA AGO's investigation progressed, including that the MA AGO had conveyed its belief that CAC may have engaged in unfair and deceptive acts or practices in violation of law:

- [February 2, 2018:]  [W]e received a second civil investigation demand from the [MA AGO] seeking updated information on its original civil investigation demand . . . , additional information related to the Company's origination and collection of consumer loans, and information regarding securitization activities.  (Ex. F at 2.)

- [January 30, 2019:]  *[W]e were informed by representatives of the [MA AGO] that it believes that the Company may have engaged in unfair*

**and deceptive acts or practices related to the origination and collection of auto loans**, which may have caused some of the Company's representations and warranties contained in securitization documents to be inaccurate. The investigation relating to the origination, collection and securitization of non-prime loans and securities transactions by the [MA AGO] remains ongoing. (Ex. G at 2.)

- [July 31, 2020:] [W]e received a third civil investigative demand from the [MA AGO] seeking updates on previously produced data and additional information related to the Company's origination of Consumer Loans. (Ex. H at 42.)

CAC informed investors of the current status of the MA AGO's investigation in every quarterly filing during the Class Period.[3] Each time, CAC stated that it was "cooperating with the inquiry" and warned that it "cannot predict the eventual scope, duration or outcome [of the investigation] at this time." (*E.g.*, Ex. B at 87.)

CAC disclosed during the Class Period that other regulators had expressed that CAC may have violated applicable laws. For example, CAC disclosed that, "on April 10, 2018, we were informed by the New York Department of Financial Services [('DFS')] . . . that it believes that the Company may have violated the law relating to fair lending . . . ." (Ex. C at 36-37.) On April 29, 2019, CAC disclosed:

> On April 23, the Attorney General of the State of Mississippi . . . filed a complaint in the Chancery Court of the First Judicial District of Hinds County, Mississippi, alleging that the Company engaged in unfair and deceptive trade practices in subprime auto lending, loan servicing, vehicle repossession and debt collection in the State of Mississippi[.]

(Ex. I at 38.) Critically, Plaintiffs do not allege that any of these robust disclosures

---

[3] (*See, e.g.*, Ex. D at 12, 91; Ex. I at 39; Ex. B at 12, 87; Ex. H at 42.)

omitted material developments during the putative Class Period.

### 3. The Market Was Fully Apprised of CAC's Regulatory Risk

In the context of the detailed disclosure of regulatory risks and ongoing regulatory matters facing CAC, the Company disclosed: "*We believe that we* maintain all material licenses and permits required for our current operations and *are in substantial compliance with all applicable laws and regulations*." (AC ¶ 97 (citing 2018 Annual Report); *see also* Ex. B at 12 (2019 Annual Report) (same).) In no sense was this statement a guarantee of regulatory compliance. Indeed, at the time CAC filed the 2019 Annual Report, CAC had already disclosed that the Mississippi Attorney General had filed suit challenging certain of CAC's business practices in that state and the MA AGO and New York DFS had indicated their beliefs that the Company may have violated the law. (*See* Ex. C at 36-37; Ex. G at 2; Ex. I at 38.)

As reflected in various analyst reports throughout the alleged Class Period, the market was well aware of the investment risk posed by CAC's regulatory oversight and followed developments closely, including developments in the MA AGO's investigation and the associated investment risk.[4]

---

[4] (*See, e.g.*, Ex. J at 2 ("[S]ince 2014, the company has received inquiries or subpoenas from the DOJ, FTC, CFPB, and Attorneys General of NY, MD, MA and MS. . . . However, to date, there has not been a notable progress or material impact to the company's business."); Ex. K at 2 ("[T]he company provided an update on two separate state investigations that have been underway for several years. The attorney general offices in both Mississippi and Massachusetts notified the company that, based on their findings thus far, it may have violated state lending laws.").)

### 4.   CAC Timely Discloses the Filing of the MA AGO's Lawsuit

As with all material regulatory and litigation developments, on September 2,

2020, CAC promptly disclosed the lawsuit filed by the MA AGO:

> On August 30, 2020, we were served with a complaint, filed by the [MA AGO] in Massachusetts Superior Court in Suffolk County, alleging that the Company engaged in unfair and deceptive trade practices in sub-prime auto lending, debt collection and asset-backed securitizations in the Commonwealth of Massachusetts, in violation of the Massachusetts Consumer Protection Law, M.G.L. c. 93A.  The complaint seeks in-junctive relief, restitution, disgorgement, civil penalties, and payment of the Commonwealth's attorney's fees and costs.  We cannot predict the duration or outcome of this lawsuit at this time.  As a result, we are unable to estimate the reasonably possible loss or range of reasonably possible loss arising from this lawsuit.  The Company intends to vigor-ously defend itself in this matter.

(Ex. L at 2; *see also* AC ¶ 33.)

### C.   Plaintiffs File This Action

This action was initiated just one month after the MA AGO commenced its

lawsuit, opportunistically seeking to capitalize on a drop in CAC's stock price.  (*See*

ECF No. 1, PageID.1-42.)  While the AC focuses on CAC's Massachusetts opera-

tions (*see* AC ¶ 33), only a very small percentage of CAC's business is Massachu-

setts-based.  (*See* Ex. B at 10 (disclosing Massachusetts as one of 45 states compris-

ing 66.7% of CAC's business with none of them accounting for more than 5%).)

### D.   CAC Vigorously Contests the MA AGO's Lawsuit

CAC consistently expressed its intent to "vigorously defend itself" in the MA

AGO's lawsuit (Ex. L at 2; Ex. M at 13), and maintained its belief that it is (and was)

"in substantial compliance with all applicable laws and regulations." (Ex. M at 93.) CAC also commenced an action in federal court challenging the constitutionality of a Massachusetts regulation prohibiting certain debt collection communications that the MA AGO had threatened to enforce. *See Credit Acceptance Corp. v. Healey*, No. 20-11572, 2021 WL 2403810, at *1 (D. Mass. June 10, 2021).[5]

As part of its defense, CAC moved to dismiss four of the MA AGO's seven claims, and then vigorously opposed the MA AGO's motion for partial summary judgment on three of its claims concerning a Massachusetts collection call regulation and Massachusetts statutory notice requirements. *See Massachusetts v. Credit Acceptance Corp.*, No. 2084CV01954-BLS2, 2021 WL 1147444, at *1 (Mass. Super. Ct. Mar. 15, 2021). CAC opposed the MA AGO's motion because, *inter alia*: (i) the MA AGO's claims were barred by the First Amendment and the Due Process Clause of the U.S. Constitution, (ii) the claims exceeded the MA AGO's authority and (iii) the MA AGO failed to carry its burden. *Id.* On March 15, 2021—long after the close of the Class Period—the state court entered an order denying CAC's motion, and granting in part and denying in part the MA AGO's motion. *See id.* at *18.

## E.   CAC Settles the MA AGO's Lawsuit

On April 29, 2021, CAC announced an agreement in principle with the MA

---

[5] Although the federal court ultimately dismissed CAC's complaint on *Younger* abstention grounds, the court "recognize[d] that enforcement of the Regulation raises legitimate First Amendment concerns." *Healey*, 2021 WL 2403810, at *4.

AGO to settle the lawsuit, and disclosed that it "estimated a probable loss of $27.2 million, all of which was recognized as a contingent loss during the first quarter of 2021." (*Id.*)  On August 31, 2021, CAC entered into a formal settlement agreement, pursuant to which CAC made no admission of liability.  (*See* Ex. N at 2.)

## ARGUMENT

## I.   The AC Must Be Analyzed Under Exacting Pleading Standards

Unlike an "ordinary civil action," federal securities actions are subject to an "[e]xacting" set of heightened pleading standards "[d]esigned to curb perceived abuses of the § 10(b) private action—'nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers.'" *Tellabs*, 551 U.S. at 319-20.  Allegations of securities fraud must satisfy the requirements of Rule 9(b), which requires a plaintiff to state "the circumstances constituting fraud . . . with particularity." *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 548 (6th Cir. 1999).  "[T]he plaintiff, at a minimum, must allege the time, place, and content of the alleged misrepresentation; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Lubbers v. Flagstar Bancorp. Inc.*, 162 F. Supp. 3d 571, 576 (E.D. Mich. 2016) (Friedman, J.) (cleaned up).

"[T]he PSLRA imposes further pleading requirements," *ISDC*, 583 F.3d at 943, which the Sixth Circuit has described as an "elephant-sized boulder blocking [securities claims]." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 461 (6th Cir.

2014).  "The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'"  *Tellabs*, 551 U.S. at 313.

Finally, although the Court must "accept all factual allegations in the complaint as true," the Court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference and matters of which a court may take judicial notice," *Tellabs*, 551 U.S. at 322, including "the full text of SEC filings, prospectus, analysts' reports and statements 'integral to the complaint,' even if not attached."  *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360-61 (6th Cir. 2001).  A document that is incorporated by reference, *i.e.*, one that is "referred to in the plaintiff's complaint and [] central to [the plaintiff's] claim," is "considered part of the pleadings."  *In re Credit Acceptance Corp. Sec. Litig.*, 50 F. Supp. 2d 662, 669 (E.D. Mich. 1999) (Edmunds, J.).  The Court may "not accept [P]laintiffs' allegations as true when they are contradicted by the actual documents central to [P]laintiffs' claims."  *Gibbs*, 2015 WL 4645009, at *4 (collecting cases).

## II.  <u>Plaintiffs Fail to State a Claim Under Section 10(b) and Rule 10b-5</u>

To state a claim under Section 10(b) and Rule 10b-5 promulgated thereunder, a plaintiff must adequately allege:  (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance;

(5) economic loss; and (6) loss causation.  *See ISDC*, 583 F.3d at 942.  Here, Plaintiffs have failed to allege a misrepresentation or omission, scienter or loss causation.

## A.   <u>Plaintiffs Fail to Plead an Actionable Misstatement or Omission</u>

As an initial matter, Plaintiffs fall woefully short of pleading an actionable misstatement or omission.  To plead an actionable misstatement, "plaintiffs must identify each misleading or false statement and explain how it is misleading."  *Omnicare*, 769 F.3d at 461; *see also* 15 U.S.C. § 78u-4(b)(1).  Similarly, to plead an actionable omission, a plaintiff must allege that "there was a prior statement of material fact that is false, inaccurate, incomplete or misleading in light of the undisclosed information."  *Lubbers*, 162 F. Supp. 3d at 577.[6]

Consistent with their efforts to turn a Massachusetts consumer protection complaint into a national securities fraud class action, Plaintiffs devote the overwhelming majority of the AC to rehashing the allegations in the MA Complaint.  Next, Plaintiffs collect generic and benign statements made throughout the Class Period—including marketing statements, routine risk disclosures and other statements of opinion.  Then, Plaintiffs conflate the concepts of misstatement and

---

[6] "Before liability for non-disclosure can attach, the defendant must have violated an affirmative duty of disclosure."  *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 400 (6th Cir. 1997).  Plaintiffs do not allege any affirmative duty of disclosure, and instead appear to allege only that disclosure was necessary to make the alleged statements not misleading.  (*See* AC ¶¶ 12, 91, 100, 102, 104.)

16

omission, and baldly assert that the statements were false because "Defendants failed to disclose that [CAC] was violating the law." (*E.g.*, AC ¶ 91.)[7]  The PSLRA "forbids such alchemy," *ISDC*, 583 F.3d at 938, and Plaintiffs' tactics should be rejected.

### 1. Plaintiffs Do Not Allege a Misrepresentation or Omission Concerning the Opportunity CAC Provides Consumers

First, Plaintiffs allege that CAC misled investors when it stated that it "provide[s] consumers with an opportunity to improve their lives by improving their credit score and move on to traditional sources of financing," and explained to consumers in a "blog post" that "[t]he dealer will work with you to understand the type of vehicle you want, as well as work with your budget, to structure a contract that meets your needs." (AC ¶¶ 88-89; *see also id.* ¶ 90.)  Plaintiffs assert that these statements were false because CAC "was violating the law," "thereby rending illusory the purported 'opportunity' and 'benefit' provided." (*Id.* ¶ 91.)

### (a) *Plaintiffs Have Not Alleged Falsity*

Plaintiffs do not plead any particularized facts demonstrating these statements were false when made, *i.e.*, that CAC did not provide consumers with the stated opportunity or that consumers cannot improve their credit score by making on-time

---

[7] Plaintiffs also compile a list of CW allegations from unidentified low-level employees, purportedly to "corroborate" that some of CAC's business practices are what the MA AGO alleged them to be. (*See* AC ¶¶ 41, 47, 57-58, 65.)  But none of these supposedly corroborating facts even suggests that any of CAC's business practices were unlawful, much less that any of CAC's statements were false when made.

payments.  *See Omnicare*, 769 F.3d at 478 (plaintiffs must "allege[] facts that, if proven, would support findings that these statements . . . were objectively false or misleading").  In fact, the AC makes several assertions of fact to suggest that CAC *did* provide such an opportunity, including allegations that some customers "were current for the entire term of their loans."  (AC ¶ 37.)  This disproves any suggestion that these statements were false when made.  *See Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 489 (6th Cir. 2015) (rejecting allegations that defendant did not require suppliers to adhere to protocols where, "[i]n fact, the amended complaint [made] several assertions of fact to suggest that [defendant] *did* impose such requirements" (emphasis in original)).  The fact that other customers may have "missed at least one payment and/or were delinquent at some point during the terms of their loans" does not mean that CAC did not provide its customers an "opportunity to improve [their] credit score" (AC ¶ 37), and "it is not reasonable to interpret [CAC's] statements as a guarantee" that its customers "would, in all instances," improve their lives by improving their credit scores.  *Bondali*, 620 F. App'x at 489.

Moreover, there is nothing misleading about the "opportunity" that CAC states it provides.  *See Lubbers*, 162 F. Supp. 3d at 578 ("Courts must look to the context in which statements are made to determine whether an omission renders prior statements misleading.").  CAC explained precisely what it meant by the statement in the documents from which Plaintiffs selectively quote:  Because CAC

"report[s] to the three national credit reporting agencies," the Company "provide[s] consumers with an opportunity to improve their lives by improving their credit score and move on to more traditional sources of financing" by making on-time payments on their Consumer Loans.  (Ex. O at 13; *see also* AC ¶¶ 88-90.)

### (b)   The Alleged Statements Are Inactionable Puffery

In any event, these statements regarding the "*opportunity*" CAC provides are the very type of "generalized statements of optimism that are not capable of objective verification" and, "thus, are not material, even if they were misleading."  *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004); *see also ISDC*, 583 F.3d at 943 ("[L]iability does not attach to mere corporate puffery or statements of corporate optimism.").  CAC's "vague" and "loosely optimistic" statements "fall squarely within this realm of corporate puffery" and thus are inactionable as a matter of law.  *ISDC*, 583 F.3d at 944; *see also In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 580 (S.D.N.Y. 2012) (statement that "[o]ur single internal focus continues to be . . . helping our students improve their lives through high quality career-based education" was "typical corporate puffery").

### (c)   Plaintiffs Have Not Alleged an Actionable Omission

Contrary to Plaintiffs' suggestion, the challenged statements are not rendered misleading by omission, as there is no nexus between the alleged omission (i.e., the failure to disclose purported legal violations) and the statements that CAC provides

an opportunity to improve consumers' credit.  *See Lubbers*, 162 F. Supp. 3d at 580 ("To constitute an omission there must be a relationship between the omission and the statement itself.").  As such, Plaintiffs' omission theory fails.  *See id.* ("Because there is no relationship, it was not necessary for Flagstar to disclose [allegedly omitted information] 'in order to make the statements made, in light of the circumstances under which they were made, not misleading.'" (quoting 17 C.F.R. § 240.10b-5)).

### (d)  *Plaintiffs Do Not Allege That <u>Investors</u> Were Misled*

In any event, the AC at most alleges that such statements were misleading to *consumers*. (*See* AC ¶¶ 2, 37.)  But to state a claim for securities fraud, "Plaintiffs must allege that *investors* were misled."  *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 812 (N.D. Cal. 2019) (emphasis in original); *see also Zaluski v. United Am. Healthcare Corp. Sec. Litig.*, 527 F.3d 564, 571 (6th Cir. 2008) (focusing on "the significance the reasonable *investor* would place on the withheld or misrepresented information'").  CAC fully disclosed to *investors* that "[s]ubstantially all of the Consumer Loans assigned to [it] are made to individuals with impaired or limited credit histories or higher debt-to-income ratios than are permitted by traditional lenders," and thus "generally entail a higher risk of delinquency, default and repossession and higher losses than loans made to consumers with better credit."  (*E.g.*, Ex. B at 13.)  CAC likewise disclosed to its *investors* that it expects to collect less than 100% of the payments owed on its Consumer Loans, and that, for Consumer Loans originated

between 2010 and 2019, CAC expects to collect, on average for each year, between 64.0% and 73.6% of the repayments that CAC was contractually owed on the Consumer Loans at the time of assignment.  (*Id.* at 25-28; AC ¶¶ 30, 35, 37.)

### 2. CAC's "Generic Risk Warnings" and Compliance Opinions Are Not Actionable

Second, Plaintiffs assert that CAC's "generic risk warnings" and stated belief that it was in "compliance with applicable regulations" (AC at 49 (subheading 2)) were false and misleading because CAC failed to disclose that it was "violating the law" (based on the MA AGO's unproven allegations), "thereby ensuring that the Company would be materially impacted by regulation and litigation."  (*Id.* ¶ 100.)

#### (a)  *Plaintiffs Have Not Alleged a Material Misstatement*

##### (i)  CAC's Robust Regulatory Risk Disclosures

Plaintiffs attempt to transform CAC's robust regulatory risk disclosures regarding regulation and litigation that "***could*** result in a material adverse effect on [the] business" into actionable misstatements by arguing that CAC's purported conduct (based on the MA AGO's unproven allegations) allegedly "ensur[ed] that [CAC ***would be*** materially impacted by regulation and litigation."  (*See id.* ¶¶ 92, 100; *see also id.* ¶¶ 92-96; *supra* at 6-8.)  But it is well settled that "cautionary statements are not actionable to the extent plaintiffs contend defendants should have disclosed risk factors 'are' affecting financial results rather than 'may' affect financial results."  *Bondali*, 620 F. App'x at 491; *see also Benzon v. Morgan Stanley Distribs.,*

*Inc.*, 420 F.3d 598, 612 (6th Cir. 2005) (rejecting as a "semantic quibble" argument that prospectus was misleading for disclosing that brokers ***may*** receive different compensation when brokers ***did*** earn more (emphasis in original)).

"No reasonable investor could interpret" CAC's thorough prospective regulatory risk disclosures "as negating the possibility" that CAC might ultimately be found by some regulatory body or court to have violated the law. *Lubbers*, 162 F. Supp. 3d at 581; *see also In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 579 (S.D.N.Y. 2013) (same), *aff'd*, 566 F. App'x 93 (2d Cir. 2014). And Plaintiffs do not allege that CAC was not facing regulatory risks that could have a material adverse effect on its business. Plaintiffs have failed to allege that CAC's risk disclosures were false or misleading when made. *See* 15 U.S.C. § 78u-4(b)(1).

(ii)      Opinions Regarding Legal Compliance

Plaintiffs also challenge CAC's statement that "[w]e believe that we . . . are in substantial compliance with all applicable laws and regulations." (AC ¶ 97.) But the Supreme Court has held in reviewing similar "legal compliance" statements that such "a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). Thus, to plead that such a statement is misleading, a plaintiff "must identify particular (and material) facts going to the basis for the issuer's opinion—

22

facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 194.[8]

Plaintiffs do not allege any particularized, contemporaneous facts going to the basis for CAC's opinion that it was in substantial compliance with all applicable laws. (*See infra* § II(B)(2)(b).)  Indeed, the AC does not (and cannot) allege that any court or other regulatory authority issued any decision or order concluding that CAC had violated *any* law during the Class Period.  *Cf. Omnicare*, 575 U.S. at 188-89.

Instead, Plaintiffs merely assert that because, on the last day of the Class Period, the MA AGO *alleged* that some of CAC's business practices violated Massachusetts law, Defendants' Class Period statements about legal compliance must have been false when made.  (*See* AC ¶ 116.)  These allegations fail as a matter of law. *See Bovee*, 272 F.3d at 361 ("Plaintiffs may not simply rely on the proposition that [d]efendants must have known . . . of, and participated in, the fraud.").

Moreover, as discussed above (*see supra* at 6-12), CAC fully explained the context for its stated beliefs, namely, that it operates in a highly regulated industry, faces regulatory risks as set forth in its robust disclosures and was cooperating with

---

[8] Although *Omnicare* addressed claims under Section 11 of the Securities Act of 1933, its reasoning applies with equal force to claims under Section 10(b) of the Exchange Act.  *See W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 648 (N.D. Ill. 2020) (collecting cases).

various regulatory investigations. *See Omnicare*, 575 U.S. at 196 ("[T]he analysis of whether Omnicare's opinion is misleading must address the statement's context. That means the court must take account of whatever facts Omnicare **did** provide about legal compliance, as well as any other hedges, disclaimers, or qualifications it included in its registration statement." (emphasis in original)); *see also Tongue v. Sanofi*, 816 F.3d 199, 211 (2d Cir. 2016) (ongoing dialogue between federal Food and Drug Administration and company "about the sufficiency of various aspects of the clinical trials" "did not prevent [d]efendants from expressing optimism . . . about the likelihood of drug approval" because investors were well aware and "would fully expect . . . that inherent in the nature of [that] dialogue [were] differing views").

      (iii)      <u>Statements About the Dealer Servicing Agreement</u>

Plaintiffs next mischaracterize CAC's statements about its relationship with dealers, alleging that CAC "stated repeatedly how [it], and its network of dealer-partners, comply with applicable state and federal laws and regulations, as well as underwriting guidelines set forth by the Company." (AC ¶ 96; *see id.* ¶ 97.) "A court must not 'pluck' disclosures out of their context and analyze their truth in a vacuum, but must look at the statements made in light of the circumstances and events that create the context in which they were made." *Lubbers*, 162 F. Supp. 3d at 578. Here, the context for the statements Plaintiffs selectively quote (in bolded and italicized font (*see* AC at n.15)) belies any suggestion of an actionable claim:

24

> Under the typical Dealer servicing agreement, **a Dealer represents** that it will only assign Consumer Loans to us that satisfy criteria established by us . . . ***and comply with applicable state and federal laws and regulations.*** . . . Through our Dealer Service Center, we perform all significant functions relating to the processing of the Consumer Loan applications and **bear certain costs of Consumer Loan assignment, including the cost of assessing** the adequacy of Consumer Loan documentation, ***compliance with underwriting and legal guidelines*** and the cost of verifying employment, residence and other information provided by the Dealer. ***We audit Consumer Loan files*** *for legal and underwriting guidelines on a daily basis in order to assess whether our Dealers are operating in accordance with the terms and conditions of our Dealer servicing agreement.*

(AC ¶ 96 (italics in original, underline emphasis added).)

Nowhere does the AC allege that (i) dealers do not make the above representation under the typical servicing agreement, (ii) CAC does not "bear . . . the cost of assessing . . . compliance with underwriting and legal guidelines"; or (iii) CAC does not "audit Consumer Loan files for legal and underwriting guidelines on a daily basis" to assess Dealer compliance with the servicing agreement. (*Id.*) Thus, Plaintiffs have failed to "explain why the statements were fraudulent." *ISDC*, 583 F.3d at 943.

### (iv)    Inactionable Puffery from Shareholder Letters

Finally, Plaintiffs challenge CAC's statements in its 2019 and 2020 Shareholder Letters that CAC "create[s] processes to enforce standards," "ensur[es] the loans [it] originate[s] meet [its] standards" and "use[s] these measures to make adjustments when necessary." (AC ¶ 99.) But the AC does not allege that CAC failed to create such processes, ensure loans met its standards or use measures to make

25

adjustments.  *See Bondali*, 620 F. App'x at 489-90; *see also I.B.E.W. Local 697 Pension Fund v. Ltd. Brands, Inc.*, 788 F. Supp. 2d 609, 634 (S.D. Ohio 2011) (no claim when statements were "unsupported by allegations of their falsity").  These statements are also classic inactionable puffery.  *See Ford*, 381 F.3d at 570-71; *see also ECA, Local 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009) (statements that company had "risk management processes [that] are highly disciplined and designed to preserve the integrity of the risk management process" and that it "set the standard for integrity" were puffery).

### (b)   *Plaintiffs Have Not Alleged an Actionable Omission*

In addition, Plaintiffs cannot establish that CAC's alleged failure to disclose that it was purportedly "violating the law" rendered any of the foregoing statements misleading.  (AC ¶ 100.)  The Sixth Circuit has expressly rejected the notion that a company has a "duty to opine about the legality of [its] own actions" because "[s]uch information is considered 'soft' and, therefore, disclosure is not required."  *ISDC*, 583 F.3d at 945; *see also Sofamor Danek*, 123 F.3d at 401-02 (no duty to disclose that company was "engaging in illegal promotion of its products" because such legality "was a matter of opinion" and not "virtually as certain as hard facts"); *accord Diehl v. Omega Protein Corp.*, 339 F. Supp. 3d 153, 164 (S.D.N.Y. 2018).

In *ISDC*, the Sixth Circuit affirmed dismissal of a securities claim alleging that a company "had a duty to disclose its involvement in 'illegal' activities" based

on its statement that, "[t]o the best of our knowledge, our purchases of pharmaceu-

ticals comply with all applicable laws and regulations." *Id.* at 941, 945-47.  The

court explained that "merely making a generic claim that they complied with the law

without providing ***any*** specifics" did not give rise to "a duty to disclose [the com-

pany's] 'illegal' operations." *Id.* at 946 (emphasis in original).  The same is true

with respect to the alleged violations of law here.

It bears emphasis that "[t]he anti-fraud provisions [of the federal securities

laws] were not intended to provide shareholders with an avenue for relief against

executives for alleged illegal practices or corporate mismanagement." *In re United*

*Am. Healthcare*, No. 2:05-CV-72112 (LPZ/RSW), 2007 WL 313491, at *14 (E.D.

Mich. Jan. 30, 2007) (Zatkoff, J.), *aff'd sub nom. Zaluski v. United Am. Healthcare*

*Corp.*, 527 F.3d 564 (6th Cir. 2008); *see also Santa Fe Indus., Inc. v. Green*, 430

U.S. 462, 479 (1977) ("Congress by s 10(b) did not seek to regulate transactions

which constitute no more than internal corporate mismanagement.").  Consequently,

corporations have no duty to confess to unproven allegations of wrongdoing.  *See*

*Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, No. 20-3231,

__ F.4d __, 2021 WL 3744894, at *4 (2d Cir. Aug. 25, 2021) ("[C]ompanies do not

have a duty to disclose uncharged, unadjudicated wrongdoing."); *City of Pontiac*,

752 F.3d at 184 (rejecting argument that "in addition to disclosing the existence of

an investigation, defendants were required to disclose that UBS was, in fact, engaged

in an ongoing tax evasion scheme" (cleaned up)); *LendingClub*, 423 F. Supp. 3d at

806 ("Defendants were not required to 'confess' to the [FTC's] uncharged allega-

tions . . . in the FTC's Complaint before it was filed").

Importantly, this is not a case where CAC is alleged to have sought to conceal

pending regulatory investigations or enforcement proceedings.  To the contrary,

CAC disclosed that the MA AGO and others were investigating the Company, and

provided regular updates throughout the Class Period.  (*See supra* at 8-11.)  The

securities laws require nothing further.  *See United Am. Healthcare*, 2007 WL

313491, at *12 ("[W]here there exists a good faith dispute as to facts or an alleged

legal violation, the law only requires disclosure of the dispute." (cleaned up)); *Lend-

ingClub*, 423 F. Supp. 3d at 809 (with disclosures "about the risks of the same vio-

lations FTC alleges **and** [of] the FTC Investigation," the alleged "omission of the

specific [allegations] in the FTC Action" was not misleading (emphasis in original)).

### 3. Plaintiffs' Quibbles with CAC's Descriptions of Its Collection Efforts and Ancillary Products Offerings

As to the third category of alleged misstatements, Plaintiffs attempt to boot-

strap allegations in the MA Complaint into a securities claim by distorting CAC's

statements about collection efforts and ancillary products.  (*See* AC ¶¶ 101-04.)

### (a)  CAC's Description of Its Collection Efforts

Piggybacking off of the MA AGO's allegation that CAC placed more collec-

tion calls than authorized by Massachusetts law, Plaintiffs allege that CAC falsely

28

stated that its "[c]ollection efforts typically consist of placing a call to the consumer within one day of the missed payment due date" because CAC "failed to disclose that [it] made more than one call to defaulting borrowers." (*Id.* ¶¶ 101-02.) Plaintiffs do not allege that this statement was false, *i.e.*, that CAC does not "plac[e] a call to the consumer within one day of the missed payment due date." (*Id.* ¶ 101.) And CAC did not state that it places only one collection call; rather, it stated that it typically places a call "within one day of the missed payment due date." (*Id.* ¶ 101.) In no sense can this statement be read as a guarantee that CAC makes only one call to customers who have missed a payment. This is precisely the type of "semantic quibbl[ing]" that has been rejected by the Sixth Circuit and courts in this District. *Benzon*, 420 F.3d at 612; *Lubbers*, 162 F. Supp. 3d at 579, 581.

### (b) *CAC's Description of Its Ancillary Product Offerings*

Based on the MA AGO's allegations that certain car dealers improperly told consumers that the purchase of a vehicle service contract ("VSC") was mandatory to obtain financing, Plaintiffs bizarrely assert that CAC misled investors when it disclosed in its 2018 10-K that CAC "***provide[s] Dealers the ability*** to offer [VSCs] to consumers." (AC ¶¶ 103-04.) As an initial matter, Plaintiffs do not—and cannot—allege that CAC does not provide Dealers the "ability" to offer these products. (*Id.* ¶ 103.) Thus, this theory fails. So too does the contention that CAC failed to disclose that it purportedly "required dealers to sell these addon products and/or

knew or was reckless in not knowing that these products were sold in violation of the law." (*Id.* ¶¶ 103-04.)  Plaintiffs identify no duty to disclose and fail to establish any relationship between (i) the alleged omission and (ii) the disclosure that CAC provides dealers the ability to offer products.  *See Lubbers*, 162 F. Supp. 3d at 580.[9]

## B.   Plaintiffs' Attempt to Plead Scienter Fails as a Matter of Law

The AC should be dismissed for the separate reason that Plaintiffs do not "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  This require-ment is "purposefully demanding," *Lubbers*, 162 F. Supp. 3d at 576, and is "not easily satisfied."  *Omnicare*, 769 F.3d at 461.  After considering the pleaded facts, the documents incorporated into the AC by reference and facts subject to judicial notice, the Court may "allow[] the complaint to go forward '***only*** if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference.'"  *Id.* (citing *Tellabs*, 551 U.S. at 324).

---

[9] Even assuming that the AC alleges a misstatement or omission (and it does not), the AC fails to allege a ***material*** misstatement or omission, as required to state a claim.  *See Zaluski*, 527 F.3d at 571.  The sole basis for the AC's threadbare legal conclusion that CAC was "violating the law" is CAC's alleged conduct in Massa-chusetts, which Plaintiffs have purported to "corroborate[]" with scattershot CW al-legations.  (AC ¶ 12; *see also id.* ¶¶ 33-40, 42-46, 48-56, 59-60, 61-64, 66-78.)  But CAC's Massachusetts operations comprise only a very small percentage of its busi-ness.  (*See supra* 12.)  It is well settled that quantitative differences of less than 5% are presumptively immaterial where, as here, Plaintiffs fail to plead any qualitative factors to rebut the presumption.  *See USM Holdings Inc. v. Simon*, No. 15-14251, 2016 WL 4396061, at *5 (E.D. Mich. Aug. 18, 2016) (Steeh, J.) (collecting cases).

### 1.    Viewed Holistically, Plaintiffs Fail to Plead Scienter

The Supreme Court has emphasized that "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 326.  Following *Tellabs*, the Sixth Circuit no longer "sort[s] through each allegation individually before concluding with a collective approach," and instead conducts an "entirely collective assessment" to determine whether "all of the facts alleged, ***taken collectively***, meet the PSLRA's requirements." *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 469-70 (6th Cir. 2011) (emphasis in original).

### (a)    *Plaintiffs Make No Attempt to Plead the* Helwig *Factors*

As part of its holistic analysis, the Sixth Circuit "considers a non-exhaustive list of nine factors." *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039-40 (6th Cir. 2016) (citing *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001)).[10]  Here, Plaintiffs allege ***only one*** of the nine factors, namely, an insider's stock sales, which, as discussed below, does not support an inference of scienter.  (*See infra*

---

[10] The nine factors are: (1) suspicious insider trading; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs. *See Doshi*, 823 F.3d at 1039-40.

§ II(B)(2)(c).) "[T]he absence of these factors [in the AC] indicates the absence of scienter." *In re Diebold Sec. Litig.*, No. 5:05CV2873, 2008 WL 3927467, at *7 (N.D. Ohio Aug. 22, 2008), *aff'd sub nom. Konkol v. Diebold, Inc.*, 590 F.3d 390 (6th Cir. 2009); *see also Doshi*, 823 F.3d at 1041-42 (two of nine factors insufficient to support inference of scienter); *Omnicare*, 769 F.3d at 484 (affirming dismissal when "each of the[] factors cut[] against finding an inference of scienter").

### (b) *Plaintiffs' Theory of Scienter Is Nonsensical*

Moreover, the inference advanced by Plaintiffs is nonsensical and lacks any "basis in logic or common experience." *Endologix*, 962 F.3d at 408. Under Plaintiffs' theory, CAC's top executives devised a plan in the first quarter of 2018 to mislead the market about the legality of the Company's business operations. (*See* AC ¶¶ 154, 159.) To carry out this plan, Defendants repeatedly disclosed to investors in painstaking detail the regulatory risks facing CAC. (*See id.* ¶¶ 92-98; *supra* at 6-12.) Defendants further "provide[d] updates to investors on pending regulatory investigations" throughout the alleged Class Period and warned that "an adverse ultimate disposition could . . . have a materially adverse impact on the Company and its operations." (AC ¶ 133; *see also supra* at 8-11.)

"This is 'hardly the sort of behavior one would expect from the perpetrator of securities fraud.'" *Pittman v. Unum Grp.*, No. 20-5710, 2021 WL 2646065, at *6 (6th Cir. June 28, 2021); *see Endologix*, 962 F.3d at 415 (where theory "does not

resonate in common experience," "the PSLRA neither allows nor requires [courts] to check [their] disbelief at the door"); *Silsby v. Icahn*, 17 F. Supp. 3d 348, 369-70 (S.D.N.Y. 2014) (disclosures about subject of securities fraud suit "weigh heavily against scienter"), *aff'd sub nom. Lucas v. Icahn*, 616 F. App'x 448 (2d Cir. 2015).

### (c)   *Plaintiffs Do Not Allege Known Falsity*

Where the core of Plaintiffs' claim is that Defendants omitted "soft" information (*i.e.,* legal noncompliance), they bear the heightened burden of "plead[ing] facts showing that the defendants ***knowingly*** misrepresented or omitted material facts to deceive, manipulate, or defraud the public." *Omnicare*, 769 F.3d at 472; *see ISDC*, 583 F.3d at 946 (complaint "fail[ed] to specifically [] allege that defendants ***knew*** their statements of 'legal compliance' were false when made"); *USM Holdings Inc. v. Simon*, No. 15-14251, 2017 WL 4005939, at *3 (E.D. Mich. Sept. 12, 2017) (Steeh, J.) ("[M]isrepresentations that concern soft information must satisfy a heightened scienter requirement:  knowledge, rather than mere recklessness.").

Unsurprisingly, Plaintiffs do not allege a single particularized fact showing that any Defendant made any statements "knowing they were false." *Omnicare*, 769 F.3d at 481.  While the AC contains a hodgepodge of allegations attributed to low-level CWs to attempt to "corroborate[]" certain allegations in the MA Complaint (*see* AC ¶¶ 41, 47, 57), "the majority of the [CWs] are not identified as having ***any*** contact or interaction with any of the Defendants." *Konkol v. Diebold, Inc.*, 590

F.3d 390, 401 (6th Cir. 2009), *abrogated in part on other grounds by Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011).  Indeed, not one of the CWs is alleged to have any less than three degrees of separation from the Individual Defendants in CAC's reporting structure.  (*See* AC ¶¶ 41 & nn.4-8, 57 & nn.9-13, 135 n.18.)[11]

At most, Plaintiffs' allegations show that the Individual Defendants had knowledge of CAC's ongoing regulatory investigations—knowledge that is apparent from and consistent with CAC's public disclosures.  (*See* AC ¶¶ 133, 135.)  But this hardly establishes that they knew that CAC was "violating the law" (*id.* ¶ 12) and intended to defraud the public about that fact.  *See In re EveryWare Global, Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 852 (S.D. Ohio 2016) ("The complaint must allege that the confidential witnesses were in a position 'to establish their basis of knowledge of the alleged misconduct ("what, when, where, and how") and they must establish that the defendants were aware of the misconduct.'"), *aff'd sub nom. IBEW Local*

---

[11] As for the two CWs even alleged to have seen either Individual Defendant in person—CW9 and CW10—those CWs are alleged only to have attended a "quarterly meeting" with "management" that ***post-dated*** the alleged Class Period and an unspecified "monthly town hall[]," during which the Individual Defendants provided general updates on ongoing investigations and litigations in a manner consistent with CAC's public disclosures.  (*See* AC ¶ 135.)  Thus, "[t]hese generalized statements cannot substitute for ***specific*** facts through which a factfinder can strongly infer that Defendants themselves ***knew***" that their Class Period statements were false.  *Konkol*, 590 F.3d at 401; *see also ISDC*, 583 F.3d at 945-46 ("complaint fail[ed] specifically to allege that defendants knew their statements of 'legal compliance' were false when made" when CW allegations did not "establish when the defendants were aware of the wrongdoing or, for that matter, when the wrongdoing was occurring").

*No. 58 Annuity Fund v. EveryWare Global, Inc.*, 859 F.3d 325 (6th Cir. 2017); *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 963 (S.D. Ohio 2009).

Without any particularized facts to support an inference of scienter, it becomes very plain that Plaintiffs' "allegations amount to impermissible fraud by hindsight." *Doshi*, 823 F.3d at 1044. At base, Plaintiffs contend that because the MA AGO filed suit on the last day of the Class Period, the Defendants must have known that their Class Period statements were false. This is insufficient to plead scienter as a matter of law. *See La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 484-85 (6th Cir. 2010) (dismissing "classic fraud by hindsight case" because "the fact that the statements later turned out to be false is irrelevant . . . under [the] PSLRA").

\*     \*     \*

The more compelling inference to be drawn from the AC is that the Defendants: (i) were aware of the intense regulatory environment in which CAC operates and doing their best to "operate in a highly compliant way" (AC ¶ 93), (ii) were cooperating with the various ongoing regulatory inquiries facing CAC and "vigorously defend[ing]" CAC in connection with pending litigation (*e.g.*, Ex. L at 2); and (iii) truly believed that CAC was "in substantial compliance with all applicable laws and regulations" (AC ¶ 97). Accordingly, the AC should be dismissed.

### 2.    Plaintiffs' Boilerplate Scienter Theories Fail

Plaintiffs proffer three specific theories for why the Individual Defendants

(and CAC by implication) acted with scienter. (*See id.* ¶¶ 128-47.) But none satisfies the "[e]xacting" pleading standard of the PSLRA. *Tellabs*, 551 U.S. at 313.

### (a) *Plaintiffs' "Core Operations" Theory Is Deficient*

First, Plaintiffs argue that the Individual Defendants' statements purportedly concern CAC's "core operations": the financing and servicing of Consumer Loans. (AC ¶¶ 128, 131.) However, the so-called "core operations" doctrine does not provide an independent basis for pleading scienter. *See Stein v. U.S. Express Enters., Inc.*, No. 1:19-cv-98, 2020 WL 3584800, at *37-38 & n.34 (E.D. Tenn. June 30, 2020) ("[T]he core operations presumption is highly fact-dependent, narrow, and, especially post-*Tellabs*, is but one consideration among many."). Rather, Plaintiffs must plead facts that "raise a strong inference that Defendants acted knowingly." *In re Federal-Mogul Corp. Sec. Litig.*, 166 F. Supp. 2d 559, 564 (E.D. Mich. 2001); *see also Doshi v. Gen. Cable Corp.*, 386 F. Supp. 3d 815, 838 (E.D. Ky. 2019) (core operations allegations "d[id] not establish" that company "actually knew [its] statements were false"). Even assuming that the Individual Defendants had intimate knowledge of every aspect of CAC's "operating condition" and "business practices," this does not mean they were experts in the "applicable laws" in each of the 50 states in which CAC operates (as well as federal law) (AC ¶ 131), much less that they "actually knew" that CAC's business practices were unlawful. *Doshi*, 386 F. Supp. 3d at 838; *see also Federal-Mogul Corp.*, 166 F. Supp. 2d at 564.

### (b)   Purported Information Access Does Not Show Scienter

Second, Plaintiffs assert that "the Individual Defendants, by virtue of their executive roles within the Company, were privy to and/or were given access to the data that demonstrated Credit Acceptance's predatory and illegal practices, as identified in the Massachusetts Attorney General's enforcement action."  (AC ¶ 137.) "It is well established that 'fraudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information.'" *Hess v. Am. Physicians Cap., Inc.*, No. 5:04-CV-31, 2005 WL 459638, at *11 (W.D. Mich. Jan. 11, 2005) (citing *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 688 (6th Cir. 2004)); *D.E. & J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 743 (E.D. Mich. 2003) (Rosen, J.) ("[C]ourts have routinely rejected the attempt to plead scienter based on allegations that because of the defendants' . . . positions, they had access to information concerning the company's adverse financial outlook."), *aff'd*, 133 F. App'x 994 (6th Cir. 2005).  Rather, a complaint "must allege specific facts or circumstances suggestive of their knowledge."  *PR Diamonds*, 364 F.3d at 688.

Here, Plaintiffs do not allege (i) what specific data or information any Individual Defendant actually reviewed, (ii) when they reviewed it or (iii) how that data or information showed that the statements challenged in the AC were false when made.  This prevents any inference of fraudulent intent.  *See, e.g., Doshi v. Gen. Cable Corp.*, No. 2:14-cv-22 (WOB-CJS), 2015 WL 366644, at *6 (E.D. Ky. Jan.

37

27, 2015) (rejecting "access to information" argument when plaintiffs "d[id] not specify any instance where [d]efendants gained relevant knowledge through these channels and disregarded it"), *aff'd*, 823 F.3d 1032 (6th Cir. 2016); *City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*, 865 F. Supp. 2d 811, 834 & n.9 (W.D. Mich. 2012) (no inference of scienter when plaintiffs "fail[ed] to allege the existence of any internal [company] documents that contradicted" their alleged misstatements and when none of the CWs could "testify as to what [d]efendants knew").[12]

### (c)   *The Alleged Stock Sales Do Not Demonstrate Scienter*

Finally, Plaintiffs rely on Mr. Roberts's sale of a small percentage of his stock holdings during the Class Period.  (AC ¶ 138.)  However, "for individual defendants'

---

[12]  Plaintiffs allege in conclusory fashion that "Defendants were aware of the information and data requested" by the regulatory authorities CAC disclosed were investigating the Company, as well as "the specific focus of the investigations, and the laws governing the specific conduct under investigation."  (AC ¶¶ 132-33.)  But allegations of awareness of CAC's ongoing regulatory investigations and the general regulatory landscape in which CAC operated are a far cry from pleading with particularity that the Individual Defendants knew that specific business practices violated specific laws during the alleged Class Period.

Plaintiffs also include a string of allegations purportedly sourced from unidentified low-level CWs to attempt to show what types of data and information about CAC's business practices may have been available to the Individual Defendants.  (*See id.* ¶ 137.)  But the allegations are used for nothing more than conclusory speculation about what information the Individual Defendants "*could [] have*" accessed.  (*Id.* (bullet 5); *see also, e.g., id.* (bullet 7 ("CW5 went on to say that *it would not surprise them* if the CEO and CFO had access to all of the collected data . . . .")).)  "When confidential sources are used to support 'vague and conclusory' allegations, the allegations are not 'accorded much weight.'"  *Konkol*, 590 F.3d at 399.

stock sales to raise an inference of scienter, plaintiffs must provide a meaningful trading history for purpose of comparison to the stock sales within the class period," including "information on non-Class Period sales, the amount of stock retained by the Defendants, or . . . whether the amount of stock owned by the Defendants actually increased during the Class Period." *Konkol*, 590 F.3d at 399-400; *see also Comshare*, 183 F.3d at 553.  Plaintiffs' tactic fails for multiple reasons.

*First*, notwithstanding their allegation that Mr. Booth and Mr. Roberts hatched a fraudulent scheme, Plaintiffs do not allege that Mr. Booth sold any stock.  "The fact that [the CFO] did not sell any shares during the class period undermines the suggestion that the ***Defendants*** engaged in securities fraud in order to profit from their own stock sales." *Credit Acceptance*, 50 F. Supp. 2d at 677; *see also Stryker*, 865 F. Supp. 2d at 834-35 (the fact that only one of two officer defendants "sold any stock during the class period . . . actually undermines an inference of scienter"); *Gruhn v. Tween Brands, Inc.*, No. 2:07-cv-852, 2009 WL 1542795, at *10 (S.D. Ohio June 2, 2009) (same); *accord PR Diamonds*, 364 F.3d at 691.

*Second*, Plaintiffs wholly ignore public documents disclosing that Mr. Booth and CAC ***purchased*** CAC stock during the alleged Class Period.[13]  "These purchases

---

[13] (*See, e.g.*, Ex. P at 1 (Mr. Booth purchased 3,000 shares on March 19, 2020); Ex. B at 83 (CAC repurchased 712,448 shares in 2019).)  When plaintiffs place defendants' stock sales at issue, courts may consider Form 4s and other SEC filings that

undermine any inference of scienter." *Ltd. Brands*, 788 F. Supp. 2d at 631; *see Doshi*, 386 F. Supp. 3d at 838 (that company "repurchased its own stock during the Class Period when the stock prices were allegedly inflated . . . 'undermine[d] any inference of scienter'" (collecting cases)); *In re Century Bus. Servs. Sec. Litig.*, No. 1:99CV02200, 2002 WL 32254513, at *8 (N.D. Ohio June 27, 2002) ("The Court finds it improbable that [individual defendant] would seek to 'increase his wealth' and 'enlarge his empire' by means of purchasing stock at inflated prices.").

*Third*, Plaintiffs do not allege ***any*** information concerning "the amount of stock retained by" Mr. Roberts or whether his holdings "actually increased during the Class Period." *Konkol*, 590 F.3d at 399-400.  This information completely undermines Plaintiffs' assertion that Mr. Roberts sold millions of dollars' worth of stock to capitalize on the alleged fraud.  (*See* AC ¶ 138.)  Indeed, the very public documents on which Plaintiffs relied in drafting the AC (*see id.* ¶ 140) show that Mr. Roberts's net stock holdings actually ***increased*** during the alleged Class Period even when accounting for the sales that Plaintiffs tout.  (*Compare* Ex. Q at 1 (382,522 shares prior to first alleged Class Period sale), *with* Ex. R at 1 (416,011 shares after last alleged Class Period sale).)  Moreover, while Plaintiffs allege that Mr. Roberts

---

negate an inference of scienter.  *See, e.g.*, *Huntington Bancshares*, 674 F. Supp. 2d at 969-70 (collecting cases); *Grillo v. Tempur-Pedic Int'l, Inc.*, 553 F. Supp. 2d 809, 821 & n.4 (E.D. Ky. 2008) (citing *Bovee*, 272 F.2d at 360-61).

"pocketed over $10.7 million" on August 7, 2020 (AC ¶ 138), they fail to mention that the shares that Mr. Roberts continued to hold *lost over $35.5 million* in value between August 28, 2020, and September 1, 2020.  (*See id.* ¶ 125.)

Mr. Roberts's continued stock holdings during the Class Period strongly undermine any inference of scienter.  *See, e.g.*, *Norfolk Cnty. Ret. Sys. v. Tempur-Pedic Int'l, Inc.*, 22 F. Supp. 3d 669, 689 (E.D. Ky. 2014) (no inference of scienter when officer "retained 85% of his stock" such that when the stock price declined, "he lost approximately $23.4 million"), *aff'd sub nom. Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*, 614 F. App'x 237 (6th Cir. 2015); *Campbell v. Lexmark Int'l Inc.*, 234 F. Supp. 2d 680, 686 (E.D. Ky. 2002) ("[p]laintiffs' assertion that defendants sales were substantial . . . [was] misleading" when "defendants gains ($27 million) pale[d] in comparison to the decline in value of their retained holdings ($76 million)").

Moreover, "[m]any courts have held that the inference of scienter is weak where an officer sells only a small fraction of the shares owned." *Credit Acceptance*, 50 F. Supp. 2d at 677 (collecting cases) (sale of 9% of pre-sale holdings "d[id] little to reveal fraudulent intent"); *see also Campbell*, 234 F. Supp. 2d at 686.  Here, each of the Class Period sales represented a small fraction of Mr. Roberts's holdings:[14]

---

[14] Through the table presented in the AC, Plaintiffs misleadingly suggest that Mr. Roberts had dozens of Class Period sales—a suggestion that is belied by the transaction dates of the listed transactions.  (*See* AC ¶ 143.)

| Transaction Date | No. of Shares Sold | No. of Pre-Sale Shares | % of Pre-Sale Shares |
|:---:|:---:|:---:|:---:|
| 8/2/2018 | 2,000 | 382,522 | 0.52% |
| 11/8/2019 | 9,937 | 426,370 | 2.33% |
| 6/5/2020 | 14,476 | 451,523 | 3.21% |
| 8/7/2020 | 21,036 | 437,047 | 4.81% |

(*See* AC ¶ 141; *see also* Ex. Q at 1; Ex. S at 1; Ex. T at 1; Ex. R at 1.)  These sales

are insufficient to show scienter.  *See Credit Acceptance*, 50 F. Supp. 2d at 677.[15]

## C.   <u>Plaintiffs Have Failed to Plead Loss Causation</u>

As an independent basis to dismiss the AC, Plaintiffs also fail to plead loss

causation, *i.e.*, a "causal connection between the material misrepresentation and the

loss."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  Plaintiffs' loss

causation theory is that:  (1) Defendants perpetrated a fraud on the market by con-

cealing CAC's "reliance on predatory and illegal business practices" (AC ¶ 116);

(2) the fraud became known on August 28, 2020, when the MA AGO filed suit (*see

id.* ¶ 3); and (3) in reaction, CAC's stock price "fell precipitously" (*id.* ¶ 117).

Plaintiffs' theory fails as a matter of law because the MA Complaint did not

---

[15] Plaintiffs halfheartedly attempt to suggest culpability based on the retirements of Mr. Roberts and another former CAC executive (who is not a defendant in this action), more than eight months after the close of the alleged Class Period.  (*See* AC ¶¶ 84-86.)  "For a resignation to add to an inference of scienter, a pleading must set forth allegations suggesting a compelling inference that the resignation was the result of something other than 'the reasonable assumption that the resignation occurred as a result of' the release of bad news."  *In re Hertz Global Holdings Inc.*, 905 F.3d 106, 118 (3d Cir. 2018) (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009)).  Plaintiffs have not done so.

reveal new information to the market. *See In re KBC Asset Mgmt. N.V.*, 572 F. App'x 356, 360 (6th Cir. 2014) (no loss causation when alleged corrective disclosure was "old news"). Where, as here, Plaintiffs invoke the so-called "fraud on the market" theory of reliance (*see* AC ¶¶ 148-50), disclosure of mere "confirmatory information," or information already known by the market, cannot cause a stock drop as a matter of law because "the market has already digested that information and incorporated it into the price." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1310 (11th Cir. 2011); *see also Basic v. Levinson*, 485 U.S. 224, 246 (1988).

The MA Complaint disclosed to the market that the MA AGO believed that CAC's business practices in that state violated that state's laws. But, as discussed above (*see supra* at 9-10), over one year and a half earlier, CAC told investors in January 2019: "[W]e were informed by representatives of the [MA AGO] that it believes that the Company may have engaged in unfair and deceptive acts or practices related to the origination and collection of auto loans." (Ex. G at 2.) Thus, "[a]ll of this was public information that the market absorbed long before" the MA AGO filed the MA Complaint. *KBC Asset Mgmt.*, 572 F. App'x at 360.

To be sure, CAC's stock price declined following the announcement of the MA Complaint. But this does not mean that the MA Complaint "reveal[ed] to the market that [CAC]'s previous statements were false or fraudulent." *Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013). Plaintiffs allege a cause for the stock

drop that undermines their conclusory allegations: market speculation about the risk of future corrective action that could negatively impact CAC's business operations. (*See* AC ¶ 124.)  This is specifically described in the Credit Suisse analyst report selectively quoted throughout the AC.  (*See id.* ¶¶ 9, 124; Ex. U at 1-2.)[16]

## III.  Plaintiffs' Duplicative "Scheme Liability" Claim Is Legally Insufficient

Plaintiffs also purport to assert a claim for "scheme liability" under Rule 10b-5(a) and (c).  (*See* AC ¶¶ 157-65.)  "To state a claim based on conduct that violates Rule 10b-5(a) and (c), [a] plaintiff must allege that a defendant (1) committed a deceptive or manipulative act, (2) with scienter, that (3) the act affected the market for securities or was otherwise in connection with their purchase or sale, and that (4) defendants' actions caused the plaintiffs' injuries."  *Byrd v. ViSalus, Inc.*, No. 17-cv-12626, 2018 WL 1637948, at *10 (E.D. Mich. Apr. 5, 2018) (Leitman, J.).

"Crucially, scheme liability hinges on the performance of an inherently

---

[16] Plaintiffs also allege a stock drop on January 31, 2020, but do not attribute the drop to the alleged fraud.  (*See* AC ¶¶ 120-21.)  Instead, Plaintiffs concede that CAC's stock price declined on that day because CAC "reported disappointing loan unit and dollar growth," "loss of market share, decreased loan volume, lower dealer signups despite a relation of signup requirements, and higher than expected loan provisions," as well as CAC's "adoption of new accounting standards."  (*Id.* ¶ 120.)  The federal securities laws are not a "partial downside insurance policy," *Dura Pharms.*, 544 U.S. at 348, and Plaintiffs' failure to "connect the alleged fraud with the [alleged] disclosure and loss" is fatal to Plaintiffs' conclusory attempt to plead loss causation based on CAC's January 30, 2020 report of its financial results for the fourth quarter of 2019 and full year 2019.  *D.E.&J. Ltd. P'Ship v. Conaway*, 133 F. App'x 994, 1000 (6th Cir. 2005); *see also ISDC*, 583 F.3d at 944.

deceptive act that is distinct from an alleged misstatement." *Id.* (cleaned up); *see also Benzon*, 420 F.3d at 610 (noting that "Rule 10b-5(a) and (c) encompasses conduct **beyond** disclosure violations"); *Gordon v. Royal Palm Real Estate Inv. Fund I, LLLP*, No. 09-11770, 2020 WL 2836312, at *5 (E.D. Mich. May 31, 2020) (Tarnow, J.) (dismissing claim that did not allege "fraudulent scheme, separate and apart from" claim that defendants "failed to disclose or misrepresented certain information").

Here, Plaintiffs' purported "scheme liability" claim fails because Plaintiffs merely incorporate the previous paragraphs in the AC and add vague and conclusory assertions that "Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did . . . deceive the investing public . . . ." (AC ¶ 159); *see Danske*, 2021 WL 3744894, at *4 (rejecting similar allegations because "[a]t no point d[id] [plaintiffs] articulate with precision the contours of the alleged scheme to defraud investors, or which specific acts were conducted in furtherance of it"). Tellingly, Plaintiffs "have not alleged any specific fraudulent acts apart from their alleged misstatements and omissions" to support their vague and conclusory scheme liability claim. *Byrd*, 2018 WL 1637948, at *10.

To the contrary, the alleged "scheme" is merely "the knowing and/or reckless suppression and concealment of information regarding Credit Acceptance's business, and compliance with applicable laws and regulations." (AC ¶ 161; *see also id.* ¶¶ 12, 27 (same).) Plaintiffs allege that they were injured by this supposed "scheme"

45

"when the Defendants' prior misrepresentations and material omissions were revealed." (*Id.* ¶ 119.)  Where, as here, "Plaintiffs' own description of their claim reveals" that it is "inextricably linked" to alleged misstatements and omissions, and "not from a separate course of conduct," Plaintiffs have "failed to plead a viable scheme liability claim." *Byrd*, 2018 WL 1637948, at *10.[17]

## IV.   <u>Plaintiffs Have Failed to State a Section 20(a) Claim</u>

Plaintiffs' failure to plead a violation of Section 10(b) requires dismissal of its Section 20(a) claims.  *See Doshi*, 823 F.3d at 1045; *ISDC*, 583 F.3d at 947.

### <u>CONCLUSION</u>

For the reasons set forth above, the AC should be dismissed with prejudice.

Dated:  September 2, 2021

**SKADDEN, ARPS, SLATE
  MEAGHER & FLOM LLP**

Scott D. Musoff
Robert A. Fumerton
Patrick G. Rideout
One Manhattan West
New York, New York 10001
(212) 735-3000
scott.musoff@skadden.com
robert.fumerton@skadden.com
patrick.rideout@skadden.com

Respectfully submitted:

**DICKINSON WRIGHT PLLC**

By:    *s/ Thomas G. McNeill*
Thomas G. McNeill (P36895)
500 Woodward Avenue, Suite 4000
Detroit, Michigan 48226
(313) 223-3500
tmcneill@dickinsonwright.com

Scott R. Knapp (P61041)
123 W. Allegan Street, Suite 900
Lansing, Michigan 48933
(517) 371-1730
sknapp@dickinsonwright.com

*Counsel for Defendants*

---

[17] Plaintiffs' claim also fails because they have not pled scienter.  (*See supra* § II(B).)