# Exhibit B

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

# FORM 10-K

(Mark One)

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2019**

**OR**

**TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

Commission file number 000-20202

# CREDIT ACCEPTANCE CORPORATION

*(Exact name of registrant as specified in its charter)*

| **Michigan** | **38-1999511** |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |

| **25505 W. Twelve Mile Road** | |
|---|---|
| **Southfield, Michigan** | **48034-8339** |
| *(Address of principal executive offices)* | *(Zip Code)* |

Registrant's telephone number, including area code: **(248) 353-2700**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.01 par value | CACC | The Nasdaq Stock Market |

Securities registered pursuant to section 12(g) of the Act:
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☑ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes   ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☑ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company.  See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | Accelerated filer | Non-accelerated filer | Smaller reporting company | Emerging growth company |
|---|---|---|---|---|

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes   No ☑

The aggregate market value of 10,249,544 shares of the registrant's common stock held by non-affiliates on June 30, 2019 was approximately $4,959.0 million.  For purposes of this computation all officers, directors and 10% beneficial owners of the registrant are assumed to be affiliates.  Such determination should not be deemed an admission that such officers, directors and beneficial owners are, in fact, affiliates of the registrant.

At February 4, 2020, there were 18,151,092 shares of the registrant's common stock issued and outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's definitive proxy statement pertaining to the  2020 Annual Meeting of Shareholders (the "Proxy Statement") filed pursuant to Regulation 14A are incorporated herein by reference into Part III of this Annual Report on Form 10-K (this "Form 10-K").

**CREDIT ACCEPTANCE CORPORATION**
**YEAR ENDED DECEMBER 31, 2019**

**INDEX TO FORM 10-K**

| Item | Description | Page |
|---|---|---|
| | **PART I** | |
| 1. | Business | 3 |
| 1A. | Risk Factors | 13 |
| 1B. | Unresolved Staff Comments | 21 |
| 2. | Properties | 21 |
| 3. | Legal Proceedings | 21 |
| 4. | Mine Safety Disclosures | 21 |
| | **PART II** | |
| 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 22 |
| 6. | Selected Financial Data | 23 |
| 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 24 |
| 7A. | Quantitative and Qualitative Disclosures About Market Risk | 38 |
| 8. | Financial Statements and Supplementary Data | 39 |
| 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 89 |
| 9A. | Controls and Procedures | 89 |
| 9B. | Other Information | 91 |
| | **PART III** | |
| 10. | Directors, Executive Officers and Corporate Governance | 91 |
| 11. | Executive Compensation | 91 |
| 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 91 |
| 13. | Certain Relationships and Related Transactions and Director Independence | 91 |
| 14. | Principal Accounting Fees and Services | 91 |
| | **PART IV** | |
| 15. | Exhibits, Financial Statement Schedules | 92 |
| 16. | Form 10-K Summary | 100 |
| | | |
| | Signatures | 101 |

**Customer and Geographic Concentrations**

No single Dealer accounted for more than 10% of total revenues during any of the last three years.  Additionally, no single Dealer's Loans receivable balance accounted for more than 10% of total Loans receivable balance as of December 31, 2019 or 2018.  The following tables provide information regarding the five states that were responsible for the largest dollar volume of Consumer Loan assignments and the related number of active Dealers during 2019, 2018 and 2017:

| (Dollars in millions) | For the Year Ended December 31, 2019 | | | |
| --- | --- | --- | --- | --- |
| | Consumer Loan Assignments | | Active Dealers (2) | |
| | Dollar Volume (1) | % of Total | Number | % of Total |
| Michigan | $          359.9 | 9.5% | 838 | 6.3% |
| Ohio | 265.2 | 7.0% | 898 | 6.7% |
| New York | 245.6 | 6.5% | 778 | 5.8% |
| Texas | 201.5 | 5.3% | 918 | 6.9% |
| New Jersey | 188.7 | 5.0% | 363 | 2.7% |
| All other states | 2,511.3 | 66.7% | 9,604 | 71.6% |
| Total | $       3,772.2 | 100.0% | 13,399 | 100.0% |

| (Dollars in millions) | For the Year Ended December 31, 2018 | | | |
| --- | --- | --- | --- | --- |
| | Consumer Loan Assignments | | Active Dealers (2) | |
| | Dollar Volume (1) | % of Total | Number | % of Total |
| Michigan | $          364.1 | 10.1% | 804 | 6.4% |
| Ohio | 260.1 | 7.2% | 858 | 6.8% |
| New York | 229.4 | 6.4% | 726 | 5.8% |
| Texas | 196.7 | 5.5% | 847 | 6.8% |
| Indiana | 167.4 | 4.7% | 428 | 3.4% |
| All other states | 2,378.1 | 66.1% | 8,865 | 70.8% |
| Total | $       3,595.8 | 100.0% | 12,528 | 100.0% |

| (Dollars in millions) | For the Year Ended December 31, 2017 | | | |
| --- | --- | --- | --- | --- |
| | Consumer Loan Assignments | | Active Dealers (2) | |
| | Dollar Volume (1) | % of Total | Number | % of Total |
| Michigan | $          285.7 | 10.0% | 792 | 6.9% |
| Ohio | 209.8 | 7.3% | 777 | 6.7% |
| Texas | 189.7 | 6.6% | 847 | 7.3% |
| New York | 176.4 | 6.1% | 690 | 6.0% |
| Maryland | 132.0 | 4.6% | 291 | 2.5% |
| All other states | 1,879.5 | 65.4% | 8,154 | 70.6% |
| Total | $       2,873.1 | 100.0% | 11,551 | 100.0% |

(1)   Represents advances paid to Dealers on Consumer Loans assigned under our Portfolio Program and one-time payments made to Dealers to purchase Consumer Loans assigned under our Purchase Program.  Payments of Dealer Holdback and accelerated Dealer Holdback are not included.
(2)   Active Dealers are Dealers who have received funding for at least one Loan during the year.

**Geographic Financial Information**

For the three years ended December 31, 2019, 2018 and 2017, all of our revenues were derived from the United States.  As of December 31, 2019 and 2018, all of our long-lived assets were located in the United States.

10

**Seasonality**

Our business is seasonal with peak Consumer Loan assignments and collections occurring during the first quarter of the year.  Historically, this seasonality has not had a material impact on our interim results. However, upon adoption of the current expected credit loss ("CECL") impairment model on January 1, 2020, this seasonality is expected to have a material impact on our interim results, as we will be required to recognize a significant provision for credit losses expense at the time of assignment. For additional information, see Note 2 to the consolidated financial statements contained in Part II - Item 8 of this Form 10-K, which is incorporated herein by reference.

**Regulation**

Our business is subject to laws and regulations, including the Truth in Lending Act, the Equal Credit Opportunity Act, the Fair Credit Reporting Act and various other state and federal laws and regulations.  These laws and regulations, among other things, require licensing and qualification; limit interest rates, fees and other charges associated with the Consumer Loans assigned to us; require specified disclosures by Dealers to consumers; govern the sale and terms of ancillary products; and define the rights to repossess and sell collateral.  Failure to comply with these laws or regulations could have a material adverse effect on us by, among other things, limiting the jurisdictions in which we may operate, restricting our ability to realize the value of the collateral securing the Consumer Loans, making it more costly or burdensome to do business or resulting in potential liability.  The volume of new or modified laws and regulations has increased in recent years and has increased significantly in response to issues arising with respect to consumer lending.  From time to time, legislation and regulations are enacted which increase the cost of doing business, limit or expand permissible activities or affect the competitive balance among financial services providers.  Proposals to change the laws and regulations governing the operations and taxation of financial institutions and financial services providers are frequently made in the U.S. Congress, in the state legislatures and by various regulatory agencies.  This legislation may change our operating environment in substantial and unpredictable ways and may have a material adverse effect on our business.

In July 2010 the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") was enacted and a number of its provisions became effective in July 2011.  The Dodd-Frank Act restructured and enhanced the regulation and supervision of the financial services industry and created the Bureau of Consumer Financial Protection (the "Bureau").  We are subject to supervision by the Bureau. The Bureau has rulemaking and enforcement authority over certain non-depository institutions, including us.  The Bureau is specifically authorized, among other things, to take actions to prevent companies providing consumer financial products or services and their service providers from engaging in unfair, deceptive or abusive acts or practices in connection with consumer financial products and services, and to issue rules requiring enhanced disclosures for consumer financial products or services.  Under the Dodd-Frank Act, the Bureau also may restrict the use of pre-dispute mandatory arbitration clauses in contracts between covered persons and consumers for a consumer financial product or service.  The Bureau also has authority to interpret, enforce and issue regulations implementing enumerated consumer laws, including certain laws that apply to our business.  Further, the Bureau has issued rules allowing it to supervise non-depository "larger participants" in certain markets for consumer financial services and  products. On June 10, 2015, the Bureau released its larger participant rule defining which nonbank automotive finance companies will be subject to supervision. The rule provides that nonbank auto finance companies that make, acquire or refinance 10,000 or more loans or leases in a year will come under Bureau supervision. The rule was officially published in the Federal Register on June 30, 2015, and became effective on August 31, 2015.

The Dodd-Frank Act and regulations promulgated thereunder, including by the Bureau, are likely to affect our cost of doing business, may limit or expand our permissible activities, may affect the competitive balance within our industry and market areas and could have a material adverse effect on us. Our management continues to assess the Dodd-Frank Act's probable impact on our business, financial condition and results of operations, and to monitor developments involving the entities charged with promulgating regulations thereunder.  However, the ultimate effect of the Dodd-Frank Act on the financial services industry in general, and on us in particular, is uncertain at this time.

In addition to the Bureau, other state and federal agencies have the ability to regulate aspects of our business. For example, the Dodd-Frank Act provides a mechanism for state attorneys general to investigate us. Separately, state attorneys general and certain state regulators have authority under their respective rules and laws, to investigate and/or regulate aspects of the business. In addition, the Federal Trade Commission has jurisdiction to investigate aspects of our business. We expect that regulatory investigations by both state and federal agencies will continue and that the results of these investigations could have a material adverse impact on us.

11

We are cooperating with the following inquiries and cannot predict the eventual scopes, durations or outcomes at this time. As a result, we are unable to estimate the reasonably possible loss or range of reasonably possible loss arising from these investigations.

- On May 7, 2019, we received a subpoena from the Office of the New York State Attorney General, relating to the Company's origination and collection policies and procedures in the state of New York.
- On April 22, 2019, we received a civil investigative demand from the Bureau of Consumer Financial Protection (the "Bureau") seeking, among other things, certain information relating to the Company's origination and collection of Consumer Loans, TPPs and credit reporting.
- On August 14, 2017, we received a subpoena from the Attorney General of the State of Mississippi, relating to the origination and collection of non-prime auto loans in the state of Mississippi. The Company cooperated with the inquiry. On April 23, 2019, the Attorney General of the State of Mississippi, on behalf of the State of Mississippi, filed a complaint in the Chancery Court of the First Judicial District of Hinds County, Mississippi, alleging that the Company engaged in unfair and deceptive trade practices in subprime auto lending, loan servicing, vehicle repossession and debt collection in the State of Mississippi in violation of the Mississippi Consumer Protection Act. The complaint seeks injunctive relief, including civil penalties and disgorgement, and payment of the State's attorney's fees and costs. The Company intends to vigorously defend itself in this matter.
- On March 18, 2016, we received a subpoena from the Attorney General of the State of Maryland, relating to the Company's repossession and sale policies and procedures in the state of Maryland.
- On December 9, 2014, we received a civil investigative subpoena from the U.S. Department of Justice pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 directing us to produce certain information relating to subprime automotive finance and related securitization activities.
- On December 4, 2014, we received a civil investigative demand from the Office of the Attorney General of the Commonwealth of Massachusetts relating to the origination and collection of non-prime auto loans in Massachusetts. On November 20, 2017 we received a second civil investigation demand from the Office of the Attorney General seeking updated information on its original civil investigation demand, additional information related to the Company's origination and collection of Consumer Loans, and information regarding securitization activities. In connection with this inquiry, we were informed by representatives of the Office of the Attorney General that it believes that the Company may have engaged in unfair and deceptive acts or practices related to the origination and collection of auto loans, which may have caused some of the Company's representations and warranties contained in securitization documents to be inaccurate. The investigation relating to the origination, collection and securitization of non-prime auto loans and securities transactions by the Office of the Attorney General remains ongoing.

In addition, governmental regulations which would deplete the supply of used vehicles, such as environmental protection regulations governing emissions or fuel consumption, could have a material adverse effect on us.

Our Dealers must also comply with credit and trade practice statutes and regulations.  Failure of our Dealers to comply with these statutes and regulations could result in consumers having rights of rescission and other remedies that could have a material adverse effect on us.

The sale of vehicle service contracts and GAP by Dealers in connection with Consumer Loans assigned to us from Dealers is also subject to state laws and regulations.  As we are the holder of the Consumer Loans that may, in part, finance these products, some of these state laws and regulations may apply to our servicing and collection of the Consumer Loans.  Although these laws and regulations do not significantly affect our business, there can be no assurance that insurance or other regulatory authorities in the jurisdictions in which these products are offered by Dealers will not seek to regulate or restrict the operation of our business in these jurisdictions.  Any regulation or restriction of our business in these jurisdictions could materially adversely affect the income received from these products.

We believe that we maintain all material licenses and permits required for our current operations and are in substantial compliance with all applicable laws and regulations. Our agreements with Dealers provide that the Dealer shall indemnify us with respect to any loss or expense we incur as a result of the Dealer's failure to comply with applicable laws and regulations.

12

**Team Members**

Our team members are organized into three operating functions: Originations, Servicing and Support.

*Originations.* The originations function includes team members that are responsible for marketing our programs to prospective Dealers, enrolling new Dealers and supporting active Dealers.  Originations also includes team members responsible for processing new Consumer Loan assignments.

*Servicing.*  The servicing function includes team members that are responsible for servicing the Consumer Loans.  The majority of these team members are responsible for collection activities on delinquent Consumer Loans.

*Support.*  The support function includes team members that are responsible for information technology, finance, human resources, analytics, credit reporting, corporate legal and compliance activities.

As of December 31, 2019, we had 2,016 full and part-time team members.  Our team members have no union affiliations and we believe our relationship with our team members is in good standing.  The table below presents team members by operating function:

| Operating Function | Number of Team Members As of December 31, | | |
| --- | --- | --- | --- |
| | **2019** | **2018** | **2017** |
| Originations | 577 | 584 | 517 |
| Servicing | 812 | 884 | 810 |
| Support | 627 | 572 | 490 |
| Total | 2,016 | 2,040 | 1,817 |

**Available Information**

Our Internet address is *creditacceptance.com*.  We make available free of charge on our Internet web site our annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, as soon as reasonably practicable after we electronically file such material with, or furnish it to, the Securities and Exchange Commission (the "SEC").

**ITEM 1A.   RISK FACTORS**

**Our inability to accurately forecast and estimate the amount and timing of future collections could have a material adverse effect on results of operations.**

Substantially all of the Consumer Loans assigned to us are made to individuals with impaired or limited credit histories or higher debt-to-income ratios than are permitted by traditional lenders.  Consumer Loans made to these individuals generally entail a higher risk of delinquency, default and repossession and higher losses than loans made to consumers with better credit.  Since most of our revenue and cash flows from operations are generated from these Consumer Loans, our ability to accurately forecast Consumer Loan performance is critical to our business and financial results.  At the time of assignment, we forecast future expected cash flows from the Consumer Loan.  Based on these forecasts, which include estimates for wholesale vehicle prices in the event of vehicle repossession and sale, we make an advance or one-time purchase payment to the related Dealer at a level designed to maximize economic profit, a non-GAAP financial measure.  We continue to forecast the expected collection rate of each Consumer Loan subsequent to assignment.  These forecasts also serve as a critical assumption in our accounting for recognizing finance charge income and determining our allowance for credit losses.  Please see the Critical Accounting Estimates – Finance Charge Revenue & Allowance for Credit Losses section in Item 7 of this Form 10-K, which is incorporated herein by reference.  Actual cash flows from any individual Consumer Loan are often different from cash flows estimated at the time of assignment.  There can be no assurance that our forecasts will be accurate or that Consumer Loan performance will be as expected.  In periods with changing economic conditions, accurately forecasting the performance of Consumer Loans is more difficult.  In the event that our forecasts are not accurate, our financial position, liquidity and results of operations could be materially adversely affected.

**We may not be able to generate sufficient cash flows to service our outstanding debt and fund operations and may be forced to take other actions to satisfy our obligations under such debt.**

Our ability to make payments of principal and interest on indebtedness will depend in part on our cash flows from operations, which are subject to economic, financial, competitive and other factors beyond our control.  We cannot assure you that we will maintain a level of cash flows from operations sufficient to permit us to meet our debt service obligations.  If we are unable to generate sufficient cash flows from operations to service our debt, we may be required to sell assets, refinance all or a portion of our existing debt or obtain additional financing.  There can be no assurance that any refinancing will be possible or that any asset sales or additional financing can be completed on acceptable terms or at all.

**Interest rate fluctuations may adversely affect our borrowing costs, profitability and liquidity.**

Our profitability may be directly affected by the level of and fluctuations in interest rates, whether caused by changes in economic conditions or other factors, which affect our borrowing costs.  Our profitability and liquidity could be materially adversely affected during any period of higher interest rates.  We monitor the interest rate environment and employ strategies designed to mitigate the impact of increases in interest rates.  We can provide no assurance, however, that our strategies will mitigate the impact of increases in interest rates.

**The phaseout of the London Interbank Offered Rate ("LIBOR"), or the replacement of LIBOR with a different reference rate, could result in a material adverse effect on our business.**

In July 2017, the United Kingdom Financial Conduct Authority (the authority that regulates LIBOR) announced that it would phase out LIBOR by the end of 2021. It is unclear whether new methods of calculating LIBOR will be established or if alternative rates or benchmarks will be adopted. Our revolving secured line of credit, certain Warehouse facilities, and our interest rate cap agreements utilize LIBOR as a benchmark for calculating the applicable interest rates. Changes in the method of calculating LIBOR, the elimination of LIBOR or the replacement of LIBOR with an alternative rate or benchmark, such as the Secured Overnight Financing Rate, may require us to renegotiate or amend these facilities, which may adversely affect interest rates and result in higher borrowing costs. This could materially adversely affect our financial position, liquidity and results of operations.

**Reduction in our credit rating could increase the cost of our funding from, and restrict our access to, the capital markets and adversely affect our liquidity, financial condition and results of operations.**

Credit rating agencies evaluate us, and their ratings of our debt and creditworthiness are based on a number of factors.  These factors include our financial strength and other factors not entirely within our control, including conditions affecting the financial services industry generally.  As the financial services industry and the financial markets periodically face difficulties, there can be no assurance that we will maintain our current ratings.  Failure to maintain those ratings could, among other things, adversely limit our access to the capital markets and affect the cost and other terms upon which we are able to obtain financing.

**We may incur substantially more debt and other liabilities.  This could exacerbate further the risks associated with our current debt levels.**

We may be able to incur substantial additional debt in the future.  Although the terms of our debt instruments contain restrictions on our ability to incur additional debt, these restrictions are subject to exemptions that could permit us to incur a substantial amount of additional debt.  In addition, our debt instruments do not prevent us from incurring liabilities that do not constitute indebtedness as defined for purposes of those debt instruments.  If new debt or other liabilities are added to our current debt levels, the risks associated with our having substantial debt could intensify.

**The regulation to which we are or may become subject could result in a material adverse effect on our business.**

Reference should be made to Item 1. Business "Regulation" for a discussion of regulatory risk factors.

**Adverse changes in economic conditions, the automobile or finance industries, or the non-prime consumer market could adversely affect our financial position, liquidity and results of operations, the ability of key vendors that we depend on to supply us with services, and our ability to enter into future financing transactions.**

We are subject to general economic conditions which are beyond our control. During periods of economic slowdown or recession, delinquencies, defaults, repossessions and losses may increase on our Consumer Loans and Consumer Loan prepayments may decline. These periods are also typically accompanied by decreased consumer demand for automobiles and declining values of automobiles securing outstanding Consumer Loans, which weakens collateral coverage and increases the amount of a loss in the event of default. Significant increases in the inventory of used automobiles during periods of economic recession may also depress the prices at which repossessed automobiles may be sold or delay the timing of these sales. Additionally, higher gasoline prices, declining stock market values, unstable real estate values, resets of adjustable rate mortgages to higher interest rates, increasing unemployment levels, general availability of consumer credit or other factors that impact consumer confidence or disposable income could increase loss frequency and decrease consumer demand for automobiles as well as weaken collateral values of automobiles. Because our business is focused on consumers who do not qualify for conventional automobile financing, the actual rates of delinquencies, defaults, repossessions and losses on these Consumer Loans could be higher than that of those experienced in the general automobile finance industry, and could be more dramatically affected by a general economic downturn.

We rely on Dealers to originate Consumer Loans for assignment under our programs. High levels of Dealer attrition, due to a general economic downturn or otherwise, could materially adversely affect our operations. In addition, we rely on vendors to provide us with services we need to operate our business. Any disruption in our operations due to the untimely or discontinued supply of these services could substantially adversely affect our operations. Finally, during an economic slowdown or recession, our servicing costs may increase without a corresponding increase in finance charge revenue. Any sustained period of increased delinquencies, defaults, repossessions or losses or increased servicing costs could also materially adversely affect our financial position, liquidity and results of operations and our ability to enter into future financing transactions.

Technological advancements or changes to trends in the automobile industry such as new autonomous driving technologies or car- and ride-sharing programs could decrease consumer demand for automobiles. Decreased consumer demand for automobiles could negatively impact demand for our financing programs as well as weaken collateral values of automobiles, which could materially adversely affect our financial position, liquidity and results of operations.

**Litigation we are involved in from time to time may adversely affect our financial condition, results of operations and cash flows.**

As a result of the consumer-oriented nature of the industry in which we operate and uncertainties with respect to the application of various laws and regulations in some circumstances, we are subject to various consumer claims, litigation and regulatory investigations seeking damages, fines and statutory penalties, based upon, among other things, usury, disclosure inaccuracies, wrongful repossession, violations of bankruptcy stay provisions, certificate of title disputes, fraud and breach of contract. As the assignee of Consumer Loans originated by Dealers, we may also be named as a co-defendant in lawsuits filed by consumers principally against Dealers. We may also have disputes and litigation with Dealers. The claims may allege, among other theories of liability, that we breached our Dealer servicing agreement. We may also have disputes and litigation with vendors and other third parties. The claims may allege, among other theories of liability, that we breached a license agreement or contract. The damages, fines and penalties that may be claimed by consumers, regulatory agencies, Dealers, vendors or other third parties in these types of matters can be substantial. The relief requested by plaintiffs varies but may include requests for compensatory, statutory and punitive damages and injunctive relief, and plaintiffs may seek treatment as purported class actions. A significant judgment against us in connection with any litigation or arbitration could have a material adverse effect on our financial position, liquidity and results of operations.

For a description of significant litigation to which we are a party, see Note 16 to the consolidated financial statements contained in Item 8 of this Form 10-K, which is incorporated herein by reference.

17

**Natural disasters, acts of war, terrorist attacks and threats or the escalation of military activity in response to these attacks or otherwise may negatively affect our business, financial condition and results of operations.**

Natural disasters, acts of war, terrorist attacks and the escalation of military activity in response to these attacks or otherwise may have negative and significant effects, such as imposition of increased security measures, changes in applicable laws, market disruptions and job losses.  These events may have an adverse effect on the economy in general.  Moreover, the potential for future terrorist attacks and the national and international responses to these threats could affect the business in ways that cannot be predicted.  The effect of any of these events or threats could have a material adverse effect on our business, financial condition and results of operations.

**ITEM 1B.   UNRESOLVED STAFF COMMENTS**

None.

**ITEM 2.   PROPERTIES**

Our headquarters is located in Southfield, Michigan, in an office building we purchased in 1993, which includes approximately 136,000 square feet of space. Additionally, in August 2018, we purchased a second office building in Southfield, which includes approximately 297,000 square feet of space, that was used to consolidate operations from our current and previous Southfield leased locations and that we intend to use to accommodate future growth. We have a mortgage loan from a commercial bank that is secured by a first mortgage lien on the second office property.

We lease approximately 54,000 square feet of office space in Southfield and approximately 31,000 square feet of office space in Henderson, Nevada. The lease for the Southfield space expires in July 2021. The lease for the Henderson space expires in December 2022. We have renewal options on both of our office space leases. Additionally, there currently is a significant amount of unoccupied office space available for lease in the markets where we operate.

**ITEM 3.   LEGAL PROCEEDINGS**

In the normal course of business and as a result of the consumer-oriented nature of the industry in which we operate, we and other industry participants are frequently subject to various consumer claims, litigation and regulatory investigations seeking damages, fines and statutory penalties. The claims allege, among other theories of liability, violations of state, federal and foreign truth-in-lending, credit availability, credit reporting, consumer protection, warranty, debt collection, insurance and other consumer-oriented laws and regulations, including claims seeking damages for alleged physical and mental harm relating to the repossession and sale of consumers' vehicles and other debt collection activities. As the assignee of Consumer Loans originated by Dealers, we may also be named as a co-defendant in lawsuits filed by consumers principally against Dealers. We may also have disputes and litigation with Dealers. The claims may allege, among other theories of liability, that we breached our Dealer servicing agreement. We may also have disputes and litigation with vendors and other third parties. The claims may allege, among other theories of liability, that we breached a license agreement or contract. The damages, fines and penalties that may be claimed by consumers, regulatory agencies, Dealers, vendors or other third parties in these types of matters can be substantial. The relief requested by plaintiffs varies but may include requests for compensatory, statutory and punitive damages and injunctive relief, and plaintiffs may seek treatment as purported class actions. An adverse ultimate disposition in any action to which we are a party
or otherwise subject could have a material adverse impact on our financial position, liquidity and results of operations.

For a description of significant litigation to which we are a party, see Note 16 to the consolidated financial statements contained in Item 8 of this Form 10-K, which is incorporated herein by reference.

**ITEM 4.   MINE SAFETY DISCLOSURES**

Not applicable.

**Consumer Loan Metrics**

At the time a Consumer Loan is submitted to us for assignment, we forecast future expected cash flows from the Consumer Loan. Based on the amount and timing of these forecasts and expected expense levels, an advance or one-time purchase payment is made to the related Dealer at a price designed to maximize economic profit.

We use a statistical model to estimate the expected collection rate for each Consumer Loan at the time of assignment. We continue to evaluate the expected collection rate of each Consumer Loan subsequent to assignment. Our evaluation becomes more accurate as the Consumer Loans age, as we use actual performance data in our forecast. By comparing our current expected collection rate for each Consumer Loan with the rate we projected at the time of assignment, we are able to assess the accuracy of our initial forecast. The following table compares our forecast of Consumer Loan collection rates as of December 31, 2019, with the forecasts as of December 31, 2018, as of December 31, 2017, and at the time of assignment, segmented by year of assignment:

| Consumer Loan Assignment Year | Forecasted Collection Percentage as of (1) | | | | Current Forecast Variance from | | |
|---|---|---|---|---|---|---|---|
| | December 31, 2019 | December 31, 2018 | December 31, 2017 | Initial Forecast | December 31, 2018 | December 31, 2017 | Initial Forecast |
| 2010 | 77.8% | 77.7% | 77.6% | 73.6% | 0.1 % | 0.2 % | 4.2 % |
| 2011 | 74.8% | 74.7% | 74.7% | 72.5% | 0.1 % | 0.1 % | 2.3 % |
| 2012 | 73.9% | 73.8% | 73.8% | 71.4% | 0.1 % | 0.1 % | 2.5 % |
| 2013 | 73.5% | 73.5% | 73.5% | 72.0% | 0.0 % | 0.0 % | 1.5 % |
| 2014 | 71.7% | 71.7% | 71.7% | 71.8% | 0.0 % | 0.0 % | -0.1 % |
| 2015 | 65.4% | 65.4% | 65.5% | 67.7% | 0.0 % | -0.1 % | -2.3 % |
| 2016 | 64.1% | 64.2% | 64.8% | 65.4% | -0.1 % | -0.7 % | -1.3 % |
| 2017 | 64.8% | 65.5% | 65.6% | 64.0% | -0.7 % | -0.8 % | 0.8 % |
| 2018 | 65.1% | 65.0% | — | 63.6% | 0.1 % | — | 1.5 % |
| 2019 | 64.6% | — | — | 64.0% | — | — | 0.6 % |

(1) Represents the total forecasted collections we expect to collect on the Consumer Loans as a percentage of the repayments that we were contractually owed on the Consumer Loans at the time of assignment. Contractual repayments include both principal and interest. Forecasted collection rates are negatively impacted by canceled Consumer Loans as the contractual amount owed is not removed from the denominator for purposes of computing forecasted collection rates in the table.

Consumer Loans assigned in 2010 through 2013 and 2018 have yielded forecasted collection results materially better than our initial estimates, while Consumer Loans assigned in 2015 and 2016 have yielded forecasted collection results materially worse than our initial estimates. For Consumer Loans assigned in 2014, 2017 and 2019, actual results have been close to our initial estimates.

For the year ended December 31, 2019, forecasted collection rates improved for Consumer Loans assigned in 2019, declined for Consumer Loans assigned in 2017 and were generally consistent with expectations at the start of the period for all other assignment years presented.

For the year ended December 31, 2018, forecasted collection rates improved for Consumer Loans assigned in 2018, declined for Consumer Loans assigned in 2016 and were generally consistent with expectations at the start of the period for all other assignment years presented.

The changes in forecasted collection rates impacted forecasted net cash flows (forecasted collections less forecasted Dealer Holdback payments) as follows:

| (In millions) | For the years ended December 31, | | |
|---|---|---|---|
| Increase (decrease) in forecasted net cash flows | 2019 | 2018 | 2017 |
| Dealer Loans | $ (7.9) | $ 2.0 | $ (5.6) |
| Purchased Loans | 22.5 | 40.3 | 41.7 |
| Total Loans | $ 14.6 | $ 42.3 | $ 36.1 |

25

In addition to the statistical model used to forecast collection rates, we use a model to forecast the timing of future net cash flows. During the fourth quarter of 2017, we updated our net cash flow timing model to incorporate more recent data. The revised forecast resulted in an expected cash flow stream with a lower net present value as compared to the prior forecast, as less cash flows were expected in earlier periods and more cash flows were expected in later periods.

The reduction in net present value was primarily the result of a change in the expected timing of cash flows from longer-term Consumer Loans. Due to our limited historical experience with longer-term Consumer Loans, our prior model relied on extrapolations from the historical performance of shorter-term Consumer Loans to predict the timing of future net cash flows on longer-term Consumer Loans. We used our additional historical experience on these longer-term loans to refine our estimate.

The revision to our net cash flow timing forecast did not impact the amount of undiscounted net cash flows we expected to receive. As a result, the dollar amount of future net portfolio revenue (finance charges less provision for credit losses) was not impacted by the revision. However, the revision did impact the period in which those net revenues are recorded as a portion of the impact of the revised timing estimate was recorded as a current period expense and a portion was recorded as a yield adjustment. For the fourth quarter of 2017, the revision increased provision for credit losses by $41.6 million, reduced finance charge revenue by $7.3 million and reduced net income by $30.8 million. The revision reduced the yield on our Loan portfolio by 90 basis points, which impacts the timing of revenue recognition in future periods.

The following table presents information on the average Consumer Loan assignment for each of the last 10 years:

| | Average | | |
| Consumer Loan Assignment Year | Consumer Loan (1) | Advance (2) | Initial Loan Term (in months) |
|---|---|---|---|
| 2010 | $        14,480 | $        6,473 | 41 |
| 2011 | 15,686 | 7,137 | 46 |
| 2012 | 15,468 | 7,165 | 47 |
| 2013 | 15,445 | 7,344 | 47 |
| 2014 | 15,692 | 7,492 | 47 |
| 2015 | 16,354 | 7,272 | 50 |
| 2016 | 18,218 | 7,976 | 53 |
| 2017 | 20,230 | 8,746 | 55 |
| 2018 | 22,158 | 9,635 | 57 |
| 2019 | 23,139 | 10,174 | 57 |

(1)   Represents the repayments that we were contractually owed on Consumer Loans at the time of assignment, which include both principal and interest.
(2)   Represents advances paid to Dealers on Consumer Loans assigned under our Portfolio Program and one-time payments made to Dealers to purchase Consumer Loans assigned under our Purchase Program.  Payments of Dealer Holdback and accelerated Dealer Holdback are not included.

Forecasting collection rates accurately at Loan inception is difficult.  With this in mind, we establish advance rates that are intended to allow us to achieve acceptable levels of profitability, even if collection rates are less than we initially forecast.

26

The following table presents forecasted Consumer Loan collection rates, advance rates, the spread (the forecasted collection rate less the advance rate), and the percentage of the forecasted collections that had been realized as of December 31, 2019.  All amounts, unless otherwise noted, are presented as a percentage of the initial balance of the Consumer Loan (principal + interest).  The table includes both Dealer Loans and Purchased Loans.

| Consumer Loan Assignment Year | As of December 31, 2019 | | | |
| | Forecasted Collection % | Advance % (1) | Spread % | % of Forecast Realized (2) |
|---|---|---|---|---|
| 2010 | 77.8% | 44.7% | 33.1% | 99.8% |
| 2011 | 74.8% | 45.5% | 29.3% | 99.6% |
| 2012 | 73.9% | 46.3% | 27.6% | 99.3% |
| 2013 | 73.5% | 47.6% | 25.9% | 98.8% |
| 2014 | 71.7% | 47.7% | 24.0% | 98.0% |
| 2015 | 65.4% | 44.5% | 20.9% | 94.5% |
| 2016 | 64.1% | 43.8% | 20.3% | 84.8% |
| 2017 | 64.8% | 43.2% | 21.6% | 68.8% |
| 2018 | 65.1% | 43.5% | 21.6% | 44.9% |
| 2019 | 64.6% | 44.0% | 20.6% | 15.4% |

(1)  Represents advances paid to Dealers on Consumer Loans assigned under our Portfolio Program and one-time payments made to Dealers to purchase Consumer Loans assigned under our Purchase Program as a percentage of the initial balance of the Consumer Loans.  Payments of Dealer Holdback and accelerated Dealer Holdback are not included.
(2)  Presented as a percentage of total forecasted collections.

The risk of a material change in our forecasted collection rate declines as the Consumer Loans age.  For 2015 and prior Consumer Loan assignments, the risk of a material forecast variance is modest, as we have currently realized in excess of 90% of the expected collections.  Conversely, the forecasted collection rates for more recent Consumer Loan assignments are less certain as a significant portion of our forecast has not been realized.

The spread between the forecasted collection rate and the advance rate has ranged from 20.3% to 33.1% over the last 10 years. The spread was at the high end of this range in 2010, when the competitive environment was unusually favorable, and much lower during other years (2015 through 2019) when competition was more intense. The decrease in the spread from 2018 to 2019 was primarily the result of the performance of 2018 Consumer Loans, which has exceeded our initial estimates by a greater margin than those assigned to us in 2019.

27

The following table compares our forecast of Consumer Loan collection rates as ofDecember 31, 2019 with the forecasts at the time of assignment, for Dealer Loans and Purchased Loans separately:

| | Dealer Loans | | | Purchased Loans | | |
| | Forecasted Collection Percentage as of (1) | | | Forecasted Collection Percentage as of (1) | | |
| Consumer Loan Assignment Year | December 31, 2019 | Initial Forecast | Variance | December 31, 2019 | Initial Forecast | Variance |
|---|---|---|---|---|---|---|
| 2010 | 77.6% | 73.6% | 4.0 % | 78.7% | 73.1% | 5.6% |
| 2011 | 74.6% | 72.4% | 2.2 % | 76.4% | 72.7% | 3.7% |
| 2012 | 73.7% | 71.3% | 2.4 % | 75.9% | 71.4% | 4.5% |
| 2013 | 73.4% | 72.1% | 1.3 % | 74.4% | 71.6% | 2.8% |
| 2014 | 71.6% | 71.9% | -0.3 % | 72.5% | 70.9% | 1.6% |
| 2015 | 64.8% | 67.5% | -2.7 % | 69.3% | 68.5% | 0.8% |
| 2016 | 63.2% | 65.1% | -1.9 % | 66.6% | 66.5% | 0.1% |
| 2017 | 64.2% | 63.8% | 0.4 % | 66.3% | 64.6% | 1.7% |
| 2018 | 64.7% | 63.6% | 1.1 % | 66.0% | 63.5% | 2.5% |
| 2019 | 64.4% | 63.9% | 0.5 % | 65.1% | 64.2% | 0.9% |

(1) The forecasted collection rates presented for Dealer Loans and Purchased Loans reflect the Consumer Loan classification at the time of assignment.

The following table presents forecasted Consumer Loan collection rates, advance rates, and the spread (the forecasted collection rate less the advance rate) as of December 31, 2019 for Dealer Loans and Purchased Loans separately. All amounts are presented as a percentage of the initial balance of the Consumer Loan (principal + interest).

| | Dealer Loans | | | Purchased Loans | | |
| Consumer Loan Assignment Year | Forecasted Collection % (1) | Advance % (1)(2) | Spread % | Forecasted Collection % (1) | Advance % (1)(2) | Spread % |
|---|---|---|---|---|---|---|
| 2010 | 77.6% | 44.4% | 33.2% | 78.7% | 47.3% | 31.4% |
| 2011 | 74.6% | 45.1% | 29.5% | 76.4% | 49.3% | 27.1% |
| 2012 | 73.7% | 46.0% | 27.7% | 75.9% | 50.0% | 25.9% |
| 2013 | 73.4% | 47.2% | 26.2% | 74.4% | 51.5% | 22.9% |
| 2014 | 71.6% | 47.2% | 24.4% | 72.5% | 51.8% | 20.7% |
| 2015 | 64.8% | 43.4% | 21.4% | 69.3% | 50.2% | 19.1% |
| 2016 | 63.2% | 42.1% | 21.1% | 66.6% | 48.6% | 18.0% |
| 2017 | 64.2% | 42.1% | 22.1% | 66.3% | 45.8% | 20.5% |
| 2018 | 64.7% | 42.7% | 22.0% | 66.0% | 45.2% | 20.8% |
| 2019 | 64.4% | 43.1% | 21.3% | 65.1% | 45.6% | 19.5% |

(1) The forecasted collection rates and advance rates presented for Dealer Loans and Purchased Loans reflect the Consumer Loan classification at the time of assignment.
(2) Represents advances paid to Dealers on Consumer Loans assigned under our Portfolio Program and one-time payments made to Dealers to purchase Consumer Loans assigned under our Purchase Program as a percentage of the initial balance of the Consumer Loans. Payments of Dealer Holdback and accelerated Dealer Holdback are not included.

Although the advance rate on Purchased Loans is higher as compared to the advance rate on Dealer Loans, Purchased Loans do not require us to pay Dealer Holdback.

The spread on Dealer Loans decreased from 22.0% in 2018 to 21.3% in 2019 primarily as a result of the performance of the 2018 Consumer Loans in our Dealer Loan portfolio, which has exceeded our initial estimates by a greater margin than those assigned to us in 2019. The spread on Purchased Loans decreased from 20.8% in 2018 to 19.5% in 2019 primarily as a result of the performance of the 2018 Consumer Loans in our Purchased Loan portfolio, which has exceeded our initial estimates by a greater margin than those assigned to us in 2019.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (CONTINUED)**

### 13. STOCK REPURCHASES

The following table summarizes our stock repurchases for the years ended December 31, 2019, 2018, and 2017:

| (Dollars in millions) | For the Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2019 | | 2018 | | 2017 | |
| Stock Repurchases | Number of Shares Repurchased | Cost | Number of Shares Repurchased | Cost | Number of Shares Repurchased | Cost |
| Open Market (1) | 669,752 | $ 282.2 | 336,743 | $ 127.1 | 588,580 | $ 119.1 |
| Other (2) | 42,696 | 18.2 | 6,185 | 2.0 | 21,680 | 4.4 |
| Total | 712,448 | $ 300.4 | 342,928 | $ 129.1 | 610,260 | $ 123.5 |

(1) Represents repurchases under authorizations by the board of directors for the repurchase of shares by us from time to time in the open market or in privately negotiated transactions. On November 7, 2019, the board of directors authorized the repurchase of up to one million shares of our common stock in addition to the board's prior authorizations. As of December 31, 2019, we had authorization to repurchase 769,713 shares of our common stock.

(2) Represents shares of common stock released to us by team members as payment of tax withholdings upon the vesting of restricted stock and restricted stock units and the conversion of restricted stock units to common stock.

### 14. STOCK-BASED COMPENSATION PLANS

Pursuant to our Amended and Restated Incentive Compensation Plan (the "Incentive Plan"), we can grant stock-based awards in the form of restricted stock, restricted stock units and stock options to team members, officers, directors, and contractors at any time prior to March 26, 2022. On March 26, 2012, our board of directors approved an amendment to our Incentive Plan, increasing the number of shares authorized for issuance by 500,000 shares, to 2.0 million shares. The shares available for future grants under the Incentive Plan totaled 121,621 as of December 31, 2019.

*Restricted Stock*

We grant performance-based and time-based shares of restricted stock to team members in accordance with our Incentive Plan. The grant-date fair value per share is estimated to equal the market price of our common stock on the date of grant. Based on the terms of individual restricted stock grant agreements, shares vest under one of the following methods:

- Over a period of 15 years, based on continuous employment and a combination of the cumulative improvement in our annual adjusted economic profit, a non-GAAP financial measure, and the attainment of annual adjusted economic profit targets.
- Over a period of three years, based on continuous employment.

A summary of the non-vested restricted stock activity under the Incentive Plan for the year ended December 31, 2019 is presented below:

| Restricted Stock | Number of Shares | Weighted Average Grant-Date Fair Value Per Share |
|---|---|---|
| Non-vested as of December 31, 2018 | 150,647 | $ 117.41 |
| Granted | 5,301 | 441.54 |
| Vested | (17,971) | 148.14 |
| Forfeited | (474) | 363.16 |
| Non-vested as of December 31, 2019 | 137,503 | $ 125.04 |

The grant-date weighted average fair value of shares granted in 2019, 2018 and 2017 was $441.54, $317.87, and $200.79, respectively. The total fair value of shares vested was $7.9 million in 2019, $4.8 million in 2018 and $5.6 million in 2017.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (CONTINUED)**

**16. COMMITMENTS AND CONTINGENCIES**

**Litigation and Other Legal Matters**

In the normal course of business and as a result of the consumer-oriented nature of the industry in which we operate, we and other industry participants are frequently subject to various consumer claims, litigation and regulatory investigations seeking damages, fines and statutory penalties. The claims allege, among other theories of liability, violations of state, federal and foreign truth-in-lending, credit availability, credit reporting, consumer protection, warranty, debt collection, insurance and other consumer-oriented laws and regulations, including claims seeking damages for alleged physical and mental harm relating to the repossession and sale of consumers' vehicles and other debt collection activities. As the assignee of Consumer Loans originated by Dealers, we may also be named as a co-defendant in lawsuits filed by consumers principally against Dealers. We may also have disputes and litigation with Dealers. The claims may allege, among other theories of liability, that we breached our Dealer servicing agreement. We may also have disputes and litigation with vendors and other third parties. The claims may allege, among other theories of liability, that we breached a license agreement or contract. The damages, fines and penalties that may be claimed by consumers, regulatory agencies, Dealers, vendors or other third parties in these types of matters can be substantial. The relief requested by plaintiffs varies but may include requests for compensatory, statutory and punitive damages and injunctive relief, and plaintiffs may seek treatment as purported class actions. Current actions to which we are a party include the following matters.

On May 7, 2019, we received a subpoena from the Office of the New York State Attorney General, relating to the Company's origination and collection policies and procedures in the state of New York. We are cooperating with the inquiry and cannot predict the eventual scope, duration or outcome at this time. As a result, we are unable to estimate the reasonably possible loss or range of reasonably possible loss arising from this investigation.

On April 22, 2019, we received a civil investigative demand from the Bureau of Consumer Financial Protection (the "Bureau") seeking, among other things, certain information relating to the Company's origination and collection of Consumer Loans, TPPs and credit reporting. We cannot predict the eventual scope, duration or outcome of this investigation at this time. As a result, we are unable to estimate the reasonably possible loss or range of reasonably possible loss arising from this investigation.

On August 14, 2017, we received a subpoena from the Attorney General of the State of Mississippi, relating to the origination and collection of non-prime auto loans in the state of Mississippi. The Company cooperated with the inquiry. On April 23, 2019, the Attorney General of the State of Mississippi, on behalf of the State of Mississippi, filed a complaint in the Chancery Court of the First Judicial District of Hinds County, Mississippi, alleging that the Company engaged in unfair and deceptive trade practices in subprime auto lending, loan servicing, vehicle repossession and debt collection in the State of Mississippi in violation of the Mississippi Consumer Protection Act. The complaint seeks injunctive relief, including civil penalties and disgorgement, and payment of the State's attorney's fees and costs. We cannot predict the duration or outcome of this lawsuit at this time. As a result, we are unable to estimate the reasonably possible loss or range of reasonably possible loss arising from this lawsuit. The Company intends to vigorously defend itself in this matter.

On June 14, 2017, we were informed that the Bureau's Office of Fair Lending and Equal Opportunity is investigating whether the Company may have violated the Equal Credit Opportunity Act ("ECOA") and Regulation B. On February 6, 2020, we were notified by the Bureau that they have completed their examination, they identified two matters requiring action and these matters will be addressed through the supervisory process.

On March 18, 2016, we received a subpoena from the Attorney General of the State of Maryland, relating to the Company's repossession and sale policies and procedures in the state of Maryland. We are cooperating with the inquiry and cannot predict the eventual scope, duration or outcome at this time. As a result, we are unable to estimate the reasonably possible loss or range of reasonably possible loss arising from this investigation.

86

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (CONTINUED)**

On February 19, 2016, we received a First Amended Complaint filed by Westlake Services d/b/a Westlake Financial Service and Nowcom Corporation, alleging that the Company has attempted to monopolize the indirect financing profit sharing program market in violation of Section 2 of the Sherman Act and seeking, among other things, injunctive relief and unspecified money damages, which, if awarded, would likely be trebled pursuant to the Sherman Act. The case was filed in the United States District Court, Central District of California, Western Division. On April 6, 2016, the Court dismissed the claims brought by Nowcom Corporation. On January 5, 2018, the Court entered judgment in favor of the Company, dismissing the case with prejudice on the merits and ordering that the Company be awarded its costs of suit from Westlake Services, LLC. On February 2, 2018, Westlake Services, LLC filed a Notice of Appeal with the Court. On July 13, 2018, Westlake Services, LLC filed its appellate brief with the United States Court of Appeals for the Ninth Circuit. On September 14, 2018, we filed our response to Westlake Services, LLC's appellate brief. On October 19, 2018, Westlake Services, LLC filed its reply brief. On February 5, 2020, the United States Court of Appeals for the Ninth Circuit affirmed the January 5, 2018 judgment entered in favor of the Company, dismissing the case with prejudice.

On December 9, 2014, we received a civil investigative subpoena from the U.S. Department of Justice pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 directing us to produce certain information relating to subprime automotive finance and related securitization activities. We have cooperated with the inquiry, but cannot predict the eventual scope, duration or outcome at this time. As a result, we are unable to estimate the reasonably possible loss or range of reasonably possible loss arising from this investigation.

On December 4, 2014, we received a civil investigative demand from the Office of the Attorney General of the Commonwealth of Massachusetts relating to the origination and collection of non-prime auto loans in Massachusetts. On November 20, 2017 we received a second civil investigation demand from the Office of the Attorney General seeking updated information on its original civil investigation demand, additional information related to the Company's origination and collection of Consumer Loans, and information regarding securitization activities. In connection with this inquiry, we were informed by representatives of the Office of the Attorney General that it believes that the Company may have engaged in unfair and deceptive acts or practices related to the origination and collection of auto loans, which may have caused some of the Company's representations and warranties contained in securitization documents to be inaccurate.  The investigation relating to the origination, collection and securitization of non-prime auto loans and securities transactions by the Office of the Attorney General remains ongoing. We are cooperating with the inquiry and cannot predict the eventual scope, duration or outcome at this time. As a result, we are unable to estimate the reasonably possible loss or range of reasonably possible loss arising from this investigation.

An adverse ultimate disposition in any action to which we are a party or otherwise subject could have a material adverse impact on our financial position, liquidity and results of operations.

**Lease Commitments**

We lease office space and office equipment.  We expect that in the normal course of business, leases will be renewed or replaced by other leases.  Total rental expense on all operating leases was $1.8 million for 2019, $2.2 million for 2018, and $1.5 million for 2017.  Contingent rentals under the operating leases were insignificant. Our total minimum future lease commitments under operating leases as of December 31, 2019 are as follows:

(In millions)

| Year | Minimum Future Lease Commitments | |
|------|---:|---:|
| 2020 | $ | 1.6 |
| 2021 |  | 1.2 |
| 2022 |  | 0.6 |
| 2023 |  | — |
| 2024 |  | — |
| Total | $ | 3.4 |

87

**EXHIBIT 31.1**

**Credit Acceptance Corporation**

**CERTIFICATION PURSUANT TO SECTION 302**
**OF THE SARBANES-OXLEY ACT OF 2002**

I, Brett A. Roberts, certify that:

1. I have reviewed this annual report on Form 10-K for the year endedDecember 31, 2019 of Credit Acceptance Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 11, 2020

By:   /s/ Brett A. Roberts

Brett A. Roberts
Chief Executive Officer
(Principal Executive Officer)

**EXHIBIT 31.2**

**Credit Acceptance Corporation**

**CERTIFICATION PURSUANT TO SECTION 302**
**OF THE SARBANES-OXLEY ACT OF 2002**

I, Kenneth S. Booth, certify that:

1. I have reviewed this annual report on Form 10-K for the year endedDecember 31, 2019 of Credit Acceptance Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 11, 2020

By:    /s/ Kenneth S. Booth
       
       Kenneth S. Booth
       Chief Financial Officer
       (Principal Financial Officer)

**EXHIBIT 32.1**

**Credit Acceptance Corporation**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K of Credit Acceptance Corporation (the "Company") for the period ending December 31, 2019 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Brett A. Roberts, as Chief Executive Officer of the Company, hereby certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that, to the best of my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: February 11, 2020                                      By:        /s/ Brett A. Roberts

                                                                             Brett A. Roberts
                                                                             Chief Executive Officer
                                                                             (Principal Executive Officer)

**EXHIBIT 32.2**

**Credit Acceptance Corporation**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K of Credit Acceptance Corporation (the "Company") for the period ending December 31, 2019 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Kenneth S. Booth, as Chief Financial Officer of the Company, hereby certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that, to the best of my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: February 11, 2020                    By:     /s/ Kenneth S. Booth
                                                   Kenneth S. Booth
                                                   Chief Financial Officer
                                                   (Principal Financial Officer)