# Exhibit D

_____

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**Washington, DC 20549**
# FORM 10-K

(Mark One)

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
   **For the fiscal year ended December 31, 2018**

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
   **For the transition period from _____ to _____**

**Commission file number 000-20202**

# CREDIT ACCEPTANCE CORPORATION
*(Exact name of registrant as specified in its charter)*

| **Michigan** | **38-1999511** |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |

| **25505 W. Twelve Mile Road** | |
| **Southfield, Michigan** | **48034-8339** |
| *(Address of principal executive offices)* | *(Zip Code)* |

Registrant's telephone number, including area code: **(248) 353-2700**

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Name of each exchange on which registered** |
|---|---|
| Common Stock | The Nasdaq Stock Market |

Securities registered pursuant to section 12(g) of the Act:
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☑     Accelerated filer ☐     Non-accelerated filer ☐     Smaller reporting company ☐     Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☑

The aggregate market value of 10,448,025 shares of the Registrant's common stock held by non-affiliates on June 30, 2018 was approximately $3,692.3 million. For purposes of this computation all officers, directors and 10% beneficial owners of the Registrant are assumed to be affiliates. Such determination should not be deemed an admission that such officers, directors and beneficial owners are, in fact, affiliates of the Registrant.

At February 1, 2019, there were 18,780,287 shares of the Registrant's common stock issued and outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Registrant's definitive Proxy Statement pertaining to the 2019 Annual Meeting of Shareholders (the "Proxy Statement") filed pursuant to Regulation 14A are incorporated herein by reference into Part III of this Annual Report on Form 10-K (this "Form 10-K").

_____

**CREDIT ACCEPTANCE CORPORATION**
**YEAR ENDED DECEMBER 31, 2018**

**INDEX TO FORM 10-K**

| Item | Description | Page |
|---|---|---|
| | **PART I** | |
| 1. | Business | 3 |
| 1A. | Risk Factors | 13 |
| 1B. | Unresolved Staff Comments | 20 |
| 2. | Properties | 20 |
| 3. | Legal Proceedings | 21 |
| 4. | Mine Safety Disclosures | 21 |
| | **PART II** | |
| 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 21 |
| 6. | Selected Financial Data | 23 |
| 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 24 |
| 7A. | Quantitative and Qualitative Disclosures About Market Risk | 42 |
| 8. | Financial Statements and Supplementary Data | 43 |
| 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 93 |
| 9A. | Controls and Procedures | 93 |
| 9B. | Other Information | 95 |
| | **PART III** | |
| 10. | Directors, Executive Officers and Corporate Governance | 95 |
| 11. | Executive Compensation | 95 |
| 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 95 |
| 13. | Certain Relationships and Related Transactions and Director Independence | 95 |
| 14. | Principal Accounting Fees and Services | 95 |
| | **PART IV** | |
| 15. | Exhibits, Financial Statement Schedules | 96 |
| 16. | Form 10-K Summary | 103 |
| | | |
| | Signatures | 104 |

**Regulation**

Our business is subject to laws and regulations, including the Truth in Lending Act, the Equal Credit Opportunity Act, the Fair Credit Reporting Act and various other state and federal laws and regulations. These laws and regulations, among other things, require licensing and qualification; limit interest rates, fees and other charges associated with the Consumer Loans assigned to us; require specified disclosures by Dealers to consumers; govern the sale and terms of ancillary products; and define the rights to repossess and sell collateral. Failure to comply with these laws or regulations could have a material adverse effect on us by, among other things, limiting the jurisdictions in which we may operate, restricting our ability to realize the value of the collateral securing the Consumer Loans, making it more costly or burdensome to do business or resulting in potential liability. The volume of new or modified laws and regulations has increased in recent years and has increased significantly in response to issues arising with respect to consumer lending. From time to time, legislation and regulations are enacted which increase the cost of doing business, limit or expand permissible activities or affect the competitive balance among financial services providers. Proposals to change the laws and regulations governing the operations and taxation of financial institutions and financial services providers are frequently made in the U.S. Congress, in the state legislatures and by various regulatory agencies. This legislation may change our operating environment in substantial and unpredictable ways and may have a material adverse effect on our business.

In July 2010 the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") was enacted and a number of its provisions became effective in July 2011. The Dodd-Frank Act restructured and enhanced the regulation and supervision of the financial services industry and created the Bureau of Consumer Financial Protection (the "Bureau"). We are subject to supervision by the Bureau. The Bureau has rulemaking and enforcement authority over certain non-depository institutions, including us. The Bureau is specifically authorized, among other things, to take actions to prevent companies providing consumer financial products or services and their service providers from engaging in unfair, deceptive or abusive acts or practices in connection with consumer financial products and services, and to issue rules requiring enhanced disclosures for consumer financial products or services. Under the Dodd-Frank Act, the Bureau also may restrict the use of pre-dispute mandatory arbitration clauses in contracts between covered persons and consumers for a consumer financial product or service. The Bureau also has authority to interpret, enforce and issue regulations implementing enumerated consumer laws, including certain laws that apply to our business. Further, the Bureau has issued rules allowing it to supervise non-depository "larger participants" in certain markets for consumer financial services and products. On June 10, 2015, the Bureau released its larger participant rule defining which nonbank automotive finance companies will be subject to supervision. The rule provides that nonbank auto finance companies that make, acquire or refinance 10,000 or more loans or leases in a year will come under Bureau supervision. The rule was officially published in the Federal Register on June 30, 2015, and became effective on August 31, 2015.

The Dodd-Frank Act and regulations promulgated thereunder, including by the Bureau, are likely to affect our cost of doing business, may limit or expand our permissible activities, may affect the competitive balance within our industry and market areas and could have a material adverse effect on us. Our management continues to assess the Dodd-Frank Act's probable impact on our business, financial condition and results of operations, and to monitor developments involving the entities charged with promulgating regulations thereunder. However, the ultimate effect of the Dodd-Frank Act on the financial services industry in general, and on us in particular, is uncertain at this time.

In addition to the Bureau, other state and federal agencies have the ability to regulate aspects of our business. For example, the Dodd-Frank Act provides a mechanism for state attorneys general to investigate us. Separately, state attorneys general and certain state regulators have authority under their respective rules and laws, to investigate and/or regulate aspects of the business. In addition, the Federal Trade Commission has jurisdiction to investigate aspects of our business. We expect that regulatory investigations by both state and federal agencies will continue and that the results of these investigations could have a material adverse impact on us.

11

We are cooperating with the following inquiries and cannot predict the eventual scopes, durations or outcomes at this time. As a result, we are unable to estimate the reasonably possible loss or range of reasonably possible loss arising from these investigations.

- On April 10, 2018, we were informed by the New York Department of Financial Services, Financial Frauds & Consumer Protection Division ("DFS") that it believes that the Company may have violated the law relating to fair lending; may have misrepresented to consumers information related to GPS Starter Interrupt Devices; and may have provided inaccurate information in the course of a DFS supervisory examination.
- On August 14, 2017, we received a subpoena from the Attorney General of the State of Mississippi, relating to the origination and collection of non-prime auto loans in the state of Mississippi. In connection with this inquiry, we were informed by representatives of the Attorney General's office that it believes that the Company may have engaged in unfair and deceptive acts or practices relating to the origination and collection of auto loans in violation of the Mississippi Consumer Protection Act.
- On June 14, 2017, we were informed that the Bureau's Office of Fair Lending and Equal Opportunity is investigating whether the Company may have violated the Equal Credit Opportunity Act and Regulation B.
- On November 7, 2016, we received a civil investigative demand from the Federal Trade Commission seeking information on the Company's policies, practices and procedures in allowing car dealers to use GPS Starter Interrupters on consumer vehicles.
- On March 18, 2016, we received a subpoena from the Attorney General of the State of Maryland, relating to the Company's repossession and sale policies and procedures in the state of Maryland.
- On September 18, 2015, we received a subpoena from the Attorney General of the State of New York, Civil Rights Bureau relating to the Company's origination and collection of Consumer Loans in the state of New York.
- On December 9, 2014, we received a civil investigative subpoena from the U.S. Department of Justice pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 directing us to produce certain information relating to subprime automotive finance and related securitization activities.
- On December 4, 2014, we received a civil investigative demand from the Office of the Attorney General of the Commonwealth of Massachusetts relating to the origination and collection of non-prime auto loans in Massachusetts. On November 20, 2017, we received a second civil investigation demand from the Office of the Attorney General seeking updated information on its original civil investigation demand, additional information related to the Company's origination and collection of Consumer Loans, and information regarding securitization activities. In connection with this inquiry, we were informed by representatives of the Office of the Attorney General that it believes that the Company may have engaged in unfair and deceptive acts or practices related to the origination and collection of auto loans, which may have caused some of the Company's representations and warranties contained in securitization documents to be inaccurate. The investigation relating to the origination, collection and securitization of non-prime auto loans and securities transactions by the Office of the Attorney General remains ongoing.

In addition, governmental regulations which would deplete the supply of used vehicles, such as environmental protection regulations governing emissions or fuel consumption, could have a material adverse effect on us.

Our Dealers must also comply with credit and trade practice statutes and regulations.  Failure of our Dealers to comply with these statutes and regulations could result in consumers having rights of rescission and other remedies that could have a material adverse effect on us.

The sale of vehicle service contracts and GAP by Dealers in connection with Consumer Loans assigned to us from Dealers is also subject to state laws and regulations.  As we are the holder of the Consumer Loans that may, in part, finance these products, some of these state laws and regulations may apply to our servicing and collection of the Consumer Loans.  Although these laws and regulations do not significantly affect our business, there can be no assurance that insurance or other regulatory authorities in the jurisdictions in which these products are offered by Dealers will not seek to regulate or restrict the operation of our business in these jurisdictions.  Any regulation or restriction of our business in these jurisdictions could materially adversely affect the income received from these products.

We believe that we maintain all material licenses and permits required for our current operations and are in substantial compliance with all applicable laws and regulations. Our agreements with Dealers provide that the Dealer shall indemnify us with respect to any loss or expense we incur as a result of the Dealer's failure to comply with applicable laws and regulations.

12

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (CONTINUED)**

**17.   COMMITMENTS AND CONTINGENCIES**

**Litigation and Other Legal Matters**

In the normal course of business and as a result of the consumer-oriented nature of the industry in which we operate, we and other industry participants are frequently subject to various consumer claims, litigation and regulatory investigations seeking damages, fines and statutory penalties. The claims allege, among other theories of liability, violations of state, federal and foreign truth-in-lending, credit availability, credit reporting, consumer protection, warranty, debt collection, insurance and other consumer-oriented laws and regulations, including claims seeking damages for alleged physical and mental harm relating to the repossession and sale of consumers' vehicles and other debt collection activities. As the assignee of Consumer Loans originated by Dealers, we may also be named as a co-defendant in lawsuits filed by consumers principally against Dealers. We may also have disputes and litigation with Dealers. The claims may allege, among other theories of liability, that we breached our Dealer servicing agreement. We may also have disputes and litigation with vendors and other third parties. The claims may allege, among other theories of liability, that we breached a license agreement or contract. The damages, fines and penalties that may be claimed by consumers, regulatory agencies, Dealers, vendors or other third parties in these types of matters can be substantial. The relief requested by plaintiffs varies but may include requests for compensatory, statutory and punitive damages and injunctive relief, and plaintiffs may seek treatment as purported class actions. Current actions to which we are a party include the following matters.

On April 10, 2018, we were informed by the New York Department of Financial Services, Financial Frauds & Consumer Protection Division ("DFS") that it believes that the Company may have violated the law relating to fair lending; may have misrepresented to consumers information related to GPS Starter Interrupt Devices; and may have provided inaccurate information in the course of a DFS supervisory examination.  We are cooperating with the inquiry, including through the exchange of certain written correspondence.  We cannot predict the eventual scope, duration or outcome at this time. As a result, we are unable to estimate the reasonably possible loss or range of reasonably possible loss arising from this inquiry.

On August 14, 2017, we received a subpoena from the Attorney General of the State of Mississippi, relating to the origination and collection of non-prime auto loans in the state of Mississippi. In connection with this inquiry, we were informed by representatives of the Attorney General's office that it believes that the Company may have engaged in unfair and deceptive acts or practices relating to the origination and collection of auto loans in violation of the Mississippi Consumer Protection Act. We are cooperating with the inquiry and cannot predict the eventual scope, duration or outcome at this time. As a result, we are unable to estimate the reasonably possible loss or range of reasonably possible loss arising from this investigation.

On June 14, 2017, we were informed that the Bureau of Consumer Financial Protection's Office of Fair Lending and Equal Opportunity is investigating whether the Company may have violated the Equal Credit Opportunity Act and Regulation B. We are cooperating with the inquiry and cannot predict the eventual scope, duration or outcome at this time. As a result, we are unable to estimate the reasonably possible loss or range of reasonably possible loss arising from this inquiry.

On November 7, 2016, we received a civil investigative demand from the Federal Trade Commission seeking information on the Company's policies, practices and procedures in allowing car dealers to use GPS Starter Interrupters on consumer vehicles. We are cooperating with the inquiry and cannot predict the eventual scope, duration or outcome at this time. As a result, we are unable to estimate the reasonably possible loss or range of reasonably possible loss arising from this investigation.

On March 18, 2016, we received a subpoena from the Attorney General of the State of Maryland, relating to the Company's repossession and sale policies and procedures in the state of Maryland. We are cooperating with the inquiry and cannot predict the eventual scope, duration or outcome at this time. As a result, we are unable to estimate the reasonably possible loss or range of reasonably possible loss arising from this investigation.

On February 19, 2016, we received a First Amended Complaint filed by Westlake Services d/b/a Westlake Financial Service and Nowcom Corporation, alleging that the Company has attempted to monopolize the indirect financing profit sharing program market in violation of Section 2 of the Sherman Act and seeking, among other things, injunctive relief and unspecified money damages, which, if awarded, would likely be trebled pursuant to the Sherman Act. The case was filed in the United States District Court, Central District of California, Western Division. On April 6, 2016, the Court dismissed the claims brought by Nowcom Corporation. On January 5, 2018, the Court entered judgment in favor of the Company, dismissing the case with prejudice on the merits and ordering that the Company be awarded its costs of suit from Westlake Services, LLC. On February 2, 2018, Westlake Services, LLC filed a Notice of Appeal with the Court. On July 13, 2018, Westlake Services, LLC filed its appellate brief with the United States Court of Appeals for the Ninth Circuit. On September 14, 2018, we filed our response to Westlake Services, LLC's appellate brief. On October 19, 2018, Westlake Services, LLC filed its reply brief. We cannot predict the duration or outcome of this lawsuit at this time. As a result, we are unable to estimate the reasonably possible loss or range of reasonably possible loss arising from this lawsuit. The Company intends to vigorously defend itself in this matter.

90

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (CONTINUED)**

On September 18, 2015, we received a subpoena from the Attorney General of the State of New York, Civil Rights Bureau relating to the Company's origination and collection of Consumer Loans in the state of New York. We have cooperated with the inquiry, but cannot predict the eventual scope, duration or outcome at this time. As a result, we are unable to estimate the reasonably possible loss or range of reasonably possible loss arising from this investigation.

On December 9, 2014, we received a civil investigative subpoena from the U.S. Department of Justice pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 directing us to produce certain information relating to subprime automotive finance and related securitization activities. We have cooperated with the inquiry, but cannot predict the eventual scope, duration or outcome at this time. As a result, we are unable to estimate the reasonably possible loss or range of reasonably possible loss arising from this investigation.

On December 4, 2014, we received a civil investigative demand from the Office of the Attorney General of the Commonwealth of Massachusetts relating to the origination and collection of non-prime auto loans in Massachusetts. On November 20, 2017 we received a second civil investigation demand from the Office of the Attorney General seeking updated information on its original civil investigation demand, additional information related to the Company's origination and collection of Consumer Loans, and information regarding securitization activities. In connection with this inquiry, we were informed by representatives of the Office of the Attorney General that it believes that the Company may have engaged in unfair and deceptive acts or practices related to the origination and collection of auto loans, which may have caused some of the Company's representations and warranties contained in securitization documents to be inaccurate. The investigation relating to the origination, collection and securitization of non-prime auto loans and securities transactions by the Office of the Attorney General remains ongoing. We are cooperating with the inquiry and cannot predict the eventual scope, duration or outcome at this time. As a result, we are unable to estimate the reasonably possible loss or range of reasonably possible loss arising from this investigation.

An adverse ultimate disposition in any action to which we are a party or otherwise subject could have a material adverse impact on our financial position, liquidity and results of operations.

**Lease Commitments**

We lease office space and office equipment. We expect that in the normal course of business, leases will be renewed or replaced by other leases. Total rental expense on all operating leases was $2.2 million for 2018, and $1.5 million for 2017 and 2016. Contingent rentals under the operating leases were insignificant. Our total minimum future lease commitments under operating leases as of December 31, 2018 are as follows:

(In millions)

| Year | Minimum Future Lease Commitments |
|------|---------------------------------:|
| 2019 | $ 1.8 |
| 2020 | 1.5 |
| 2021 | 1.1 |
| 2022 | 0.5 |
| 2023 | — |
| Total | $ 4.9 |

91

**EXHIBIT 31.1**

**Credit Acceptance Corporation**

**CERTIFICATION PURSUANT TO SECTION 302**
**OF THE SARBANES-OXLEY ACT OF 2002**

I, Brett A. Roberts, certify that:

1. I have reviewed this annual report on Form 10-K for the year ended December 31, 2018 of Credit Acceptance Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 8, 2019                    By:     /s/ Brett A. Roberts

                                                  Brett A. Roberts
                                                  Chief Executive Officer
                                                  (Principal Executive Officer)

**EXHIBIT 31.2**

**Credit Acceptance Corporation**

**CERTIFICATION PURSUANT TO SECTION 302**
**OF THE SARBANES-OXLEY ACT OF 2002**

I, Kenneth S. Booth, certify that:

1. I have reviewed this annual report on Form 10-K for the year ended December 31, 2018 of Credit Acceptance Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 8, 2019

By:      /s/ Kenneth S. Booth

Kenneth S. Booth
Chief Financial Officer
(Principal Financial Officer)

**EXHIBIT 32.1**

**Credit Acceptance Corporation**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K of Credit Acceptance Corporation (the "Company") for the period ending December 31, 2018 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Brett A. Roberts, as Chief Executive Officer of the Company, hereby certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that, to the best of my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: February 8, 2019                                    By:      /s/ Brett A. Roberts

                                                                                  Brett A. Roberts
                                                                                  Chief Executive Officer
                                                                                  (Principal Executive Officer)

**EXHIBIT 32.2**

**Credit Acceptance Corporation**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K of Credit Acceptance Corporation (the "Company") for the period ending December 31, 2018 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Kenneth S. Booth, as Chief Financial Officer of the Company, hereby certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that, to the best of my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: February 8, 2019                                    By:        /s/ Kenneth S. Booth

                                                                    Kenneth S. Booth
                                                                    Chief Financial Officer
                                                                    (Principal Financial Officer)