**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| PALM TRAN, INC. AMALGAMATED TRANSIT UNION LOCAL 1577 PENSION PLAN, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) ) | Case No.: 2:20-cv-12698-LVP-EAS |
| | ) | Hon. Linda V. Parker |
| Plaintiff, | ) ) ) | CLASS ACTION |
| v. | ) ) | |
| CREDIT ACCEPTANCE CORPORATION, BRETT A. ROBERTS, and KENNETH S. BOOTH, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**LEAD PLAINTIFFS' RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT [ECF No. 35]**

## STATEMENT OF ISSUES PRESENTED

1. Should the Court deny Defendants' motion to dismiss because Plaintiffs' Amended Class Action Complaint (the "AC") adequately pled claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, and alleged with particularity facts showing material misstatements and/or omissions?

   Plaintiffs say: YES.

2. Should the Court deny Defendants' motion to dismiss because the AC adequately states with particularity facts giving rise to a strong inference of scienter that is cogent and at least as compelling as any opposing inference of nonfraudulent intent?

   Plaintiffs say: YES.

3. Should the Court deny Defendants' motion to dismiss because the AC adequately alleges a causal connection between the alleged misrepresentations and omissions and the alleged loss?

   Plaintiffs say: YES.

4. Should the Court deny Defendants' motion to dismiss the "control person" claims under Section 20(a) of the Exchange Act because the AC alleged facts sufficient to establish underlying violations of the federal securities laws.

   Plaintiffs say: YES.

ii

# CONTROLLING OR MOST APPROPRIATE AUTHORITY

*Armata v. Target Corp.*,
   480 Mass. 14 (2018)

*Chamberlain v. Reddy Ice Holdings, Inc.*,
   757 F. Supp. 2d 683 (E.D. Mich. 2010)

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
   399 F.3d 651 (6th Cir. 2005)

*Helwig v. Vencor, Inc.*,
   251 F.3d 540 (6th Cir. 2001)

*Indiana State District Council of Laborers & Hod
   Carriers Pension & Welfare Fund v. Omnicare, Inc.*,
   583 F.3d 935 (6th Cir. 2009)

*Jackson Cty. Emps.' Ret. Sys. v. Ghosn*,
   510 F. Supp. 3d 583 (M.D. Tenn. 2020)

*Klein v. Altria Grp., Inc.*,
   2021 WL 955992 (E.D. Va. Mar. 12, 2021)

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
   830 F.3d 376 (6th Cir. 2016)

*Omnicare, Inc. v. Laborers Dist. Council
   Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)

*PR Diamonds, Inc. v. Chandler*,
   364 F.3d 671 (6th Cir. 2004)

*Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt.*, Corp.,
   111 F. Supp. 3d 1336 (S.D. Fla. 2015)

*S.E.C. v. Conaway*,
   698 F. Supp. 2d 771 (E.D. Mich. 2010)

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001)

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)

*The MJK Fam. LLC v. Corp. Eagle Mgmt. Servs., Inc.*,
    365 F. Supp. 3d 900 (M.D. Tenn. 2019)

*Wilkof v. Caraco Pharm. Lab'ys, Ltd.*,
    2010 WL 4184465 (E.D. Mich. Oct. 21, 2010)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................. vii

INTRODUCTION ............................................................................................1

ARGUMENT ...................................................................................................4

I.      STANDARD OF REVIEW.....................................................................4

II.     THE AC PLEADS MATERIAL MISREPRESENTATIONS AND
        OMISSIONS............................................................................................6

        A.      Misstatements and Omissions Concerning an Illusory Opportunity
                to Improve the Lives of Defendants' Customers ..................................7

        B.      Generic Risk Warnings and Misstatements Regarding the
                Compliance with Applicable Regulations...........................................13

                1.      Defendants' Misstatements.......................................................15

                        a.      Misstatements Regarding Compliance with
                                Applicable Regulations....................................................15

                        b.      Misstatements Regarding Dealer-Partners'
                                Compliance with Applicable Laws and
                                Underwriting Guidelines .................................................18

                        c.      Misleading Risk Warnings ..............................................20

                        d.      Misstatements from Shareholder Letters........................21

                2.      Defendants' Omissions ............................................................23

        C.      Defendants' Misstatements Regarding Credit Acceptance's
                Collection Efforts and Ancillary Product Offerings ..........................26

                1.      Misstatements Regarding Collection Efforts............................26

                2.      Misstatements Regarding Ancillary Product Offerings............27

III.   THE AC PLEADS SCIENTER....................................................................28

    A.   Scienter Must Be Considered Holistically ............................................28

    B.   Viewed Holistically, the AC Pleads Scienter.......................................30

        1.   Insider Trading Supports an Inference of Scienter ...................31

        2.   Defendants' Misstatements Diverged from Internal Reports and Disregarded Factual Information ........................................36

        3.   Closeness in Time of Fraudulent Statement or Omission to Later Disclosure of Inconsistent Information ..........................41

        4.   Closely Related Ancillary Lawsuit ...........................................41

IV.   THE AC PLEADS LOSS CAUSATION.......................................................42

    A.   The January 30, 2020 – Materialization of the Concealed Risk .........42

    B.   The August 28-31, 2020 – Final Disclosure of the Truth ...................44

V.   PLAINTIFFS HAVE STATED A SECTION 20(a) CLAIM .......................46

CONCLUSION .......................................................................................................46

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Acadia Pharms. Inc. Sec. Litig.*,
  2020 WL 2838686 (S.D. Cal. June 1, 2020) ...............................................37, 39

*In re APAC Teleservices Inc. Sec. Litig.*,
  1999 WL 1052004 (S.D.N.Y. Nov. 19, 1999).....................................................32

*Armata v. Target Corp.*,
  480 Mass. 14 (2018) ...............................................................15, 16, 39, 40

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...................................................................................4

*Ashland, Inc. v. Oppenheimer & Co.*,
  648 F.3d 461 (6th Cir. 2011) ......................................................................29

*Atlas v. Accredited Home Lenders Holding Co.*,
  556 F. Supp. 2d 1142 (S.D. Cal. 2008)............................................................8

*Backe v. Novatel Wireless, Inc.*,
  642 F. Supp. 2d 1169 (S.D. Cal. 2009)...........................................................32

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988).................................................................................10

*Bennett v. Bascom*,
  788 F. App'x 318 (6th Cir. 2019)..............................................................14, 44

*Benzon v. Morgan Stanley Distribs., Inc.*,
  420 F.3d 598 (6th Cir. 2005) .....................................................................20

*In re BioScrip, Inc. Sec. Litig.*,
  95 F. Supp. 3d 711 (S.D.N.Y. 2015) .....................................................17, 25, 30

*Bondali v. Yum! Brands, Inc.*,
  620 F. App'x 483 (6th Cir. 2015)............................................................20, 30

*Brendon v. Allegiant Travel Co.*,
  412 F. Supp. 3d 1244 (D. Nev. 2019) ................................................................45

*In re Bristol Myers Squibb Co. Sec. Litig.*,
  586 F. Supp. 2d 148 (S.D.N.Y. 2008) ...............................................................42

*Burges v. BancorpSouth, Inc.*,
  2015 WL 4198795 (M.D. Tenn. July 10, 2015) ..........................................17, 40

*In re Cardinal Health Sec. Litig.*,
  426 F. Supp. 2d 688 (S.D. Ohio 2006) .........................................................23, 30

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014) ..............................................................................45

*Chamberlain v. Reddy Ice Holdings, Inc.*,
  757 F. Supp. 2d 683 (E.D. Mich. 2010) ..................................................10, 13, 24

*In re Citigroup Inc. Sec. Litig.*,
  753 F. Supp. 2d 206 (S.D.N.Y. 2010) ...............................................................38

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
  957 F. Supp. 2d 277 (S.D.N.Y. 2013) ...............................................................37

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
  399 F.3d 651 (6th Cir. 2005) ......................................................................9, 23, 30

*In re Comshare, Inc. Sec. Litig.*,
  1997 WL 1091468 (E.D. Mich. Sept. 18, 1997) ................................................33

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
  433 F. Supp. 3d 515 (S.D.N.Y. 2020) ...............................................................45

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) ...........................................................8, 9

*In re Credit Acceptance Corp. Sec. Litig.*,
  50 F. Supp. 2d 662 (E.D. Mich. 1999) ..............................................................33

*Doshi v. Gen. Cable Corp.*,
  386 F. Supp. 3d 815 (E.D. Ky. 2019) ................................................................34

*Dougherty v. Esperion Therapeutics, Inc.*,
   905 F.3d 971 (6th Cir. 2018) ...................................................................6

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)..........................................................................5, 42

*In re Fairway Grp. Holding Corp. Sec. Litig.*,
   2015 WL 249508 (S.D.N.Y. Jan. 20, 2015) ......................................35

*Frank v. Dana Corp.* (*Dana I*),
   547 F.3d 564 (6th Cir. 2008) ............................................................6, 29

*Frank v. Dana Corp. (Dana II)*,
   646 F.3d 954 (6th Cir. 2011) ....................................................4, 29, 33

*Fresno Cty. Emps.' Ret. Ass'n v. ComScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017) ................................................35

*In re Gentiva Sec. Litig.*,
   932 F. Supp. 2d 352 (E.D.N.Y. 2013) ................................................42

*George v. China Auto. Sys., Inc.*,
   2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012)......................................31

*Grae v. Corr. Corp. of Am.*,
   2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017) ................................22

*Halford v. AtriCure, Inc.*,
   2010 WL 8973625 (S.D. Ohio Mar. 29, 2010)...................................45

*Handy-Clay v. City of Memphis, Tenn.*,
   695 F.3d 531 (6th Cir. 2012) ................................................................4

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) ..............................................................33

*Helwig v. Vencor, Inc.*,
   251 F.3d 540 (6th Cir. 2001) .........................................................*passim*

*Hutchins v. NBTY, Inc.*,
   2012 WL 1078823 (E.D.N.Y. Mar. 30, 2012)....................................35

ix

*I.B.E.W. v. Ltd. Brands, Inc.*,
788 F. Supp. 2d 609 (S.D. Ohio 2011) ..............................................34

*Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*,
2021 WL 1316705 (M.D. Tenn. Apr. 8, 2021) ...........................17, 38

*Indiana State District Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*,
583 F.3d 935 (6th Cir. 2009) .......................................................5, 23

*In re Initial Pub. Offering Sec. Litig.*,
544 F. Supp. 2d 277 (S.D.N.Y. 2008) ...............................................43

*In re Insys Therapeutics, Inc. Sec. Litig.*,
2018 WL 2943746 (S.D.N.Y. June 12, 2018) ..................................38

*In re Intuitive Surgical Sec. Litig.*,
65 F. Supp. 3d 821 (N.D. Cal. 2014)................................................31

*JAC Holding Enters., Inc. v. Atrium Cap. Partners, LLC*,
997 F. Supp. 2d 710 (E.D. Mich. 2014) ..............................................4

*Jackson Cty. Emps.' Ret. Sys. v. Ghosn*,
510 F. Supp. 3d 583 (M.D. Tenn. 2020) ...............................11, 19, 28

*In re KBC Asset Mgmt. N.V.*,
572 F. App'x 356 (6th Cir. 2014)......................................................44

*Klein v. Altria Grp., Inc.*,
2021 WL 955992 (E.D. Va. Mar. 12, 2021)......................4, 25, 26, 45

*Lubbers v. Flagstar Bancorp. Inc.*,
162 F. Supp. 3d 571 (E.D. Mich. 2016) .......................................12, 21

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) ................................................35

*Nguyen v. New Link Genetics Corp.*,
297 F. Supp. 3d 472 (S.D.N.Y. 2018) ...............................................36

*In re Nuko Info. Sys., Inc. Sec. Litig.*,
199 F.R.D. 338 (N.D. Cal. 2000).......................................................33

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
  830 F.3d 376 (6th Cir. 2016) ....................................................................43

*In re Omnicare, Inc. Sec. Litig.*,
  769 F.3d 455 (6th Cir. 2014) ....................................................................22

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension
  Fund*,
  575 U.S. 175 (2015).....................................................................15, 40, 41

*In re Oxford Health Plans, Inc.*,
  187 F.R.D. 133 (S.D.N.Y. 1999) ..............................................................31

*Pittman v. Unum Grp.*,
  2021 WL 2646065 (6th Cir. June 28, 2021).............................................41

*Plymouth Cty. Ret. Ass'n v. ViewRay, Inc.*,
  2021 WL 3773330 (N.D. Ohio Aug. 25, 2021).........................................32

*PR Diamonds, Inc. v. Chandler*,
  364 F.3d 671 (6th Cir. 2004), *abrogated on other grounds by
  Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011).............29, 33

*Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*,
  111 F. Supp. 3d 1336 (S.D. Fla. 2015)......................................................39

*Ricker v. Zoo Ent., Inc.*,
  534 F. App'x 495 (6th Cir. 2013) ..............................................................11

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ......................................................................30

*S.E.C. v. Conaway*,
  698 F. Supp. 2d 771 (E.D. Mich. 2010) ........................................12, 19, 27

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) ...................................................................32, 36

*In re SLM Corp. Sec. Litig.*,
  740 F. Supp. 2d 542 (S.D.N.Y. 2010) .......................................................32

xi

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) (*Tellabs I*)....................................................................29, 30

*The MJK Fam. LLC v. Corp. Eagle Mgmt. Servs., Inc.*,
   2009 WL 4506418 (E.D. Mich. Nov. 30, 2009).......................................5, 19, 21

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016) ...............................................................................16

*USM Holdings Inc. v. Simon*,
   2016 WL 4396061 (E.D. Mich. Aug. 18, 2016)....................................................41

*Veal v. LendingClub Corp.*,
   18-cv-02599-BLF (N.D. Cal. Dec. 19, 2019), ECF No. 93 ...................................9

*Veal v. LendingClub Corp.*,
   423 F. Supp. 3d 785 (N.D. Cal. 2019)...................................................................9

*Weiner v. Tivity Health, Inc.*,
   365 F. Supp. 3d 900 (M.D. Tenn. 2019) ...........................................19, 20, 26, 27

*Wilkof v. Caraco Pharm. Lab'ys, Ltd.*,
   2010 WL 4184465 (E.D. Mich. Oct. 21, 2010)..............................................15, 38

*Williams v. Globus Med., Inc.*,
   869 F.3d 235 (3d Cir. 2017) ................................................................................30

*Zimmerman v. Diplomat Pharmacy, Inc.*,
   2018 WL 3768793 (E.D. Mich. Aug. 9, 2018)..............................................42, 43

**Statutes**

15 U.S.C. § 78u-4(b)(1)(B).........................................................................................6

15 U.S.C. § 78u-4(b)(2)(A).......................................................................................28

Mass. Code Regs. tit. 940, Ch. 7.00, Refs & Annos..................................................16

**Other Authorities**

17 C.F.R. § 240.10b5-1.............................................................................................32

17 CFR § 240.10b-5..............................................................................................2, 12

xii

xiii

Fed.R. Civ. P. 9 ............................................................................................6

Lead Plaintiffs Ontario Provincial Council of Carpenters' Pension Trust Fund and Millwright Regional Counsel of Ontario Pension Trust Fund ("Plaintiffs") respectfully submit this memorandum of law in opposition to the motion of Defendants Credit Acceptance Corporation ("Credit Acceptance" or the "Company"), Brett A. Roberts, and Kenneth S. Booth (collectively, "Defendants") to dismiss the Amended Complaint (the "AC").  ECF No. 35.[1]

## **INTRODUCTION**

Credit Acceptance is a subprime auto lender that garnered investor attention by reaping handsome profits while distinguishing itself from other subprime lenders that all too often employed predatory business practices in violation of consumer protection laws.  Indeed, throughout the Class Period, Credit Acceptance not only maintained that it was in compliance with the law, Defendants also repeatedly publicly touted the "opportunity" the Company provided its subprime customers to "mov[e] their financial lives in a positive direction."  But unbeknownst to the Company's shareholders, this was all a sham masked by Defendants' misrepresentations and omissions.

On August 28, 2020, the Massachusetts Attorney General filed a complaint (the "Massachusetts Attorney General's Complaint") that laid bare the foundation

---

[1] Citations herein to specific paragraphs are to the AC, unless otherwise indicated.

of Credit Acceptance's business model and profitability: illegal, unfair, and deceptive trade practices with respect to auto lending, debt collection, repossessions, and asset-backed securitizations. While investors had previously speculated on the legality of the Company's practices, and Defendants had generically warned about regulatory risk, the Massachusetts Attorney General's Complaint provided new, detailed data and factual support demonstrating that Defendants had *knowingly* violated the law and continued to do so. As a result, Credit Acceptance's stock price declined more than *18%*. Just weeks before this calamity, the Company's CEO, Defendant Roberts, sold $11 million worth of Credit Acceptance stock.

Defendants move to dismiss Plaintiffs' Section 10(b) and Rule 10b-5 claims, arguing that Plaintiffs failed to: (1) plead a material misstatement or omission, (2) allege facts that create a strong inference of scienter, and (3) plead loss causation. Defendants' motion must be denied.

*As to falsity and materiality*, the AC pleads three categories of materially false and misleading misstatements: (1) Defendants' misstatements concerning the illusory "opportunity" that Credit Acceptance provides its customers; (2) Defendants' purported risk disclosures and misstatements regarding the Company's compliance with applicable regulations; and (3) Defendants' misstatements concerning the Company's collection practices. The AC adequately

2

explains why Defendants' non-disclosures rendered these statements materially false and misleading.  *See* Section II, *infra*.

*As to scienter*, the AC pleads five of the hallmarks of scienter identified in *Helwig v. Vencor, Inc.*: (1) insider trading; (2) divergence between internal reports and external statements; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) existence of an ancillary lawsuit charging fraud and Defendants' quick settlement; and, (5) disregard of the most current factual information before making statements.  251 F.3d 540, 544 (6th Cir. 2001).  More fundamentally, the AC establishes a cogent theory of fraud.  Defendants sought to extend the Company's reliance on highly profitable but illegal lending practices for as long as possible despite unambiguous precedent forbidding such practices, all while publicly stating that they complied with applicable law.  And just weeks before the Massachusetts Attorney intervened, Defendant Roberts profited handsomely.  *See* Section III, *infra*.

*As to loss causation*, Defendants argue that investors effectively knew they were engaging in illegal, unfair, and deceptive lending practices, and therefore the Massachusetts Attorney General's Complaint does not constitute "new" information.  This argument is belied by the new information provided in the Massachusetts Attorney General's Complaint that, when disclosed to the market, caused a massive drop in Credit Acceptance's stock price.  Even if Defendants'

3

argument had any merit (which it does not), it is not appropriate for resolution on a motion to dismiss. *See, e.g.*, *Klein v. Altria Grp., Inc.*, 2021 WL 955992, at \*14-15 (E.D. Va. Mar. 12, 2021).[2] *See* Section IV, *infra*.

## ARGUMENT

## I.    STANDARD OF REVIEW

In assessing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must consider the complaint in its entirety, "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 538 (6th Cir. 2012).  To survive a motion to dismiss, the complaint must allege only "enough facts to state a claim to relief that is plausible on its face." *Frank v. Dana Corp. (Dana II)*, 646 F.3d 954, 958-59 (6th Cir. 2011). "[P]lausibility" is something "more than the 'sheer possibility' of relief but less than a 'probable' entitlement to relief." *JAC Holding Enters., Inc. v. Atrium Cap. Partners, LLC*, 997 F. Supp. 2d 710, 725 (E.D. Mich. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The allegations must merely produce an inference of liability strong enough to "nudge" the plaintiff's claims "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680.

---

[2] Defendants also fail to challenge the January 30, 2020, materialization of the risk, and thereby concede loss causation as to that disclosure.  *See* n.7 *infra*.

4

To state a claim for securities fraud under § 10(b) of the Exchange Act, a plaintiff must allege: (1) "a material misrepresentation (or omission)"; (2) "scienter, *i.e.*, a wrongful state of mind"; (3) "a connection with the purchase or sale of a security"; (4) "reliance"; (5) "economic loss"; and (6) "loss causation, *i.e.*, a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). Defendants challenge only three elements: material falsity, scienter, and loss causation.

"At this stage of the proceedings, [the Court] need not decide whether any particular statement is rendered misleading by a particular omission. [The Court] must only determine whether Plaintiffs have sufficiently alleged circumstances under which they could conceivably prove their claim of fraudulent misrepresentation under any set of facts." *The MJK Fam. LLC v. Corp. Eagle Mgmt. Servs., Inc.*, 2009 WL 4506418, at *8 (E.D. Mich. Nov. 30, 2009). Defendants cite to *Indiana State District Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 938 (6th Cir. 2009) ("ISDC") in an attempt to cast this action as nothing more than "bad corporate news." Certainly, the public revelation of Defendants' illegal practices was "bad corporate news," but the material falsity of Defendants' misrepresentations and omissions that "news" revealed is actionable under the federal securities laws.

5

## II.   THE AC PLEADS MATERIAL MISREPRESENTATIONS AND OMISSIONS

Under the PSLRA, investors must "specify each statement alleged to have been misleading" and "the reason or reasons why." 15 U.S.C. § 78u-4(b)(1)(B). Likewise, Rule 9(b) requires a plaintiff to: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.* (*Dana I*), 547 F.3d 564, 569-70 (6th Cir. 2008). Defendants largely ignore or recast the AC's well-pled, particularized allegations.

The AC details Defendants' materially false and misleading statements over the two-year Class Period that portrayed a legal and sustainable business model, including: (1) misstatements concerning an illusory opportunity to improve the lives of the Company's subprime customers; (2) purported risk disclosures and misstatements concerning compliance with applicable laws and regulations; and (3) misstatements related to the Company's unfair and deceptive collection practices. ¶¶88-104. Consistent with this Circuit's pleading requirements, Plaintiffs have properly identified each false and misleading statement and explained why each statement is misleading. *See Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 978 (6th Cir. 2018) ("[A] complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the

6

speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."); AC at Section IV.E.

The AC further alleges that Defendants made material omissions during the Class Period.  Defendants argue that Plaintiffs have failed to allege an affirmative duty of disclosure. *See* MTD at 16 n.6, PageID.674. ("Plaintiffs do not allege any affirmative duty of disclosure, and instead appear to allege only that disclosure was necessary to make the alleged statements not misleading.").  However, Plaintiffs have adequately alleged actionable omissions and the respective duty associated with each non-disclosure.  *See, e.g.*, ¶¶26, 150 (discussing "Defendants' omissions of material fact of which there is a duty to disclose").

## A.     Misstatements and Omissions Concerning an Illusory Opportunity to Improve the Lives of Defendants' Customers

Throughout the Class Period, Defendants made material misstatements and omissions regarding the purported "opportunity" Credit Acceptance offered to the Company's subprime customers to improve their lives and credit scores.  AC at Section IV.E.  For example, the Company issued various press releases and SEC filings that stated, "an important ancillary benefit of our programs is that *we provide consumers with an opportunity to improve their lives by improving their credit score and move on to more traditional sources of financing*."  ¶88.  Credit Acceptance also released a blog post on its website where it promised that the

7

Company, along with its participating dealers, would assist consumers in rebuilding their credit. The post stated, "The dealer will work with you to understand the type of vehicle, ***you want***, as well as ***work with your budget, to structure a contract that meets your needs***." ¶89. In addition to these misstatements, Defendant Roberts wrote Shareholder Letters, in which he stated:

> ***We provide an opportunity for our customers***, many of whom have been turned down for financing from other lenders, ***to purchase a vehicle and establish or reestablish a positive credit history, thereby moving their financial lives in a positive direction***. ¶90.

Defendants argue that Plaintiffs have improperly alleged that consumers were misled, as opposed to the proposed class of investors Lead Plaintiffs represent. *See* MTD at 20, PageID.678. This is wrong. The AC pleads that Defendants engaged in illegal and predatory business practices to profit from low credit score consumers, which was, by virtue of Defendants' public misstatements, materially misleading. *See, e.g.*, ¶¶12, 115, 118, 119, 121; *see also Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008) (noting that despite defendant mortgage lender's statements on underwriting policies not being easily quantified, "***underwriting practices would be among the most important information looked to by investors***."); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1185 (C.D. Cal. 2008) (materiality of the

8

representations and omissions are not "persuasively disputed" where the

misrepresentations related to quality of the company's underwriting).[3]

Defendants further argue that Credit Acceptance's previous disclosures had

already informed investors of their illegal and deceptive acts.  MTD at 20,

PageID.678.  But those purported disclosures merely stated that Credit

Acceptance's loans were made "to individuals with impaired or limited credit

histories" with a "higher risk of delinquency, default and repossession."  *Id*.  Thus,

they failed to inform investors that Credit Acceptance was growing by preying on

consumers and deploying illegal and unsustainable practices that did not provide

consumers with any meaningful "opportunity."

Defendants also argue that these statements were "inactionable puffery."

MTD at 19, PageID.677.  This argument fails given the context of the statement.

*See City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 672 (6th

Cir. 2005) ("What might be innocuous 'puffery' or mere statement of opinion

standing alone may be actionable as an integral part of a representation of material

fact when used to emphasize and induce reliance upon such a representation.").

---

[3] Unlike the complaint referenced in *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 812 (N.D. Cal. 2019), Plaintiffs' AC adequately alleges that **investors** were misled.  *Compare* ¶¶12, 115, 118, 119, 121, *with* Second Am. Consol. Class Action Compl., *Veal v. LendingClub Corp.*, 18-cv-02599-BLF (N.D. Cal. Dec. 19, 2019), ECF No. 93.

9

Investors were keenly focused on the ongoing regulatory investigations regarding Credit Acceptance's lending practices throughout the Class Period.  *See, e.g.*, ¶¶9, 93, 120-21, 124, 132-35.  Yet, Defendants issued these misstatements, which not only created an illusory expectation of an "opportunity" for consumers, but also continued to reassure investors that the Company was not engaging in illegal business practices.  Put simply, these misstatements were material to investors because disclosure of the Company's illegal business practices "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information."  *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988).

Defendants' statements were false and misleading because they failed to disclose that Credit Acceptance was violating the law when it: (1) approved and funded high risk loans that it knew and/or was reckless in not knowing customers were unable to repay; (2) engaged in the illegal practice of marking up prices for cars sold to certain borrowers; (3) required the purchase of vehicle service contracts ("VSCs"); and (4) engaged in illegal debt collection and repossession practices.  ¶91; *see Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 708-09 (E.D. Mich. 2010) (holding that a duty to disclose uncharged illegal conduct will arise "when disclosure is necessary to prevent another statement from misleading the public.").  This nondisclosure rendered the purported "opportunity"

10

and "benefit" illusory, "as 62% of [Credit Acceptance's] loans with scores lower than 70% would default or become non-performing." ¶91.

Defendants argue that Plaintiffs have not pled any particularized facts demonstrating that these statements were false when made. MTD at 17, PageID.675. Not so. The AC pleads a plethora of facts that underscore just how illusory this "opportunity" was, including, statements from former Credit Acceptance employees ("confidential witness" or "CW"). *See, e.g.*, ¶¶41, 47, 57, 65; *see also Jackson Cty. Emps.' Ret. Sys. v. Ghosn*, 510 F. Supp. 3d 583, 610 (M.D. Tenn. 2020) ("[I]t is enough to identify the misrepresentations (the Form 10–K statements) and explain how they are false or misleading.").[4]

Defendants further argue that their misrepresentations were not objectively false because some of the Company' customers were current on their payments for the entire term of their loan. MTD at 18, PageID.676. This argument cannot be reconciled with the fact that Credit Acceptance's business model *assumes* that a large majority of its customers' loans will not be paid in full, *see, e.g.*, ¶37, and robust statistical evidence for loans made between 2013 and 2016, for which

---

[4] Defendants suggest that the CWs allegations are insufficient to corroborate the allegations in the AC because the CWs are "unidentified" employees. MTD at 17 n.7, PageID.675. However, Plaintiffs have provided sufficient details with respect to each CW's former position and responsibilities such that their statements should be credited more than a mere "anonymous source." *See Ricker v. Zoo Ent., Inc.*, 534 F. App'x 495, 497 (6th Cir. 2013).

11

"roughly **93-95%** of borrowers missed at least one payment and/or were delinquent at some point during the terms of their loans."  ¶37 (emphasis added).  By failing to disclose the Company's illegal lending practices, Defendants' statements falsely assured investors that Credit Acceptance's business model could legally generate handsome profits from subprime auto lending.  *See S.E.C. v. Conaway*, 698 F. Supp. 2d 771, 827–28 (E.D. Mich. 2010) ("Rule 10b–5 allow[s] misrepresentations be found based on implied assertions or reasonable inferences that are false.").[5]

Finally, Defendants argue that Plaintiffs have failed to allege an actionable omission because "there is no nexus between the alleged omission . . . and the statements that [Credit Acceptance] provides an opportunity to improve consumers' credit."  MTD at 19-20, PageID.677-678; *see Lubbers v. Flagstar Bancorp. Inc.*, 162 F. Supp. 3d 571, 580 (E.D. Mich. 2016).  But, because there is a clear nexus in the present case, Defendants' cited authority is distinguishable.[6]  Specifically, Defendants' misstatements refer to Credit Acceptance's lending

---

[5] Defendants contend that Plaintiffs selectively quote these misstatements.  But the omitted language does not suggest any alternative non-misleading meaning for the statements: "[Because Credit Acceptance] report[s] to the three national credit reporting agencies. . . ."  MTD at 18-9, PageID.676-677.

[6] In *Lubbers*, the plaintiff claimed that Flagstar's statement, regarding the disclosure of ongoing investigations by government agencies, was misleading because Flagstar failed to mention that Fannie Mae had threatened to terminate its rights to loan servicing.  162 F. Supp. 3d at 580.  Unlike here, there was no nexus between the omission and the relevant statement giving rise to a duty to disclose.

practices to customers with low credit scores, which is directly related to the Company's undisclosed, illegal practices associated with loans to those same customers.  As such, Plaintiffs have pled actionable omissions.  *See Chamberlain*, 757 F. Supp. 2d at 709 (finding a direct nexus between the allegedly illegal conduct and the defendants' allegedly materially false and misleading statements).

**B.     Generic Risk Warnings and Misstatements Regarding Compliance with Applicable Regulations**

Defendants issued a series of generic risk warnings and false and misleading statements relating to Credit Acceptance's compliance with applicable regulations. AC at Section IV.E.2.  These statements were false and misleading when made because Defendants knew, or were reckless in not knowing, and failed to disclose the material fact that the Company was violating the law when it (1) approved and funded high-risk loans that it knew customers were unable to repay; (2) engaged in the unfair and deceptive practice of marking up prices for cars sold to certain borrowers; (3) required the purchase of VSCs; (4) engaged in unfair and deceptive debt collection and repossession practices; and (5) sold securities to investors pursuant to materially misleading statements in the Company's offering documents

13

in order to cheaply access capital markets,[7] thereby ensuring that the Company would be materially impacted by regulation and litigation. ¶100.

For example, during the Class Period, Credit Acceptance's Forms 10-K contained the following statement, "***failure to comply with these laws or regulations could have a material adverse effect on us by*** . . . ***restricting our ability to realize the value of the collateral securing the Consumer Loans, making it more costly or burdensome to do business or resulting in potential liability***." ¶94. Additionally, Credit Acceptance's Forms 10-K also contained the following statement, "***We believe that we . . . are in substantial compliance with all applicable laws and regulations***." ¶97. Defendants argue first that Plaintiffs have not alleged a material misstatement with respect to the Company's (1) risk warnings; (2) statements regarding its compliance with applicable regulations; (3) statements about the dealer service agreement; and (4) statements from Shareholder Letters. Second, Defendants argue that Plaintiffs have not alleged an actionable omission. As explained below, Defendants' arguments lack merit.

---

[7] Defendants fail to challenge Plaintiffs' falsity allegations regarding the sale of securities to investors pursuant to Credit Acceptance's materially misleading offering documents. Thus, Defendants have conceded the falsity of these allegations. *See Bennett v. Bascom*, 788 F. App'x 318, 323 (6th Cir. 2019) ("We generally do not permit arguments to be raised for the first time in a reply brief.").

14

### 1.     Defendants' Misstatements

#### a.     Misstatements Regarding Compliance with Applicable Regulations

Defendants argue that Credit Acceptance's statement, "***[w]e believe that we . . . are in substantial compliance with all applicable laws and regulations***," does not constitute a material misstatement because it is a "sincere statement of pure opinion."  MTD at 22, PageID.680 (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015)).[8]  However, as this Court previously held in *Wilkof v. Caraco Pharm. Lab'ys, Ltd.*, "opinions may be deemed false or misleading under the securities law."  2010 WL 4184465, at *4 (E.D. Mich. Oct. 21, 2010).

Like the defendant in *Wilkof*, Credit Acceptance continued to represent that the Company was compliant with applicable laws and regulations despite at least two clear indications to the contrary.  First, on June 25, 2018, the Superior Court of Massachusetts explicitly construed the revised Massachusetts debt collection regulations, which limit how often a creditor may attempt to contact a debtor via telephone in order to collect a debt.  *See Armata v. Target Corp.*, 480 Mass. 14, 14

---

[8] Defendants fail to address Defendant Roberts' materially false and misleading statement from Credit Acceptance's 1Q 2018 Earnings Call.  AC at ¶93 ("***[I]t's our job to operate in a highly compliant way***, and we take that seriously.").  Thus, Defendants concede that it was false and misleading when made. *See supra* n.7.

(2018). [9]  This decision left no ambiguity as to whether Credit Acceptance's

collection call practices were "in excess of [the] two [] communications in [a]

seven-day period" limit as imposed by the state of Massachusetts.  *See id*.; *see also*

AC at ¶¶61-65 (containing Plaintiffs' factual allegations related to Credit

Acceptance's illegal debt collection practices). [10]  Second, the Massachusetts

Attorney General warned Credit Acceptance of its belief that the Company

engaged in culpable conduct.  *See* AC at ¶32; Exhibit B to MTD at 87, PageID.732

("On November 20, 2017 . . . we were informed by representatives of the Office of

the Attorney General that it believes that the Company may have engaged in unfair

and deceptive acts or practices related to the origination and collection of auto

loans, which may have caused some of the Company's representations and

---

[9] This case is cited in Credit Acceptance's August 31, 2021, formal settlement agreement with the Massachusetts Attorney General, which Defendants failed to include.  *See* Exhibit 1 ¶17 attached hereto ("CAC shall initiate collection calls to its customers in Massachusetts in a manner that is compliant with 940 C.M.R. § 7.00 *et seq.*, and *Armata,*, 480 Mass. at 14.  This shall include initiating an unrequested communication with each such customer no more frequently than two times within each seven-day period.").

[10] In *Tongue v. Sanofi*, 816 F.3d 199, 211 (2d Cir. 2016), the Second Circuit found that the defendants' statements regarding FDA approval for their testing methodology were not misleading where the FDA had explicitly noted that the deficiencies could be overcome.  But here, there is no ambiguity as to whether Credit Acceptance's collection call practice violated Massachusetts law and regulations.  *Id*.

warranties contained in securitization documents to be inaccurate.").[11]  Thus, Defendants' statement was materially false and misleading because it misrepresented Credit Acceptance's compliance with applicable laws and regulations.  *See Burges v. BancorpSouth, Inc.*, 2015 WL 4198795, at *4-5 (M.D. Tenn. July 10, 2015) (finding statements of compliance with applicable laws were false where the complaint plausibly alleged that defendants were not in compliance with those laws); *see also In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 729 (S.D.N.Y. 2015) ("[A] legal compliance statement may be deemed misleading if, although sincerely held, it is formed on the basis of an omitted fact, not disclosed by the speaker, that would likely conflict with a reasonable investor's own understanding of the facts conveyed by that statement.").

---

[11] Defendants' assertion—that they cannot be liable because Credit Acceptance "fully explained" "the context for its beliefs"—is inaccurate because the Company failed to disclose the various violations that had already occurred, including those described by the various CW accounts in the AC.  *See, e.g.*, AC ¶¶41, 47, 57, 58, 65; *see also Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2021 WL 1316705, at *7 n.12 (M.D. Tenn. Apr. 8, 2021) ("[T]here can be a downside for defendants to having made truthful disclosures: the disclosures serve to make clear that the defendants were aware of the facts truthfully disclosed, and such awareness in some cases can undermine the defendants' position.").

Further, as explained in Section III, *infra*, Plaintiffs have sufficiently plead that Defendants knew, were reckless in not knowing, and/or failed to disclose the material fact that the Company was violating the law.[12]

### b.   Misstatements Regarding Dealer-Partners' Compliance with Applicable Laws and Underwriting Guidelines

Credit Acceptance's statements regarding its compliance with applicable laws and underwriting guidelines were materially false and misleading.  MTD at 24-5, PageID.682-683. For example:

> Under the typical Dealer servicing agreement, a Dealer represents that it will only assign Consumer Loans to us that satisfy criteria established by us . . . ***and comply with applicable state and federal laws and regulations***. . . . Through our Dealer Service Center, we perform all significant functions relating to the processing of the Consumer Loan applications and bear certain costs of Consumer Loan assignment, including . . . ***compliance with underwriting and legal guidelines*** . . . . ***We audit Consumer Loan files for legal and underwriting guidelines on a daily basis in order to assess whether our Dealers are operating in accordance with the terms and conditions of our Dealer servicing agreement***.  AC ¶96.

---

[12] Defendants contend that "Plaintiffs merely assert that because, on the last day of the Class Period, the [Massachusetts Attorney General] alleged that some of [Credit Acceptance's] business practices violated Massachusetts law, Defendants' Class Period statements about legal compliance must have been false when made." MTD 23, PageID.681.  However, this grossly understates the facts in the AC, including, but not limited to, numerous accounts from CWs detailing predatory lending practices and other wrongdoing that was widespread and widely known within the Company.  *See, e.g.*, AC ¶¶41, 47, 57, 58, 65.

Defendants misconstrue the well pled allegations in the AC by arguing that Plaintiffs failed to allege that "(i) dealers do not make the above representations under the typical servicing agreement; (ii) [Credit Acceptance] does not 'bear . . . the cost of assessing . . . compliance with underwriting guidelines'; or (iii) [Credit Acceptance] does not 'audit Consumer Loan files for legal and underwriting guidelines on a daily basis' to assess Dealer compliance with the servicing agreement."  MTD at 25, PageID.683.

Defendants' misstatements created the misleading impression that Credit Acceptance and its dealer-partners were compliant with applicable laws and underwriting guidelines.  *See Conaway*, 698 F. Supp. 2d at 830 n.40 (noting that "[a] statement containing a half-truth may be as misleading as a statement wholly false"); *see also Jackson Cty. Emps.' Ret. Sys. v. Ghosn*, 510 F. Supp. 3d 583, 610–11 (M.D. Tenn. 2020) ("[O]nce a company has chosen to speak on an issue . . . it cannot omit material facts related to that issue so as to make its disclosure misleading."); *Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 913 (M.D. Tenn. 2019) (same).

Furthermore, Defendants' misstatements need to be read in conjunction with their subsequent misstatement, made within the same SEC filings—"***We believe that we . . . are in substantial compliance with all applicable laws and regulations***."  *The MJK Fam. LLC v. Corp. Eagle Mgmt. Servs., Inc.*, 2009 WL

19

4506418, at *10 (E.D. Mich. Nov. 30, 2009) (finding the defendants' statement materially false and misleading after considering the context in which it was made). Accordingly, these statements were misleading because they implied that Credit Acceptance and its dealer-partners were compliant with relevant laws, regulations, and underwriting guidelines. *Id*.

### c.  Misleading Risk Warnings

Defendants argue that Credit Acceptance's purported risk disclosures are "not actionable to the extent plaintiffs contend defendants should have disclosed risk factors 'are' affecting financial results rather than 'may' affect financial results." MTD at 21-2, PageID.679-680 (citing *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015), [13] and *Benzon v. Morgan Stanley Distribs., Inc.*, 420 F.3d 598, 612 (6th Cir. 2005)).[14]

---

[13] *Yum! Brands* is non-precedential *dicta* from the Sixth Circuit. *See Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 909–10 (M.D. Tenn. 2019) (finding that *Yum! Brands* is unpublished and therefore not binding authority, and that the *Yum! Brands* court even explicitly recognized that "there may be circumstances under which [such] a risk disclosure might support Section 10(b) liability").

[14] The Ninth Circuit's holding in *Benzon* is distinguishable *dicta* that is specific to the relationship between investors and their financial advisors in a case focused on a dispute regarding the structure of broker compensation. *See Benzon*, 420 F.3d at 612 ("[T]he inclusion of this statement . . . served to put prospective investors on notice . . . such that investors could pursue that line of inquiry with their financial advisors if they were concerned about broker incentives.")

But Credit Acceptance's purported risk disclosures are actionable because they mislead investors to "negate the possibility" that the Company could be found to have violated the law. *See* MTD at 22, PageID.680 (citing *Lubbers*, 162 F. Supp. 3d at 581). Those misstatements, coupled with their misstatements regarding Credit Acceptance's compliance with applicable regulations, "negate[d] the possibility" as to whether the Company **had** violated the law and **would** be subject to regulation and litigation. *Compare* AC at ¶94 ("***failure to comply with these laws or regulations could have a material adverse effect on us*** . . . ."), *with* AC at ¶¶93, 96, 97 ("***We believe that we*** . . . ***are in substantial compliance with all applicable laws and regulations***."); *The MJK Fam. LLC v. Corp. Eagle Mgmt. Servs., Inc.*, 2009 WL 4506418, at *10 (E.D. Mich. Nov. 30, 2009) (rejecting the argument that the plaintiff's assertion was a "semantic quibble" and reasoning that the statement at issue was materially false and misleading when read in its proper context).

### d.    Misstatements from Shareholder Letters

Defendants' statements in Credit Acceptance's 2019 and 2020 Shareholder Letters—that the Company "create[s] processes to enforce standards," "ensur[es] the loans [it] originate[s] meet [its] standards," and "use[s] these measures to make adjustments when necessary"—were false and misleading.

21

Defendants argue that "the AC does not allege that [Credit Acceptance] failed to create such processes, ensure loans met its standards or use measures to make adjustments."  MTD at 25-6, PageID.683-684.  But this is not so because:

- Credit Acceptance's business model allows for the approval of all loan applications, but does not consider the likelihood that a borrower will default on its loans.  ¶¶35-37

- Credit Acceptance approved loans for customers whose payments exceeded 25% of their monthly income in contradiction of internal guidelines, and failed to "audit loans to see if any were approved that should not have been, but rather pulled samples of loans and audited them for error, such as missing information or misspellings."  ¶41

Faced with a host of repeated misrepresentations about the Company's core business model, Defendants attempt to escape liability by raising a factual challenge that certain of the underlying statements were "puffery."  MTD at 25-6, PageID.683-684.  This argument is an attack on materiality, raising fact-based contentions that require courts to proceed cautiously on a motion to dismiss because "context matters when analyzing materiality."  *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 472, 478 (6th Cir. 2014) (cautioning that courts "must tread lightly at the motion-to-dismiss stage, engaging carefully with the facts of a given case and considering them in their full context"); *Grae v. Corr. Corp. of Am.*, 2017 WL 6442145, at *14 (M.D. Tenn. Dec. 18, 2017) ("[E]ven superficially broad statements of corporate self-praise must be evaluated in context to determine if

22

they convey more than just a generalized optimism."); *See also City of Monroe Emps. Bridgestone* , 399 F.3d at 672-73.[15]

Furthermore, the context for these misstatements is clear.  Credit Acceptance was ensuring investors as to its compliance with applicable law and regulations. AC at ¶99 ("**We measure both loan compliance** and dealer satisfaction to assess our performance, and *use these measures to make adjustments when necessary*.") (first emphasis added).

### 2.    Defendants' Omissions

Despite their false statements regarding Credit Acceptance's compliance with relevant laws and regulations, Defendants contend they did not have a duty to disclose that the Company was violating the law because such information is considered "soft" information.  MTD at 26, PageID.684.  Defendants rely on the Sixth Circuit's decision in *ISDC*, where the court determined that defendants were not obligated to disclose opinions related to the legality of its actions.  583 F.3d at 945.  But "[w]hat Defendants fail to discuss in their reliance on [*ISDC*] is the court's prior important finding that there were no sufficiently pled allegations that

---

[15] *See In re Cardinal Health Sec. Litig.*, 426 F. Supp. 2d 688, 749 n.70 (S.D. Ohio 2006) (noting that "most courts now consider statements of corporate optimism with more hesitation" and should "proceed cautiously when examining [d]efendants' assertions that their enthusiastic statements . . . were 'puffery'").

23

defendants knew" that Credit Acceptance had failed to comply with relevant laws and regulations. *See Chamberlain*, 757 F. Supp. 2d at 707–08.

Indeed, this Court has previously held that "there is no duty to disclose 'soft information' such as . . . a belief as to the legality of the company's own actions . . . . [But,] it is equally well accepted that 'opinions cease to be soft information [] when contradicted by actual knowledge of wrongdoing.' Thus, if a complaint adequately alleges that defendants knew of the illegal nature of their conduct at the time they made the allegedly material misstatement, courts will impose a duty of disclosure." *Id*. As explained in Section III, *infra*, the AC pleads that Defendants knew Credit Acceptance failed to comply with relevant laws and regulations.

Defendants' argument that "corporations have no duty to confess to unproven allegations of wrongdoing," MTD at 27-28, PageID.685-686, fares no better, as it is supported by unpersuasive decisions that are at odds with prior holdings of this Court. *See, e.g.*, *Chamberlain*, 757 F. Supp. 2d at 708-9 ("While materiality alone does not obligate a corporation to accuse itself of wrongdoing, a duty to disclose uncharged illegal conduct will arise when disclosure is necessary to prevent another statement from misleading the public."). The question to consider is whether Credit Acceptance's statements that it "believed" it was in compliance with relevant laws and regulations "would have led a reasonable investor to assume the company was not in receipt of [] all of the information

Plaintiffs allege [], despite the fact that it was." *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d at 730.  Based on the facts pled in the AC, the answer is yes.

Lastly, Defendants argue that they should be absolved from any liability because they "disclosed that the [Massachusetts Attorney General] and others were investigating the Company, and provided regular updates throughout the Class Period. . . . The securities laws require nothing further."  MTD at 28, PageID.686. However, the protections of the securities laws are not upended simply because Defendants have merely disclosed the existence of investigations and some relevant details.  *See Klein v. Altria Grp., Inc.*, 2021 WL 955992, at *14 (E.D. Va. Mar. 12, 2021) ("Although the defendant had repeatedly disclosed the existence and relevant details of the [] litigation . . . the Court . . . held that disclosing a lawsuit's existence and allegations while also vigorously denying their validity does not satisfy a company's duty to make full, honest disclosures.").

Accordingly, Defendants' failure to disclose this information to investors rendered their statements materially false and misleading.[16]

---

[16] Defendants re-assert the same argument—that Plaintiffs' case wrongfully seeks to "provide shareholders with an avenue for relief against executives for alleged illegal practices or corporate mismanagement."  MTD at 27, PageID.685.  But, as explained in the AC and this brief, Plaintiffs have adequately alleged securities fraud with respect to Credit Acceptance's illegal conduct.

25

### C. Defendants' Misstatements Regarding Credit Acceptance's Collection Efforts and Ancillary Product Offerings

Defendants challenge the falsity of their statements related to Credit Acceptance's collection efforts and ancillary products. MTD at 28-30, PageID.686-688. Specifically, they contend that Plaintiffs are "bootstrap[ping] [the] allegations in the Massachusetts Attorney General's Complaint." *Id*. Defendants' arguments are meritless and fail for the reasons explained below.

### 1. Misstatements Regarding Collection Efforts

The AC pleads that Defendants' statement—that Credit Acceptance's "***[c]ollection efforts typically consist of placing a call to the consumer within one day of the missed payment due date***"—was false and misleading because Defendants failed to disclose that they made more than one call to defaulting borrowers, calling each up to 8 times per day, in violation of state law. AC at ¶¶101-2, PageID.486-487; *Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d at 913. ("[O]nce a company has chosen to speak on an issue . . . it cannot omit material facts related to that issue so as to make its disclosure misleading.").

Plaintiffs concede that the AC does not allege that Credit Acceptance failed to "plac[e] a call to the consumer within one day of the missed payment due date." MTD at 29, PageID.687. However, Plaintiffs strongly disagree with Defendants' assertion that the statement cannot be read to mean that Credit Acceptance only

26

makes one call to consumers who have missed a payment. *Id*. Regardless, a more reasonable reading demonstrates that this statement conveys the overall message that Credit Acceptance was not harassing delinquent consumers with multiple calls per day/week, in violation of state law, especially given the ongoing investigations against the Company disclosed in the same document. *See S.E.C. v. Conaway*, 698 F. Supp. 2d 771, 877 (E.D. Mich. 2010) ("A defendant's statements must be viewed as part of a mosaic to see if those statements, in the aggregate, created a misleading impression."). Therefore, Defendants' failure to disclose their illegal collection practices rendered these statements materially false and misleading.

### 2. Misstatements Regarding Ancillary Product Offerings

The AC pleads that Defendants' statements that Credit Acceptance "***provide[s] Dealers the ability to offer***" VSCs and Guaranteed Asset Protection ("GAP")[17] were materially false and misleading when made. AC at ¶¶103-4, PageID.487. Specifically, Plaintiffs allege that Defendants failed to disclose that Credit Acceptance often required dealers to sell these addon products and/or knew or were reckless in not knowing that these products were sold in violation of the law. AC at ¶104.

---

[17] Defendants have failed to contest Plaintiffs' alleged misstatement regarding the Company's "ability" to offer GAP insurance to dealers. Therefore, Defendants concede that it was materially false and misleading when made. *See supra* n.7.

27

Plaintiffs concede this statement is literally true and that the AC does not allege that Credit Acceptance failed to "provide Dealers the ability to offer these products." MTD at 29, PageID.687. But that does not mean the statement is not misleading in context. *See Jackson Cty. Emps.' Ret. Sys.*, 510 F. Supp. 3d at 612. It is misleading in context because it creates the false impression that Credit Acceptance merely provided dealers with the ability to offer these products with no direct involvement from Credit Acceptance. But Credit Acceptance did not just provide dealers with this ability. Rather, the Company often required dealers to sell these addon products. AC at ¶¶48-60.

Thus, Defendants' failure to disclose its practice of requiring dealers to sell these addon products, coupled with Defendants' failure to disclose the fact that these products were sold in violation of the law, render these statements materially false and misleading.

## III.   THE AC PLEADS SCIENTER

### A.   Scienter Must Be Considered Holistically

A plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). In the Sixth Circuit, recklessness satisfies the scienter requirement. *Helwig*, 251 F.3d at 550-52. "While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it."

28

*PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 681 (6th Cir. 2004), *abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011), *as recognized in Dana II*, 646 F.3d at 961.

The Court must consider the allegations "holistically" and decide "whether **all** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Dana II*, 646 F.3d at 959 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310, 323 (2007) (*Tellabs I*), (emphasis in original)). While an inference of scienter "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent," it "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs I*, 551 U.S. at 314, 324. In other words, a tie goes to the Plaintiffs. *See Dana I*, 547 F.3d at 571 ("*Tellabs* now awards the draw to the plaintiff.").

In *Helwig,* the Sixth Circuit set forth a "non-exhaustive" list of factors to consider for evaluating scienter that are now part of the holistic analysis mandated by *Tellabs I*. 251 F.3d at 552. A plaintiff need not establish all these factors, and the Court should consider other indicia of scienter as well. *See, e.g.*, *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 469 (6th Cir. 2011) (eschewing *Helwig*'s checklist of non-exhaustive factors and analyzing scienter by following *Tellabs*'

29

"holistic" approach); *Cardinal Health*, 426 F. Supp. 2d at 718 n.43 (plaintiff "should draw upon these factors where applicable").

### B.      Viewed Holistically, the AC Pleads Scienter

The AC alleges five of the *Helwig* factors and other indicia, providing support for a strong inference of scienter.  *See Tellabs I*, 551 U.S. at 310, 323; *Bridgestone*, 399 F.3d at 687 (finding scienter even though four *Helwig* factors not probative of scienter).  Defendants claim that Plaintiffs' theory is "nonsensical", MTD at 32, PageID.690, because Defendants issued boilerplate risk warnings and provided opaque updates on the status of pending regulatory matters.  But there is nothing illogical about executives misrepresenting a Company's legal compliance through generic risk warnings to avoid necessary reforms and continuing to rely on illegal but highly profitable business practices while selling tens of millions of dollars' worth of stock.  *See Williams v. Globus Med., Inc.*, 869 F.3d 235, 242 (3d Cir. 2017) ("[A] company may be liable under Section 10b for misleading investors when it describes as hypothetical a risk that has already come to fruition."); *see also BioScrip*, 95 F. Supp. 3d at 736 (quoting *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004)) ("[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired"); *Yum! Brands, Inc.*, 620 F. App'x at 490–91 (the Court must "ask not only whether

the statement is literally true but also whether the statement creates an impression that is false by, for example, impliedly asserting an objective fact that is false.").

### 1.     Insider Trading Supports an Inference of Scienter

First, the AC alleges massive, unusually timed insider stock sales by Defendant Roberts while in possession of information contradicting his public statements.  *See Helwig* (factor one); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139 n.1 (S.D.N.Y. 1999) ("evidence of unusual or suspicious insider trades . . . is also relevant as evidence of conscious or reckless behavior"); *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *10 (S.D.N.Y. Aug. 8, 2012) (analyzing unusual trading and access to insider information together to find a strong inference of scienter).  Defendant Roberts' stock sales drastically increased during the Class Period, rendering them out of line with a comparable period before the Class Period.  Indeed, Roberts ***sold no stock*** from January 8, 2016 to May 3, 2018, the Control Period.[18]  ¶141.  However, during the Class Period, Roberts sold $22,803,458 dollars worth of Credit Acceptance stock.  *Id.*

Moreover, Defendant Roberts' sales were conspicuously well-timed, enabling him to take full advantage of the artificial inflation in the Company's

---

[18] Plaintiffs analyzed Defendant Roberts' trading during the Class Period and during the equal-length period immediately preceding the Class Period beginning January 8, 2016 and ending May 3, 2018 (the "Control Period"). *See In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 839 (N.D. Cal. 2014).

stock price caused by Defendants' misstatements and omissions before the market learned the truth about Credit Acceptance's compliance with applicable laws. Indeed, less than a month before the filing of the Massachusetts Attorney General's Complaint, Roberts sold $10.7 million worth of his Credit Acceptance stock. ¶145.  *See, e.g.*, *Backe v. Novatel Wireless, Inc*., 642 F. Supp. 2d 1169, 1190-91 (S.D. Cal. 2009) (timing suspicious because sales occurred when the company was making optimistic statements and near the stock's class period high and before dramatic drop).  And, all of Roberts' sales were made outside of any 10b5-1 plan,[19] a fact Defendants conveniently ignore.  ¶146.

In an effort to minimize the importance of Defendant Roberts' unusually timed and suspicious stock sales, Defendants first argue that Defendant Booth's lack of sales undermines an inference of scienter.  MTD at 39, PageID.697.  But courts routinely find scienter based on one defendant's "unusual" sales despite another defendant's lack of sales.  *See, e.g.*, *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 558-59 (S.D.N.Y. 2010); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75 (2d Cir. 2001); *In re APAC Teleservices Inc. Sec. Litig.*, 1999 WL 1052004, at *7 (S.D.N.Y. Nov. 19, 1999) ("The fact that not every one of the defendants

---

[19] SEC Rule 10b5-1 creates a defense to insider trading, 17 C.F.R. § 240.10b5-1(c), and courts regularly reference 10b5–1 plans when considering scienter in securities fraud actions.  *See, e.g.*, *Plymouth Cty. Ret. Ass'n v. ViewRay, Inc.*, 2021 WL 3773330, at *19 (N.D. Ohio Aug. 25, 2021).

may have sold stock does not defeat an inference of scienter.").  Indeed, this

principle was recognized in *PR Diamonds, Inc.*, 364 F.3d at 691, where the Sixth

Circuit noted that "we have never held that the absence of insider trading defeats

an inference of scienter."  *Id.* (citing *Hanon v. Dataproducts Corp.,* 976 F.2d 497,

507 (9th Cir. 1992) (scienter can be established even if officers who made

misleading statements did not sell stock during the class period)); *see also In re*

*Nuko Info. Sys., Inc. Sec. Litig.*, 199 F.R.D. 338, 344–45 (N.D. Cal. 2000) (noting

that "the absence of Defendants' selling or trading has little bearing on determining

whether Plaintiffs' have adequately pleaded scienter.").[20]

Defendants next argue that Defendant Booth and Credit Acceptance's stock

purchases undermine an inference of scienter.  But stock purchases by non-selling

insiders do not defeat an inference of scienter.  *See PR Diamonds, Inc.,* 364 F.3d at

691 ("We also reject the Individual Defendants' contention that their purchase of

---

[20] Defendants also cite *In re Credit Acceptance Corp. Sec. Litig.*, 50 F. Supp. 2d 662, 677 (E.D. Mich. 1999), for the proposition that a lack of sales by Defendant Booth militates against the probative value of Defendant Roberts' stock sales.  But that opinion in turn relied on *Comshare,* in which both the CEO and CFO did not sell any stock.  *See id.* (citing *In re Comshare, Inc. Sec. Litig.*, 1997 WL 1091468, at \*10 (E.D. Mich. Sept. 18, 1997)).  Moreover, it predated both *Tellabs I* and *Matrixx,* under which stock sales may be probative of scienter as part of the holistic analysis of scienter this Court is required to undertake.  *See Dana II*, 646 F.3d at 961 ("However, we decline to follow that approach in light of the Supreme Court's recent decision in *Matrixx* [that] provided for us a post-*Tellabs* example of how to consider scienter pleadings 'holistically' in section 10(b) cases.").

shares during the class period refutes any inference that they knowingly or recklessly misled the market."). Defendants cite *I.B.E.W. v. Ltd. Brands, Inc.*, but that case explicitly noted that "conspicuously absent from this case ***are any allegations of insider stock sell-offs***, ancillary lawsuits, or investigations." 788 F. Supp. 2d 609, 631 (S.D. Ohio 2011) (emphasis added). All are present here.[21]

Ignoring the temporal proximity of Defendant Roberts' most significant Class Period stock sale to the precipitous decline in Credit Acceptance's stock price caused by the disclosure of the Massachusetts Attorney General's Complaint, Defendants maintain that the AC's failure to identify the amount of (or increase in) Roberts' holdings during the Class Period militates against a finding of scienter. MTD at 40-1, PageID.698-699. But the case cited by Defendants for that proposition establishes only a disjunctive list of allegations sufficient to constitute a "meaningful trading history" necessary to analyze a defendant's trading. Plaintiffs have provided this "meaningful trading history" by identifying Defendant Roberts' stock sales during the Control Period. ¶¶138-143. Defendants' additional suggestion that a defendant must avoid even more significant losses by liquidating his entire position in a company or avoid more losses than those suffered by their

---

[21] Defendants similarly cite to *Doshi v. Gen. Cable Corp.*, 386 F. Supp. 3d 815, 838 (E.D. Ky. 2019), but *Doshi* relied on *Ltd. Brands, Inc.*, and is thus distinguishable on the same ground.

other holdings, in order to support scienter is contrary to law.  Courts have held that just because a defendant retains company holdings beyond the class period does not negate an inference of scienter.  *See, e.g.*, *Fresno Cty. Emps.' Ret. Ass'n v. ComScore, Inc.*, 268 F. Supp. 3d 526, 556 (S.D.N.Y. 2017) ("[T]he culpable inference of scienter that [the defendant] was complicit despite his failure to unload his stock before the scheme unraveled is at least as powerful as any nonculpable inference."); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 647 (E.D. Va. 2000) ("'[A]n insider may not always trade all his shares in the company . . . ; the trader may hold on to a portion of his shares to hedge against the unforeseen or to obscure the insider trading from the SEC.'").

Similarly, Defendants argue that Defendant Roberts sold only 10.87 percent of his holdings.  MTD at 41-2, PageID.699-700.  But courts have found such percentages sufficient to support an inference of scienter.  *See In re Fairway Grp. Holding Corp. Sec. Litig.*, 2015 WL 249508, at *13-14 (S.D.N.Y. Jan. 20, 2015) (scienter pled where 8% of holdings sold); *see also Hutchins v. NBTY, Inc.*, 2012 WL 1078823, at *2 (E.D.N.Y. Mar. 30, 2012) (scienter plead where 9% of holdings sold).

In sum, assessing whether insider stock sales support motive, courts look to (1) the profits realized; (2) whether the sales during the alleged class period were unusual relative to other comparable periods; (3) the timing of the sales relative to

35

the fraudulent misstatements and corrective disclosures; (4) whether those sales were made pursuant to a 10b5-1 plan; (5) the number of insiders selling; and (6) the percentage of holdings sold.  *See Scholastic*, 252 F.3d at 74-75; *see also Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 493 (S.D.N.Y. 2018). No single factor is dispositive.  *See, e.g., Nguyen*, 297 F. Supp. 3d at 493.  Here, these factors collectively demonstrate the unusual and suspicious nature of Defendant Roberts' sales, and thus support an inference of scienter.

### 2. Defendants' Misstatements Diverged from Internal Reports and Disregarded Factual Information

Second, the AC alleges both a divergence between internal reports and external statements on the same subject as well as disregard of the most current factual information before making statements.  *See Helwig* (factors two and six). Credit Acceptance is, by its nature, a data-driven Company.  CWs identified in the AC described Credit Acceptance's data architecture and reporting structure and have confirmed that the Defendants Roberts and Booth, by virtue of their executive roles within the Company, were privy to and/or were given access to the data that demonstrated Credit Acceptance's predatory and illegal practices, as identified in the Massachusetts Attorney General's Complaint.  ¶137.  These CWs describe Defendants' access to or possession of information which contradicted their public statements, including specifically Credit Acceptance's "dealer dashboard," which

36

showed penetration rates for all contracts that contained a VSC or GAP.  These CWs also describe the Company's Loan Servicing database, which was used by its collection department, and "captured" the number of collection calls made to a borrower and could provide the number of calls made each day to each borrower, which information was included in morning reports to its senior executives.  *See City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 296 (S.D.N.Y. 2013) (fraud in relation to a "core business operation" bolsters the inference of scienter).  More fundamentally, access to information and data increased for personnel that were higher up the chain of command, as explained by CW4 and corroborated by CW8.  Thus, Defendants had access to data or received morning reports containing many of the facts alleged in the Massachusetts Attorney General's Complaint.  *In re Acadia Pharms. Inc. Sec. Litig.*, 2020 WL 2838686, at *7 (S.D. Cal. June 1, 2020) ("The most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement.").

Defendant Roberts also spoke publicly about his knowledge of applicable regulations under which Credit Acceptance operated, commenting that "[t]here are state differences [in the law], but they're not huge differences," ¶93, and reassured investors that "***it's our job to operate in a highly compliant way***." *Id.; see also*

*Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2021 WL 1316705, at *7 (M.D.

Tenn. Apr. 8, 2021) ("But there can be a downside for defendants to having made

truthful disclosures: the disclosures serve to make clear that the defendants were

aware of the facts truthfully disclosed, and such awareness in some cases can

undermine the defendants' position.); *In re Insys Therapeutics, Inc. Sec. Litig.*,

2018 WL 2943746, at *6 (S.D.N.Y. June 12, 2018) (scienter plead where

defendants admitted to reviewing key company metrics); *In re Citigroup Inc. Sec.*

*Litig.*, 753 F. Supp. 2d 206, 241 (S.D.N.Y. 2010) (admission of "familiarity" with

key indices relevant to the company's financial health supported scienter).

Nonetheless, like the defendant in *Wilkof*, Credit Acceptance continued to

represent that the Company was compliant with applicable laws and regulations.

Even if these representations were "opinions," they are actionable.  *See Wilkof v.*

*Caraco Pharm. Lab'ys, Ltd.*, 2010 WL 4184465, at *4 (E.D. Mich. Oct. 21, 2010)

("[O]pinions may be deemed false or misleading under the securities law.").

Further, in responding to requests from the Massachusetts Attorney General,

Defendants necessarily produced the very data that demonstrated their violations of

applicable laws and regulations, as elaborately detailed in the Massachusetts

Attorney General Complaint.  *See, e.g.*, AC Ex. 1 at ¶97 (detailing evidence to

support the fact that "CAC knew or should have known that a substantial majority

of these loans were unable to be repaid"); *id*. at ¶147 (detailing evidence to support

the fact that "[a]s a result of borrowers' statements to CAC and CAC's knowledge of dealers' VSC penetration rates in Massachusetts, CAC knew or should have known that borrowers were required to purchase VSCs in order to obtain CAC loans"); *id.* at ¶164 (detailing evidence to support the fact that "CAC knew or should have known that the statements in its offering documents . . . are materially false and misleading"); *id.* ¶182 (detailing evidence to support the fact that "CAC knew or should have known that its acts or practices [relating to pre- and post-sale repossession notices] were in violation of G. L. c. 93A, § 2"); *see also Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1376 (S.D. Fla. 2015) ("Defendant . . . knew that Green Tree was under investigation for aggressive and illegal collection practices, knew that consumers were complaining about Green Tree's aggressive and fraudulent collection practices and knew that current and former Green Tree employees confirmed such practices. . . . [T]he Court finds that these allegations further support an inference that Defendants Anderson and Corey acted with scienter."); *In re Acadia Pharms. Inc. Sec. Litig.*, 2020 WL 2838686, at *7 (reasoning that "given the reporting requirements, Defendants cannot claim ignorance of the payments").

For example, in 2018, the Superior Court of Massachusetts limited how often a creditor may attempt to contract a debtor via telephone to collect a debt. *See Armata*, 480 Mass. at 14.  This decision left no ambiguity as to whether Credit

39

Acceptance's collection call practices were "in excess of [the] two []

communications in [a] seven-day period" limit.  *See id*.; *see also* ¶¶61-65.

Additionally, the Massachusetts Attorney General warned Credit

Acceptance of its belief that the Company engaged in culpable conduct.  *See* ¶32;

Exhibit B to MTD at 87, PageID.732; *see also Burges v. BancorpSouth, Inc.*, 2015

WL 4198795, at *4-5 (finding statements of compliance with applicable laws were

false where complaint plausibly alleged that defendants were not in compliance

with those laws). [22]  Thus, having been specifically warned that Defendants were in

violation of the law concerning the number of calls that could be made to attempt

to collect a debt, and having produced to the Massachusetts Attorney General

through discovery data on the number of calls made, which was accessible to

Defendants, all while knowing of binding legal authority forbidding the practice,

there can be no doubt that when Defendants spoke about their compliance with

applicable laws, they did so with knowledge of facts that contradicted those

statements and, therefore, did not reasonably believe those statements.  *Omnicare*

presented just such a hypothetical:

> Similarly, if the issuer made the statement in the face of its lawyers' contrary
> advice, or ***with knowledge that the Federal Government was taking the***

---

[22] Defendants are incorrect to assert that they cannot be liable because Credit
Acceptance "fully explained" "the context for its beliefs" where the Company
failed to disclose the various violations that had already occurred, including those
described by the various CWs. *See, e.g.*, AC ¶¶41, 47, 57, 58, 65.

*opposite view*, the investor again has cause to complain: He expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time.

575 U.S. at 188–89 (2015) (emphasis added); *see also USM Holdings Inc. v. Simon*, 2016 WL 4396061, at *11 (E.D. Mich. Aug. 18, 2016) (same).

### 3. Closeness in Time of Fraudulent Statement or Omission to Later Disclosure of Inconsistent Information

Third, the AC establishes the closeness in time of Defendants' fraudulent statement or omission to the later disclosure of inconsistent information. *See Helwig* (factor three). Specifically, Defendants continued to repeat their false and misleading statements concerning (1) the purported opportunity to improve the lives of the Company's customers, (2) generic risk warnings, and (3) compliance with applicable laws, up through July 30-31, 2020, less than a month before the filing of the Massachusetts Attorney General Complaint and the end of the Class Period, supporting an inference of scienter. *See Pittman v. Unum Grp.*, 2021 WL 2646065, at *5 (6th Cir. June 28, 2021) (holding both six- and three-week intervals between false statements and corrective disclosure as supportive of scienter).

### 4. Closely Related Ancillary Lawsuit

Fourth, the AC alleges the existence of a "closely related" ancillary lawsuit by the Massachusetts Attorney General charging fraud by the company and the company's relatively quick settlement of that suit. *See Helwig* (factor five). Specifically, the Massachusetts Attorney General's Complaint was filed on August

41

28, 2020, AC Ex. 1 at 1, and a settlement in principle was announced on April 27, 2021, AC ¶78, just six months later. The presence of a government investigation or suit, even without a quick settlement, may also support an inference of scienter. *See, e.g.*, *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008) (finding it "easy to infer that Defendants acted with scienter" even though they failed to reach a settlement with regulatory entities); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) ("[C]ourts have considered a governmental investigation as one piece of the puzzle when taking a holistic view of the purported facts as they relate to scienter.").

## IV. THE AC PLEADS LOSS CAUSATION

The AC pleads loss causation, *i.e.*, a "causal connection between the material misrepresentation and the loss." *Dura*, 544 U.S. at 342. Loss causation is not subject to a heightened pleading standard in this Circuit. *See Zimmerman v. Diplomat Pharmacy, Inc.*, 2018 WL 3768793, at *2 (E.D. Mich. Aug. 9, 2018) ("Defendants recognize that certain elements of the complaint are governed by the standard advanced by *Twombly*."). The AC alleges two loss causing events.

### A. The January 30, 2020 – Materialization of the Concealed Risk

On January 30, 2020, after the close of the market, Credit Acceptance reported its financial results for the fourth quarter of 2019 and full year 2019. While analysts viewed the quarter negatively, they also focused on the Company's

42

adoption of new accounting standards, which they believed would require the Company "to present additional disclosures to justify the [CECL[23] mandated] reserve, such as delinquencies and charge-offs." ¶120. Credit Suisse noted, "We view this as a net negative in light of potential for increased regulatory scrutiny." *Id.* On January 31, 2020, in response to investor concerns about increased transparency and regulatory scrutiny into the Company's predatory and illegal lending practices, the price of Credit Acceptance's common stock declined $37.86 per share, or *8.46%* on heavy trading volume. ¶121. The AC alleges this was a materialization of the regulatory risk that shed light on Defendants' fraudulent behavior, but did not ultimately reveal the full truth.

This Circuit recognizes the materialization of the risk theory of loss causation. *See Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 385 (6th Cir. 2016); *In re Initial Pub. Offering Sec. Litig.,* 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008) ("Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, a plaintiff may plead that it is 'the materialization of the undisclosed condition or event that causes

---

[23] The Financial Accounting Standards Board issued a new expected credit loss accounting standard in June 2016. The new accounting standard introduces the current expected credit losses methodology (CECL) for estimating allowances for credit losses. The standard is effective for most SEC filers in fiscal years and interim periods beginning after December 15, 2019.

the loss.'"").  And, because Defendants have failed to challenge this disclosure in their motion to dismiss, they concede that the AC plead loss causation. *Bennett*, 788 F. App'x 323.

> **B.     The August 28-31, 2020 – Final Disclosure of the Truth**

Plaintiffs allege that Defendants perpetrated a fraud on the market by concealing the extent of as well as Defendants' "reliance on predatory and illegal business practices." ¶116.  Defendants' fraud was finally fully disclosed starting on August 28, 2020, with the filing of the Massachusetts Attorney General's Complaint which revealed the systemic nature and illegality of Defendants' business practices, supported by voluminous new evidence that the market had not yet assimilated.  In response, Credit Acceptance's stock price fell precipitously from $459.43 at close on August 28, 2020, down to $374.07 at the close of trading on September 1, 2020—an $85.36 drop equating to an *18%* two-day decline.  ¶117.

Defendants' claim that Plaintiffs' theory of loss causation fails as a matter of law because, having previously apprised investors of the Massachusetts Attorney General's investigation, the Massachusetts Attorney General's Complaint did not reveal *new* information to the market.  MTD. at 42-43, PageID.700-701 (citing *In re KBC Asset Mgmt. N.V.*, 572 F. App'x 356, 360 (6th Cir. 2014)).  Investors and analysts plainly disagreed, noting that the enforcement action "lays out the issues more clearly than we have seen in the past supported by data from the underlying

44

loans" and was particularly relevant as the "evidence gathered and arguments made

. . . could strengthen" other state attorney general investigations and lawsuits.

¶124; *see also Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1264 (D.

Nev. 2019) ("The *60 Minutes* report is an adequate corrective disclosure because it

revealed new information to the market and brought to light the **systemic** nature of

Allegiant's maintenance issues.") (emphasis added). Thus, the Massachusetts

Attorney General's Complaint revealed new information, backed up by new data,

on Credit Acceptance's reliance on predatory and illegal lending practices and

violation of the securities laws. Nothing more is required. *See, e.g.*, *Altria Grp.,*

*Inc.*, 2021 WL 955992, at *14-15 (denying motion to dismiss on loss causation

grounds where defendants argued truth-on-the-market based on ongoing

disclosures concerning the existence of lawsuits and investigations into the

defendants' marketing practices).

As such, the AC pleads loss causation. *See, e.g.*, *Carpenters Pension Tr.*

*Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233–34 (2d Cir. 2014) (finding

that a negative market reaction to an alleged corrective disclosure supported

sufficiency of loss causation allegations); *Constr. Laborers Pension Tr. for S. Cal.*

*v. CBS Corp.*, 433 F. Supp. 3d 515, 550 (S.D.N.Y. 2020) (finding loss causation

plead despite analysts being aware of **risk** of harassment allegations when stock

drop occurred when allegations were actually made); *Halford v. AtriCure, Inc.*,

45

2010 WL 8973625, at *18 (S.D. Ohio Mar. 29, 2010) (loss causation plead despite the argument that the plaintiffs "cannot plausibly connect the decline in [the] stock price following the announcement of the DOJ investigation to any fraud.").

## V.   PLAINTIFFS HAVE STATED A SECTION 20(a) CLAIM

Defendants' sole challenge to Plaintiffs' Section 20(a) claim is the absence of any predicate fraud under Section 10(b). This argument fails for the reasons discussed above.

## CONCLUSION

For the foregoing reasons, the Court should deny the Motion in its entirety.

Dated: October 14, 2021                     Respectfully Submitted,

/s/ Michael P. Canty                        Kelly E. Kane (P81912)
**LABATON SUCHAROW LLP**                     **CLARK HILL PLC**
Michael P. Canty                            Woodward Ave
Thomas G. Hoffman, Jr.                      Suite 3500
Alec T. Coquin                              Detroit, Michigan 48226
Charles J. Stiene                           Tel.: (313) 309-9495
140 Broadway                                Fax: (313) 309-6875
New York, New York 10005                    Email: kkane@clarkhill.com
Tel.: (212) 907-0700
Fax: (212) 818-0477
mcanty@labaton.com                          **CLARK HILL PLC**
thoffman@labaton.com                        Ronald A. King (P45088)
acoquin@labaton.com                         212 E. Cesar Chavez Ave
cstiene@labaton.com                         Lansing, Michigan 48906
                                            Tel.: (517) 318-3015
                                            Fax: (517) 318-3068
*Counsel for Lead Plaintiffs and the*        rking@clarkhill.com
*Proposed Class*

                                            *Liaison Counsel for Lead Plaintiffs*

46

# CERTIFICATE OF SERVICE

I, Michael P. Canty, the undersigned, certify under the penalty of perjury that, on October 14, 2021, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel of record.

/s/ Michael P. Canty

Michael P. Canty
Labaton Sucharow LLP
140 Broadway
New York, NY 10005

*Counsel for Lead Plaintiffs and the Proposed Class*