IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PALM TRAN, INC.                    )
AMALGAMATED TRANSIT UNION          )
LOCAL 1577 PENSION PLAN,           )
Individually and On Behalf of )
All Others Similarly Situated,)
                                   )      Civil Case No.
              Plaintiffs,          )
                                   )      2:20-cv-12698-LVP
        -vs-                       )
                                   )
CREDIT ACCEPTANCE CORPORATION,)
BRETT A. ROBERTS, and              )
KENNETH S. BOOTH,                  )
                                   )
              Defendants.          )
_____/

MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
BEFORE THE HONORABLE LINDA V. PARKER
UNITED STATES DISTRICT JUDGE
HEARING CONDUCTED VIA VIDEO CONFERENCE
ALL PARTIES APPEARING REMOTELY
Tuesday, August 30, 2022

APPEARANCES:

FOR THE MOVANT:        MICHAEL P. CANTY, ESQ. and
                       NICOLE M. ZEISS, ESQ.
                       Labaton Sucharow, LLP
                       140 Broadway
                       New York, New York 10005
                       (212) 907-0700

APPEARANCES (Continued):

FOR THE DEFENDANT:          ROBERT ALEXANDER FUMERTON, ESQ.
Credit Acceptance           Skadden, Arps, Slate, Meagher &
                            Flom, LLP
                            One Manhattan West
                            New York, New York 10001-8602
                            (212) 735-3902


and                         THOMAS G. McNEILL, ESQ.
                            Dickinson Wright
                            500 Woodward Avenue
                            Suite 4000
                            Detroit, Michigan 48226-3425
                            (313) 223-3500


ALSO PRESENT:               Chris Fredmonski

                            Brendan Frey

REPORTED BY:                Darlene K. May, CSR, RPR, CRR, RMR
                            231 W. Lafayette Boulevard
                            Detroit, Michigan 48226
                            (313) 234-2605

TABLE OF CONTENTS

PROCEEDINGS:                                               PAGE:

  Appearances                                                4

  Hearing                                                    6

  Court Reporter's Certificate                              28

Detroit, Michigan

Wednesday, August 31, 2022

1:05 p.m.

-- --- --

THE CLERK OF THE COURT:  The United States District Court for the Eastern District of Michigan is now in session. The Honorable Linda V. Parker presiding.

Your Honor, the Court calls civil matter 20-12698, Palm Tran, Incorporated, Amalgamated Transit Union Local 1577 Pension Plan versus Credit Acceptance Corporation and others.

Today is the date and time set for a motion hearing.

THE COURT:  Yup.

THE CLERK OF THE COURT:  Counsel, please place your appearances on the record, beginning with the plaintiff.

MR. CANTY:  Good afternoon, Your Honor.  My name is Michael Canty.  I'm joined by my colleague Nicole Zeiss.  We represent Ontario Provincial Council, a Carpenters' Pension Trust Fund, and Millwright Regional Council of Ontario Pension Trust Fund and the proposed class.

THE COURT:  Thank you.

And Mr. Fumerton?

MR. FUMERTON:  Yeah.  Tom, do y'all want to introduce us?

MR. McNEILL:  Sure.  I'd be delighted to.  Your Honor, Tom McNeill from Dickinson Wright on behalf of Credit

Acceptance Corp.

THE COURT: Okay.

MR. McNEILL: I'm delighted to have a couple of colleagues on the line as well. And depending on how it all goes, you may hear from us and you may not. Obviously, we're in support of the motion.

Starting with our client, Brendan Frey, who is with the company as senior vice-president and counsel for litigation.

THE COURT: Okay.

MR. McNEILL: And from Skadden Arps firm, Rob Fumerton, who has been lead counsel throughout from the defense perspective, intimately involved with the mediation and the matters that preceded the group to settlement. And so I think if you need to hear from us, it will probably be through Rob.

THE COURT: Okay.

MR. FUMERTON: Good afternoon, Your Honor.

THE COURT: Very good. Thank you. Good afternoon, sir. How are you?

All right. We're going to begin with you, Mr. Canty?

MR. CANTY: Yes, Your Honor.

THE COURT: Okay.

MR. CANTY: If I may. If it please the Court, we're here --

THE COURT: Let me just -- let me just say that I have

reviewed all the materials that have been submitted and I have specific questions that I want to raise, but I would like for you to just go forward and go with your plan.  Okay?  Thank you.

MR. CANTY:  Yes.  And I'm happy to answer any questions that you have.

We're here today seeking preliminary approval of the settlement reached between the proposed class and the defendants.  Specifically we're seeking approval of the preliminary approval order which includes the long form notice, the claim form, and the summary notice.  The proposed preliminary approval order and the exhibits were included in our submission to the Court on August 24th, 2022. Additionally, we respectfully request the Court set a hearing date for final approval for December 5th or as soon thereafter as it is convenient for the Court.

We respectfully submit that the settlement class meets all of the requirements of Rule 23(a) and (b)(3).  Specifically Rule 23(a), the fact there's numerosity, commonality, typicality, adequacy of representation, as well as Rule 23(b) which questions of law fact common to class members predominate over any questions affecting the individual members.  And that class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  And specifically with respect to the settlement purposes, it certainly is

appropriate.

In Rule 23(e), which obviously requires the Court as fiduciary for the class at this point, to impose judicial approval of the settlements and whether or not notice should be provided to the class given the likelihood that the Court will be able to finally approve the settlement and certify the class.  The Court must determine whether it's fair, reasonable and adequate.  Whether lead plaintiffs and lead counsel adequately represented the settlement class.  Whether the settlement was negotiated at arm's length.  Whether the relief is adequate, and whether the proposal treats class members equitably to one another.  With respect to all of those questions, the plaintiffs respectfully request they are answered in the affirmative, the answer is yes to all of those.

I'm happy to go through all of the factors on the Rule 23(a) and the determinations, but I certainly would be happy to answer any questions the Court has at this --

THE COURT:  Okay.  Let -- yeah.  Okay.  Let me just get -- I want to be able to understand a couple of things here.  Can you explain to me -- talk about what the range of recovery is for claimants.  I know that there are a lot of factors that go into the amount that any individual claimant would receive because it -- I guess it's driven by the number of common shares and when they were traded and what the value was at the time --

MR. CANTY: That's correct, Your Honor.

THE COURT: -- the trades were made, right?

MR. CANTY: I will -- I'm sorry. I don't mean to interrupt.

THE COURT: No, no. You're not interrupting. Go ahead, please.

MR. CANTY: I will attempt to answer your question, and if my colleague, Nicole Zeiss, who specializes in this area has anything to add, I'll ask her to do so.

But under the -- under the plan of allocation, those class members that purchased during the class period and that suffered damages, meaning they lost -- that the price of the share that they purchased during the class period went down, they would receive their pro rata equitable distribution of the settlement. So that's -- in simplest terms, that's how that's determined. The total amount is conditioned on the number of how many claims that are filed and what the specific loss was to each individual claimant.

So if somebody -- just using numbers not related to this case. If somebody bought a share at $10 and sold it at $3, then they have a $7 loss. Somebody else that bought it at 10 but sold at 8 has a $2 loss. So -- but they will be -- receive their pro rata portion. But to say what each individual class member will get, that would be determined by the claims administrator through the claims process.

THE COURT: So we'll know more about that when it comes to the final approval hearing, you think? We would, maybe?

No?

MS. ZEISS: Your Honor, this Nicole Zeiss from Labaton.

THE COURT: Yes.

MS. ZEISS: We will be able to provide you with some information about the claims process. The number of claims that we've received, the number of shares purchased during the class period. However, the actual processing, you know, takes some time after claims come in. But we'll be able to give you some kind of big picture numbers.

THE COURT: Yeah.

MS. ZEISS: And -- so, yes.

THE COURT: So, Ms. Zeiss, do you think you would -- when that information comes in, would you be able to give me like, you know, an idea of the range, like, you know, what the -- you know, if there is such a thing as an average claimant? You know, that most claimants had X number of stock during the relevant period of time or, you know, is there that kind of -- are there -- I'm not even going to call them outliers, but, I mean, are there certain claimants that are going to have just a ton of common stock and they would -- do you understand what I'm saying?

I'm just -- it is hard for me to understand, candidly, how a $1.34, you know, after all expenses are taken out, what would a recovery look like for -- you know, on the range here? I mean, nobody is just buying -- people are buying on average, what do you think? Could you even estimate and how would you estimate at this point?

MS. ZEISS: Yeah. The $1.34 is assuming all the damage shares have put in claims.

THE COURT: Yeah.

MS. ZEISS: Based on our expert's analysis of how many shares were damaged.

I don't -- we can give you some averages, but, you know, I would say maybe a retail investor would have a thousand shares. So then on average they're going to receive, you know, a thousand dollars.

THE COURT: Okay. Yeah. I got you. Okay. That helps.

MS. ZEISS: But we can break that out for you in the final approval and then the reply papers.

THE COURT: Okay. Good.

All right. That helps. Let's see. Hang on. I just want to see what else I had here. Talk to me about -- a little bit about the attorney's fees here. Because we're looking at an estimated amount of 3.6 million, right? That's not going to -- isn't that pretty much a set amount?

MR. CANTY: It certainly -- the fees that are awarded to counsel is within sole discretion of the Court.

THE COURT: Okay.

MR. CANTY: So it's certainly up to the Court. We put up to 30 percent. That's -- I think we've given some. We can give some examples of cases that settle for similar amounts --

THE COURT: Yeah.

MR. CANTY: -- where courts have awarded up to 30 percent.

THE COURT: Okay. You -- did you do that in your -- any of your materials? I thought that you did.

MR. CANTY: I can't speak definitively to that now, Your Honor. I --

THE COURT: Okay.

MR. CANTY: I can look into it and let the Court know. But there are -- we can certainly provide the Court at final approval when we ask for a specific fee.

THE COURT: Okay. Fair enough. Yeah. That will be separate. That's fine. I would appreciate that. That would be helpful for me.

MS. ZEISS: Your Honor, there will be a whole motion directed simply at our request for fees and expenses.

THE COURT: I understand. Yeah. I understand.

Okay. And can you talk a little bit about the option that the defendants have to terminate the settlement if the

request for exclusions exceed the -- a threshold?  Can you just talk a little bit about that?

Is that you, Ms. Zeiss, in terms of it or is it Mr. Canty?

MR. CANTY:  Either one.  I'll make an attempt to answer your question.  And, again, I'll -- Ms. Zeiss if she has something to add, I'm sure.  But the idea here is that the defendant -- I'll let Mr. Fumerton speak to this as well because I think it also involves defendants.

The defendants are seeking essentially global peace here through the settlement.  They want to make sure that this issue is resolved.  And certainly I don't want to speak to them, but this is the idea -- and we've come to an agreement that if there is a certain number of opt outs that put -- exceeds a certain threshold, which we obviously keep confidential, that they have the opportunity to walk away from the deal, so to speak, because they're not really getting the global peace that they had expected.

So we -- the plaintiffs have agreed to deliver the class members to make sure that they are part of the class settlement.  And if not, then if that provision is breached, the defendants then have the opportunity -- it's certainly not mandatory, but they have the opportunity to walk away from the deal.

MR. FUMERTON:  And this is Robert Fumerton for

defendants, Your Honor.  This provision is very standard.  The threshold percentage we've negotiated is at the very high end of the percentages.  And counsel is correct, the reason it's a standard provision is just to protect the defendants in the very unlikely event that there's an exceedingly high number of opt outs we could render the release not effectual for defendants.

THE COURT:  Is the -- is the number -- have you -- is that in the document, in the appendix that I could -- would be privy to in camera?  Is that where those numbers are in that confidential document?  Yes?

MR. FUMERTON:  That's correct, Your Honor.

THE COURT:  Okay.  That's fine.  And have you -- I would like to view -- to review it.  I don't think it -- has it been filed already?

MS. ZEISS:  No, Your Honor.  This is Nicole Zeiss.  It's confidential.  It has not been filed.

THE COURT:  So it just needs -- yeah.  Uh-huh.  So we can do it one of -- I guess you can file it under seal, right?  Or deliver it.  I don't know what you want to do.

Aaron, what do we typically?  It can be filed under seal, right?

THE CLERK OF THE COURT:  I'm sorry, Judge.  The phone is ringing in the background.

THE COURT:  Oh, I'm sorry.

THE CLERK OF THE COURT:  Yeah.  They can file it under seal or they could send it -- just E-mail it to me and I can forward it to you to review.

THE COURT:  Whatever is most comfortable for the parties.  I don't have a problem either way.

MR. CANTY:  Your Honor, may I suggest I confer with Mr. Fumerton and we'll make sure we get you that as soon as possible?

THE COURT:  Okay.  And a question about that appendix is, I reviewed the 39-page notice to the potential class members here, to those who might be eligible.  And it is that document that -- it's a 39-page document the people will be receiving, right?

This is why nobody joins class actions.  Okay, I'm just kidding.

You know, we get them in the mail.  I like the font size, though.  Let me say that to you.  I hope you keep it that way.

But will the parties -- will the potential class members or settlement -- members of the settlement, will they be able to review that appendix as well if they deem it necessary?  I thought I reviewed language that said that they could.

MS. ZEISS:  Your Honor, this is Nicole Zeiss.

THE COURT:  Yes.

MS. ZEISS: Yes. The notice and the claim form, they will be formatted so they will be condensed. It will be a lot cheaper that way. And that will be mailed.

THE COURT: Okay.

MS. ZEISS: The claims administrator will create and host a website and all of our motions will be posted on the website -- the notice, the claim form.

THE COURT: Okay.

MS. ZEISS: So people will be able to download documents. The complaint will be there. And there also will be an online claim portal so people can just file their claims online if they want to.

THE COURT: Okay. Good.

Okay. I don't really have any more questions. I want you to continue, Mr. Canty. Will you still just go ahead and make a record here for me of highlighting those factors that I'm required to review?

MR. CANTY: Sure. Yes, Your Honor. We can start with the factors under 23(a).

THE COURT: Um-hmm.

MR. CANTY: With respect to numerosity, obviously Credit Acceptance is a commonly traded stock on NASDAQ and therefore, we certainly have hundreds, if not thousands of claims -- or members that could bring a case and certainly the efficiency would call for this being handled in the class

action settlement, class action setting.

Millions of Credit Acceptance shares were traded publicly during the class period on NASDAQ as I stated. And as of September 30th, 2020, Credit Acceptance had over 17 million shares of stock outstanding. So there are likely hundreds, if not thousands of settlement class members that are essentially spread geographically across the United States, making joinder of all the claims and therefore, we think that the numerosity certainly has been satisfied.

With respect to commonality, as we've alleged in the complaint, there are common questions of law and fact which include, among others, whether the federal securities laws were violated by the defendants' acts or omissions. Whether press releases and other statements inseminated to the investing public during the class period misrepresented material facts about the business, finance and prospects of Credit Acceptance. Whether Credit Acceptance made statements by the defendants to the investment public during the class period that misrepresented or omitted facts or failed to disclose material facts about the business, finances, value, performance and prospects of Credit Acceptance, and whether the market price of Credit Acceptance common stock during the class period was artificially inflated due to those material misrepresentations and failures to create the material misrepresentations as alleged in the complaint, and to the extent to which class

members have sustained damages.

So certainly security class action cases are uniquely situated for a class action treatment because you have these commonality issues.  There are very, very few individual issues and commonality predominates.  These are questions that have to be answered for almost any claim that would be filed.  So, therefore, we respectfully submit that commonality has been satisfied.

With respect to Rule 23(a)(3), a typicality.  Here, the plaintiffs' claims and the claims of the settlement class members arise from the identical alleged conduct by the defendants.  Lead plaintiffs like all other members of the settlement class purchased Credit Acceptance common stock during the class period at the allegedly inflated prices and suffered damages when the alleged fraud was revealed through the corrected disclosures as outlined in our complaint.

Therefore, we submit that typicality has been satisfied.

Under Rule 23(a)(4), adequacy of representation, lead plaintiffs must meet the adequacy requirement to fairly and adequately protect the interests of the class.

With respect to the two named plaintiffs here, I can personally attest to the involvement in the case.  And they're leading the litigation.  We've had multiple meetings with them. They've reviewed all filings in the case.  They were actively

involved in the settlement negotiations and they were well versed on the claims that we made, the risks associated with the case, and the decision to ultimately settle this matter.

The second prong of adequacy is whether or not the lead plaintiffs have retained the services of sufficient counsel. So I guess this is my opportunity to brag a little bit about Labaton Sucharow, but Labaton Sucharow has been in the business of securities class actions for well over 50 years. We have been involved in some of the largest class act -- securities class action cases since the passage of the PSLRA. We've taken two cases to the United States Supreme Court. We are routinely before courts of appeals and we've litigated cases with some of the highest recoveries for class members. Cases that have oftentimes have -- oftentimes have gone over a decade. We've had an in-house investigative team so we are certainly -- I believe we are adequate representation for the class here.

THE COURT: Let me stop you there, Mr. Canty, about adequate recovery because I do want you to address that. And so it's hard for me to see just because this isn't necessarily -- I mean, you know, this is not where I practiced law in the areas of security. So I just want to know how are recovery -- when you have a settlement of 12 million and there is a, you know, 4.6 percent -- I don't even know how to articulate it. It's 4.6 -- recovering 4.6 of the maximum

damages, right?

MR. CANTY: Yes.

THE COURT: That's how I would articulate that. How does that compare, sir, with the security class action settlements that your firm has seen in its practice? Because it seems low and I know there's a reason for that.

MR. CANTY: That's a fair argument.

THE COURT: Yeah.

MR. CANTY: And Ms. Zeiss can talk about specifics of other cases and recoveries. But as you know -- I'm sure you know, Your Honor, with numbers, numbers can be interpreted in a number of different ways.

THE COURT: Um-hmm.

MR. CANTY: But with respect to why this is a fair recovery here. I think we need to start with risk. And the highest risk to the plaintiffs here are non-recoveries right now. The case has not been decided on a motion to dismiss. And where does the risk go from here? It doesn't really drop off. There's risk at class certification. There's risk at summary judgment. And then ultimately for those of us that have trial experience, I can tell you firsthand there's always, always, always a risk going to trial and recovering nothing.

So the question is, what's in the best interest of the class. Here, we have a recovery where the defendants have put forth valid defenses. Well reasoned, well thought out defenses

that any trial lawyer will look at and say, can we get by the motion to dismiss? I would respectfully submit, yes, we could. But for me, I looked at the case here and I saw that there was trial risk. There's significant arguments that the defense raised in their motion to dismiss that call into question whether or not that total damages number is attainable at trial. Will a jury look at that number and cut that number down. And what does that mean for class members? It means in order to get there, to make that determination, you have to go through the discovery process. You have to go through depositions, class certification, summary judgment, and ultimately trial. And there's a risk that the class would recover nothing.

What happens when we have a settlement like this? That risk is taken away. So what can we provide the class? We can provide the class and class members certain recovery now as opposed to, you know, a risk recovery two, three, four, five years down the road. And as I said before, Your Honor, some of these cases have gone on for more than a decade. We're going up against well heeled defendants that are the top in the field, the defense field of security litigation. They're certainly not going to roll over with respect to challenging class certification and summary judgment or taking appeals to the Court of Appeal or even the United States Supreme Court.

So when you look at that number, that's a number that

our experts have come up with to determine whether -- you know, what the 100 percent damages were if we were able to prove all of the -- all of the corrected disclosures were attributable to the fraud.

Well, the defendants have raised specific issues with respect to falsity. They raised specific issues with respect to acindare (ph). You know, the defendants have argued with respect to falsity that the alleged misstatements constitute inactionable omissions, statements of puffery and generic risk warnings. With respect to the claims we've made that the filing of the Massachusetts consumer complaint led -- laid bare the issues with respect to the fraud, the defendants have said no, that we've disclosed that prior. Is that argument that a juror would look at and say, wait a minute. Everybody knew about the Massachusetts litigation because they disclosed that they had received subpoenas for the Massachusetts.

So those are all questions of risk and as a fiduciary for the class. You have to make a determination as to whether or not this settlement is the right settlement. Well, how do you do that?

Well, in this case, we went and we enlisted the assistance of a nationally recognized mediator. And I can -- without getting into the specifics of the mediation, I can tell you that we had a full day mediation that did not end in a resolution. It took weeks of working with the mediator and

ultimately the mediator making a proposal that he felt was fair for the parties to consider and ultimately we were able to reach an agreement in settling the case.

So having an independent third-party look at this case objectively and carefully analyze the risks. Obviously, the defendants thought that these were real risks that were going to be successful to them, plaintiffs thought the risks really weren't as serious as the defendants laid them out. Having an independent party look at the case objectively and make a recommendation where both parties then agree, I think speaks volumes as to whether or not this is a fair and reasonable settlement in light of the risks associated with the case.

Again, there's also the post motion to dismiss risk which is reliance and damages we talked about. Whether or not the defendants would attempt to attack that overall damages number. And there's a whole host of uncertainty and also there's expense associated with moving a case forward. That takes -- probably will take away from the class recovery.

So, for example, if we wound up at this number, two years from now the expenses would be exponentially higher than they would -- what they're going to be here today. So as an experienced law firm in conjunction with experienced lead plaintiffs, we have to make a determination as to whether or not it's fair and reasonable. And in this case in conjunction with consultation with our clients who are representatives of

the class, we believe it's a fair and reasonable settlement.

THE COURT: Thank you. Let me ask you one other question. What happened in the case that was filed by the AG in Massachusetts?

MR. CANTY: I'm sure Credit Acceptance can answer that, but my understanding it was settled with no admission of wrongdoing by Credit Acceptance.

THE COURT: Okay. Mr. Fumerton?

MR. FUMERTON: That's correct, Your Honor.

THE COURT: Okay. All right.

Okay. Is that a confidential settlement, Mr. Fumerton?

MR. FUMERTON: No, it's not. The number is public and, again, there was no admission whatsoever of any wrongdoing or liability on behalf of the company.

THE COURT: Fair enough. Okay. Thank you.

You can go ahead, Mr. Canty. I appreciate it.

MR. CANTY: With respect to the Rule 23(e) factors which require judicial approval of settlements.

THE COURT: Uh-huh.

MR. CANTY: The question is whether or not lead plaintiffs' lead counsel adequately represented the settlement class. I believe I've addressed that issue.

THE COURT: Yes, you have.

MR. CANTY: With respect to the settlement negotiated

at arm's length.

THE COURT: Yep.

MR. CANTY: I believe we've addressed that. We used an independent mediator. And, again, that was not something that was done in a day. I know Mr. Fumerton can attest to, it got a little bit contentious at times going back and forth, but ultimately we were able to reach a resolution. So certainly I would characterize it as arm's length. Whether or not the relief is adequate when looking at costs, risks, delay, the effectiveness of the proposed method of distribution what Ms. Zeiss has talked about and in terms of a fee award, again, we have proposed no more than a 30 percent fee and we'll put forth before the Court a separate fee proposal with --

THE COURT: Thank you.

MR. CANTY: -- cases that support that fee.

Any proposal treats class members equitably to one another. I believe Ms. Zeiss talked about that as well. Everybody that purchased during the class period and that suffered loss will be -- will receive a pro rata portion of that loss based on how many claims are filed with the claims administrator.

I believe that fulfills all the Rule 23 requirements that the Court must consider --

THE COURT: Okay.

MR. CANTY: -- in determining whether or not there's

likelihood that the Court will approve -- finally approve the settlement. But, again, I'm happy to answer any questions the Court may have.

THE COURT: Right. I don't have any other questions other than to just remind you, if you would -- I'd appreciate it if on this whole issue of the -- you know, the percentage of the -- you know, the 4.6 and how that is a fair number, if there are other cases that you can cite from this circuit, I would appreciate it. And if you can't find any from this circuit -- I know that you did, in fact, cite a case in -- where is -- Nevada from 2012. This is International Brotherhood of Electric Workers.

If you can find anything else, I'd appreciate it. I just want to be able to -- I would like to include that in -- really, in the preliminary order of approval.

MR. CANTY: We'll provide you something very quickly, Your Honor. Yes.

THE COURT: Thank you. Okay.

And, Ms. Zeiss, did you want to add anything to that? When we talked about the percentage of recovery I know that Mr. Canty said you might want to add to that. I don't know that you did. I can't -- I don't think you did yet.

MS. ZEISS: No, Your Honor. I think he covered it. And you'll see from the cases --

THE COURT: Okay.

MS. ZEISS: -- that the recovery is in line. And I think as the preliminary approval brief notes, the -- the gross settlement amount is larger than the median security settlement amount last year.

THE COURT: Okay.

All right. And so, let me just say that -- so I'm looking for just full supplemental information on that and also a copy of the appendix A, which really sets forth the confidential agreement.

And it's looking good. I don't -- you know, I'm thinking that -- I mean, I don't -- I have not seen -- I have not seen or heard anything. I want to clarify some things, that's why I've asked you for the submissions, including the confidential document. And so I'll be able to rule on this. I know you have already submitted an order for me to sign. And if -- I might end up tweaking that and I might end up tweaking it with some of the case law that you'll be able to provide for me. And so the sooner you can get that, the better. Okay?

MR. CANTY: Yes, Your Honor.

THE COURT: All right. Do we need -- is there anything else, Mr. Canty, that you and your colleagues would like to place on this record?

MR. CANTY: No. Thank you, Your Honor.

THE COURT: Okay. And how about for the defendants? Mr. Fumerton, anything from you, sir?

MR. FUMERTON:  Nothing for defendants, Your Honor.

THE COURT:  Okay.  I appreciate it.  I think you all -- I really appreciate the way you briefed it.  It was very comprehensive.  And so I should be able to move quickly.  All right?

MR. CANTY:  Thank you, Your Honor.

MR. FUMERTON:  Thank you, Your Honor.

THE COURT:  All right, everyone.  Thanks so much for your time today.  All the best.

THE CLERK OF THE COURT:  Court is adjourned.

(At 1:36 p.m., matter concluded.)

- - -

C E R T I F I C A T E

I, Darlene K. May, Official Court Reporter for the United States District Court, Eastern District of Michigan, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability, from the record of proceedings in the above-entitled matter. I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

September 2, 2022          /s/ Darlene K. May
Date                       Darlene K. May, CSR, RPR, CRR, RMR
                           Federal Official Court Reporter
                           Michigan License No. 6479