# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| PALM TRAN, INC. AMALGAMATED TRANSIT UNION LOCAL 1577 PENSION PLAN, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> CREDIT ACCEPTANCE CORPORATION, BRETT A. ROBERTS, and KENNETH S. BOOTH, <br><br> Defendants. | Case No. 20-cv-12698 <br> Honorable Linda V. Parker |

## DECLARATION OF MICHAEL P. CANTY IN SUPPORT OF (I) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND <u>PAYMENT OF LITIGATION EXPENSES</u>

I, MICHAEL P. CANTY, declare as follows, pursuant to 28 U.S.C. §1746:

1.  I am a partner in the law firm of Labaton Sucharow LLP ("Labaton Sucharow").  Labaton Sucharow serves as Court-appointed Lead Counsel for Lead Plaintiffs Ontario Provincial Council of Carpenters' Pension Trust Fund and Millwright Regional Council of Ontario Pension Trust Fund (collectively, "Lead Plaintiffs") and the proposed class in the above-captioned litigation (the "Action").[1] I have been actively involved in prosecuting and resolving the Action, am familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon my supervision of and participation in all material aspects of the Action.

2.  Pursuant to Rule 23 of the Federal Rules of Civil Procedure, I submit this declaration in support of Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation.  I also submit this declaration in support of Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Litigation Expenses, on behalf of my firm and other Plaintiffs' Counsel.[2]  Both motions have the full support of Lead Plaintiffs.  *See* Declaration of Tom Cardinal

---

[1]  All capitalized terms used herein that are not otherwise defined shall have the meanings provided in the Stipulation and Agreement of Settlement, dated August 24, 2022 (the "Stipulation", ECF No. 42-2), which was entered into by and among (i) Lead Plaintiffs, on behalf of themselves and the Settlement Class, and (ii) Credit Acceptance Corporation ("Credit Acceptance" or the "Company"), Brett A. Roberts and Kenneth S. Booth (collectively, "Defendants," and together with Lead Plaintiffs, the "Parties").

[2] Plaintiffs' Counsel are Labaton Sucharow LLP, Clark Hill PLC, and Himelfarb Proszanski.

on Behalf of Ontario Provincial Council of Carpenters' Pension Trust Fund, dated October 31, 2022 attached hereto as Exhibit 1, and the Declaration of Mark Beardsworth on Behalf of Millwright Regional Council of Ontario Pension Trust Fund, dated November 2, 2022, attached hereto as Exhibit 2.[3]

## I.      PRELIMINARY STATEMENT

3.      The proposed Settlement now before the Court provides for the full resolution of all claims in the Action, and related claims, in exchange for a cash payment of $12,000,000.  As detailed herein, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement represents a favorable result for the Settlement Class in light of the significant risks of continuing to litigate the Action.

4.      Lead Plaintiffs and Lead Counsel are well-informed of the strengths and weaknesses of the claims and defenses to the claims.  In choosing to settle, Lead Plaintiffs and Lead Counsel took into consideration the substantial risks associated with advancing the claims alleged in the Action, as well as the duration and complexity of the legal proceedings that remained ahead.  As discussed below, had the Settlement not been reached, there were considerable barriers to a greater recovery, or any recovery at all.  Principally, Defendants have argued in their pending

---

[3]  Citations to "Exhibit" or "Ex.___" herein refer to exhibits to this Declaration. For clarity, citations to exhibits that have attached exhibits will be referenced as "Ex. __-__."  The first numerical reference is to the designation of the entire exhibit attached hereto and the second alphabetical reference is to the exhibit designation within the exhibit itself.

motion to dismiss, and would continue to argue throughout continued litigation, that Lead Plaintiffs had neither alleged particularized facts demonstrating, nor could they prove, any false or misleading statement or omission of material fact. Defendants have also argued, and would continue to maintain, that Lead Plaintiffs have neither pled, nor would they be able to prove, that Defendants allegedly made any misstatements or omissions with scienter. Further, issues relating to establishing loss causation and the calculation of the class's damages would have been hotly disputed, with Defendants arguing that none of the allegedly corrective disclosures were actionable. These issues would have come down to an inherently unpredictable and hotly disputed "battle of the experts." Accordingly, in the absence of a settlement, there was a very real risk that the class could have recovered nothing or an amount significantly less than the negotiated Settlement.

5.      In contrast with these challenges, the Settlement provides a favorable recovery that is above industry trends. The $12 million recovery is above the median settlement amount of $7.9 million for securities actions between 2012 and 2021 alleging claims under the Exchange Act and is higher than the median recovery in 2021 of $8.3 million, and higher than the $5.8 million median recovery between 2017 and 2021 in cases that settled after a motion to dismiss was filed, but before a ruling. *See* Laarni T. Bulan and Laura E. Simmons, *Securities Class Action Settlements – 2021 Review and Analysis*, at 1, 13, 14 (Cornerstone Research 2022),

Ex. 3. Thus, compared to other similarly situated cases in 2021, and during the past few years, the Settlement is a very favorable outcome for the Settlement Class.

6. In addition to seeking approval of the Settlement, Lead Plaintiffs seek approval of the proposed Plan of Allocation governing the calculation of claims and the distribution of the Settlement proceeds. As discussed below, the proposed Plan of Allocation was developed with the assistance of Lead Plaintiffs' consulting damages expert and provides for the distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment on a *pro rata* basis based on their losses attributable to the alleged fraud.

7. With respect to the Fee and Expense Application, as discussed in the Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Litigation Expenses ("Fee Brief"), the requested fee of 30% of the Settlement Fund would be fair both to the Settlement Class and to Plaintiffs' Counsel, and warrants the Court's approval. This fee request is on par with fee percentages frequently awarded in this type of action and, under the facts of this case, is justified in light of the benefits that Lead Counsel conferred on the Settlement Class, the risks they undertook, the quality of the representation, the nature and extent of the legal services, and the fact that Plaintiffs' Counsel pursued the case at their financial risk. Lead Counsel also seeks $59,615.60 in Litigation Expenses incurred in connection with their work.

5

## II.   HISTORY OF THE ACTION

### A.   The Initial Complaint and Appointment of Lead Plaintiffs and Lead Counsel

8.      A securities class action complaint was filed on October 2, 2020 in this Court by Palm Tran, Inc. Amalgamated Transit Union Local 1577 Pension Plan on behalf of all persons and entities who purchased or otherwise acquired Credit Acceptance common stock from November 1, 2019 through August 28, 2020, in *Palm Tran, Inc. Amalgamated Transit Union Loc. 1577 Pension Plan v. Credit Acceptance Corp.*, No. 20-CV-12698 (E.D. Mich.) (the "Action").  ECF No. 1.

9.      The initial complaint alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act ("Exchange Act") and Rule 10b-5 promulgated thereunder.  To establish a claim under the Exchange Act, a plaintiff must prove: (i) the defendant made a material misrepresentation or omission; (ii) with scienter; (iii) in connection with the purchase or sale of a security; (iv) reliance on the material misrepresentation or omission; (v) economic loss; and (vi) loss causation.

10.      The Action asserted claims against Credit Acceptance and the Individual Defendants arising from Credit Acceptance's alleged misrepresentations to investors throughout the Class Period regarding Credit Acceptance's compliance with consumer protection laws.  In general, the initial complaint alleged that the price of Credit Acceptance common stock was artificially inflated as a result of Defendants' conduct.  The complaint further alleged that when the truth regarding

these unfair and deceptive trade practices was allegedly disclosed to the market, the price of Credit Acceptance shares declined causing damages to the proposed class.

11.    On December 1, 2020, Ontario Provincial Council of Carpenters' Pension Trust Fund and Millwright Regional Council of Ontario Pension Trust Fund filed a Motion for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel pursuant to the procedure set forth by the Private Securities Litigation Reform Act of 1995 (the "PSLRA").  ECF No. 16.

12.    On May 28, 2021, pursuant to the PSLRA, the Court issued an order appointing Ontario Provincial Council of Carpenters' Pension Trust Fund and Millwright Regional Council of Ontario Pension Trust Fund as Lead Plaintiffs and appointing Labaton Sucharow LLP as Lead Counsel and Clark Hill as Liaison Counsel to represent the class.  ECF No. 28.

**B.    Lead Plaintiffs' Investigation and the Amended Complaint**

13.    After their appointment, Lead Plaintiffs, through Lead Counsel, continued their investigation into the claims for the purpose of drafting a comprehensive amended complaint that would survive the strictures of the PSLRA. During this process, Lead Counsel engaged in a thorough factual investigation that included, among other things, the review and analysis of: (i) press releases, news articles, transcripts, and other public statements issued by or concerning Credit Acceptance and the Individual Defendants; (ii) research reports issued by financial

analysts concerning Credit Acceptance's business; (iii) Credit Acceptance's filings with the U.S. Securities and Exchange Commission ("SEC"); (iv) news articles, media reports and other publications concerning the auto lending industry and markets; (v) other publicly available information and data concerning Credit Acceptance, its securities, and the markets therefor.

14. Lead Counsel's investigation, conducted by and through attorneys and investigators, also included the identification of 162 former employees of Credit Acceptance with relevant knowledge, of whom 143 were contacted and 31 were interviewed on a confidential basis.

15. Lead Counsel thoroughly investigated Credit Acceptance's historical financial statements and SEC filings. Lead Counsel reviewed relevant balance sheet changes during the Class Period and the accounting policies (and changes therein) for relevant assets. As detailed below, Lead Counsel consulted with an economic expert regarding loss causation and damages.

16. Lead Counsel also reviewed Defendant Roberts' compensation and insider sales throughout his tenure at the Company, utilizing data provided by Bloomberg, and engaged in a comparative analysis of his sales before and during the Class Period in order to support Lead Plaintiffs' scienter allegations.

17. Lead Counsel sent Freedom of Information Act ("FOIA") requests to the Massachusetts AG in connection with the Company's allegedly illegal, unfair,

and deceptive trade practices with respect to auto lending, debt collection, repossession, and asset-backed securitizations; Consumer Financial Protection Bureau ("CFPB") in connection with its Notice and Opportunity to Respond and Advise ("NORA") letter; New York AG in connection with the investigation relating to Credit Acceptance's loan origination and collection practices and its securitizations; Maryland AG and New Jersey AGs in connection with the investigation relating to Credit Acceptance's repossession practices, sale policies and procedures, loan origination practices, and collection practices; and United States Department of Justice requesting information related to subprime automotive finance and related securitization activities.

18.  Further, Lead Counsel also reviewed numerous available research reports issued by financial analysts concerning Credit Acceptance's business and operations, as well as transcripts of conference calls hosted by Defendants during which analysts asked relevant questions of Defendants.  These conference calls, press releases, and reports provided invaluable insight into the market's awareness of key industry trends impacting Credit Acceptance, including Credit Acceptance's exposure to regulatory action.

19.  In consultation with Lead Plaintiffs' damages experts, Lead Counsel also reviewed statistically significant stock price movements for an extended period both before and after the class period alleged in the initial complaint.  Based on this

review and the ongoing review of developments in the Action, Lead Counsel identified allegedly statistically significant stock price declines and related disclosures, which were included in the Complaint as allegedly corrective disclosures, including the Massachusetts Attorney General filing a complaint and alleging that the Company engaged in unfair and deceptive trade practices with respect to auto lending, debt collection, repossessions, and asset-backed securitizations.

20.    On July 22, 2021, Lead Plaintiffs filed their Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint" or "Amended Complaint") (ECF No. 31).

### C.    Defendants' Motion to Dismiss

21.    On September 2, 2021, Defendants filed their motion to dismiss the Complaint (the "Motion to Dismiss").  ECF No. 35.  Defendants argued, *inter alia*, that the alleged misstatements constitute inactionable omissions, statements of puffery, and generic risk warnings, and that Lead Plaintiffs have not pled sufficient facts to demonstrate that any alleged misstatement was false when made.  With respect to scienter, Defendants argued that Lead Plaintiffs did not allege facts supporting a strong inference that Defendants knowingly misrepresented or omitted material facts.  Moreover, Defendants argued that Defendant Roberts's stock sales

did not demonstrate scienter; and that Lead Plaintiffs had not sufficiently alleged loss causation.

22.    On October 14, 2021, Lead Plaintiffs opposed the Motion to Dismiss.  ECF No. 38.  With respect to the misstatements pled in the Complaint, Lead Plaintiffs argued that they were false and misleading because they failed to disclose that Credit Acceptance was allegedly violating the law when the Company allegedly: (1) approved and funded high risk loans that it knew and/or was reckless in not knowing customers were unable to repay; (2) engaged in the illegal practice of marking up prices for cars sold to certain borrowers; (3) required the purchase of vehicle service contracts ("VSCs"); and (4) engaged in illegal debt collection and repossession practices.  Moreover, Lead Plaintiffs argued that the Complaint pled particularized facts demonstrating the falsity of the misstatements, including statements from former Credit Acceptance employees.

23.    With respect to scienter, Lead Plaintiffs argued that the Complaint alleged five of the *Helwig* factors and other indicia that, when viewed holistically, provided support for a strong inference of scienter.  Moreover, Lead Plaintiffs argued that the Complaint properly alleged that Defendant Roberts had suspiciously timed insider stock sales while he was in possession of information contradicting his public statements.

11

24.     On November 11, 2021, Defendants filed a reply in further support of their Motion to Dismiss.  ECF No. 40.  The motion was pending at the time the Settlement was reached.

## III.   RISKS OF CONTINUED LITIGATION

25.     Based on their experience and close knowledge of the facts of the case and law governing the claims, Lead Counsel has determined that settlement at this juncture is in the best interests of the Settlement Class.  As described herein, at the time the Settlement was reached, there were sizable risks facing Lead Plaintiffs with respect to both pleading and establishing liability, loss causation, and damages were the case to continue.

### A.     Risks Related to Liability – Falsity and Scienter

26.     Lead Plaintiffs faced a very real risk of not surviving Defendants' pending Motion to Dismiss.  Defendants strenuously argued that the alleged misstatements are inactionable statements of opinion, puffery, or generic risk warnings, and that Lead Plaintiffs have not even pled sufficient facts to demonstrate that any alleged misstatement was false when made.  Defendants also argued that Lead Plaintiffs did not plead a strong inference of scienter with respect to each Defendant, or sufficiently plead loss causation.  According to analyses of federal securities class actions conducted by NERA Consulting, in 2020, 77% of filed securities class actions were dismissed, and in 2021, 64% were dismissed.  *See*

Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2021 Full-Year Review* (NERA 2022), Ex. 4 at 11.  Moreover, motions to dismiss securities class actions from 2012 to 2021 were denied in full only 19% of the time. *Id*. at 14.

27.     Even if Lead Plaintiffs overcame Defendants' Motion to Dismiss, Defendants would likely move for summary judgment following discovery, arguing, among other things, that there was no evidence that there was anything false or misleading to investors about the way Credit Acceptance was describing or employing its business practices.  Defendants likely would have sought to separate Credit Acceptance's allegedly predatory lending and collection practices with respect to consumers, from misstatements to investors, and likely would have argued that Lead Plaintiffs improperly rely on "unproven consumer protection allegations" to prove securities fraud allegations.

28.     Regarding the falsity of the alleged misstatements, Defendants would likely have contended that the alleged misrepresentations and omissions are inactionable as a matter of law.  In particular, Defendants likely would have continued to maintain that the Company made robust disclosures about the risks of the regulatory environments that it operated in, as well as about ongoing investigations into those practices.  With respect to the alleged misrepresentations concerning Credit Acceptance's compliance with applicable laws and regulations,

loan offerings, and risk warnings, Defendants would have likely continued to maintain that such statements were either true, inactionable puffery, or opinions that were "fully explained" to investors.

29.     Moreover, scienter would have remained a key issue well beyond the Motion to Dismiss.  Specifically, Defendants likely would have continued to argue and seek to establish, among other things, that: (i) they disclosed the information they had a duty to disclose about each regulatory investigation and material litigation involving Credit Acceptance, and (ii) they did not knowingly make any false or misleading statements or omissions, instead they were doing their best to comply with intense regulations and to be forthcoming about the environment they were operating in, while cooperating with investigators and defending their business practices.  Additionally, Defendants would likely seek to establish that they did not profit from the alleged fraud, including, for example, by showing that Defendant Kenneth S. Booth purchased many shares of Credit Acceptance stock during the Class Period and that his net holdings increased during that same period, even while the value of his holdings declined.

**B.     Risks Concerning Loss Causation and Damages**

30.     Assuming that Lead Plaintiffs overcame the above risks at the motion to dismiss stage, summary judgment, and trial, Lead Plaintiffs also faced significant challenges in ultimately proving loss causation and damages.

31.     Here, Defendants would have sought to establish that the declines in Credit Acceptance's stock price were not caused by the truth concerning Defendants' alleged false statements being revealed.  If Lead Plaintiffs did not meet their burden of establishing causation by a preponderance of the evidence for at least one alleged corrective disclosure, then the class would have recovered nothing.

32.     Lead Plaintiffs' consulting damages expert has estimated that if liability were established with respect to both allegedly corrective disclosures (the Company's January 30, 2020 announcement of its 4Q2019 and full year 2019 financial results and the August 2020 disclosures of the Massachusetts Attorney General's enforcement action against the Company), maximum aggregate damages recoverable at trial, based on stock price declines on the three alleged disclosures dates and with netting of gains on pre-class period purchases, would be approximately $370 million.  However, Defendants were certain to attack the alleged disclosures underlying this estimate both at summary judgment and trial.

33.     For instance, Defendants would likely argue throughout continued litigation that the stock price drop on January 31, 2020 was not attributable to the alleged fraud at all.  Specifically, Defendants would likely contend that the Company's stock price declined on that day primarily because it had "reported disappointing loan unit and dollar growth," "loss of market share, decreased loan volume, lower dealer signups despite a relation of signup requirements, and higher

than expected loan provisions," which were unrelated to the alleged fraud.  They also would have likely challenged the price impact of the announcement of the Company's "adoption of new accounting standards," which Lead Plaintiffs alleged was a materialization of the risks that had not been disclosed to investors.  Proving damages related to this disclosure would have involved a complex and challenging expert driven "disaggregation" analysis to parse out the impact of information that was not related to the alleged fraud.  Losing this disclosure would decrease Lead Plaintiffs' estimated aggregate damages by approximately $100 million.  Under this scenario, the Settlement represents approximately 4.6% of estimated damages.

34.    With respect to the August 2020 disclosures concerning the Massachusetts' Attorney General's lawsuit, Defendants would likely seek to present evidence at summary judgment and trial that the disclosures were not corrective because they did not reveal any new information to the market.  They would likely argue that the Massachusetts' Attorney General's views concerning the Company's business practices and alleged violations of Massachusetts' laws were known to the market because the Company had disclosed, in January 2019 before the start of the Class Period, that the Attorney General's Office was conducting an investigation relating to the Company's sub-prime loan origination and collection.  If this argument were credited by the Court at summary judgment, or the jury at trial,

recoverable damages would have been significantly decreased or eliminated altogether.

35.     Finally, as the case continued, the Parties' respective damages experts would strongly disagree with each other's assumptions and their respective methodologies.  The risk that the Court or a jury would credit Defendants' expert's anticipated damages positions over those of Lead Plaintiffs would have considerable consequences in terms of the amount of recovery for the Settlement Class, even assuming liability were proven.

## IV.     MEDIATED SETTLEMENT NEGOTIATIONS

36.     The proposed Settlement resulted from a thoughtful and demanding mediation process.  Early in the litigation, the Parties were cognizant of the practical problem that prolonged litigation would likely quickly result in both sides expending significant resources.  Given that fact, the Parties considered both the advisability of an early resolution of the litigation, and the means by which they could do so in a manner that protected their respective interests.

37.     The Parties agreed to retain Robert Meyer, Esq. of JAMS to act as mediator and to oversee a formal mediation.  Mr. Meyer has been involved in the mediation of hundreds of disputes and has been a full-time mediator, arbitrator, and special master since 2006.  Mr. Meyer has successfully mediated numerous

securities class action lawsuits in federal and state courts alleging violations of the Exchange Act.

38.     In anticipation of a formal mediation session, each side prepared and exchanged written submissions addressing liability and damages for the Parties' and mediator's review.  The material allowed each side to better understand the other's position and provided Lead Plaintiffs with valuable insight into the risks of establishing Defendants' liability and the protracted process of seeking to do so.

39.     On April 1, 2022, Lead Plaintiffs and Defendants met with Mr. Meyer via Zoom, in an attempt to reach a settlement.  Although an agreement to settle was not reached at the mediation, mediated discussions continued thereafter.  Based on the Mediator's recommendation, Lead Plaintiffs and Defendants ultimately reached an agreement in principle to settle the claims on June 13, 2022, subject to the negotiation of the terms of a formal settlement agreement and approval by the Court.

40.     The Parties then negotiated the Stipulation, which was executed on August 24, 2022.  *See* ECF No. 42-2.  The agreements between the Parties concerning the Settlement are the Stipulation and the Confidential Supplemental Agreement Regarding Requests for Exclusion.[4]

---

[4] The Supplemental Agreement sets forth the conditions under which Defendants may terminate the Settlement in the event that requests for exclusion exceed a certain amount (the "Termination Threshold").  As is standard in securities class actions, such agreements are not made public in order to avoid incentivizing the formation of a group of opt-outs for the sole purpose of leveraging the Termination Threshold

41.     On August 24, 2022, Lead Plaintiffs moved for preliminary approval of the Settlement.  ECF No. 42.  On September 19, 2022, the Court entered the Preliminary Approval Order, authorizing that notice of the Settlement be sent to Settlement Class Members (ECF No. 48) and scheduled the Settlement Hearing for December 7, 2022 to consider whether to grant final approval to the Settlement (ECF No. 50).

**V.     LEAD PLAINTIFFS' COMPLIANCE WITH PRELIMINARY APPROVAL ORDER AND REACTION OF THE SETTLEMENT CLASS TO DATE**

42.     Pursuant to the Preliminary Approval Order, the Court appointed JND Legal Administration ("JND") as Claims Administrator in the Action and instructed JND to disseminate copies of the Notice of Pendency and Proposed Settlement of Class Action and Motion for Attorneys' Fees and Expenses and Proof of Claim (collectively the "Notice Packet") by mail and to publish the Summary Notice of Pendency and Proposed Settlement of Class Action and Motion for Attorneys' Fees and Expenses ("Summary Notice").

43.     The Notice Packet, attached as Exhibit A to the Declaration of Luiggy Segura Regarding (A) Mailing of the Notice Packet; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion to Date, dated November 2, 2022

---

to exact an individual settlement.  The Parties have submitted the Supplemental Agreement to the Court *in camera*.

("Mailing Decl." or "Mailing Declaration") (Exhibit 5 hereto), provides potential Settlement Class Members with information about the terms of the Settlement and contains, among other things: (i) a description of the Action and the Settlement; (ii) the terms of the proposed Plan of Allocation for calculating claims; (iii) an explanation of Settlement Class Members' right to participate in the Settlement; (iv) an explanation of Settlement Class Members' rights to object to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or exclude themselves from the Settlement Class; and (v) the manner for submitting a Claim Form in order to be eligible for a payment from the net proceeds of the Settlement.  The Notice also informs Settlement Class Members of Lead Counsel's intention to apply for an award of attorneys' fees in an amount not to exceed 30% of the Settlement Fund and for payment of litigation expenses in an amount not to exceed $125,000.

44.    As detailed in the Mailing Declaration, JND mailed Notice Packets to potential Settlement Class Members as well as banks, brokerage firms, and other third-party nominees whose clients may be Settlement Class Members.  Ex. 5 ¶¶3-12.  In total, to date, JND has mailed 65,513 Notice Packets to potential nominees and Settlement Class Members by first-class mail, postage prepaid. *Id.* ¶12.  To disseminate the Notice, JND obtained the names and addresses of potential Settlement Class Members from data provided by the Company's transfer agent and

20

from banks, brokers, and other nominees whose clients may be Settlement Class Members. *Id.* ¶¶4-11.

45. On October 17, 2022, JND also caused the Summary Notice to be published in *The Wall Street Journal* and to be transmitted over the internet using *PR Newswire*. *Id.* ¶13 and Exhibit B thereto.

46. JND also maintains and posts information regarding the Settlement on the website, www.CreditAcceptanceSecuritiesSettlement.com, to provide Settlement Class Members with information concerning the Settlement, as well as downloadable copies of the Notice Packet and the Stipulation. *Id.* ¶15. Lead Counsel also posted the Notice Packet on its website.

47. Pursuant to the terms of the Preliminary Approval Order, the deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or to request exclusion from the Settlement Class is November 16, 2022. To date, no objections to the Settlement, the Plan of Allocation, or the Fee and Expense Application have been received, and no requests for exclusion have been received. *Id.* ¶16.

48. Should any objections or requests for exclusion be received, Lead Plaintiffs will address them in their reply papers, which are due to be filed with the Court on November 30, 2022.

## VI.   THE PLAN OF ALLOCATION FOR DISTRIBUTION OF SETTLEMENT PAYMENTS

49.   Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who wish to participate in the distribution of the Net Settlement Fund must submit a valid Claim Form, including all required information, postmarked no later than December 2, 2022.  As provided in the Notice, after deduction of Court-awarded attorneys' fees and expenses, Notice and Administration Expenses, and all applicable Taxes, the balance of the Settlement Fund (the "Net Settlement Fund") will be distributed to eligible claimants according to the plan of allocation approved by the Court (the "Plan of Allocation").

50.   The proposed Plan of Allocation, which is set forth in full in the Notice (Ex. 5-A at 14-18), was designed to achieve an equitable and rational distribution of the Net Settlement Fund.  Lead Counsel developed the Plan of Allocation in close consultation with Lead Plaintiffs' consulting damages expert and believes that the plan provides a fair and reasonable method to equitably distribute the Net Settlement Fund among Authorized Claimants.

51.   The Plan of Allocation provides for distribution of the Net Settlement Fund among Authorized Claimants on a *pro rata* basis based on their "Recognized Claims," calculated according to the Plan of Allocation's formulas, which are consistent with Lead Plaintiffs' theories of liability and alleged damages under the Exchange Act.  These formulas consider the amount of alleged artificial inflation in

22

the prices of Credit Acceptance publicly traded common stock, as estimated by Lead Plaintiffs' expert.

52.     Claimants will be eligible for a payment based on when they purchased, held, or sold their Credit Acceptance shares.   The Court-approved Claims Administrator, under Lead Counsel's direction, will calculate Claimants' Recognized Claims using the transactional information provided in their Claim Forms.   Claims may be submitted to the Claims Administrator through the mail, online using the settlement website, or for large investors with thousands of transactions through email to JND's electronic filing team.   (Neither the Parties nor the Claims Administrator independently have claimants' transactional information.) Lead Plaintiffs' losses will be calculated in the same manner.

53.     Once the Claims Administrator has processed all submitted claims and provided Claimants with an opportunity to cure deficiencies or challenge rejection determinations, payment distributions will be made to eligible Authorized Claimants using checks and wire transfers.   After an initial distribution, if there is any balance remaining in the Net Settlement Fund (whether by reason of tax refunds, uncashed checks or otherwise) after a reasonable period of time from the date of initial distribution, Lead Counsel will, if feasible and economical, re-distribute the balance among Authorized Claimants who have cashed their checks.   Re-distributions will be repeated until the balance in the Net Settlement Fund is no longer economically

feasible to distribute.  *See* Ex. 5-A ¶64.  Any balance that still remains in the Net Settlement Fund after re-distribution(s), which is not economical to reallocate, after payment of any outstanding Notice and Administration Expenses or Taxes, will be donated to the Consumer Federation of America, or such other secular, non-profit approved by the Court.  *Id*.

54.     To date, there have been no objections to the Plan of Allocation.

55.     In sum, the proposed Plan of Allocation, developed in consultation with Lead Plaintiffs' consulting damages expert, was designed to fairly and rationally allocate the Net Settlement Fund among Authorized Claimants.  Accordingly, Lead Counsel respectfully submits that the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved.

## VII.   LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE

### A.     Consideration of Relevant Factors Justifies a 30% Fee

56.     Consistent with the Notice to the Settlement Class, Lead Counsel, on behalf of itself and Plaintiffs' Counsel, seeks a fee award of 30% of the Settlement Fund, which includes accrued interest.  Lead Counsel also requests payment of Litigation Expenses in connection with the prosecution of the Action from the Settlement Fund in the amount of $59,615.60, plus accrued interest.  Lead Counsel submits that, for the reasons discussed below and in the accompanying Fee Brief,

24

such awards would be reasonable and appropriate under the circumstances before the Court.

### 1. Lead Plaintiffs Support the Fee and Expense Application

57.    Lead Plaintiffs have evaluated and fully support the Fee and Expense Application.  Ex. 1 ¶¶2, 5-6 and Ex. 2 ¶¶2, 5-6.  In coming to this conclusion, Lead Plaintiffs—sophisticated institutional investors that were involved throughout the prosecution of the Action and negotiation of the Settlement—considered the recovery obtained as well as Lead Counsel's efficient prosecution of the claims to obtain a favorable recovery.  *Id*.

### 2. The Time and Labor of Plaintiffs' Counsel

58.    The investigation, prosecution, and settlement of the claims asserted in the Action required diligent efforts on the part of Plaintiffs' Counsel.  The tasks undertaken by Plaintiffs' Counsel in this case are detailed above.

59.    Among other efforts, Lead Counsel conducted a comprehensive investigation in connection with the preparation of the Complaint, and engaged in a vigorous settlement process with experienced defense counsel.  At all times throughout the pendency of the Action, Lead Counsel's efforts were driven and focused on advancing the litigation to bring about the most successful outcome for the Settlement Class, whether through settlement or trial.

60.     Attached hereto are counsel declarations detailing their time and expenses, which are submitted in support of the request for an award of attorneys' fees and payment of Litigation Expenses.  *See* Declaration of Michael P. Canty on Behalf of Labaton Sucharow LLP (Ex. 6), and Declaration of Ronald A. King on Behalf of Clark Hill PLC (Ex. 7).

61.     Included with these declarations are schedules that summarize the time of each firm, as well as each firm's litigation expenses by category (the "Fee and Expense Schedules").[5]   The attached declarations and the Fee and Expense Schedules report the amount of time spent by Lead Plaintiffs' attorneys and professional support staff and the "lodestar" calculations, *i.e.*, their hours multiplied by their current hourly rates.[6]  As explained in each declaration, they were prepared from daily time records regularly prepared and maintained by the respective firms, which are available at the request of the Court.

62.     The hourly rates of Plaintiffs' Counsel here range from $625 to $1,300 for partners, $625 to $850 for of-counsels, and $350 to $575 for associates.  *See* Exs. 6-A and 7-A.  It is respectfully submitted that the hourly rates for attorneys and professional support staff included in these schedules are reasonable and customary

---

[5]   Attached hereto as Exhibit 8 is a summary table of the lodestars and expenses of Plaintiffs' Counsel.

[6]   As set forth in their respective firm declarations, Plaintiffs' Counsel have included time from inception through and including October 31, 2022.

within the securities class action bar.  Exhibit 9, attached hereto, is a table of hourly rates for defense firms compiled by Labaton Sucharow from fee applications submitted by such firms nationwide in bankruptcy proceedings in 2021.  The analysis shows that across all types of attorneys, Plaintiffs' Counsel's rates are consistent with, or lower than, the firms surveyed.

63.    Plaintiffs' Counsel have collectively expended 2,524.7 hours prosecuting the Action.  *See* Exs. 6-A, 7-A, and 8.  The resulting collective lodestar is $1,512,963.50.  *Id.*  The requested fee of 30% of the Settlement Fund ($3,600,000 before interest, at the same rate as is earned by the Settlement Fund) results in a "multiplier" of 2.4 on the lodestar.

### 3.    The Professional Skill and Standing of Plaintiffs' Counsel

64.    Plaintiffs' Counsel are each highly experienced and skilled litigation law firms.  Exs. 6-C and 7-C.

65.    The expertise and experience of Lead Counsel Labaton Sucharow's attorneys are described in Exhibit 6-C annexed hereto.  Labaton Sucharow has served as lead counsel in a number of high profile matters, for example: *In re Am. Int'l Grp., Inc. Sec. Litig.*, No. 04-8141 (S.D.N.Y.) (representing the Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and Ohio Police & Fire Pension Fund and reaching settlements of $1 billion); *In re HealthSouth Corp. Sec. Litig.*, No. 03-1500 (N.D. Ala.) (representing the State of

Michigan Retirement System, New Mexico State Investment Council, and the New Mexico Educational Retirement Board and securing settlements of more than $600 million); and *In re Schering-Plough Corp. / ENHANCE Sec. Litig.*, Civil Action No. 08-397 (DMC) (JAD) (D.N.J.) (representing Massachusetts Pension Reserves Investment Management Board and reaching a settlement of $473 million).

### 4.      Standing and Caliber of Opposing Counsel

66.      The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of opposing counsel.  Here, Defendants were represented by two highly respected defense firms— Skadden, Arps, Slate Meagher & Flom LLP and Dickinson Wright PLLC.  These counsel are skilled and experienced securities attorneys with vast resources.  In the face of this knowledgeable and formidable defense, Lead Counsel was nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle on terms that are favorable to the Settlement Class.

### 5.      The Contingency Risk Faced by Plaintiffs' Counsel

67.      From the outset, Lead Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that

funds were available to compensate staff and to cover the considerable costs that a case such as this requires.  With an average time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Plaintiffs' Counsel received no compensation during the course of the Action but incurred 2,542.7 hours of time for a total lodestar of $1,512,963.50 and incurred $59,615.60 in expenses in prosecuting the Action for the benefit of the Settlement Class.

68.    Lead Counsel knows from experience that the commencement of a class action does not guarantee a settlement.  To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to convince sophisticated defendants to engage in serious settlement negotiations at meaningful levels.  Lead Counsel is aware of many hard-fought lawsuits where, because of the discovery of facts unknown when the case was commenced, or changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel.

69.    Federal circuit court cases include numerous opinions affirming dismissals with prejudice in securities cases.  The many appellate decisions affirming summary judgments dismissals show that even surviving a motion to dismiss is not a guarantee of recovery.  *See, e.g.*, *McCabe v. Ernst & Young, LLP*,

29

494 F.3d 418 (3d Cir. 2007); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999); *Phillips v. Scientific-Atlanta, Inc.*, 489 F. App'x. 339 (11th Cir. 2012); *In re Smith & Wesson Holding Corp. Sec. Litig*, 669 F.3d 68 (1st Cir. 2012); *In re Digi Int'l Inc. Sec. Litig.*, 14 F. App'x. 714 (8th Cir. 2001); *Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001).

70.     Successfully opposing a motion for summary judgment is also not a guarantee that plaintiffs will prevail at trial.  While only a few securities class actions have been tried before a jury, several have been lost in their entirety, such as *In re JDS Uniphase Securities Litigation*, Case No. C-02-1486 CW (EDL), slip op. (N.D. Cal. Nov. 27, 2007) (tried by Labaton Sucharow), or substantially lost as to the main case, such as *In re Clarent Corp. Securities Litigation*, Case No. C-01-3361 CRB, slip op. (N.D. Cal. Feb. 16, 2005).

71.     Even plaintiffs who succeed at trial may find their verdict overturned by a post trial motion for a directed verdict or on appeal.  *See, e.g.*, *In re BankAtlantic Bancorp, Inc.,* No. 07-cv-61542 (S.D. Fla. 2010) (in case tried by Labaton Sucharow, after plaintiffs' jury verdict, court granted defendants' motion for judgment as a matter of law on loss causation grounds), *aff'd,* 688 F. 3d 713 (11th Cir. 2012) (trial court erred, but defendants entitled to judgment as matter of law on lack of loss causation); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1998)

(reversing plaintiffs' jury verdict for securities fraud); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *Glickenhaus & Co., et al. v. Household Int'l, Inc., et al.*, 787 F.3d 408 (7th Cir. 2015) (reversing and remanding jury verdict of $2.46 billion after 13 years of litigation on loss causation grounds and error in jury instruction under *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S.Ct. 2296 (2011)); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice). And, the path to maintaining a favorable jury verdict can be arduous and time consuming. *See, e.g., In re Apollo Grp., Inc. Sec. Litig.*, Case No. CV-04-2147-PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd*, No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010) (trial court rejecting unanimous verdict for plaintiffs, which was later reinstated by the Ninth Circuit Court of Appeals) and judgment re-entered (*id.*) after denial by the Supreme Court of the United States of defendants' Petition for Writ of Certiorari (*Apollo Grp. Inc. v. Police Annuity and Benefit Fund*, 562 U.S. 1270 (2011)).

72.     As discussed in greater detail above, Lead Plaintiffs' success was by no means assured. Defendants would have continued to vigorously dispute whether Lead Plaintiffs could establish falsity, scienter, and loss causation. In addition, Defendants would no doubt have contended, if the case proceeded to summary judgment, that even if liability existed, the amount of damages was substantially

31

lower than Lead Plaintiffs alleged.  If this Settlement was not achieved, Lead Plaintiffs and Plaintiffs' Counsel faced potentially years of costly and risky trial and appellate litigation against Defendants, with ultimate success far from certain and the significant prospect of no recovery.

### B.    Request for Litigation Expenses

73.    Lead Counsel seeks payment from the Settlement Fund of Litigation Expenses reasonably and necessarily incurred in connection with commencing and prosecuting the claims against Defendants.

74.    From the beginning of the case, Lead Counsel was aware that it might not recover any of its expenses, and, at the very least, would not recover anything until the Action was successfully resolved.  Thus, Lead Counsel was motivated to take steps to manage expenses without jeopardizing the vigorous and efficient prosecution of the case.

75.    As set forth in the Fee and Expense Schedules and the Summary Table of Lodestars and Expenses, Plaintiffs' Counsel's Litigation Expenses in connection with the prosecution of the Action total $59,615.60.  *See* Exs. 6-B, 7-B, and 8 (Summary Table).  As attested to, these expenses are reflected on the books and records maintained by each firm.  These books and records are prepared from expense vouchers, check records, and other source materials and are an accurate record of counsel's expenses.  Plaintiffs' Counsel's declarations identify the specific

categories of expense—*e.g.*, experts' fees, mediation fees, travel costs, online/computer research, and duplicating.

76.    Of the total amount of expenses, $22,387.50 or approximately 38% was expended on experts and consultants in the fields of damages and loss causation. These experts were valuable for Lead Counsel's analysis and development of the claims, as well as mediation efforts and the Plan of Allocation.

77.    Computerized research costs total $21,989.10, or approximately 37% of total expenses.  These are the charges for computerized factual and legal research services, including PACER, Westlaw, Thomson Research, and LexisNexis.  These services allowed counsel to perform media searches on the Company, obtain analyst reports and financial data for the Company, and conduct legal research.

78.    Lead Counsel incurred $8,475.00, or approximately 14% of total expenses, in connection with mediation fees assessed by the Mediator in this matter.

79.    Lead Counsel also retained counsel for confidential witnesses who provided information used in the Complaint ($1,309.00).

80.    The other expenses for which Lead Counsel seeks payment are the types of expenses that are necessarily incurred in complex commercial litigation and routinely charged to clients billed by the hour.  These expenses include, among others, late night transportation and working meals, duplicating costs, and court fees.

All of the Litigation Expenses, which total $59,615.60, were necessary to the successful prosecution and resolution of the claims against Defendants.

### C.     The Reaction of the Settlement Class to the Fee and Expense Application

81.     As mentioned above, consistent with the Preliminary Approval Order, a total of 65,513 Notices have been mailed to potential Settlement Class Members advising them that Lead Counsel would seek an award of attorneys' fees not to exceed 30% of the Settlement Fund, and payment of Litigation Expenses in an amount not greater than $125,000. *See* Ex. 5-A ¶¶4, 34. Additionally, the Summary Notice was published in *The Wall Street Journal* and disseminated over *PR Newswire*. *Id*. ¶13. The Notice and relevant documents have also been available on the website maintained by the Claims Administrator, *id*. ¶15, and Lead Counsel's website.[7]

82.     While the deadline set by the Court for Settlement Class Members to object to the requested fees and expenses has not yet passed, to date no objections have been received. Lead Counsel will respond to any objections received in their reply papers, which are due on November 30, 2022.

---

[7]  Lead Plaintiffs' motion for approval of the Settlement and Lead Counsel's motion for an award of attorneys' fees and Litigation Expenses will also be posted on the websites.

34

## VIII.  MISCELLANEOUS EXHIBITS

83.    Attached hereto as Exhibit 10 is a compendium of unreported cases, in alphabetical order, cited in the accompanying Fee Brief.

## IX.    CONCLUSION

84.    In view of the favorable recovery for the Settlement Class and the substantial risks of this litigation, as described above and in the accompanying memorandum of law, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and that the proposed Plan of Allocation should likewise be approved as fair, reasonable, and adequate.  In view of the recovery in the face of substantial risks, the quality of work performed, the contingent nature of the fee, and the standing and experience of Plaintiffs' Counsel, as described above and in the accompanying memorandum of law, Lead Counsel respectfully submit that a fee in the amount of 30% of the Settlement Fund be awarded and that Litigation Expenses in the amount of $59,615.60 be paid in full.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 2nd day of November, 2022.

*/s/ Michael P. Canty*
MICHAEL P. CANTY
